## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 7 |
| Chan Suk Kim, | ) | |
| | ) | CASE NO. 21-52662-LRC |
| Debtor. | ) | |
| ------------------------------------------------------- | ) | |
| | ) | |
| Priority Payment Systems, LLC, | ) | |
| | ) | ADVERSARY PROCEEDING |
| Plaintiff, | ) | CASE NO. 21-05112-LRC |
| | ) | |
| v. | ) | |
| | ) | |
| Chan Suk Kim, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT TO DETERMINE DEBT NON-DISCHARGEABLE AND DENIAL OF DISCHARGE

Pursuant to 11 U.S.C. §§ 523 and 727, Plaintiff, Priority Payment Systems, LLC, ("PPS" or Plaintiff") files this *Amended Complaint to Determine Debt Non-Dischargeable and Denial of Discharge* (this "Amended Complaint") against the Chapter 7 debtor, Chan Suk Kim ("Kim" or "Defendant"). In support thereof, Plaintiff respectfully states as follows:

## JURISDICTION AND PARTIES

1.
This Court has jurisdiction over this adversary proceeding pursuant (the "Adversary Proceeding") to 28 U.S.C. §§ 157 and 1334, as well as 11 U.S.C. §§ 523.
2.
This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), & (J).
3.
This Court has jurisdiction over Defendant who is the debtor in the underlying bankruptcy case (the "Bankruptcy Case") before this Court.
4.
PPS is a creditor of Kim's in the Bankruptcy Case with the authority to raise, appear, and be heard on the issues presented in this Adversary Proceeding pursuant to, inter alia, 11 U.S.C. §§ 523(c) and Fed. R. Bankr. P. 4007.
5.
Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) and the order granting automatic reference of such cases and proceedings to this Court.

6.

Kim may be served with a copy of this Complaint at Kim's address of record at 6257 Clapham Lane, Johns Creek, Georgia 30097.

## PRIOR LITIGATION

7.

On August 11, 2020, PPS filed a complaint in the Superior Court of Fulton County, Georgia, against Kim (the "Superior Complaint"). A true and correct copy of the Superior Complaint, excluding exhibits, is attached is attached hereto and incorporated herein as Exhibit "A".

8.

The Superior Court case was stayed during the discovery period due to the filing of the Bankruptcy Case.

## PROCEDURAL BACKGROUND

9.

On April 1, 2021, Defendant filed a Voluntary Petition for Individuals Filing for Bankruptcy (the "Petition"), seeking relief under chapter 7 of title 11 of the United States Code.

10.

On June 18, 2021, a Meeting of the Creditors pursuant to Bankruptcy Code Section 341 (the "341 MOC") was held. Defendant, Defendant's Bankruptcy Case counsel, Chapter 7 Trustee, and the undersigned counsel were present for the hearing.

11.

On August 31, 2021, PPS conducted a 2004 examination pursuant to Bankruptcy Rule 2004. A true and correct copy of the transcript of the 2004 Examination is attached is attached hereto and incorporated herein as Exhibit "B".

12.

On October 31, 2021, PPS initiated this Adversary Proceeding case ("AP Case"). (AP Doc. No. 1).

13.

On December 8, 2021, Kim filed a *Motion to Dismiss Complaint, or in the Alternative, Motion for More Definite Statement with Memorandum of Law In Support* ("AP MTD"). (AP Doc. No. 7).

14.

On December 28, 2021, by agreement of the parties, a Consent Order Staying Discovery and Pre-Trial Deadlines was filed pending resolution of the AP MTD. (AP Doc. No. 10).

## FACTUAL BACKGROUND

15.

PPS is a Georgia based company that provides financial transaction processing services, which allow merchants to accept credit card, debit card, gift card, and other payments from their customers.

16.

Since 2014, Kim was an independent contractor who located merchants that need credit card processing services and referred them to PPS for those services in exchange for a portion of the fees charged to the merchants for those services.  Most of the merchants Kim referred to PPS are businesses in the Korean community.

17.

Kim is not a party to PPS' contracts with those merchants, which are referred to as "Merchant Agreements".  The merchants that Kim has referred to PPS are referred to as "Referred Merchants" or the "Portfolio."  The portion of fees PPS pays to Kim is referred to as "residual revenue" or simply "residuals."

18.

Kim is a party to a contract with PPS, referred to as the "Processing Agreement", which specifies the residuals to be paid to Kim and prohibits him from soliciting any Referred Merchants or other PPS merchants away from PPS or encouraging any Referred Merchant or other PPS merchant to terminate or breach its agreement with PPS.

19.

Kim is party to several other contracts with PPS, including a loan agreement, promissory notes, and two residual purchase agreements pursuant to which PPS has loaned him millions of dollars based on representations and warranties by Kim.

## The Processing Agreement

20.

On or about June 2, 2014, Kim executed and submitted an Agreement for Processing Services to PPS.  ("Processing Agreement") On or about November 1, 2014, Kim executed and submitted an Amendment to the Agreement for Processing Services to PPS. ("Processing Agreement") A true and correct copy of the Processing Agreement and the Processing Agreement as Amended, excluding exhibits, is attached hereto and incorporated herein as Exhibit "C".

21.

The Processing Agreement sets forth the terms and conditions under which Kim shall refer prospective merchants to PPS and the compensation PPS will pay Kim for such referrals and other services described therein.

22.

The Processing Agreement also provides that any merchant referred by Kim to PPS that is accepted by PPS will have a direct business and contractual relationship with PPS in the form of a Merchant Agreement ("Referred Merchant").

23.

Through the Processing Agreement, and the resulting business relationship, Kim has access to PPS's confidential information including, but not limited to, pricing and customer information.

24.

The Processing Agreement requires Kim to retain in strictest confidence all information and data belonging to or relating to the business of PPS including, but not limited to, information related to the Referred Merchants. *See* Exhibit "C", Section 11.

25.

The Processing Agreement, as amended, prohibits Kim from directly or indirectly:

- marketing the Merchant Services or any services substantially similar to the Merchant Service to any PPS merchant (Section 3(l)(i));

- soliciting or contacting any Referred Merchant for the purpose of providing or receiving Merchant Services, or otherwise encouraging a Referred Merchant to terminate a Merchant Agreement with PPS (Section 5(d)); or

- marketing or selling the Merchant Services of, or on behalf of, any party other than Priority (Section 7(n), as amended).

26.

In violation of these and other provisions of the Processing Agreement, Kim has solicited, marketed, and encouraged Referred Merchant to terminate their Merchant Agreement with PPS. Kim has also transferred Referred Merchants to other electronic payment providers like PPS and sold Merchant Services of at least one other such company.

## The Loan Agreement and Promissory Notes

27.

On November 1, 2014, Kim entered into a Loan Agreement with Priority, which includes a Security Agreement and a Personal Guaranty. True and correct copies of the Loan Agreement, Security Agreement, and Personal Guaranty are attached hereto and incorporated herein as Exhibit "D", Exhibit "E", and Exhibit "F" respectively.

28.

The Loan Agreement memorialized a multi-draw loan from PPS to Kim of up to Two Hundred Thousand Dollars ($200,000.00), which was to be used exclusively to grow the business for PPS, and which was to be repaid per the terms of the Promissory Note. *See* Exhibit "D", Section 2.1.

29.

The Loan Agreement also prohibited Kim from entering into any agreement with any other electronic payment provider other than PPS to provide or market electronic payment processing services or any services that PPS offers. *See* Exhibit "D", Section 6.12.

30.

In the Personal Guaranty executed on November 1, 2014, Kim represented to PPS that he owned a property located at 3734B Ashford Dunwoody Road, Atlanta, Georgia 30319 ("Ashford Dunwoody Property") and listed it as a collateral. *See* Exhibit "F", §2.

31.

On the Client Office Application attached to the Processing Agreement executed on June 2, 2014, Kim also represented to PPS the Ashford Dunwoody Property was his home address and that he was the 100% owner. *See* Exhibit "C".

32.

Kim has subsequently entered into a series of amendments to the Promissory Note, each time increasing the amount of money borrowed from PPS. The most recent amendment, which replaces the prior Promissory Note and amendments: (i) is dated September 10, 2019; (ii) in the principal amount of $714,637.20; (iii) requires Kim to repay the loan amount in monthly installments on the 20th of each month; and (iv) matures in October 2020.  A true and correct copy of the September 10, 2019 Promissory Note is attached hereto and incorporated herein as Exhibit "G" ("Amended Promissory Note").

33.

Per the Loan Agreement and the series of promissory notes, PPS loaned Kim a total of $2,932,500.00, which Kim agreed to pay back in monthly installments.

34.

Kim has materially breached the Loan Agreement and Amended Promissory Note by, among other things, failing to make the agreed upon monthly installment payments since April, 2020.

35.

On August 1, 2020, PPS declared and notified Kim that the entire outstanding principal balance of the indebtedness evidenced by the Amended Promissory Note, together with all accrued and unpaid interest thereon any other amounts accrued and unpaid, immediately due and payable in full. A true and correct copy of PPS's Notice is attached hereto and incorporated herein Exhibit "H".

36.

As of July 20, 2020, the outstanding balance that Kim owes PPS pursuant to the Loan Agreement and Amended Promissory Note was $482,116.97, plus interest accruing on that amount at 12½% per annum.

**The Residual Purchase Agreements**

37.

On July 20, 2018, Kim entered into a Residual Purchase Agreement with PPS ("First Residual Purchase Agreement").   A true and correct copy of the First Residual Purchase Agreement, excluding exhibits, is attached hereto as Exhibit "I".

38.

Pursuant to the First Residual Purchase Agreement, PPS paid Kim One Million Eight Hundred Thousand Dollars ($1,800,000.00) in exchange for: (i) Forty-Five Thousand Dollars ($45,000.00) of residual payments per month generated by a portfolio of merchants identified in the First Residual Purchase Agreement ("Portfolio") for 32 months and, after 32 months, (ii) all rights, title and interests in a group of merchants from the Portfolio selected by PPS (the "First Sub-Portfolio")

39.

On May 1, 2019, Kim entered into a second Residual Purchase Agreement with PPS (Second Residual Purchase Agreement").   A true and correct copy of the Second Residual

Purchase Agreement, excluding exhibits, is attached hereto as Exhibit E. Pursuant to the Second Residual Purchase Agreement, PPS paid Kim One Million Seven Hundred Ten Thousand Dollars ($1,710,000.00) in exchange for (i) Forty-Five Thousand Dollars ($45,000.00) of residual payments per month generated by a portfolio of merchants identified in the Second Residual Purchase Agreement ("Portfolio") for 30 months and, after 30 months, (ii) all rights, title and interests in a group of merchants from the Portfolio selected by PPS (the "Second Sub-Portfolio")

40.

Per the two residual purchase agreements, PPS paid Kim a total of $3,510,000.00.

41.

In Section 4.4 of the Residual Purchase Agreements, Kim agreed not to do anything to impair the continued payment of the residual payments from the Portfolio to PPS or to engage in activities that violate the Residual Purchase Agreements or the Processing Agreement, or which may pose financial risk to PPS. *See* Exhibit "I".

42.

In Section 6.10 of the Residual Purchase Agreements, Kim agreed not to, directly or indirectly, solicit, divert, take away, or attempt to solicit, divert or take away, any of the merchants which are or were a party to any of the Merchant Agreements related to the Portfolio or Sub-Portfolio, or their respective affiliates. *See* Exhibit "I".

43.

Kim has materially breached the Residual Purchase Agreements by, among other things, failing to make all of the payments called for under those agreements, failing to maintain and diverting merchants from the Portfolios, failing to maintain and diverting merchants from the First Sub-Portfolio and the Second Sub-Portfolio, and failing to transfer all rights, title in those sub-portfolios to PPS.

44.

In addition, Kim owes PPS damages for the remaining terms of the residual purchase agreements and expected value of the residuals.

## COUNT I

## DEFENDANT'S INDEBTEDNESS TO PPS FOR MONEY, PROPERTY, OR SERVICES WAS OBTAINED BY FALSE PRETENSES, A FALSE REPRESENTATION, OR ACTUAL FRAUD 11 U.S.C. § 523(a)(2)(A)

45.

PPS re-alleges and incorporates herein the allegations contained in paragraphs 1 through 44.

46.

Section 523(a)(2)(A) of the Bankruptcy Code provides:

A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt—

(2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

(A)     false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

47.

Kim intentionally made false representations to PPS knowing they were false to induce PPS to loan him funds.

48.

On the Client Office Application attached to the Residual Agreement and on the Personal Guaranty, Kim falsely represented to PPS that he owned personal assets including the Ashford Dunwoody Property which he knew he did not. *See* Exhibit "F" and "H".

49.

Further, in multiple email conversations with PPS, Kim falsely represented that he would utilize additional funding to grow PPS' business, knowing that he would divert such funds to other businesses he owned and to associates of his.

50.

Although all contracts were signed between PPS and Kim as an individual, and all residuals, loan amounts, and residual purchase agreement amounts paid to Kim as an individual, Kim diverted all the funds from PPS to companies he did not own. Kim deposited all funds from PPS to bank accounts that he did not own or had access to.

51.

Kim diverted all the funds from PPS to Solim, LLC ("Solim") by depositing the funds to the bank account owned by Solim, LLC. (Kim Depo. 26:13-25, 27:1-9, 28:3-19, 30:4-14).

52.

Kim testified at the 2004 Examination that he did not have access to Solim's bank account where the PPS funds were deposited, that he was not a signor on that account, and that he did not have any access to view the account. (Kim Depo. 29:3-10).

53.

Although the PPS funds were to be used solely to grow the business for PPS, Solim's bank account statements show large amounts were routinely being transferred out of Solim's account and into various other bank accounts and to various associates of Kim's. [Kim Depo. 188:14-25, 189:1-25, 190:1-10, 192:12-25, 193:1-6]

54.

Kim used funds in Solim's bank account to pay his personal expenses. (Kim Depo. 30:19-25, 31:2-6).

55.

On or around July 2018, Kim purchased another company, Secom, Inc. (Kim Depo. 22:7-23).

56.

Kim used funds in Solim's bank account to purchase Secom, Inc. (Kim Depo. 22:7-25, 23:1-25, 24:1-25, 25:1-25, 26:1-9).

57.

On or around March 2019, Kim started diverting all funds from PPS to PPS Business Solutions, LLC by depositing the funds to the bank account owned by PPS Business Solutions, LLC. (Kim Depo. 40:4-14; 56:15-25 – 57:1-5, 60:1-5, 62:7-18).

58.

Kim was not an owner nor had any interest of PPS Business Solutions, LLC. (Kim Depo. 60:4-24, 61-18-20).

59.

Kim did not have access to PPS Business Solutions, LLC's bank account nor was a signor on the account. (Kim Depo. 40:11-14, 60:16-21, 61-18-20).

60.

Kim caused PPS to loan large amounts of funds over the years to Kim by making intentional false representations.

61.

Kim's fraud and misrepresentations proximately caused PPS to suffer economic injury and substantial monetary damages.

62.

Similarly, Kim's indebtedness to PPS is the result of Kim's actual fraud. Kim intentionally misrepresented facts to PPS and PPS reasonably relied on his false representations in entering into contracts with Kim, and subsequently, providing substantial funds to Kim.

63.

Kim's actions were undertaken with the intent to benefit himself, his other businesses, and his associates, at the expense of PPS.

64.

The indebtedness owed to PPS is the result of Kim's false pretenses, false representations, and actual fraud.

65.

The indebtedness owed to PPS is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## COUNT II

### DEFENDANT'S INDEBTEDNESS TO PPS FOR MONEY, PROPERTY, OR SERVICES WAS OBTAINED BY USE OF A MATERIALLY FALSE WRITTEN STATEMENT MADE WITH DEFENDANT'S INTENT TO DECEIVE REGARDING THE FINANCIAL CONDITION OF AN INSIDER OF DEFENDANT ON WHICH PPS RELIED 11 U.S.C. § 523(a)(2)(B)

66.

PPS re-alleges and incorporates herein the allegations contained in paragraphs 1 through 65.

67.

Section 523(a)(2)(B) of the Bankruptcy Code provides:

A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(B)      use of a statement in writing—

(i)      that is materially false; (ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive . . .

68.

Kim signed multiple agreements with PPS all of which included representations by Kim that he owned substantial assets that PPS could attach liens to in the event of default.

69.

Kim intentionally lied to PPS about his financial status including listing assets that do not belong to him. (Kim Depo. 142:23-25, 143:1-6).

70.

Further, as consideration for the Residual Purchase Agreements, Kim provided PPS a list of merchants from whom Kim represented he would obtain substantial residuals. Kim provided this list of merchants knowing that he would later transfer such merchants and the residuals from those merchants to another merchant processor.  Kim did, in fact, transfer the majority of the Referred Merchants away from PPS. *See* Exhibit "I", Exhibit 1.1.

71.

PPS reasonably relied on these documents and representations by Kim to loan large sums of money to Kim.

72.

Kim knowingly provided such false statement to induce PPS to enter into agreements with the intent to deceive and thus, causing PPS substantial damage.

73.

Kim's knowing, materially false written statements regarding his assets, his intent to service and maintain the list of merchants with PPS, the anticipated revenue that would be generated by those merchants, and the manner in which he would use funds solicited by him from PPS is the cause of his indebtedness to PPS.

74.

The indebtedness owed to PPS is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

## COUNT III

### DEFENDANT'S INDEBTEDNESS TO PPS STEMS FROM DEFENDANT'S WILLFUL AND MALICIOUS INJURY TO PPS OR TO PPS' PROPERTY 11 U.S.C. § 523(a)(6)

75.

PPS re-alleges and incorporates herein the allegations contained in paragraphs 1 through 74.

76.

Section 523(a)(6) of the Bankruptcy Code provides:

A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

77.

Kim deposited all funds that he received from PPS into the bank account of an entity in which he now claims he had no ownership interest in and no control over. Kim diverted such funds to himself, his other businesses, and to his associates.

78.

Kim willfully misrepresented material facts, including but not limited to, his assets, his financial status, his intent to maintain the Referred Merchants with PPS, and his intent to utilize the funds received from PPS to grow PPS's business upon which he knew PPS would rely in determining whether to enter into contracts with and subsequently provide funds to Kim, knowing he had no intention of fulfilling his obligations under the respective contracts. Kim's actions were intended to, and did in fact, cause willful and malicious injury to PPS.

79.

The indebtedness owed to PPS is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## COUNT VI

### DEFENDANT SHOULD NOT BE ENTITLED TO A DISCHARGE PURSUANT TO 11 U.S.C. § 727.

80.

PPS re-alleges and incorporates herein the allegations contained in paragraphs 1 through 79.

81.

Kim caused all of the residuals and loan amounts received from PPS to be deposited into Solim and PPS Business Solutions, LLC's bank accounts.

82.

Kim cannot account for these funds.

83.

Kim testified at the 2004 Examination that he did not have an ownership interest in Solim or access to or control over the bank account where the funds from PPS were deposited. (Kim Depo. 29:3-7, 30:4-14).

84.

According to the Solim's bank statements, however, Kim signed multiple checks from Solim's account. Kim later testified at the 2004 Examination that he did sign some checks from Solim's bank account. (Kim Depo. 191:10-22, 198:16-20)

85.

In addition, according to Solim's bank statements, the funds from PPS were routinely transferred out of the Solim account to at least nine (9) separate bank accounts and to various associates of Kim's. (Kim Depo. 189:20-24, 192:22-25, 193:1-6).

86.

Kim used Solim's account as his personal bank account to pay for his personal expenses, to purchase other companies, and to enrich his associates. (Kim Depo. 31:2-4).

87.

Kim testified at the 2004 Examination that he did not have an ownership interest in PPS Business Solutions, LLC or access to or control over the bank account where the funds from PPS were deposited.

88.

According to his testimony, Kim took millions of dollars paid by PPS to him, personal funds, and diverted those funds to a business in which he claims not to have any interest. Further, Kim claims that he cannot account for how those funds were used or where they are located.

89.

Debtor has routinely given false statements under oath during the Section 341 Meeting of Creditors and the 2004 Examination.

90.

Kim should not be entitled to a discharge in this case.

**WHEREFORE,** PPS respectfully asks this Court to:

(a) Under Count I, except from discharge the indebtedness owed to PPS pursuant to 11 U.S.C. § 523(a)(2)(A);

(b) Under Count II, except from discharge the indebtedness owed to PPS pursuant to 11 U.S.C. § 523(a)(2)(B);

(c) Under Count IV, except from discharge the indebtedness owed to PPS pursuant to 11 U.S.C. § 523(a)(6);

(d) Under Count V, deny Defendant a discharge in this Bankruptcy Case pursuant to 11 U.S.C. § 727; and

(e) And, grant such other relief as this Court deems necessary and appropriate.

Respectfully submitted, this the 31st day of January, 2022.

**BLEVINS & HONG, P.C.**

_/s/_____
Soo J. Hong
GA Bar No. 129608
Blevins & Hong, P.C.
191 Roswell Street
Marietta, GA 30060

**Stanley, Esrey & Buckley, LLP**

_/s/_____
Greg Michell
GA Bar No. 504053
Stanley, Esrey & Buckley, LLP
Promenade, Suite 2400
1230 Peachtree Street, NE
Atlanta, GA 30309

# EXHIBIT A

Fulton County Superior Court
***EFILED***LW
Date: 8/11/2020 7:48 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

PRIORITY PAYMENT SYSTEMS, LLC,    )
                                  )
      Plaintiff,                )
                                  )    Civil Action File No.:
v.                                )
                                  )    __2020CV339261_____
CHAN S. KIM,                      )
                                  )
      Defendant.                )
                                  )
_____   )

### VERIFIED COMPLAINT

Priority Payment Systems, LLC ("Priority") files this Verified Complaint against Chan S. Kim ("Kim"), showing the Court as follows:

### Introduction

1.

Kim is an independent contractor who locates merchants that need credit card processing services and refers them to credit card processing companies for those services.

2.

Since 2014, Kim has referred such merchants to Priority.  Priority has entered into contracts with, and provided processing services to, the referred merchants, and paid Kim a portion of the fees charged to the referred merchants for those services.  Kim is not a party to Priority's contracts with those merchants, which are referred to as "Merchant Agreements."  The merchants Kim has referred to Priority are referred to as "Referred Merchants" or the "Portfolio."  The portion of fees Priority pays to Kim is referred to as

"residual revenue" or simply "residuals."

3.

Kim is a party to a contract with Priority, referred to as the "Processing Agreement," which specifies the residuals to be paid to Kim and prohibits him from soliciting any merchant away from Priority or encouraging any Priority merchant to terminate or breach its agreement with Priority.

4.

Kim is party to several other contracts with Priority as well, including a loan agreement, promissory notes, and two residual purchase agreements.

5.

Per the loan agreement and promissory notes, Priority loaned Kim a total of $2,932,500.00, which Kim agreed to pay back in monthly installments.

6.

Per the two residual purchase agreements, Priority paid Kim a total of $3,510,000.00 to purchase: (i) $90,000.00 of Kim's monthly residuals for 30-32 months and, after that, (ii) Kim's rights to two groups of merchants (to be selected by Priority) each of which would generate $45,000.00 of residual per month for Priority thereafter.  Each of these groups of merchants is referred to as a "Sub-Portfolio."

7.

Like the processing agreement, the residual purchase agreements prohibit Kim from soliciting any merchant away from Priority or encouraging any merchant to terminate or breach its Merchant Agreement with Priority.

8.

In the past year or more, however, Kim has repeatedly violated the Processing Agreement and the residual purchase agreements by soliciting Priority's merchants and moving them to another processor.

9.

Due to Kim's solicitation, since July 2019, the total number of merchants in the portfolio has fallen from 928 to 560, and the residual revenue generated by the Portfolio has fallen from approximately $180,000.00 per month to approximately $57,000.00 per month. As a result, the Portfolio is not achieving the monthly residual revenue targets agreed upon and required by the residual purchase agreements and will not achieve the annual residual revenue targets either.

10.

Kim is obligated under the residual purchase agreements to pay Priority the difference between the residual revenue targets and the actual residual revenue, which is referred to as the "shortfall amount." The current shortfall amount for May, June, and July is $84,211.27.

11.

Kim has also violated the loan agreement and promissory notes by, among other things, failing to make monthly installment payments. Under the terms of those contracts, therefore, the entire outstanding principal balance, together with all accrued and unpaid interest, and any other amounts accrued and unpaid, are due and payable in full. As of July 20, 2020, the outstanding

balance owed by Kim is $482,116.97, plus interest accruing on that amount at 12½% per annum.

12.

Due to his breaches of the Processing Agreement, residual purchase agreements, loan agreement, and promissory notes, Kim currently owes Priority a total of $564,328.24.

13.

Further, it is clear that Kim will not be able to pay Priority the 90,000.00 that he owes each month for the remaining terms of the residual purchase agreements or to transfer the two Sub-Portfolios of merchants to Priority at the end of those terms as required in those agreements.

14.

Accordingly, Priority will incur not less than $1,000,000 in additional damages, plus the expected value of the residuals to be transferred groups of merchants at historic performance levels, plus attorneys' fees and costs

**Parties**

15.

Priority is a Georgia limited liability company with its principal office located at 2001 Westside Parkway, Suite 155, Alpharetta, Georgia 30004.

16.

Kim is an individual resident of the State of Georgia who, upon information and belief, resides at 6257 Clapham Ln, Johns Creek, Fulton County, GA 30097.  He may be served with process by personally serving him

with an original summons and copy of the complaint at that address.

## Jurisdiction and Venue

17.

This Court has jurisdiction over the subject matter of this action.

18.

This Court has jurisdiction over Defendant pursuant to a valid forum selection clause and because he is a resident of this County.

19.

Venue is proper in this Court.

## Background Facts

20.

Priority is a Georgia based company that provides financial transaction processing services, which allow merchants to accept credit card, debit card, gift card, and other payments from their customers.

21.

Kim locates merchants that need credit card processing services and refers them to companies like Priority in exchange for a portion of the fees charged to the merchants for those services.  Most of the merchants Kim referred to Priority are businesses in the Korean community.

22.

In 2019, Kim began soliciting merchants from Priority and referring them to Card Connect Corp. ("CardConnect"), a Pennsylvania based company that also provides financial transaction processing services.

## The Processing Agreement

23.

On or about June 2, 2014, Kim executed and submitted an Agreement for Processing Services to Priority ("Processing Agreement").  A true and correct copy of the Processing Agreement, as Amended, excluding exhibits, is attached hereto and incorporated herein as **Exhibit A**.

24.

The Processing Agreement sets forth the terms and conditions under which Kim shall refer prospective merchants to Priority and the compensation Priority will pay Kim for such referrals and other services described therein.

25.

The Processing Agreement also provides that any merchant referred by Kim to Priority that is accepted by Priority will have a direct business and contractual relationship with Priority in the form of a Merchant Agreement ("Referred Merchant").

26.

Kim is not, and has never been, a party to any Merchant Agreement between Priority and any Referred Merchant (or any other merchant of Priority).

27.

Through the Processing Agreement, and the resulting business relationship, Kim has access to Priority's confidential information including, but not limited to, pricing and customer information.

28.

The Processing Agreement requires Kim to retain in strictest confidence all information and data belonging to or relating to the business of Priority including, but not limited to, information related to the Referred Merchants. See Section 11.

29.

The Processing Agreement prohibits Kim from directly or indirectly:

- marketing the Merchant Services or any services substantially similar to the Merchant Service to any Priority merchant (Section 3(l)(i));

- soliciting or contacting any Referred Merchant for the purpose of providing or receiving Merchant Services, or otherwise encouraging a Referred Merchant to terminate a Merchant Agreement with Priority (Section 5(d)); or

- marketing or selling the Merchant Services of, or on behalf of, any party other than Priority (Section 7(n), as amended).

30.

In violation of these and other provisions of the Processing Agreement, Kim has solicited merchants away from Priority (some without their knowledge) and diverted those merchants to CardConnect.

31.

Pursuant to Section 7(o) of the Processing Agreement, as amended, Kim's violations of the Processing Agreement constitute material breaches and entitle Priority to terminate the Processing Agreement for cause and/or terminate Kim's compensation under the Processing Agreement.

- 7 -

## The Loan Agreement and Promissory Notes

32.

On November 1, 2014, Kim entered into a Loan Agreement with Priority, which includes a Security Agreement.  True and correct copies of the Loan Agreement and Security Agreement are attached hereto and incorporated herein as **Exhibit B**.

33.

The Loan Agreement memorialized a multi-draw loan from Priority to Kim of up to Two Hundred Thousand Dollars ($200,000.00), which was to be used exclusively to grow the business for Priority, and which was to be repaid per the terms of the Promissory Note.

34.

Kim has subsequently entered into a series of amendments to the Promissory Note.  The most recent amendment, which replaces the prior Promissory Note and amendments: (i) is dated September 10, 2019; (ii) in the principal amount of $714,637.20; (iii) requires Kim to repay the loan amount in monthly installments on the 20th of each month; and (iv) matures in October 2020.  A true and correct copy of the September 10, 2019 Promissory Note is attached hereto and incorporated herein as **Exhibit C** ("Amended Promissory Note").

35.

Per the loan agreement and promissory notes, Priority loaned Kim a total of $2,932,500.00.

36.

Kim has materially breached the Loan Agreement and Amended Promissory Note by, among other things, failing to make the agreed upon monthly installment payments in April, May, June, or July of 2020.

37.

Per the terms of the Amended Promissory Note, upon the occurrence of such an Event of Default, the entire outstanding principal balance of the indebtedness evidenced thereby, together with all accrued and unpaid interest thereon any other amounts accrued and unpaid, may be declared, and immediately shall become, due and payable in full.

38.

On August 1, 2020, Priority declared and notified Kim that the entire outstanding principal balance of the indebtedness evidenced by the Amended Promissory Note, together with all accrued and unpaid interest thereon any other amounts accrued and unpaid, immediately due and payable in full.

39.

As of July 20, 2020, the outstanding balance that Kim owes Priority was $482,116.97, plus interest accruing on that amount at 12½% per annum.

**The Residual Purchase Agreements**

40.

On July 20, 2018, Kim entered into a Residual Purchase Agreement with Priority ("First Residual Purchase Agreement").   A true and correct copy of the

First Residual Purchase Agreement, excluding exhibits, is attached hereto as **Exhibit D**.

41.

Pursuant to the First Residual Purchase Agreement, Priority paid Kim One Million Eight Hundred Thousand Dollars ($1,800,000.00) in exchange for: (i)  Forty-Five Thousand Dollars ($45,000.00) of residual payments per month generated by a portfolio of merchants identified in the First Residual Purchase Agreement ("Portfolio") for 32 months and, after 32 months, (ii) all rights, title and interests in a group of merchants from the Portfolio selected by Priority (the "First Sub-Portfolio").

42.

On May 1, 2019, Kim entered into another Residual Purchase Agreement with Priority (Second Residual Purchase Agreement").   A true and correct copy of the Second Residual Purchase Agreement, excluding exhibits, is attached hereto as **Exhibit E**. Pursuant to the Second Residual Purchase Agreement, Priority paid One Million Seven Hundred Ten Thousand Dollars ($1,710,000.00) to purchase (i)  Forty-Five Thousand Dollars ($45,000.00) of residual payments per month generated by a portfolio of merchants identified in the First Residual Purchase Agreement ("Portfolio") for 30 months and, after 30 months, (ii) all rights, title and interests in a group of merchants from the Portfolio selected by Priority (the "Second Sub-Portfolio").

43.

In Section 4.4 of the Residual Purchase Agreements, Kim agreed not to

do anything to impair the continued payment of the residual payments from the Portfolio to Priority or to engage in activities that violate the Residual Purchase Agreements or the Processing Agreement.

44.

In Section 5.1 of Residual Purchase Agreements, Kim agreed to indemnify Priority from any and all liabilities, losses, damages, demands, claims, suits, costs, and expenses, including reasonable attorneys' fees, asserted against, resulting to, imposed upon, or incurred or suffered by Priority, directly or indirectly, as a result of or arising out of any breach or nonfulfillment of any of the representations, warranties, covenants or agreements made by Kim in the Residual Purchase Agreements, the Processing Agreement, or any other agreements and documents to be executed and delivered by Kim pursuant to the Residual Purchase Agreements or the Processing Agreement.

45.

In Section 6.10 of the Residual Purchase Agreements, Kim agreed not to, directly or indirectly, solicit, divert, take away, or attempt to solicit, divert or take away, any of the merchants which are or were a party to any of the Merchant Agreements related to the Portfolio or Sub-Portfolio, or their respective affiliates.

46.

In Section 6.10 of the Residual Purchase Agreements, Kim also agreed that in the event he breached the covenants and promises contained in Section

6.10, Priority would suffer irreparable injury for which there is no adequate remedy at law, and Priority would, therefore: (1) be entitled to temporary, preliminary, and permanent injunctive relief enjoining said breach or threatened breach; and (2) have the right to seek a remedy at law as well as or in lieu of equitable relief.

**Kim's Solicitation of Priority's Merchants**

47.

Since 2019, Kim or persons acting on his behalf have actively and intentionally contacted Referred Merchants, solicited them to stop using Priority's processing services, and diverted them to other companies for their processing services, and continue to do so.

48.

Upon information and belief, since 2019, Kim or persons acting on his behalf have contacted Referred Merchants and provided them with false, misleading and/or untrue information in order to induce them to stop using Priority's processing services, and, instead, to use other companies' processing services, and continue to do so.

49.

Upon information and belief, Kim or persons acting on his behalf have moved Referred Merchants to other processing companies without the merchants' knowledge, and continue to do so.

50.

At all relevant times, the Merchant Agreements between Priority and the

Referred Merchants, and the Processing Agreement and Residual Purchase Agreements, have been in effect.

51.

Upon information and belief, Defendants have solicited, and continue to solicit, hundreds of Referred Merchants away from Priority.

52.

These solicitations have all occurred within the non-solicitation periods set forth in the Processing Agreement and Residual Purchase Agreements.

53.

On August 1, 2020, Priority notified Kim in writing that he was in breach of the Processing Agreement and Residual Purchase Agreements and demanded that he cure such breaches. A true and correct copy of Priority's written notice of breach to Kim is attached as **Exhibit F**.

54.

Kim continues to solicit and divert Referred Merchants and/or the Merchants in the Portfolio.

55.

All conditions precedent to the filing of this action have been satisfied or waived by Kim.

**COUNT I**
**<u>INJUNCTIVE RELIEF</u>**

56.

Priority incorporates by reference, as if fully set forth herein, the

allegations in paragraphs 1-55 of its Verified Complaint.

57.

Through the Processing Agreement, Residual Purchase Agreements, and the business relationship between Kim and Priority, Kim gained access to Priority's confidential information regarding Priority's merchants.

58.

Kim or persons acting on his behalf have actively and intentionally contacted Priority's merchants and solicited them to terminate their Merchant Agreements with Priority and/or stop using Priority's processing services and, instead, to use other companies' processing services.

59.

Kim or persons acting on his behalf have actively and intentionally used Priority's confidential information to solicit Priority's merchants.

60.

Kim or persons acting on his behalf have used false, misleading and/or untrue information to solicit Priority's merchants to terminate their Merchant Agreements with Priority and/or stop using Priority's processing services and, instead, to use other companies' processing services.

61.

Kim continues to interfere with Priority's merchants by soliciting them to terminate their Merchant Agreements with Priority and use other companies' processing services.

62.

Upon information and belief, Kim intends to continue to interfere with Priority's merchants by soliciting them to terminate their Merchant Agreements with Priority and use other companies' processing services.

63.

By his conduct, Kim has breached the covenants and promises contained in the Processing Agreement and the Residual Purchase Agreements including, but not limited to, the covenants and promises contained in Section 6.10 of the Residual Purchase Agreements.

64.

Section 6.10 of the Residual Purchase Agreements provides that in the event of a breach of the covenants and promises contained in Section 6.10, Priority would suffer irreparable injury for which there is no adequate remedy at law, and Priority would, therefore be entitled to temporary, preliminary, and permanent injunctive relief enjoining said breach or threatened breach and have the right to seek a remedy at law as well as or in lieu of equitable relief.

65.

Kim should be enjoined from violating the non-solicitation provisions of the Processing Agreement and Residual Purchase Agreements.  See O.C.G.A. § 9-11-65(d).

66.

Priority will be irreparably and imminently harmed unless Kim and those working on his behalf are enjoined and restrained from soliciting Priority's

merchants, violating the terms of the Processing Agreement and Residual Purchase Agreements, using and disseminating Priority's confidential information, and otherwise altering the status quo between and among the Priority and Kim.

67.

Because Priority has no adequate remedy at law, an interlocutory injunction is the only way to maintain the status quo.

68.

The relative equities weigh in favor of interlocutory injunctive relief because Kim is seeking to alter the status quo by breaching the Processing Agreement and Residual Purchase Agreements, soliciting Priority's merchants, and by using and disseminating Priority's confidential information in violation contractual covenants and Georgia law.

69.

Priority is entitled to temporary and permanent injunctive relief to prevent irreparable harm to Priority caused by Kim's continued solicitation of Priority's merchants, and his use and dissemination of Priority's confidential, information regarding those merchants.

70.

Kim will not be harmed if the relief requested by Priority is granted by the Court.

71.

Accordingly, Priority is entitled to injunctive relief to preserve the status

- 16 -

quo, to prevent further injury to Priority, to stop Kim from soliciting Priority's merchants, and to stop Kim from disclosing Priority's confidential business information to others.

## COUNT II
## <u>CONSTRUCTIVE TRUST</u>

72.

Priority incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-55 of its Verified Complaint.

73.

Kim acquired possession of property belonging to Priority in the form of its confidential information.

74.

Kim has also acquired possession of property belonging to Priority in the form of Priority's merchants and the revenue associated with those merchants' business relationship with Priority.

75.

Kim is not authorized to take or keep Priority's confidential information or to use it for any purpose other than for the benefit of Priority.

76.

Kim was not and is not authorized to take or keep Priority's merchants or the revenue associated with those merchants' business relationship with Priority.

77.

Kim has obtained Priority's merchants, and the revenue associated with

those merchant's accounts, by improperly using Priority's confidential, information and soliciting those merchants to terminate contractual relationships with Priority.

78.

Shortly after learning that Kim was taking its merchants, Priority notified Kim and demanded that he return those merchants.  To date, however, he has not responded to Priority's demand.

79.

Shortly after learning that Kim was taking its merchants, Priority filed the instant lawsuit seeking to preserve and enforce its rights against Kim.

80.

Kim's conduct in obtaining Priority's confidential information, as well as inducing Priority's merchants to leave Priority, was improper and violates established principles of equity.

81.

Therefore, the Court should imply a constructive trust over Priority's confidential information and Priority's merchants and related revenue streams, which are now in the possession of Kim and/or other parties.

**COUNT III**
**BREACH OF CONTRACT**

82.

Priority incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-55 of its Verified Complaint.

83.

All conditions precedent to Priority's entitlement to enforce the Processing Agreement, Residual Purchase Agreements, Loan Agreement, and Amended Promissory Note have been satisfied, or waived and excused by Kim.

84.

The Processing Agreement, Residual Purchase Agreements, Loan Agreement, and Amended Promissory Note are valid, binding, and enforceable contracts.

85.

By executing the Processing Agreement, Residual Purchase Agreements, Loan Agreement, and Amended Promissory Note, Kim agreed to adhere to the terms therein.

86.

Kim has breached the Processing Agreement in a variety of ways including, but not limited to:

- Failing to retain in strictest confidence all information and data belonging to or relating to the business of Priority including, but not limited to, information related to the Referred Merchants. (Section 11);
- marketing the Merchant Services or any services substantially similar to the Merchant Service to any Priority merchant (Section 3(l)(i));
- soliciting or contacting Referred Merchant for the purpose of providing or receiving Merchant Services, or otherwise encouraging a Referred Merchant to terminate a Merchant Agreement with Priority (Section 5(d)); and

- marketing or selling the Merchant Services of, or on behalf of, any party other than Priority (Section 7(n), as amended).

87.

Kim has breached the Residual Purchase Agreements in a variety of ways including, but not limited to:

- Contacting and attempting to divert Priority's merchants within the 48-month non-solicitation period set forth in the Residual Purchase Agreements;

- Contacting Priority's merchants and inducing them to stop using Priority's processing services and, instead, to use other companies' processing services;

- Soliciting Priority's merchants away from Priority, and diverting those merchants to another party or parties; and

- Using Priority's confidential, proprietary, and/or trade secret information and documents (which he gained access to through the Processing Agreement, Residual Purchase Agreements, and business relationship with Priority) in order to induce Priority's merchants to terminate their Merchant Agreements.

88.

Kim has materially breached the Loan Agreement and Amended Promissory Note by, among other things, failing to make the agreed upon monthly installment payments in April, May, June, or July of 2020.

89.

Kim also breached his duty to Priority to act in good faith and engage in fair dealing with respect to Processing Agreement, Residual Purchase Agreements, Loan Agreement, and Amended Promissory Note.

90.

On August 1, 2020, Priority notified Kim in writing that he was in breach of the Processing Agreement, Residual Purchase Agreements, Loan Agreement,

and Amended Promissory Note and demanded that he cure said breaches.  <u>See</u>
Exhibit F.

91.

Kim has failed and refused to cure his breaches, and continues to breach
the Processing Agreement, Residual Purchase Agreements, Loan Agreement,
and Amended Promissory Note.

92.

As a direct and proximate result of Kim's breaches of the Processing
Agreement, Residual Purchase Agreements, Loan Agreement, and Amended
Promissory Note, Priority has been damaged, and is, therefore, entitled to
judgment against Kim in an amount to be proven at trial, plus interest and
reasonable attorneys' fees.

**COUNT IV**
**<u>INDEMNITY</u>**

93.

Priority incorporates by reference, as if fully set forth herein, the
allegations in paragraphs 1-55 of its Verified Complaint.

94.

In Section 6 of the Processing Agreement, Kim agreed to indemnify and
hold harmless Priority from any claim, demand, loss, damage, liability, or cost
(including reasonable legal fees and expenses) caused by or in any way arising
from any breach or default by Kim of the Processing Agreement or any other
agreement between Kim and Priority or any negligent or wrongful act or
misrepresentation of information of or by Kim in performing or failing to

- 21 -

perform its obligations under the Processing Agreement.

95.

In Section 5.1 of the Residual Purchase Agreements, Kim agreed to indemnify Priority from and against "any and all liabilities, losses, damages, demands, claims, suits, costs and expenses, including without limitation reasonable attorneys' fees," incurred or suffered by Priority, directly or indirectly, as a result of or arising out of any inaccuracy in or breach or nonfulfillment of any of the representations, warranties, covenants or agreements made by the Seller in the Residual Purchase Agreements, the Processing Agreement, or the other agreements and documents to be executed and delivered by the Kim pursuant to the Residual Purchase Agreements or the Processing Agreement.

96.

In Section 9.4 of the Loan Agreement, Kim agreed that he would on demand reimburse Priority for all reasonable out-of-pocket fees and expenses, including without limitation the fees and expenses of legal counsel for Priority incurred by Priority in connection with the preparation, administration, amendment, restatement, modification, or enforcement of the Loan Documents and the collection or attempted collection of the Note.

97.

Georgia common law also requires Kim to indemnify Priority from any and all losses suffered by Priority as a result of Kim's misrepresentations and breach of the Processing Agreement and/or the Residual Purchase Agreements.

98.

Kim's conduct set forth above, including *inter alia*, breach of the non-solicitation provisions of the Processing Agreement and Residual Purchase Agreements and improper use of Priority's confidential information, falls under the ambit of the indemnification clauses in the Processing Agreement, Residual Purchase Agreements, and Loan Agreement.

99.

Kim's conduct set forth above has damaged Priority.

100.

Kim has failed to acknowledge his indemnity liability to Priority and has not compensated Priority for any of its losses.

101.

As a direct and proximate result of Kim's conduct, Priority has been damaged, and is, therefore, entitled to judgment against Kim in an amount to be proven at trial, plus interest and reasonable attorneys' fees.

**COUNT V**
**UNJUST ENRICHMENT**

102.

Priority incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-55 of its Verified Complaint.

103.

Through Kim's business relationship with Priority, he gained access to and currently possess confidential information regarding Priority's merchants that belongs to Priority.

104.

Kim has improperly used Priority's confidential information regarding Priority's merchants to improperly obtain dominion over Priority's merchants, and the revenue generated by Priority's merchants.

105.

As a result, Kim has been unjustly enriched in an amount to be determined at trial.

**COUNT VI**
**<u>CONVERSION</u>**

106.

Priority incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-55 of its Verified Complaint.

107.

Kim has used confidential information belonging to Priority, without Priority's knowledge or authorization, for the purpose of inducing Priority's merchants to terminate their Merchant Agreements and converting Priority's merchants, and the revenue generated by Priority's merchants, for his own profit and benefit.

108.

Kim's conversion and possession of Priority's confidential information, merchants, and the revenue generated by Priority's merchants has damaged and continues to damage Priority in an amount to be proven at trial.

109.

Priority is entitled to possession of all of its confidential information, merchants, and the revenue generated by its merchants, as well as any other amounts by which Priority has been damaged by Kim.

110.

Kim's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences. Accordingly, Priority is entitled to punitive damages in an amount to be determined at trial.

## COUNT VII
## ATTORNEYS' FEES AND EXPENSES OF LITIGATION

111.

Priority incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-55 of its Verified Complaint.

112.

Pursuant to Section 6 of the Processing Agreement and Section 5.1 of the Residual Purchase Agreements Kim is required to pay Priority the attorney's fees and costs it has incurred in pursuing this action. Priority intends to enforce these provisions and any similar provisions in the agreements between Priority and Defendant.

113.

Pursuant to Section 9.4 of the Loan Agreement, Kim is required to pay Priority the attorney's fees and costs it has incurred in pursuing this action.

Priority intends to enforce this provision and any similar provisions in the agreements between Priority and Defendant. Pursuant to O.C.G.A. § 13-1-11, Defendant has ten (10) days from receipt of this notice within which to pay the full principal, interest, and late fees owing under the Loan Agreement and Amended Promissory Note without incurring additional liability for attorneys' fees related to enforcement of those agreements.

114.

In addition, Kim has acted in bad faith, making it necessary for Priority to retain the undersigned attorneys to file this suit.  Kim has been stubbornly litigious, and has caused Priority unnecessary trouble and expense. Therefore, Priority is entitled to recover its actual litigation expenses, including reasonable attorneys' fees from Kim pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Priority prays that this Court grant the following relief:

a) Preliminary and permanent injunction prohibiting Kim from using or disclosing Priority's confidential information regarding its Merchants;

b) Preliminary and permanent injunction requiring Kim to return Priority's confidential information to Priority;

c) Preliminary and permanent injunction requiring Kim to return Priority's merchants, and related revenue from those merchants, to Priority;

d) Preliminary and permanent injunction prohibiting Kim from contacting Priority's merchants or soliciting them to terminate their Merchant Agreements with Priority;

e)      A constructive trust over Priority's confidential information, as well as its merchants and related revenue, currently in the possession of Kim;

f)      Judgment that Kim's conduct constitutes a breach of the Processing Agreement, the Residual Purchase Agreements, the Loan Agreement and the Amended Promissory Note;

g)      Judgment that Kim must indemnity Priority for all damages caused by Kim's conduct;

h)      Judgment that Kim has been unjustly enriched;

i)      Judgment that Kim's conduct constitutes conversion;

j)      Judgment for Priority and against Kim for all actual and compensatory damages, prejudgment interest in an amount to be determined at trial, and post-judgment interest as provided by law;

k)      Judgment for Priority and against Kim for Priority's costs of litigation, including its actual attorneys' fees, court costs, and the costs of investigation and related expenses;

l)      Judgment for Priority and against Kim for punitive damages in an amount to be determined by the enlightened conscience of a jury; and

m)      For all such other and further relief as the Court may deem appropriate.

This 11th day of August 2020.

/s/Greg Michell
Greg Michell
Georgia Bar No. 504053
Garrett E. Land
Georgia Bar No. 880750

**STANLEY, ESREY & BUCKLEY, LLP**
Promenade, Suite 2400
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 835-6200
Facsimile: (404) 835-6221

*Attorneys for Plaintiff*

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

PRIORITY PAYMENT SYSTEMS, LLC,  )
                               )
      Plaintiff,                )
                               )          Civil Action File No.:
v.                             )
                               )          __2020CV339261__
CHAN S. KIM,                   )
                               )
      Defendant.                )
_____)

## VERIFICATION

Before the undersigned officer, duly authorized by law to administer oaths,

comes George Holmes, who, after first being duly sworn according to law on oath,

deposes and states that the facts contained in Priority's ***Verified Complaint*** are

true and correct and within his personal knowledge.

George Holmes, Jr.
VP, Relationship Management
Priority Payment Systems, LLC

SWORN TO and SUBSCRIBED
before me this ⎯11⎯ day of August 2020.

_____
Notary Public

My commission expires:
02/27/2024

# EXHIBIT B

8/31/2021

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
NORTHEN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHAN SUK KIM,                    )
                                 )
     Debtor.                     ) CHAPTER 7
                                 ) CASE NO.: 21-52662-LRC

- - -

        The 2004 Examination of CHAN SUK KIM, taken

pursuant to the stipulations contained herein; all

formalities waived; the reading and signing of the

examination reserved; before Tanga Donnelly, CCR; taken on

Tuesday, August 31, 2021; commencing at 9:56 a.m.

## Page 2

```
 1                    APPEARANCES
 2
    ON BEHALF OF THE DEBTOR:
 3
    WILLIAM A. ROUNTREE
 4  ROUNTREE LEITMAN & KLEIN
    Century Plaza 1
 5  2987 Clairmont Road
    Suite 350
 6  Atlanta, Georgia  30329
    (404) 584-1244
 7
    ON BEHALF OF MOVANT:
 8
    SOO J. HONG
 9  BLEVINS & HONG, P.C.
    191 Roswell Street
10  Marietta, Georgia 30060
    (678) 354-2290
11
    GREG MICHELL
12  STANLEY, ESREY & BUCKLEY
    1230 Peachtree Street
13  Promenade II, Suite 2400
    Atlanta, Georgia 30309
14  (404)  835-6200
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                     INDEX
 2
                                           Pages:
 3
    Examination:
 4
      By Mr. Michell . . . . . . . . . . . . . .5-225
 5
 6                    EXHIBITS
 7  Creditor's                           Page Marked/
    Exhibit No.     Description           Identified
 8
       1        Motion to Conduct Examination    20/20
 9
       2        Solim Statements of Revenue and  47/47
10                Expenses
11     3        Belmont Creek Lease              51/51
12     4        Gower Way Lease                  51/54
13     5        2015 1099 - Priority Payment     51/54
                  Systems
14
15     6        ACH Forms                        57/57
16     7        Shopping Center Lease            72/72
17     8        Defendant's Objections and       79/80
                  Responses
18     9        Voluntary Petition for Bankruptcy 93/93
19    10        2020 1040 Tax Return - Chan Kim  101/101
20    11        Secretary of State documents     130/130
21    12        Priority Payment Systems         142/142
                  documents
22
23    13        Promissory Note Schedule         171/171
24    14        Promissory Note Schedule         174/174
25
                            3
```

## Page 4

```
 1                    EXHIBITS
 2  Creditor's                      Page Marked/
    Exhibit No.    Description       Identified
 3
       15    Notification of Breach and    182/182
 4            Demand for Remedy
 5     16    Solim Bank Statements         188/188
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

---

Page 5

 1          P R O C E E D I N G S
 2                    9:56 a.m.
 3          (Whereupon, the court reporter complied with the
 4     requirements of O.C.G.A. §9-11-28(d).)
 5          MR. MICHELL:  This will be the Rule 2004
 6     Examination of Chan Kim.  It's being taken by Priority
 7     Payment Systems on cross-examination pursuant to
 8     Federal Rules of Civil Procedure for all purposes
 9     allowed by law.  It's being taken pursuant to motion
10     and agreement of Counsel as to the time and place.  Do
11     you want to read and sign?
12          MR. ROUNTREE:  Yes.
13          MR. MICHELL:  Okay.  Are there any preliminary
14     matters we need to address before we get going?
15          MR. ROUNTREE:  Reserve objections, except to the
16     form of the question.
17          MR. MICHELL:  Okay.  Anything else?
18          MR. ROUNTREE:  Do you have anything?
19          THE WITNESS:  No.
20          MR. MICHELL:  All right.  Please swear the
21     witness.
22          (Witness sworn.)
23     Whereupon,
24               CHAN SUK KIM,
25     was called as a witness herein and, having been first

---

Page 6

 1     duly sworn, was examined and examined as follows:
 2               EXAMINATION
 3     BY MR. MICHELL:
 4          Q.  Please state your full name for the record.
 5          A.  Chan Suk Kim.
 6          Q.  Do you go by any other name, or have you ever
 7     gone by another name?
 8          A.  Chan.
 9          Q.  Just Chan?
10          A.  Yes, Chan.
11          Q.  C-H-A-N?
12          A.  Correct.
13          Q.  Okay.  No nicknames, nothing else?
14          A.  No.
15          Q.  Okay.  Have you ever given testimony before under
16     oath?
17          A.  Yes, I have.
18          Q.  Okay.  Was that a deposition, or in a lawsuit
19     hearing, or what was it?
20          A.  Traffic violation, is that...
21          Q.  Okay.  So you showed up in court?
22          A.  Yeah.
23          Q.  But have you ever sat in a room like this with a
24     court reporter and had your --
25          A.  No.

---

Page 7

 1          Q.  -- testimony taken down?
 2          A.  This is the first time.
 3          Q.  All right.  My name is Greg Michell.  Like I
 4     said, I represent Priority.  I'm going to ask you some
 5     questions.  It goes a little easier particularly with us
 6     wearing masks if you wait until I finish my question before
 7     you give your answer.  Okay?
 8          A.  Okay.
 9          Q.  And you need to give verbal responses so the
10     court reporter can get that down.  All right?
11          A.  Okay.
12          Q.  If I ask a question and you don't understand it,
13     please let me know.  And I'll try and rephrase it.  Okay?
14          A.  Okay.
15          Q.  And if you need a break, just let me know.
16          A.  Okay.
17          Q.  I would ask, though, if I've asked a question
18     that you answer it before you take a break.
19          A.  Okay.
20          Q.  All right.  Are you taking any medication or
21     suffering from any condition that would prevent you from
22     answering my questions truthfully today?
23          A.  No.
24          Q.  And you understand that you're under oath and
25     subject to penalty of perjury, correct?

---

Page 8

 1          A.  Yes.
 2          Q.  Okay.  Where are you from originally?
 3          A.  Where -- where was I born?
 4          Q.  Correct.
 5          A.  What was your name again, I'm sorry?
 6          Q.  Greg.
 7          A.  Greg, okay.  Where was I born?
 8          Q.  Yes.
 9          A.  South Korea.
10          Q.  Okay.  How long have you lived in Georgia?
11          A.  For 13 years.
12          Q.  All right.
13          A.  2009.
14          Q.  All right.  What brought you to Georgia?
15          A.  My parents owned a restaurant out in Seattle, and
16     I worked for them for -- for quite some time.  And just
17     wanted to venture out into -- to a new place and figure
18     things out by myself.
19          Q.  Okay.  And how did you decide Georgia?
20          A.  One of our chefs at my dad's restaurant, he's
21     from here.  He had good things to say about Atlanta, so I
22     just figured I would give it a try.
23          Q.  Okay.  Are you married?
24          A.  Divorced.
25          Q.  Okay.  What's your ex-wife's name?

---

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 9

1      A.  The last name is Yu.
2      Q.  Will you spell that for me?
3      A.  Yu, Y-U.
4      Q.  Okay.
5      A.  And the first name is J-U-N-G.
6      Q.  J-U-N-G, Y-U?
7      A.  Yes.
8      Q.  Okay.  Does she live here in Georgia?
9      A.  She does.
10     Q.  When were you divorced?
11     A.  In '18 -- 2018, I want to say sometime in May if
12  I remember correctly.
13     Q.  All right.  And where does she live; do you know
14  her address here in Georgia?
15     A.  No, I don't.
16     Q.  Okay.  Do you know what part of Georgia she lives
17  in?
18     A.  She lives in Gwinnett.
19     Q.  Has she remarried?
20     A.  Not that I know of.
21     Q.  Do you have any children?
22     A.  Yes.
23     Q.  How many?
24     A.  One.
25     Q.  All right.  What's his or her name?

Page 10

1      A.  Noah, N-O-A-H.
2      Q.  Okay.  How old is Noah?
3      A.  He's just turned five.
4      Q.  Does he live with you or with your ex-wife?
5      A.  Ex-wife.
6      Q.  Okay.  And you don't know the address where he
7  lives?
8      A.  I mean, I know where she lives.  I don't -- I
9  don't know her address off -- off the top of my head, but I
10  can find out.
11     Q.  Okay.  And your parents, are both of your parents
12  still alive?
13     A.  My -- my mom is in Korea, and my dad is in
14  Seattle.  Yes, they're both alive.
15     Q.  All right.  What's your dad's name?
16     A.  See Kim, S-E-E, K-I-M.
17     Q.  All right.  And what about your mom?
18     A.  Hong Kim, H-O-N -- H-O-N-G, last name is Kim.
19     Q.  Okay.  Do you have any siblings?
20     A.  I have a brother.
21     Q.  Okay.  Where does he live?
22     A.  He lives in Seattle.
23     Q.  All right.  What's his name?
24     A.  Alex Yoo -- or I mean, I'm sorry, Alex Kim.
25     Q.  Okay.

Page 11

1      A.  His legal name is B-U-M, Bum Kim.
2      Q.  Gotcha.  All right.  So you moved out here in
3  2009.  What did you do for work when you moved out here?
4      A.  At first, I think I worked at a convenience
5  store.  I was a -- as a settle-in job.  Oh, no.  You know,
6  actually I took -- I took a real estate class for six
7  months.  And then, after that -- I figured out that that
8  wasn't going to work.  I took a job at a convenience store,
9  and I worked there for about six months.  And after that I
10  started working for a company as a sales agent, Bank Card
11  Services.
12     Q.  That was the name of the company?
13     A.  Yeah.  And that's how I got introduced into the
14  credit card business.
15     Q.  Bank Card Services?
16     A.  Correct.
17     Q.  Who's the owner of Bank Card Services; do you
18  know?
19     A.  I wouldn't know that.
20     Q.  Do you know who it was at the time?
21     A.  I don't know.  Just the management -- there were
22  managers, but it's -- you know, it's a big company so --
23     Q.  Oh, is it?
24     A.  Yes.
25     Q.  Okay.  Does it still exist, Bank Card Services?

Page 12

1      A.  I'm not sure.
2      Q.  As far as you know?
3      A.  I'm not sure.
4      Q.  Okay.  You did they process with?
5      A.  I'm not sure.
6      Q.  At the time, you didn't know?
7      A.  No, it was more -- that was more of a clerk
8  because I spoke both languages.
9      Q.  Uh-huh (affirmative).
10     A.  And it's comprised of Korean community and Asian
11  community.
12     Q.  Okay.  And I'm not -- I'm not trying to trip you
13  up.  I think originally you said you were a sales agent,
14  but you're -- are you amending that to say that you were
15  more --
16     A.  I was -- I was both.
17     Q.  -- like a clerk?
18     A.  Because I was -- I was hired as a sales agent
19  first because they were looking for that position.  And
20  then they -- they realized I spoke Korean and English
21  fluently.
22     Q.  Right.
23     A.  So then they had a group of salespeople and
24  internal Korean speaking so I was a dual position.
25     Q.  Okay.

3 (Pages 9 to 12)

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 13

1    A.  But -- but eventually I helped more towards
2  translating and helping co-workers translate some of the
3  things that I don't understand in -- in English terms so I
4  was more geared towards that.  So the position itself was a
5  sales agent, but -- but I ended up doing more of the
6  clerical work and technical work.
7    Q.  How long did you work for Bank Card Services?
8    A.  For 18 months, I want to say.
9    Q.  All right.
10    A.  Somewhere around that vicinity.
11    Q.  All right.  Then what, did you leave there?
12    A.  Yeah, I did.
13    Q.  Okay.
14    A.  And I became an independent sales agent.  A
15  company called Omega.
16    Q.  Is that here in Georgia?
17    A.  That's out of -- that's based out of Chicago.
18    Q.  Okay.  Is that a card processing company?
19    A.  Yes, it was.  Yeah.
20    Q.  Okay.  What did you do for them?
21    A.  I was basically in the same position - training,
22  technical, terminal maintenance, installation.  I'd gotten
23  to know well through Bank Card Services how to program and
24  support the terminals, POS systems, and so forth.
25    Q.  Gotcha.  And were you an employee of Omega?

Page 14

1    A.  I was a 1099.  So I guess I was an independent
2  salesperson or independent agent, they wanted to call it.
3    Q.  All right.  Who was the principal of Omega; do
4  you know?
5    A.  His name was Paul.
6    Q.  Do you know his last name?
7    A.  Kim.  I want to say Kim -- Kim or Kang.
8    Q.  Kim or what's the last one?
9    A.  Kang.  Kim or Kang.
10    Q.  Will you spell the last one for me?
11    A.  K-A-N-G.
12    Q.  Okay.
13    A.  It's been a while back.  Excuse my --
14    Q.  Sure.
15    A.  Yeah.  It's been a while back.
16    Q.  That's okay.  How long were you at Omega?
17    A.  I think that was maybe eight months.
18    Q.  Okay.
19    A.  Eight months or so.  Somewhere -- somewhere
20  between eight months to, I want to say, about a year.
21    Q.  Okay.  Where did you go after Omega?
22    A.  And then I became an independent sales agent with
23  Priority Payment Systems.
24    Q.  Was that in 2014?
25    A.  I think it was late 2013 --

Page 15

1    Q.  Okay.
2    A.  -- because I remember -- I remember it was around
3  Christmas, so it couldn't have been --
4    Q.  Okay.  Late 2013?
5    A.  Yeah, late 2013.  And then, took some time off
6  for five months, six months or so.  And then I started
7  actively being a sales agent I think, maybe, early 2014.  I
8  think -- I think -- I think I took about six months off in
9  between then.
10    Q.  Okay.
11    A.  But again, these aren't -- it's just right off my
12  memory so I --
13    Q.  Sure.  Sure.
14    A.  If I had known that you would ask me these
15  questions, I would have just kind of looked back.
16    Q.  Okay.  What about education, did you go to
17  college; do you have a college degree?
18    A.  I went to college, dropped out.
19    Q.  Where was that?
20    A.  In Seattle.
21    Q.  Okay.  What's the name of the school?
22    A.  Oh, gosh.  I want to say Skagit, Skagit College.
23    Q.  Okay.  Will you spell that?
24    A.  S-K-A-G-I-T.
25    Q.  Okay.  How long were you at --

Page 16

1    A.  Just very short, two -- two, three months.
2    Q.  Okay.
3    A.  Very short.  One quarter, less than one quarter.
4    Q.  Okay.  Any other formal education after that,
5  after you dropped out?
6    A.  Well, the real estate.
7    Q.  Class you took?
8    A.  Yeah.
9    Q.  Okay.  Where was that?
10    A.  That was here in Roswell.
11    Q.  A private company?
12    A.  It was a -- it was a -- it was a campus course,
13  so...
14    Q.  Okay.  What campus?
15    A.  I don't remember.
16    Q.  Did you do anything to prepare for this
17  examination today?
18    A.  Besides -- besides talking to Will, you know,
19  outside of that not much.
20    Q.  Okay.  Well, by not much, what do you mean; what
21  else did you do other than talk to Will?
22    A.  Well, going over some of the questions that --
23  that -- that were sent over to us.
24    Q.  You reviewed some of the questions.  Okay, we'll
25  take a look at those.

4 (Pages 13 to 16)

8/31/2021

Page 17

1   A.  Yeah.
2   Q.  Did you look at any documents?
3   A.  Yes, I tried to track back to my emails and see -
4   - try to remember at least a timeline of -- of a rough
5   estimate of what had happened.
6   Q.  Okay.  So what email service do you use?
7   A.  Gmail.
8   Q.  Okay.  Any others?
9   A.  No.
10  Q.  How many email addresses do you have?
11  A.  Currently one.
12  Q.  Okay.  What is that address?
13  A.  Happy, H-A-P-P-Y, honda@gmail.com.
14  Q.  Okay.  You don't have any other email addresses
15  right now?
16  A.  No, not currently that I use.
17  Q.  But you've had some --  Well, I don't want just
18  the ones you use; I want any that you have.
19  A.  There's another Gmail account that I rarely use
20  now -- chansukkim, my name spelled out, @gmail.
21  Q.  Okay.
22  A.  Chansukkim@gmail.com.
23  Q.  Okay.  And are there email addresses that you've
24  used previously that you don't use anymore?
25  A.  I do, but if you -- I -- I don't remember right

Page 18

1   off the top of my head because I don't -- I haven't use
2   them.  I don't use them, but I'm pretty sure I could get
3   them to you.
4   Q.  Okay.  Yeah, I would appreciate that.
5   A.  Okay.
6   THE WITNESS:  Do I need to write this down, Will?
7   MR. ROUNTREE:  Yeah.
8   THE WITNESS:  Can I get a --
9   MR. ROUNTREE:  Well, no, I'm -- I'm writing it
10  down.
11  THE WITNESS:  Oh, you're writing it down.
12  MR. ROUNTREE:  Yeah.
13  BY MR. MICHELL:  (Resuming)
14  Q.  Okay.  So you looked back through your email
15  address.  What do -- what do you use; do you use Outlook or
16  something for emails or do you just go straight to Gmail?
17  A.  I don't use Outlook.
18  Q.  Okay.  What do you use?
19  A.  What do you mean?
20  Q.  Well, how do you access your email box; do you
21  log into Gmail?
22  A.  Yes.
23  Q.  Okay.  And you don't use any other type of
24  Outlook-type software --
25  A.  No.

Page 19

1   Q.  -- on top of that?
2   A.  No.
3   Q.  Okay.  How do you store emails or keep them; are
4   they just in your Gmail box?
5   A.  Correct, yeah.  Just like you would use in a
6   personal use, you know, if -- if it's junk mail then --
7   Yeah, just a Gmail.
8   Q.  And you use that same email address for both
9   personal emails and work?
10  A.  Correct.
11  Q.  Okay.  And do you keep every email you send, or
12  do you prune them some way over time?
13  A.  Well, you know, once it gets full -- because
14  there's so much junk mails, I delete them.  I go through --
15  I go through them once and a while.  And if I don't use
16  them, then I just delete it.  I clean out my junk boxes,
17  maybe, every year or so.
18  Q.  Okay.  And what's your current business?
19  A.  What do you mean?
20  Q.  What's your current --  Do you own a business
21  right now or own any interest in a business right now?
22  A.  No, I don't.
23  Q.  So you have no ownership interest in any
24  business?
25  A.  No.

Page 20

1   Q.  Okay.  Do you have any IT person that assists you
2   with your emails?
3   A.  No.
4   Q.  Okay.  So are you the only one that has access to
5   your emails?
6   A.  Correct.
7   MR. MICHELL:  Will you mark that as Exhibit --
8   that's 1.  And let me get that -- and, Will, this is
9   the motion.
10  (Whereupon, the court reporter
11  marked Creditor's Exhibit
12  No. 1 for identification.)
13  THE WITNESS:  Can I ask you a question?
14  MR. ROUNTREE:  Yeah.  Give us -- give us two
15  minutes.
16  MR. MICHELL:  Sure.
17  (Whereupon, a recess was taken.)
18  BY MR. MICHELL:  (Resuming)
19  Q.  Let me -- let me back up and fill in just real
20  quick.  On your -- your ex-wife's name, you said Jung Yu;
21  does she have a middle name?
22  A.  He.
23  Q.  H-E?
24  A.  H-E.
25  Q.  Okay.

5 (Pages 17 to 20)

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 21

1    A.  Yeah.  Well, you know, in Korean we -- we say
2  Jung He, but in English we just say the first name.
3    Q.  Okay.
4    A.  Like, I go by Chan.
5    Q.  Rather than --
6    A.  Chan Suk.
7    Q.  Right.
8    A.  Yeah.
9    Q.  And how about your son, Noah, does he have a
10  middle name?
11    A.  He doesn't.
12    Q.  Okay.  And your parents -- your dad, does he have
13  a middle name?
14    A.  Yang.
15    Q.  And your brother?
16    A.  Suk, S-U-K.
17    Q.  Okay.
18    A.  And my mom's is Suk, S-U-K as well, Hong Suk.
19    Q.  Okay.
20    A.  Yeah.
21    Q.  All right.  And on the happyhonda@gmail, that's
22  your only email address?  Because I -- I've seen others.  I
23  just want to make sure that I have that correct, it's just
24  happyhonda@gmail.com?
25    A.  Happyhonda1001@gmail.com.

Page 22

1    Q.  Okay.  So there's -- you don't have a just plain
2  happyhonda?
3    A.  No. Happyhonda1001@gmail.com.
4    Q.  Okay.
5    A.  And second one is Chansukkim@gmail.com.  My name
6  spelled out fully.
7    Q.  Okay.  And I'd asked you if you have an ownership
8  interest in any company, and you said no.  Have you ever
9  had an ownership interest in any company?
10    A.  Yes.
11    Q.  Okay.  What company?
12    A.  My very last one was Secom, Inc., S-E-C-O-M, I-N-
13  C.
14    Q.  I'm sorry, spell that again.
15    A.  S-E-C-O-M, I-N-C and...
16    Q.  When did you -- when did you own that company;
17  from when to when?
18    A.  I want to say 2000 --
19    MR. ROUNTREE:  It's on the Statement of Financial
20  Affairs.
21    MR. MICHELL:  Okay.
22  BY THE WITNESS:  (Resuming)
23    A.  2000 -- or 2018 July to 2020 November.
24    THE WITNESS:  Right here, this one?
25    MR. ROUNTREE:  Yeah.

Page 23

1  BY MR. MICHELL:  (Resuming)
2    Q.  Did you own a hundred percent of it?
3    A.  It was a company that was existent and -- and we
4  took over.  So at the time when we took over, it was a
5  hundred percent.  And -- and so, the person who owned it
6  had sold the business to us.  So if I'm trying to answer
7  your question correctly, the person who owned it, he signed
8  an agreement to release 100 percent share of that
9  ownership.  So at the time of dissolvement, was -- I
10  believe it was 100 percent.
11    Q.  Okay.
12    A.  The reason -- the reason I ask is that I don't
13  understand -- I -- I don't really know the correct terms as
14  to what was owned 100 percent.  So the person who sold it
15  left.  So he released his -- all of his shares.  And then,
16  I owned it.  So yes, I did own 100 percent to answer your
17  question.
18    Q.  Okay.  And who did you buy it from?
19    A.  Jae Kim, J-A-E, Hong Kim, H-O-N-G Kim.
20    Q.  Okay.  How much did you pay him for that company?
21    A.  To the best of my knowledge --  I don't know, but
22  if you want me to give you an estimate -- or a rough est --
23  rough --
24    MR. ROUNTREE:  Don't speculate.
25    THE WITNESS:  Okay.

Page 24

1  BY THE WITNESS:  (Resuming)
2    A.  I don't know.
3    Q.  You have no idea whether it was $1 million, or
4  $50 million, or 500,000?
5    A.  Well, I mean I want to give you an accurate
6  answer but I -- I can't remember off of -- off of -- our
7  conversation right now.  But I believe it was 150,000 is
8  what was agreed to be paid.
9    Q.  Okay.  Is that -- was that paid?
10    A.  Not fully.  The business just -- it -- it looked
11  like it was going to -- it was a good deal.  And in the
12  midst of it, there were -- we found out a lot of debt that
13  he owned.  He had personal credit cards, personal debt,
14  vendor payments, non-completion of work.  So it flopped, I
15  mean as soon as it started it flopped.  There was a lot of
16  mistrust within -- within -- within -- as soon as we
17  started.  There were a lot of things that we found out -- I
18  found out that was not going to work.
19    Q.  How much of the 150,000 do you think you paid?
20    A.  35 was probably paid out, 35.
21    Q.  Okay.
22    A.  But again, I want to give you an accurate answer,
23  but I don't know.  If I would have known that I was going
24  to be asked these questions, I would've probably had it --
25  asked him or asked people that I worked with at the time.

6  (Pages 21 to 24)

Metro Atlanta Reporters, Inc.
770-985-2344

Page 25

```
 1        Q.  Do you have any documents that show that
 2   transaction?
 3        A.  I would have to get it from -- from him because
 4   he would, you know, have to access his bank account.
 5        Q.  Well, what I'm saying is did y'all sign a
 6   contract for that purchase?
 7        A.  Yes, yes.
 8        Q.  Do you have that contract?
 9        A.  I don't have it with me, but I do have it.
10        Q.  Okay.  Was it just one document or multiple
11   documents?
12        A.  It was just one document.
13        Q.  Okay.  Did you use lawyers or was it a contract
14   that you put together yourself?
15        A.  No, we hired a local attorney.  I don't --
16        Q.  Who was that?
17        A.  I -- I could find out for you.
18        Q.  Okay.  All right.  And you --  In part of your
19   answer you said we.  Who were you referring to when you
20   said we acquired this from --
21        A.  Well, when I used to work at Solim, everybody --
22   we had -- we had people work with us, so it was a mutual
23   decision with everybody.  So I keep on referring to we
24   because I don't do anything independently.  You know, I
25   consult, and I have people -- I had people help me out so
```

Page 27

```
 1   Solim was the account that Priority paid to each month in
 2   the course of eight to nine years.  You know, no -- no
 3   independent money -- no -- no amount has come into my
 4   personal account or to me personally.
 5        It has all been deposited into Solim, LLC bank account
 6   over the course of eight to nine years any residuals, any
 7   buyouts, any -- any deposits that -- that Priority has made
 8   on our behalf -- or paid to us in residuals or buyouts has
 9   been deposited into Solim, LLC bank account.
10        Q.  Right, I understand that.  So Solim is an LLC.
11   Who are the members of that LLC?
12        A.  Kwang Lim, K-W-A-N-G.
13        Q.  What about a middle name?
14        A.  B-I-N, Lim L-I-M.
15        Q.  Does Kwang go by any other names?
16        A.  It's just short for KB.  We call him KB.
17        Q.  Has he ever been called Kevin?
18        A.  No, we just call him KB.
19        Q.  Okay.
20        A.  Yeah.  We call him KB so -- and then Chris Suh.
21   I don't know his Korean name, C-R -- Chris -- C-H -- Chris,
22   S-U-H.
23        Q.  Okay.
24        A.  I don't know his Korean name, but that's what he
25   goes by.
```

Page 26

```
 1   that's why I keep on saying we.
 2        Q.  Okay.  So the 35,000, was that paid by you?
 3        A.  It was paid off from Solim, LLC.
 4        Q.  Okay.  And where did that money come from?
 5        A.  What do you mean?
 6        Q.  Well, the $35,000 came from something; is it
 7   money you supplied to Solim or...?
 8        A.  Well, Solim was in -- in -- with Priority so we
 9   were -- we -- we got payments from Priority, too.  You
10   know, I worked in partnership with Priority, so it was all
11   from residual stuff we -- we earned through our independent
12   sales organization business.
13        Q.  Right.  But the only contracts - and we'll go
14   through them - that I've seen with Priority have your name;
15   they don't have Solim on them.
16        A.  Okay.
17        Q.  So you had a contract with Priority?
18        A.  Correct, correct.
19        Q.  Okay.  And so, Solim is what; a company you own?
20        A.  No, Solim is a -- it's a corporation we -- we
21   used as a primary business checking account.
22        Q.  Who is we?
23        A.  Solim was a business -- Solim was a bank account
24   that -- that our company used to pay out for -- for
25   everyday purposes, operating expenses, and incomes and --
```

Page 28

```
 1        Q.  Okay.  Those were the two members of Solim?
 2        A.  Correct.
 3        Q.  Okay.  But the contract you had with Priority,
 4   why would -- why would the money from that contract go into
 5   Solim rather than to your account?
 6        A.  I just never -- I've never had a bank account.
 7   When we -- when I started working with KB, it was an
 8   account that he used for business purposes.
 9        Q.  The Solim account?
10        A.  Correct.  And it was just -- it was just
11   convenient for us to use that account as residual deposits.
12   And -- and he is more -- he is better off --  He was better
13   off doing accounting and a little more -- a little better
14   with calculation.  So that's why we used Solim, LLC.
15        Q.  Okay.  But you instructed Priority where to send
16   the money, --
17        A.  Yes.
18        Q.  -- correct?
19        A.  Yes.
20        Q.  So you could change it to another account if you
21   wanted to?
22        A.  I believe -- I believe that was — Yes.
23        Q.  Okay.
24        A.  I believe that was -- just never thought that --
25   that we would deposit money anywhere else at the time.  But
```

7 (Pages 25 to 28)

8/31/2021

Page 29

1  -- but if I did tell him to deposit money somewhere else,
2  I'm pretty sure that they would have.
3      Q.  Okay.  So the Solim account, were you a signatory
4  on that account?
5      A.  No.
6      Q.  Okay.  Did you have online access to it?
7      A.  No.
8      Q.  Could you write checks out of it?
9      A.  I wasn't a signer.  I was -- K -- KB wrote all
10  the checks out.
11      Q.  You never wrote a check out of that account?
12      A.  No, no.
13      Q.  Okay.  I assume that you could get money out of
14  that account when you wanted?
15      A.  If I had asked him, yes.
16      Q.  So tell me how that process worked; if you wanted
17  money, what would you do to get it out of that account?
18      A.  I would --
19          MR. ROUNTREE:  I want to object to the form of
20      the question, but you can go ahead.
21  BY THE WITNESS:  (Resuming)
22      A.  Well, there was -- there was a huge trust factor
23  between him and I.  So there were expenses that needed to
24  be paid, and, you know, -- and I was always outside.  You
25  know, I was always an outside field guy so just never had

Page 30

1  to advise him.  I -- probably if I did have to ask him and
2  if I did tell him, I'm pretty sure he would have, but that
3  never happened that way.
4      Q.  Well, over the years between 2014 and 2020,
5  Priority was paying an awful lot of money into that
6  account, correct?
7      A.  Priority was paying what was agreed --
8          MR. ROUNTREE:  Object to form.
9          MR. MICHELL:  Sure.
10  BY MR. MICHELL:  (Resuming)
11      Q.  We'll -- we'll go to the -- we'll go through the
12  accounts and look at it.  But in addition to residuals,
13  there were also loan payments into that account, correct?
14      A.  Yes.
15      Q.  And is your testimony that you never accessed any
16  of that money?
17      A.  Personally -- what -- you mean accessed online
18  or...?
19      Q.  No, you personally.  You never used any of that
20  money?
21      A.  Oh, yeah.  I have, yes.
22      Q.  Okay.  I'm asking how did you get that money.
23      A.  Well, we had -- I had bills to pay, and I had
24  utility bills, and I had personal bills to pay.  So, you
25  know, I would tell him what needed to be paid, and if he

Page 31

1  agreed then he would pay that.
2      Q.  Okay.  So checks were written out of the Solim
3  account to pay your personal bills?
4      A.  I believe so.
5      Q.  Okay.
6      A.  Yeah.
7      Q.  What about if you wanted to buy something - a
8  house or a car; how would you get that money, a check out
9  of Solim?
10      A.  Never bought a car, never bought a house.  So no
11  large purchases were made from -- from that account.
12      Q.  Okay.
13      A.  Yeah.  I have -- I personally don't own anything.
14  My -- my main focus over the -- over the -- over seven,
15  eight years in -- in doing what I did was just focused on
16  just building a team and building -- building a company for
17  me to grow.  So it just never occurred to me.  And I might
18  -- it might sound odd, but I've just never had an urge to
19  buy a house, to buy a car, or to buy a boat, buy a watch,
20  or anything like that.
21      Q.  Okay.  And did you take any kind of salary from
22  Solim?
23      A.  No, everything was -- everything was reinvested.
24  Everything was -- went back into the business - buying
25  terminals, pay out guys.  We grew pretty fast.  We grew --

Page 32

1  we grew larger.  You know, at one point, we had 48 people,
2  so we were always tight on money.
3      Q.  How about --  What was your arrangement with KB
4  about how much he got paid?
5      A.  Well, he had his handful of customers.  He did
6  his independent, you know, his customers.  Even though the
7  -- the account was set up, you know --  Well, Priority
8  Payment System the agent contract was set up with me, but I
9  had 15 to 20 other salespeople that work off of residuals.
10  So we would set up schedule A with them, and then we'd pay
11  that out.
12      And he had -- he had his own accounts that he
13  referred, and he earned -- or not earned but sold or went
14  out and got.  So he would calculate his own customers, and
15  he would pay out.  And same -- same thing for all the sales
16  agents that we had in -- in house.  So we would calculate
17  his schedule A, and then pay out his residuals, his base
18  salaries, his gas pay, and stuff like that.
19      Q.  Right.
20      A.  And that's what KB was in charge of.
21      Q.  Okay.  And did you have your merchants that you
22  received residuals, payouts from?
23      A.  Well, I thought I was a -- you know, I'm a lead.
24  So besides -- besides the -- the few payments that I had to
25  make, everything was put back.  So we -- we -- my salary

8 (Pages 29 to 32)

Page 33

1  wasn't -- wasn't considered. So it just -- whatever --
2  whatever was there we just reinvested and used to hire more
3  people, and -- and that's how we were able to grow a little
4  bit larger.
5      Even though the company didn't produce a huge profit,
6  you know, we saw -- we saw -- we saw it going back into the
7  business and making -- making sure that it grew. We went
8  from 5 employees to 10 to 15 to 20 to 25 over -- over a
9  very short period of time I believe. So all of the money
10  was put back.
11      Q. Okay. But the -- some of the money was paid out
12  to the 15 to 20 subagents for the merchants that they
13  signed up, correct?
14      A. Well, it wasn't all the time. It grew from 5 to
15  7 to 10.
16      Q. Right.
17      A. Yeah.
18      Q. And KB took some money for his merchants --
19      A. Correct.
20      Q. -- that he signed up, correct?
21      A. Correct.
22      Q. And I'm asking you -- it's your testimony that
23  you didn't take any money for the merchants that you signed
24  up?
25      A. No.

Page 34

1      Q. No, you didn't take any money?
2      A. No, I didn't take any money.
3      Q. Okay.
4      A. So my calculation for -- for the handful of
5  merchants that I -- that I have, I did not take it
6  individually. No, it was just my -- my profit or my
7  merchant was all put back into the company as -- when -- as
8  they were needed and when they needed it.
9      Q. Okay. Take a look at what's been marked as
10  Creditor's Exhibit 1. Have you seen this document before?
11      A. (Witness reviews document.) No.
12      Q. Okay.
13      MR. ROUNTREE: Well, you've -- you've seen the
14  document request.
15      THE WITNESS: Oh, is this the document request?
16      MR. ROUNTREE: Yeah.
17      MR. MICHELL: It is.
18      THE WITNESS: Okay.
19  BY THE WITNESS: (Resuming)
20      A. Yes, I have. Yes, I have.
21      Q. Okay.
22      MR. ROUNTREE: Can we go off the record for a
23  second?
24      MR. MICHELL: Sure.
25      (Whereupon, a discussion ensued off the

Page 35

1  record.)
2  BY MR. MICHELL: (Resuming)
3      Q. So turn to Exhibit B, will you?
4      A. (Witness complies with request of Counsel.)
5  Okay.
6      Q. Just tell me generally, what did you do to look
7  for the documents that are requested in here?
8      A. (Witness reviews document.) Just -- just to see
9  if any of the documents that I had in my possession. And
10  went through emails and see if they -- see if they -- if I
11  had any emails. And contacted people who had helped me at
12  the time to prep these documents such as tax documentation,
13  bank statements, and so forth.
14      Q. Okay. Do you keep any physical files?
15      A. No, I don't.
16      Q. Okay. Not at your office or at home?
17      A. No.
18      Q. Where do you live currently?
19      A. I live in 6 -- in Johns Creek.
20      Q. What's your address?
21      A. 6 -- 6527 Clapham -- 6257 Clapham Lane.
22      THE COURT REPORTER: I need -- I need you to
23  repeat the name of the street again, I'm sorry.
24      THE WITNESS: Clapham, C-L-A-P-H-A-M.
25      MR. ROUNTREE: It's the address on the Petition.

Page 36

1      THE COURT REPORTER: Thank you.
2  BY MR. MICHELL: (Resuming)
3      Q. And where is your office address?
4      A. I don't have an office.
5      Q. Okay. When's the last time you had an office?
6      A. Well, we were evicted 2009 -- I -- I -- I can't
7  remember the exact date, but I can give you a rough
8  estimate, 2019.
9      Q. Who was evicted?
10      A. Well, we were -- they terminated our lease - the
11  landlord.
12      Q. Okay.
13      A. Not evicted, but they terminated our lease.
14      Q. Okay. And who was that lease with?
15      A. Park Village Shopping Center.
16      Q. Who was the tenant?
17      A. I was.
18      Q. You personally?
19      A. Uh-huh (affirmative). It's in Duluth -- Duluth,
20  Georgia.
21      Q. Okay. But you don't have any physical files
22  after that lease terminated; you didn't bring any files
23  home from that office?
24      A. No.
25      Q. Okay. Do you have any electronic files that you

9 (Pages 33 to 36)

Page 37

1  save or keep somewhere other than emails?
2      A.  I did have it on a hard drive, you know, some of
3  the work documentation that I had.  I just haven't accessed
4  it in a while so...
5      Q.  Do you still have that hard drive?
6      A.  I don't know.  I haven't --
7      Q.  If you did, would you have it at home?
8      A.  I would believe so.
9      Q.  Okay.  And that Clapham Lane, do you own that, or
10  do you lease it?
11      A.  It's -- it's a friend.  You know, after all this
12  has happened, I wasn't producing income.  So I don't own it
13  and I don't lease it personally.  But it's a friend's home
14  that I occupy until this is somehow figured out, and -- and
15  hopefully I'll be in my -- my place pretty soon.
16      Q.  Do you pay anything for that house?
17      A.  No, I don't.
18      Q.  Okay.  So you have no rent obligation?
19      A.  No.
20      Q.  Okay.  In Exhibit B it asked for -- Number 1
21  asked for an evaluation or appraisal of your assets.  Have
22  you ever provided a statement of your net worth or anything
23  like that?
24      A.  In my lifetime?
25      Q.  Yeah.

Page 38

1      A.  Unh-unh (negative).
2      Q.  No?
3      A.  No.
4      Q.  All right.  How about tax returns, have you ever
5  filed any tax returns?
6      A.  Yes, I have.
7      Q.  Okay.  Have you filed them every year?
8      A.  I think there was a delay.  KB used to -- KB did
9  -- again, KB did all the taxes.
10      Q.  He did your personal taxes as well?
11      A.  Yeah.
12      Q.  Okay.  But as far as you know you have filed --
13      A.  As far as I know I'm current, yes.
14      Q.  Okay.
15      A.  Yeah, as far as I know.
16      Q.  Is KB an accountant?
17      A.  He's just better, you know, he's just better at
18  taking care of numbers and help -- helping.
19      Q.  Okay.  Do you have copies of those tax returns
20  that have been filed?
21      A.  Last -- last one that I was able to produce for
22  Will was 2020 and 2019.
23      MR. MICHELL:  Okay.  I haven't seen those.
24      MR. ROUNTREE:  Well, they were produced to the
25  trustee.

Page 39

1      MR. MICHELL:  Have you seen those, Soo?
2      MS. HONG:  No.
3      MR. ROUNTREE:  Yeah, I think they've been
4  produced.
5      MR. MICHELL:  Okay.
6      MS. HONG:  Can you get those to us?
7      MR. ROUNTREE:  Uh-huh (affirmative).
8      MS. HONG:  Can you get those to us?
9      MR. ROUNTREE:  Yeah.
10  BY MR. MICHELL:  (Resuming)
11      Q.  I also asked for all statements for any financial
12  account in which you were an account holder or authorized
13  user.  You produced the Solim statements from January of
14  2016 to March of 2019.
15      A.  Uh-huh (affirmative).
16      Q.  Do you have any other statements for any other
17  accounts?
18      A.  No, I don't.
19      Q.  Okay.  Do you have any other bank accounts?
20      A.  No, I don't.
21      Q.  Okay.  No more bank accounts with Bank of America
22  or USAA?
23      A.  No.
24      Q.  Okay.  Vanguard?
25      A.  No.

Page 40

1      Q.  Do you have any personal IRA or retirement
2  accounts?
3      A.  No.
4      Q.  Okay.  After this 2019 -- March of 2019 when the
5  account for Solim was zeroed out, you provided Priority
6  with a different account number?
7      A.  Uh-huh (affirmative).
8      Q.  Where -- where are the statements from that
9  account?
10      A.  Well, I don't have access to -- I'm thinking
11  you're referring to PPS Business Solution, LLC.  I don't
12  have access to the account.  I wasn't an account holder,
13  and the person who was -- who is and was an account holder,
14  he cannot be reached.
15      Q.  So why would you direct Priority to pay money
16  that's owed to you into an account that you don't have
17  access to?
18      MR. ROUNTREE:  Object to the form.  You can
19  answer.
20  BY THE WITNESS:  (Resuming)
21      A.  Well, KB and I split.  You know, he went out and
22  did his own thing.  So after, that I wanted to just pull
23  out from the business, and I didn't want to do too much.
24  The group of people that was in our office when we decided
25  that -- who was going to lead the team and Jong Lee, you

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 41

1  can write that down, Jong Lee is the account holder for PPS
2  Business Solution. And the business just started
3  deteriorating. It wasn't -- wasn't going much to our
4  expected. And Jong Lee was one of the leads in our office,
5  and he decided to create a busi -- PPS Business Solution,
6  LLC. And he was going to kind of take the torch from KB
7  and kind of continue on in his -- what he was doing. You
8  know, I'm good at what I do, and there's certain things
9  that I -- I'm absolutely not good at. And I'm never in the
10  office. So there had to be a lead or a main manager or
11  someone that I could work for. To make sure that as soon
12  as KB left, that they were able to take care of their own
13  business and continue to pay whatever bill that the --
14  existing utilities, and bills, and stuff that needed to be
15  paid. But the -- one of the reasons that I wasn't able to
16  produce PPS Business Solution, LLC is just that I can't get
17  a hold of him anymore.
18      Q.  Jong Lee?
19      A.  Yeah. Jong, J-O-N-G, Lee.
20      Q.  Okay. When did KB leave Solim?
21      A.  I don't know. I can't remember exactly the date.
22  But I presume --
23      Q.  Do you know what year?
24      A.  2019, early -- I'm pretty sure it was early 2019.
25      Q.  Okay. Why did he leave Solim; do you know?

Page 42

1      A.  He wanted to venture out into restaurant
2  business. And we worked with -- we worked together for so
3  long. He wanted to do something independently. You know,
4  the credit card industry is draining, sales is draining,
5  service is draining. And he decided that it was better for
6  him and his family to venture out into something normal,
7  you know, open to close.
8      Q.  Is he still in Georgia?
9      A.  Yeah, he is.
10      Q.  Do you know where he lives?
11      A.  I -- I don't know his address.
12      Q.  Do you know where in Georgia he lives?
13      A.  No, I've never been to his house.
14      Q.  Okay.
15      A.  I want to say Gwinnett. He's probably in
16  Gwinnett.
17      Q.  So does --
18      A.  Am I able to ask you a question?
19          MR. ROUNTREE: No.
20  BY MR. MICHELL: (Resuming)
21      Q.  So when you signed the agreements with Priority
22  back in late 2013 or 2014 to have a credit card processing
23  business, right, an independent sales office; is that
24  correct?
25      A.  Correct.

Page 43

1      Q.  All right. Where are the financial records for
2  that business?
3      A.  Do you mean tax returns?
4      Q.  Tax returns, balance sheets, profit and loss
5  statements, anything like that?
6      A.  I don't have them personally, but we did hire --
7  we did have a CPA office I believe at the time to process
8  those. Again, I wasn't an owner of Solim, so I wasn't able
9  to produce these documents. But did they exist, yes. I
10  believe that it's either with KB or the -- the accounting
11  firm that did the financials.
12      Q.  Who's the accounting firm?
13      A.  I can find out for you.
14      Q.  You don't recall the name?
15      A.  I -- I've never had to contact them. They don't
16  -- I've never asked them to do anything. All the
17  accounting was handled through KB. But it should be an
18  easy -- easy research to find out who it is.
19      Q.  Okay. I would ask for that.
20      A.  Yeah, but -- but they -- they would -- they would
21  have it.
22      Q.  And so all of the money that Priority paid either
23  through residuals or through loans was deposited in that
24  Solim account; is that correct?
25      A.  Yes, sir.

Page 44

1      Q.  Then the financial accounting for Solim would
2  account for all of those funds; is that correct?
3      A.  I didn't under -- I didn't understand the
4  question.
5      Q.  The money from Priority all went into the Solim
6  account, correct?
7      A.  Correct.
8      Q.  Okay. So the financial records for Solim would
9  show that money coming in and going out of the company, how
10  it was spent, and how it was used?
11      A.  Absolutely, yes.
12      Q.  Okay.
13      A.  Absolutely.
14      Q.  And to your knowledge, have you ever seen those
15  financial documents I'm talking about - tax returns,
16  balance sheets for Solim?
17      A.  I never took an interest. I figured it would,
18  you know, it's handled through KB at the time when he was
19  working, so I personally didn't go through. I trusted him
20  to -- to go through the documents and make sure they were
21  okay.
22          MR. ROUNTREE: Let's take a quick break.
23          MR. MICHELL: Okay.
24          MR. ROUNTREE: Just a couple minutes.
25          MR. MICHELL: Sure.

11 (Pages 41 to 44)

Page 45

```
 1          (Whereupon, a recess was taken.)
 2   BY MR. MICHELL:  (Resuming)
 3        Q.  Okay.  I -- I want to make sure that I'm -- I
 4   have it correct.  When I asked you companies that you had
 5   an ownership interest in, you said Secom, correct?
 6        A.  Uh-huh (affirmative).
 7        Q.  Which you no longer have an interest in; is that
 8   correct?
 9        A.  It's dissolved.
10        Q.  Okay.  Any other companies that you've had an
11   ownership interest in?
12        A.  In my lifetime?
13        Q.  Yes.
14        A.  Well, I did -- I -- I worked in Alaska for six
15   years and I had a business there.
16        Q.  This was prior to 2009?
17        A.  Yeah.  It was -- I want to say 2000 -- I want to
18   say '99 -- or 2003.  Yeah, 2003 until about 2007 -- I want
19   to say '07.  Yeah.  I ran a convenience store out in Alaska
20   for about six years.
21        Q.  How about post-2009?
22        A.  Post-2009, not to my recollection, no.
23        Q.  Okay.  If you didn't have an ownership interest
24   in it, have you worked for or worked with any company since
25   2009 other than Solim and Secom?
```

Page 46

```
 1        A.  No.
 2        Q.  Okay.
 3          MR. ROUNTREE:  Well, some of that's asked and
 4   answered, right?  I mean, we -- we went through his
 5   employment history since he moved to Atlanta.
 6          MR. MICHELL:  Right.
 7   BY MR. MICHELL:  (Resuming)
 8        Q.  I'm just -- I'm wanting to make sure that I'm not
 9   leaving anything out any company like Solim or Secom.  What
10   about SecomUSA?
11        A.  No.
12        Q.  No what?
13        A.  It's -- That's not my company.  I mean, to my
14   best recollection, it was Secom, Inc. which is the very
15   last one that I owned.  And -- and another one was back,
16   again, way back in Alaska when I was running the
17   convenience store.  Yeah.
18        Q.  Right.
19        A.  CNH Northwest Development.
20        Q.  Okay.  But you don't have any ownership interest
21   in Solim?
22        A.  No.
23        Q.  How did you get the bank statements for Solim?
24        A.  I -- I contacted KB.
25        Q.  Okay.
```

Page 47

```
 1        A.  Yeah, I contacted KB.  Asking him what he has
 2   had, and he produced what he has had to me.
 3        Q.  So you are able to get in touch with him?
 4        A.  Yeah, of course.
 5        Q.  Okay.  You also produced -- or we got last night
 6   a statement of revenue from 2015 for Solim.  How did you
 7   get that?
 8        A.  That was in -- that was in my email at one point,
 9   I believe.  I was just -- I was really trying to produce
10   whatever that was in relation to Solim.  And I just went
11   through -- went through whatever I could find trying to
12   prepare for this meeting, and just grabbing a hold of any
13   emails or paper trails that -- that I had.
14        Q.  Okay.
15        A.  And I believe even -- even there it might be a
16   name of the CPA office who has prepared that.
17          MR. MICHELL:  I don't have another copy because
18   these just came in last night.  So will you mark this
19   for me, please?
20          THE COURT REPORTER:  Number 2?
21          MR. MICHELL:  Yes.
22          (Whereupon, the court reporter
23          marked Creditor's Exhibit
24          No. 2 for identification.)
25   BY MR. MICHELL:  (Resuming)
```

Page 48

```
 1        Q.  We are going to have to share that.  Do you
 2   recognize what's been marked as Exhibit 2?
 3        A.  Do you mean this document?
 4        Q.  Yes.
 5        A.  (Witness reviews document.)  Yes.
 6        Q.  Okay.  What is that?
 7        A.  Statement of revenue and expense.
 8        Q.  Okay.  And why did you have that?
 9        A.  Why did I have it?
10        Q.  Yes, you're not an owner of Solim, correct?
11          MR. ROUNTREE:  Asked and answered.
12   BY THE WITNESS:  (Resuming)
13        A.  I think may -- KB might have sent it to me just
14   to share.
15        Q.  Okay.  What's -- what's underneath that?
16        A.  Pay stubs, I believe.
17        Q.  For Solim?
18        A.  Yes.
19        Q.  And how did you get those to produce?
20        A.  How did I get it?  I -- I would presume that it
21   was emailed to me at one point.
22        Q.  Okay.  You don't recall how you -- how you came
23   to get those to your lawyer so that he could produce them?
24        A.  No, I'm -- I'm pretty confident that KB probably
25   had sent me this email and -- for review, for -- for
```

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 49

1  payroll purposes.
2      **Q.  Why would he send you payroll to review for**
3  **Solim?**
4      A.  You know, we'd trade emails back and forth and
5  see who has paid for what and for operation purposes.
6      **Q.  Right.  But why would you have any say in what**
7  **someone was paid if it's a company you didn't have an**
8  **ownership interest in?**
9          MR. ROUNTREE:  Object to form.
10  BY THE WITNESS:  (Resuming)
11      A.  Well, the ownership -- you know, I hired these
12  guys, too, because I was -- I was a member manager.  So I
13  was managing these people, and I was training these people.
14  We wanted -- I'm pretty sure he wanted to confirm that --
15  that these payments were accurate to see -- make sure that
16  payroll was right because I was a manager -- in a manager
17  position.
18      **Q.  You hired those sales reps that work for Solim?**
19      A.  Yes.
20      **Q.  Okay.  And did you control what they were paid?**
21      A.  I would -- I would confirm and make sure that it
22  was okay with -- with everybody who was working with us,
23  yes.
24      **Q.  Who was everybody who would be in on that**
25  **decision?**

Page 50

1      A.  That would be KB, Susan, and Jaden, and Chris.  I
2  think that would be the decision -- and I.
3      **Q.  And you?**
4      A.  And I, yeah.
5      **Q.  So the five of you made management decisions**
6  **about Solim?**
7      A.  We made management --  Well, agents and training
8  and -- and outside field door-to-door sales skill set and
9  technical support that I would handle.  All of the money -
10  the money flowing in, money flowing out, the payments, the
11  utility bills, the payouts would be handled with Susan Park
12  and KB.  And --
13      **Q.  Susan, what's her last name?**
14      A.  Susan Park.
15      **Q.  P-A-R-K?**
16      A.  Yeah.
17      **Q.  Okay.  And what was Chris's last name?**
18      A.  Suh, S-U-H.
19      **Q.  And can you give me middle names for them as**
20  **well?**
21      A.  I don't -- I don't know their middle names.
22      **Q.  And how about Jaden?**
23      A.  Jaden Jeong, J-E-O-N-G.  You know, we don't
24  normally go -- go through their middle names.  It's just a
25  first name and a last name in Korean.  So we don't -- we

Page 51

1  would -- we would rarely know their middle names unless
2  they tell us.
3      **Q.  Okay.  So that group would make decisions about**
4  **Solim and how business was conducted?**
5      A.  Yes.
6          MR. MICHELL:  Let's mark that, too, and that.
7  We'll mark it separate.  And that -- might as well
8  just go through them.  These are documents that I just
9  got last night.  Sorry, I don't have copies of them.
10          (Whereupon, the court reporter
11          marked Creditor's Exhibit
12          Nos. 3-5 for identification.)
13  BY MR. MICHELL:  (Resuming)
14      **Q.  So let me show you what's marked as Exhibit 3**
15  **which is a lease?**
16      A.  (Witness reviews document.)  Uh-huh
17  (affirmative).
18      **Q.  Can you tell me why you produced that document?**
19      A.  Well, in -- within the documents, any lease
20  agreement that I -- that I -- that I wasn't able to produce
21  in my residential history.  At this time, my credit was --
22  was not approved so I asked a friend, so I don't know...
23      **Q.  What's the property there?**
24      A.  1872 Belmont Creek Pointe.
25      **Q.  Okay.  Is that a place where you lived?**

Page 52

1      A.  I lived, yes.
2      **Q.  You live there currently?**
3      A.  No, I don't.
4      **Q.  Okay.  You did live there?**
5      A.  I did live here.
6      **Q.  Okay.  And this lease is -- help me understand**
7  **that; I don't see your name on that lease?**
8      A.  Well, I wanted to produce my residential history.
9  So I asked Jin An, he -- he leased it.  He lived there with
10  me, and I was a roommate for -- for this residential
11  history here.  So I wanted to at least get some
12  documentations of where I lived, and this is the lease that
13  he was able to give me.  Because he leased it when I moved
14  in -- so I subleased it from this property -- from him.
15  And he -- he let me live there for -- for a little bit.
16      **Q.  Jin?**
17      A.  Jin An, Jin An.
18      **Q.  Jin An?**
19      A.  Correct.
20      **Q.  Did he work for Solim?**
21      A.  No.
22      **Q.  Okay.  Did y'all live together?**
23      A.  The better part of three or four months.  The
24  house -- house was -- house had issues so I had to move
25  out.

Metro Atlanta Reporters, Inc.
770-985-2344

Page 53

```
 1        Q.  All right.  And then, here's another lease that
 2  you provided for -- This is Exhibit 4.  2825 Gower Way,
 3  what is that?
 4        A.  (Witness reviews document.)  Well, this is my
 5  residential history.  So I lived there I believe from 2015
 6  to say the better part of 2016.  Yeah.
 7        Q.  That's -- you do not own that house?
 8        A.  No, I don't.
 9        Q.  That's a house you leased?
10        A.  Yeah.  Well, I rented.
11        Q.  You rented?
12        A.  Yeah.
13        Q.  Are you shown as the tenant on that?
14        A.  No.  Well, yeah --  Yeah, this was 2825 Gower.
15  Yeah, I was -- I was -- I leased this property.
16        Q.  Okay.  And is that your signature on the lease?
17  No, it's not signed.  Was it not signed?
18        A.  I'm pretty sure --  I'm sure I could get a signed
19  copy.  It's just I wanted to -- you know, it said
20  lease/residential history.  So within -- within the email
21  that I had, I just researched residential lease, and this
22  is a copy.  I'm pretty sure I printed it out, and then sent
23  it out to the landlord.
24        Q.  Okay.
25        A.  But if you need it, I could probably produce
```

Page 54

```
 1  that.  I'm sure I could produce a signed copy.
 2        Q.  And the landlord, Bong Ja Lee, who is that?
 3        A.  He's a landlord.
 4        Q.  Okay.  You have no other connection with him?
 5        A.  No.
 6        Q.  And in the lease that we just looked at before,
 7  you have no connection with the tenant or owner of 1872
 8  Belmont Creek other than this lease?
 9        A.  No.
10        Q.  Okay.  And so, at Solim you were -- were you in
11  charge of sales; is that what your position was?
12        A.  Correct, training.
13        Q.  Sales training.  Did you do any actual sales
14  yourself?
15        A.  Well, I was a sales agent, yes.  So I -- no,
16  beyond 2016, no.
17        Q.  Okay.  Prior to 2016 you did, but not after 2016?
18        A.  Of course.  Yeah, of course.
19        Q.  Let me show you Exhibit 5.  That's another one
20  that I got last night.  Do you recognize that document?
21        A.  (Witness reviews document.)  Of course, yeah.
22        Q.  Okay.  And what is it?
23        A.  It's a 1099 from Priority.
24        Q.  Okay.  For the year...?
25        A.  2015.
```

Page 55

```
 1        Q.  All right.  Do you have any other 1099s from
 2  Priority?
 3        A.  I -- I don't believe so.  I don't remember.
 4        Q.  Okay.  So it looks like in 2015 the nonemployee
 5  compensation you received from Priority is $464,388; is
 6  that correct?
 7        A.  Yes.
 8        Q.  Did all of that money go into the Solim bank
 9  account?
10        A.  Yes.
11        Q.  Okay.  Do you think you can find other years'
12  1099s for Priority?
13        A.  I could give it a shot.  But wouldn't Priority
14  have those 1099s as well?
15        Q.  Potentially.  But I'm asking if you can pull it.
16        A.  I can, yeah.  Yeah, I can give it a try.
17        Q.  Do you -- did you receive any other 1099s other
18  than the one from Priority?
19        A.  I would believe that we -- we would receive it
20  every year for the money that was provided by Priority.
21        Q.  Okay.  Did you receive any other 1099s from
22  companies other than Priority?
23        A.  No.
24        Q.  So your only income was from the residuals from
25  Priority?
```

Page 56

```
 1        A.  Yes.
 2        Q.  Okay.  Solim didn't pay you a salary or a
 3  commission?
 4        A.  No.
 5        Q.  Secom didn't pay you a salary or a commission?
 6        A.  No.  You know, Priority has -- Priority has paid
 7  base -- based on residual purposes so they --  I've worked
 8  with them ever since -- until 2019, early part of 2020.
 9  And these -- these residual payments and payouts are -- are
10  deposited every month over the course of eight month --
11  eight years.  And every time that we would, you know, we
12  would have to draw or borrow money they review and there
13  are contractual terms.  There's -- there's a promissory
14  note that is paid, reviewed by their management at each
15  time.  So all the payments have all been -- absolute
16  payment has gone into Solim up until -- up until 2019.
17        Q.  Okay.  And then, where did they go?
18        A.  The money --
19        Q.  Yes.
20        A.  -- that was deposited?  I would presume that it
21  was spent for operation expenses, payout --
22        MR. ROUNTREE:  I think he's asking if the money
23  went anywhere other than Solim after --
24  BY MR. MICHELL:  (Resuming)
25        Q.  Yeah.  You said it went there until 2019.  I'm
```

14 (Pages 53 to 56)

8/31/2021

Page 57

1  asking you after that, where did the money go?
2      A.  Right here, PPS Business Solution.
3      Q.  Okay.
4      A.  Yeah.  After KB had left, then it went into PPS
5  Business Solutions.
6      Q.  Okay.
7          MR. MICHELL:  Could you mark that, please?
8          (Whereupon, the court reporter
9          marked Creditor's Exhibit
10         No. 6 for identification.)
11  BY MR. MICHELL:  (Resuming)
12     Q.  So can you take a look at what's been marked as
13  Exhibit 6?
14     A.  (Witness reviews document.)
15     Q.  The first page is a bank change authorization
16  form directing Priority on 6/2/14, it looks like, to pay
17  money into an account with Metro City Bank; do you see
18  that?
19     A.  Yes.
20     Q.  And there's a check on the back of that?
21     A.  Uh-huh (affirmative).
22     Q.  And what's that name at the top there?
23     A.  Hee Jong Kim.
24     Q.  Who is that?
25     A.  She was my girlfriend at the time.

Page 58

1      Q.  Was that an account of hers?
2      A.  Yes.
3      Q.  Okay.  So you were directing Priority to pay
4  monies owed to you into your girlfriend's account?
5      A.  Well, I believe at the time we were going to work
6  together.  We were going to work together.  She was going
7  to help me at the office and -- and help me out.  And she
8  was going to be getting involved with sales and so forth.
9  That never happened because we -- we separated.  So at the
10 time, that's what we intended to do at one point.
11     Q.  Okay.
12     A.  And I -- I don't believe that -- that we've ever
13 used this bank account if I remember correctly.
14     Q.  Okay.  Did --
15         MR. ROUNTREE:  And -- I'm sorry, go ahead.  I
16 was just going to ask is this supposed to be two
17 different bank change authorizations?
18         MR. MICHELL:  It is.
19         MR. ROUNTREE:  One and two, okay.  All right.
20         MR. MICHELL:  It is.  Yeah, I'm grouping these.
21         MR. ROUNTREE:  That's fine.
22 BY MR. MICHELL:  (Resuming)
23     Q.  Let's go to the next page.
24     A.  Okay.
25     Q.  It should look like this.

Page 59

1      A.  (Witness complies with request of Counsel.)
2  Okay.
3      Q.  This is from July 31st of 2018, and it's a dollar
4  amount of 1,050,000; do you see that?
5      A.  (Witness reviews document.)  Yes.
6      Q.  Do you know what that -- that's money from
7  Priority into a bank account ending in 6909; do you
8  recognize that?
9      A.  I don't memorize the bank accounts so I wouldn't
10 know if -- if that bank account belonged to what account.
11     Q.  Okay.  Do you remember this dollar amount?
12     A.  I think it's at the point -- at one point when we
13 did a residual buyout.
14     Q.  Correct.
15     A.  Yeah.
16     Q.  Okay.  So we'll figure out if we can figure out
17 what that account number is.
18     A.  Okay.
19     Q.  If you'll go to the next one.
20     A.  (Witness complies with request of Counsel.)
21     Q.  There's another bank change authorization form;
22 is that your signature on it?
23     A.  (Witness reviews document.)  Yes.
24     Q.  And this is in March of 2019?
25     A.  Yes.

Page 60

1      Q.  And it's telling Priority to deposit money into
2  an account ending in 3577?
3      A.  Yes.
4      Q.  Okay.  Is that PPS Business Solutions, LLC?
5      A.  Yes.
6      Q.  Who are the owners of that company?
7      A.  Jong Kim.
8      Q.  Will you spell that?
9      A.  J-O-N-G -- I'm sorry, Jong Lee, L-E-E.
10     Q.  Okay.
11     A.  And the previous memo is wrong, too.  His name is
12 Jong Lee.
13     Q.  Okay.  And do you have a business partnership
14 with Jong Lee?
15     A.  No, I don't.
16     Q.  Okay.  But he is in charge of the office for PPS
17 Business Solution; is that correct?
18     A.  Yes.
19     Q.  All right.  And are you a signatory on this bank
20 account?
21     A.  No.
22     Q.  Okay.  Do you know if there's -- where the
23 statements are for this account?
24     A.  No.  He would have it.
25     Q.  But you don't know how to contact him?

15  (Pages 57 to 60)

8/31/2021

Page 61

1      A.  No, I can't.  I -- I was -- I was -- I was trying
2  to to produce documentation, and I wasn't able to get a
3  hold of him.
4      Q.  So as far as you know, any money from Priority
5  since March of 2019 has been going into this account?
6      A.  Yes, yes.
7      Q.  But you have no idea how much?
8      A.  Well, I presume the residuals, you know, because,
9  you know, Priority provides residual reports -- online
10  access and...  Yeah.
11      Q.  Okay.  And what -- what has been done with that
12  money?
13      A.  The same thing -- the same thing as -- as we did
14  before.  Paid out, you know, employees, and -- and I would
15  assume they paid out utilities and expenses, and so forth -
16  - the residuals for the salespeople, and so forth.
17      Q.  But you don't know?
18      A.  Well, I don't have access -- I didn't have access
19  to bank accounts and the expenses.  So I don't know a
20  hundred percent exactly where and what was paid, but it was
21  -- Because Jong took over when KB left -- this was when it
22  all happened.  So he was trained with KB in 2008 what was
23  paid out to what and the bills that needed to go out.
24      Q.  Have you received any money out of that bank
25  account, 3577, since March of 2019?

Page 62

1      A.  No.
2      Q.  Not a penny?
3      A.  Not a penny.
4      Q.  Okay.  Let's go to the last page.
5      A.  (Witness complies with request of Counsel.)
6  Okay.
7      Q.  This is a wire transfer $1.3 million on May 10th
8  of 2019 being deposited into that account 7 -- ending
9  73577; do you see that?
10      A.  (Witness reviews document.)  Yes.
11      Q.  Do you know what that money is for?
12      A.  That was a second residual purchase - residual
13  purchase buyout.
14      Q.  That you did with Priority?
15      A.  Yes.
16      Q.  Okay.  And 100 percent of it went into the PPS
17  Business Solution's account?
18      A.  Yes.  And then, if I remember correctly, just to
19  notate, there was -- there was some that was borrowed
20  through PPS or through -- with Priority.  So any time I did
21  -- did a buyout, we made sure the -- the lending sum was
22  paid down.  So if we were -- I don't remember the numbers
23  correctly.  So if we borrowed 10, we paid back 4 by selling
24  because there was -- there was -- there was a loan that had
25  to be drawn down.  And that was the deal with Priority.  Go

Page 63

1  ahead and sell, but we agreed to draw down the loan to make
2  sure that we're in a healthy status.  If we -- if we sold a
3  portfolio or did a buyout transaction and they agreed on
4  say a million, then 400 -- I think 40 percent was then paid
5  -- paid back to Priority to draw down the loan.  So that
6  way we were able to keep the balance lower.
7      Q.  Right.  So as I understand you -- Just to make
8  sure.  So in addition to -- there were two residual
9  buyouts.  But in addition there were a number of times
10  where you borrowed money from Priority, correct, on like a
11  line of credit almost?
12      A.  Yeah, a line of credit.  Yeah.  Well, they call
13  it --
14      Q.  Okay.  And when you --
15      A.  -- they call it a multi-draw loan.
16      Q.  A multi-draw loan?
17      A.  Yeah.
18      Q.  And so, when you would do a residual purchase
19  agreement with Priority, you would take some of that money
20  and pay down the amount --
21      A.  Yeah, that --
22      Q.  -- owed on the multi-draw loan; is that correct?
23      A.  Yes.  And that would be agreed upon --  We would
24  -- we would ask hey, you know, we want to sell a portion of
25  our portfolio.  And they would come back and say well, we

Page 64

1  can do that, but you need to draw down -- you need to pay
2  down according to their calculation.  And I'd have to
3  agreed on -- agree on that to make sure that -- that that
4  transaction goes through.  So they'd say, hey, you --
5  you've built up so much loan.  I know you want to sell your
6  portfolio, but you should pay down this lump sum.  And
7  then, I would -- we would have to agree on that to --
8      Q.  Right.
9      A.  -- to do a purchase sale.  So I think -- I think
10  just roughly about 30 or 40 percent of any time we did --
11  well, it's only two times.  When we did a buyout, then we
12  would con --
13      Q.  The residual purchase agreement?
14      A.  Yeah, we would contribute.
15      Q.  Some to pay down your loan, --
16      A.  Yes.
17      Q.  -- correct?
18      A.  Yeah.
19      Q.  Okay.  Do you know how much you borrowed from
20  Priority in 2019 separate and apart from the -- the RPA
21  that we -- amount we just saw?
22      A.  Not -- not the exact number, but -- No, I don't.
23  I can't -- I can't remember the exact number that we
24  borrowed.
25      Q.  If I told you it was a million dollars, would you

16  (Pages 61 to 64)

Page 65

1  say that's correct?
2     A.  That seems on a high -- high -- high figure.  You
3  know, we were struggling in '17, '18 and '19 but that --
4  that sounds like a little bit high on a borrow note.
5     Q.  Okay.
6     A.  Because from my recollection, we would draw 40 --
7  about -- I would -- I would do a 50k draw.  And then, they
8  would -- they would take some sort of a wire and processing
9  fee.
10    Q.  Do you remember doing a $500,000 draw in 2019?
11    A.  I don't remember.
12    Q.  Okay.
13    A.  It was just a -- it was just a crazy time.  But
14  if we -- if I go back to --  There's an Excel spreadsheet.
15  Every time that they send money or -- or they would -- we --
16  - I would have to sign something to release the money.
17    Q.  Right.
18    A.  There's a promissory note, and then there's a
19  schedule in an -- in an Excel spreadsheet.
20    Q.  Right.
21    A.  And we would --  If you look at the promissory
22  note, there are factors involved where I don't exceed
23  ratio, they caledl it some sort of an attrition ratio.  So
24  17 percent or 17 times - multiples they called it so we
25  wouldn't -- we wouldn't exceed.  So all the line of credit

Page 66

1  was there within the agreed capitalization.  So if I had
2  50,000 in residuals, then I would only be capped to borrow
3  this much, which is agreed on, and vice versa.  They would
4  have to review each borrow -- each promissory note, and
5  they go through their risk factors, and they approve.
6     Q.  All right.  Who made the decisions -- I guess
7  you made the decision on when you wanted to borrow on that
8  multi-draw loan, correct?
9     A.  It was a mutual decision within the management
10  group because, again, these aren't just -- these aren't
11  just my individual customers.  You know, these are
12  salespeople.  You know, these are a whole bunch of
13  salespeople.  Again, at one point, we had 10 -- close to 15
14  salespeople.  So the managing member would -- the -- the
15  main crew would decide hey, is this a good time to sell,
16  and -- and get back, and reinvest.
17    Q.  But you were the only one that was personally
18  obligated on those amounts, correct, that you borrowed from
19  Priority?
20    A.  Yes.
21    Q.  Okay.  So ultimately, it was your call whether
22  you wanted to incur any additional debt to Priority,
23  correct?
24    A.  Theoretic -- theoretically so.  But again, when
25  we made these decisions to sell, it was a group decision

Page 67

1  not just an individual decision.  But at the end of the
2  day, would I be -- I would be -- I would have to sign the
3  paperwork in order for them to release the -- the money.
4     Q.  Right.  And I'm not talking about the residual
5  purchase agreements.  I'm talking about the -- the multi-
6  draw loan.  How did you determine what amount you needed
7  when you -- when you asked for a draw?
8     A.  Well, KB would tell me what we would be short of
9  for that month.  And -- and generally, we were down about
10  40 to $50,000 in payroll or expenses that he would tell me.
11  And we would have to depend on the multi-draw loan to pay
12  out our operating expenses.  So we would say max -- that
13  would be the max, and then he would tell me hey, this is
14  how much we need to do a -- do a multi-draw on.
15        MR. ROUNTREE:  Are you finished with your
16  response?
17        THE WITNESS:  Yes.
18        MR. ROUNTREE:  All right.  Let's take a quick
19  break.
20        MR. MICHELL:  Okay.
21        (Whereupon, a recess was taken.)
22  BY MR. MICHELL:  (Resuming)
23    Q.  Will you clip those back together and put them in
24  that pile so they don't get lost?  I don't have any more
25  questions about that.

Page 68

1     A.  (Witness complies with request of Counsel.)
2     Q.  That's all one -- and put the --  Yeah, here.
3  Let me do that just so it's in order.  Thanks.  The
4  individual employees at Solim, were they also the same
5  employees at Secom?
6     A.  No.
7     Q.  Did any -- did they have any common employees?
8     A.  No, Secom had its own employees.
9     Q.  Okay.
10    A.  I think they had four or five.
11    Q.  And then, how about -- what is it -- PPS Business
12  Solution, LLC, is that the same employees as Solim?
13    A.  No.
14    Q.  Completely different?
15    A.  Yeah, it's a -- it's a completely different
16  company.  We were trying to venture into grow -- or we were
17  trying to grow.
18    Q.  Trying to grow what, the merchant --
19    A.  Merchant basis.
20    Q.  -- portfolio?
21    A.  Yeah, because generally we -- we're -- we're in
22  the business of service, you know.  Our specialty is being
23  able to provide services who -- for Korean community who
24  speak Korean -- who doesn't speak English as their first
25  language, and these are business owners.  So we thought we

17 (Pages 65 to 68)

Page 69

1  understood the nature of service a little better, and
2  that's what we started looking for. We started looking for
3  a company that we could learn, and grow network and IT
4  work, you know, running wires and stuff like that. And at
5  the same time the -- It's funny that you -- you had
6  provided that. I actually had a loss of remembrance of
7  when and the time of when the money was pulled out. You
8  know, Priority has -- has 100 percent understanding of
9  exactly what I was doing with the borrowed money. Priority
10  has -- with, you know, with the management crew at
11  Priority, we've communicated -- I actually had a pretty
12  decent relationship with George, and Duayne, and John. You
13  have to remember, you know, I was a -- I was a pretty
14  growing company for them. I don't know how big I was for
15  them or how beneficial or profitable I was for them. But I
16  was invited to six, seven salesmen of the year from every
17  year since I was with Priority. And I had a very close
18  relationship -- not -- not a personal relationship but a
19  business relationship as far as exactly what I was doing
20  and what I was gearing towards. They were not looking for
21  conventional independent sales organizations. We -- we
22  explained to them what our specialties were, these were the
23  ways that we were growing. So any money that was given
24  outside of a contract, you know, the document terms, they
25  had a complete understanding of how I was going to grow.

Page 70

1  And they helped me by pointing me in the right direction as
2  well. They were great mentors in the industry. And the
3  draw seems abnormal to them at times, but they understood
4  that we were growing, and the portfolio was growing. And
5  that's why they continued to borrow and were okay with this
6  large sum of money being -- coming in and being invested.
7  They visited our office every three months. When we were
8  at the Duluth office, I'd invite them over. Let them know
9  what's going on, what venture that we were venturing into.
10  You know, we were -- we weren't just -- we weren't just a
11  credit card company. We were getting into POS systems,
12  hardware, the terminals. We were getting into outside
13  labor running wires, and they thought it was a unique idea.
14  And I -- I would presume that that is probably one of the
15  reasons that they were able to set a pretty high -- the
16  draw limit and a risk -- a pretty flexible risk factor.
17  And there was never a time that Priority ever has said no
18  to the communication when I needed to draw or sell.
19  Because I felt like we mutually understood the direction
20  that we were going in. And maybe that was the -- not a
21  conventional independent sales organization relationship,
22  but more of, hey, these guys are doing POS. And, you know,
23  you guys are in Alpharetta. We're in Duluth. We're 15
24  minutes away. They came into our office, and they saw what
25  was going on. And they were pretty psyched up about it at

Page 71

1  the time.
2      Q.  And the office you're talking about is Solim's
3  office?
4      A.  Yeah, Solim's office.
5      Q.  And where was that?
6      A.  That's in Duluth, the Park Village. So that's
7  Park Village...
8      Q.  Do you remember the address?
9      A.  Well, it's here in one of these --
10      Q.  The lease?
11      A.  Yeah, the lease. Yeah.
12      Q.  Okay.
13      A.  The one that we were --
14      Q.  This one?
15      A.  (Witness reviews document.) No, that's not it.
16      Q.  There's only --
17      A.  Well, if you need the address, it's right here
18  (indicating). I -- I saw it.
19      Q.  What's that, 2550 Pleasant Hill Road, Suite 424;
20  is that where Solim was?
21      A.  Uh-huh (affirmative).
22      Q.  And that's where PPS Business Solution is now?
23      A.  No.
24      Q.  That was where PPS Business Solution was --
25      A.  Was, yes.

Page 72

1      Q.  -- until the lease was terminated?
2      A.  Yes.
3      Q.  Did you run any other businesses out of that
4  space?
5      A.  No.
6      Q.  Okay.
7      MR. MICHELL:  Will you mark that?
8      THE WITNESS:  I'm sorry, can I take a bathroom
9  break? I just -- I think I had too much water.
10      MR. MICHELL:  Sure. We can take that up when you
11  get back.
12          (Whereupon, a recess was taken.)
13          (Whereupon, the court reporter
14          marked Creditor's Exhibit
15          No. 7 for identification.)
16  BY MR. MICHELL:  (Resuming)
17      Q.  Let me show you what has been marked as Exhibit
18  7. Do you recognize that document?
19      A.  Yes.
20      Q.  What is it?
21      A.  It's a lease.
22      Q.  Will you look at the two tabbed pages I tabbed
23  for you and just tell me if that's your signature?
24      A.  (Witness reviews document.) Yes.
25      Q.  On page -- What is the page at the bottom there?

18 (Pages 69 to 72)

Page 73

1    A.  Yes.
2    Q.  Let me see if --
3    A.  But I don't --  Can I make a statement?  I don't
4  know if that is the actual lease because -- or actual final
5  draft of the lease because KB was a joint signer, so I am
6  not sure if that is like a draft -- the first draft or the
7  second draft that went back and forth.
8    Q.  Okay.
9    A.  Yeah.
10    Q.  So page 18 and 29 you looked at, those are the
11  tabbed pages, that is your signature on this lease,
12  correct?
13    A.  I believe that.
14    Q.  And this is a lease between you and Park Village
15  Shopping Center, that's the landlord; is that correct?
16    A.  Yes.
17    Q.  And it says you are doing business and the trade
18  name.  What is the trade name there?
19    A.  (Witness reviews document.)
20    Q.  I think I can help you get there, I believe.
21  Trade name right there.
22    A.  PPS Card Service.
23    Q.  Right.  And this was --  In the lease it says it
24  starts when, in 2015 sometime?
25    A.  September 1, yes.

Page 74

1    Q.  Okay.
2    A.  I think that is about when we moved in.
3    Q.  Okay.  And when --  Who is we?
4    A.  KB myself and at that time I think it was Susan
5  and a couple of other guys.
6    Q.  So we is the business, the process -- the ISO
7  business of yours?
8    A.  Yes.
9    Q.  Solim, is that the business?
10    A.  Yes.
11    Q.  Okay.  PPS Card Service is just the trade name of
12  Solim?
13    A.  Yes.
14    Q.  Okay.
15    A.  At the time.  At the time because -- because we
16  wanted to use -- because we were an ISO of Priority Payment
17  System, so PPS, Priority Payment System.  That's why we
18  used the name PPS.
19    Q.  Okay.
20    A.  Because we were representing PPS, so I thought it
21  had a pretty good flow.
22    Q.  So you signed the documents with Priority,
23  correct?
24    A.  Yes.
25    Q.  And so you were obligated for the monies borrowed

Page 75

1  from Priority, correct?
2    A.  Absolutely, yes.
3    Q.  And you signed the lease in your own name,
4  correct?
5    A.  Yes.
6    Q.  Again, a lease that Solim used for its business,
7  correct?
8    A.  Correct.
9    Q.  And all of the money from Priority went into a
10  bank account in the name of Solim, correct?
11    A.  Correct.
12    Q.  But you didn't receive any compensation for that?
13    A.  You mean pay?
14    Q.  Pay.
15    A.  No.
16    Q.  Okay.  So from 2014 to present, you never
17  received any payment?
18    A.  No.
19    Q.  From Solim or anybody at Solim?
20    A.  No.  Because again, I am repeating myself,
21  anything that has produced money was spent back to the
22  business.  So no check was written to me.  No check was
23  written to myself to go out and spend, no money was
24  transferred into my personal bank account which I didn't
25  have.  So no compensation was given to me directly.  It was

Page 76

1  all spent for the business growth.
2    Q.  So how did you live?  How did you eat?  How did
3  you pay rent?
4    A.  Again, basic utility KB took care of.  Basic
5  utilities, rent and stuff like that.  I was never into
6  buying a house.  I was never into buying a car.  It was
7  just all expenses and just day-to-day food and allowances
8  and gas.  It was all involved with business because I
9  traveled so much all the time.
10    Q.  So Solim paid some of those expenses for you?
11    A.  Correct, correct.
12    Q.  And that's how you lived?
13    A.  That's how I lived.
14    Q.  That's how you paid for everything?
15    A.  For everything.  For everything that -- that --
16  my expenses was Solim, it was paid straight out of Solim.
17    Q.  Did you have a credit card?
18    A.  No.
19    Q.  Do you have a credit card now?
20    A.  No.
21    Q.  You have never had a credit card?
22    A.  I think up until probably 2002, 2003.
23    Q.  Is the last time you had a credit card?
24    A.  Yeah.
25    Q.  So Solim didn't have to pay any credit card bills

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 77

1  for you?
2      A.  No.  I have had a credit card in 20 years.
3      Q.  How about a car?
4      A.  Card?
5      Q.  Car, automobile?
6      A.  Again, we had a company vehicle that was allowed
7  to me, so we used that.  I had a personal car that was
8  worth about $3,000.  It got in an accident.  After that,
9  you know, I started working with KB.  And after that we
10  bought a business car, so we used that from then up until
11  2019.
12      Q.  So Solim did pay for a business car, automobile
13  for you?
14      A.  Yes, yes.
15      Q.  What about cell phone?
16      A.  Everybody had a company cell phone.
17      Q.  It was in the name of Solim?
18      A.  Yeah.
19      Q.  Did you have one or more than one?
20      A.  Just one.
21      Q.  Is that still true today?
22      A.  Well, nobody is paying for it now because, you
23  know, there's nobody in the business anymore.
24      Q.  Solim is no longer?
25      A.  No.

Page 78

1      Q.  And the other one -- the other bank account we
2  looked at, PPS?
3      A.  That's no longer either.
4      Q.  So currently what are you doing?  Let me get the
5  name right, sorry.  PPS Business Solution, LLC, that is no
6  longer in business?
7      A.  No.
8      Q.  Okay.  Do you currently have a job?
9      A.  No.
10      Q.  Do you currently have any income?
11      A.  No.  I haven't worked since I think back in 2000
12  -- right when -- right when Corona started, when all the
13  stuff started.
14      Q.  The first part of 2020?
15      A.  I want to say so.  December 2019.  I helped out -
16  - I helped out at friends' and relatives' businesses.
17  There are a lot of businesses that Koreans and the Asian
18  community are opening and closing.  So, again, my specialty
19  is translating, helping them with their permits and
20  licenses and interpreting and translating and stuff like
21  that.  So they would help me out here and there.
22      Q.  Meaning they would pay you some?
23      A.  Yeah, they would pay me a thousand cash, 500
24  there.  And I'm blessed to have a lot of people surrounding
25  me that helps me out.

Page 79

1      Q.  How about KB; did he get paid anything by Solim,
2  a salary?
3      A.  I would believe so because, again, he took in his
4  residuals, you know, whatever account he made or
5  capitalization to residual reports that he's got.  He
6  probably paid himself throughout -- through Solim, LLC.
7      Q.  And that kind of management group that you
8  mentioned earlier, let me see the individuals' names?
9      A.  Chris, Jaden, KB, Susan, myself.
10      Q.  Right.  Were you the only one that wasn't paid
11  anything out of the group?
12      A.  Yes, they were all on salary.
13      Q.  All of the rest of them were on salary?
14      A.  Yeah.  Initially we contributed -- everybody
15  contributed to make the business grow.  That was up until -
16  - that was up until Priority agreed to give us a line of
17  credit.  And that is when things started to work better.
18  Afshin (ph), which is, I guess, I don't know if he is now,
19  but the president of Priority at the time, we shared how we
20  were going to grow and that gave us a lot of breathing room
21  to grow.
22      MR. MICHELL:  Let's mark that as 8.
23          (Whereupon, the court reporter
24          marked Creditor's Exhibit
25          No. 8 for identification.)

Page 80

1  BY MR. MICHELL:  (Resuming)
2      Q.  Take a look at what has been marked as Exhibit 8.
3  These were questions that Priority asked you in the lawsuit
4  that Priority filed against you in Fulton County.
5      A.  Okay.  This was back last year?
6      Q.  Yeah.  Take a look at the very last page and tell
7  me if that is your signature on the page that says
8  verification.
9      A.  Yes.
10      Q.  All right.  So I want to look at a couple of the
11  questions here.  Look at number one.  It is on page 3 if
12  you will.  And it says, "Identify any person answering or
13  assisting in the preparation of the answers to these
14  interrogatories."  Do you see that?
15      A.  Uh-huh (affirmative).
16      Q.  It says, "Chan Kim.  Gabe Lee, who is Mr. Kim's
17  translator and the undersigned counsel."  Do you know the
18  name Gabe Lee?
19      A.  Yes.
20      Q.  Do you require a translator?
21      A.  I don't think this was meant to be a translator.
22  You know, I don't know all these legal terms.  It's a
23  little hard for me to understand the questions.
24      Q.  So he's not your translator?
25      A.  No, he's a friend.  He's not my translator.

Page 81

1        MR. ROUNTREE:  Could you clarify whether you are
2    talking about oral or written?  Because some people
3    are fluent speaking a language, but not reading and
4    writing it.
5    BY MR. MICHELL:  (Resuming)
6        Q.  I'm not limiting it.  Does Mr. Lee have to
7    translate anything for you?
8        A.  No.  He help me understand some of these
9    questions, like even here movant review.  I don't know what
10   that word is, so it takes me a little time looking at the
11   dictionary to find out what the questions are.
12       Q.  Is he a lawyer?
13       A.  No, he is not.
14       Q.  You said he's a friend.  Do y'all work together?
15       A.  No.  He has -- he's helped me out throughout my
16   years, even with residual contracts.  I personally have a
17   little bit of hard time looking at documents and trying to
18   understand the questions.  And I don't want to blame that
19   to answering anything wrongly, but I try to have the best
20   understanding.  There are a lot of wordings here that I
21   just definition wise that I simply don't understand.  So a
22   lot of times, I'd have to look at the dictionary to
23   identify the question.  And he was helpful enough to kind
24   of run me through.  He's a firstborn, so it's a lot easier
25   for me to talk to him in English.  He does not speak Korean

Page 82

1    fluently.
2        Q.  Okay.  Did Mr. Gabe Lee work at Solim at all?
3        A.  Yes.
4        Q.  Okay.
5        A.  I think he worked the better part of 2019 about
6    six months.  He's in the Reserves.  He's in the Reserves,
7    the military, so he left to go serve overseas.
8        Q.  Did he work with you at Secom?
9        A.  No.
10       Q.  Did he work with you at PPS, whatever Solim
11   became?
12       A.  Yeah, well, he worked at Solim.  He worked at
13   Solim.  He has been a lifelong friend.  So whenever I am
14   shorthanded or just running errands if I need help, he is a
15   big help.
16       Q.  Are you still able to login to the Priority
17   Payment account and see the merchants?
18       A.  No.  I haven't done that since -- I haven't
19   logged in since I would say in about a -- almost 18, 19
20   months.  The last login was I think maybe at the end of
21   2019.
22       Q.  Did Mr. Lee have the ability, Gabe Lee have the
23   ability to login to that?
24       A.  No.
25       Q.  If you will look at question 12 it, is on page 6.

Page 83

1    "Identify all entities that you have or have had an
2    ownership interest in, percentage of interest you have and
3    the position or job held by you and each identified for the
4    past three years;" do you see that?
5        A.  Uh-huh (affirmative).
6        Q.  And if you flip over, your answer.  There are
7    some objections, but it states you are the chief executive
8    officer and sole shareholder of Secom Inc.; is that
9    correct?
10       A.  Which line are you referring to here?
11       Q.  It is kind of third from the bottom right above
12   the number 13.
13       A.  Right here, okay.
14       Q.  Do you see that?
15       A.  Okay.
16       Q.  So you were the chief executive officer and sole
17   shareholder of Secom?
18       A.  Yeah, for the better part of 2019.
19       Q.  It further states you are an independent
20   contractor consultant for Solim, PPS Business Solution, LLC
21   at SecomUSA, LLC; is that correct?
22       A.  I don't think that is correct here.  Solim, LLC
23   obviously I was involved with.  PPS Business Solution, LLC
24   I was involved in.  SecomUSA, LLC I was not involved with.
25   But I think what it meant to say was Secom, Inc. and then

Page 84

1    somehow it was miss --
2        Q.  You think that should be Secom, Inc.?
3        A.  Yeah, I believe so.
4        Q.  Okay.  And it says that you were paid commissions
5    or a percentage of the entity's profits; do you see that?
6        A.  Yes.
7        Q.  Is that true?
8        A.  In --
9        MR. ROUNTREE:  I'm going to object to the form,
10   but you can answer.
11   BY THE WITNESS:  (Resuming)
12       A.  Well, compensation based on again on the cars for
13   me to have a car to drive and they paid for my gas and my
14   food as I traveled, and cell phones, you know, just day-to-
15   day utilities and the bills, the basic bills that need to
16   be covered for me to live, to travel, yes.
17       Q.  We are talking about Solim?
18       A.  Solim, yes.
19       Q.  How about PPS Business Solution?
20       A.  And PPS business Solution.
21       Q.  Same arrangement?
22       A.  Same arrangement.
23       Q.  What about Secom?
24       A.  Secom, Inc. just never fruited.  You know, there
25   was no money in, money out.

21 (Pages 81 to 84)

8/31/2021

Page 85

1    Q.  So you never paid anything in connection with
2    Secom?
3    A.  No, absolutely not.
4    Q.  Okay.
5    A.  Yeah.
6    Q.  And they didn't pay any your expenses either?
7    A.  No.  At the time Solim and PPS were still going,
8    you know, we were still operating.  Secom was just a
9    venture -- one of the ventures that we thought was a great
10   idea.  And I ended up losing a lot of money and a lot of
11   friends.  But Secom, Inc. has never -- it just never
12   produced any money to do anything with.
13   Q.  Okay.
14   A.  It was always a minus.
15   Q.  Okay.  In your --  Did you receive a 1099 from
16   Solim?
17   A.  Yes.
18   Q.  Okay.  Did you receive a K-1?
19   A.  I don't know what a K-1 is.
20   Q.  Or did you receive a W-2?
21   A.  No.
22   Q.  Just a 1099?
23   A.  Yes.
24   Q.  And you received one every year?
25   A.  Yes.  I believe so.

Page 86

1    Q.  Okay.  And the same thing, did you receive a 1099
2    from PPS business solution?
3    A.  I don't think so.
4    Q.  So just Solim?
5    A.  I don't think so.  John wasn't as knowledgeable
6    as KB with this.  And Susan was a point of contact, too,
7    and she left after Corona or all this happened, so I don't
8    think PPS Business Solution provided a 1099.
9    Q.  Okay.  And you referred to when all of this stuff
10   happened.  What do you mean when you said that?
11   A.  What do you mean?
12   Q.  You just said she left when all this stuff
13   happened.  And I'm asking what were you referring to when
14   you said all this stuff happened?
15   A.  The end of 2018/'19 was very, very tough for us
16   because a lot of salespeople left in groups, and they
17   decided to form another company.
18   Q.  What company is that?
19   A.  I don't know.
20   Q.  Oh.
21   A.  I don't know.  You know, we were the better part
22   of 50 people and then we were down to 8 within the short
23   period of eight months.
24   Q.  What period is that?  I'm sorry again.
25   A.  Do you mean the year and the date?

Page 87

1    Q.  Yeah.
2    A.  Two thousand --  I think it kind of started 2018
3    to the beginning part of 2020, 2019.  Right before all the
4    Corona and stuff like that started.
5    Q.  Okay.
6    A.  I was traveling a lot trying to create new
7    customers or maintaining service.  And we had a group of
8    employees that, you know, there were maybe four or five or
9    six of us that were really close that were -- kind of
10   treated each other as far as operations goes.  But there
11   was a group of people that had better ambitions for
12   themselves.  So I had -- we had a group of people leave.
13   And I thought it was just a, you know, just a departure
14   and, you know, little you know one by one everyone started
15   leaving and they went out and created their workforce.  A
16   couple of guys started a local company, based on what they
17   learned from us, a couple of guys started POS companies.  A
18   group of salespeople, a pretty significant group of
19   salespeople went out and formed their company to produce
20   their own -- you know, people are like that sometimes.  But
21   that's what happened.  when I referred to all this
22   happening, 2018/2019, when I was more out traveling and
23   doing shows and stuff like that, they kind of created their
24   own cliques and had their own agenda and went out and did
25   their own thing.  And I was naïve to think.  I was naïve

Page 88

1    because when I came back, there were a lot of people --  Or
2    when I went back and forth, a lot of people had decided to
3    leave without any notification or --  And you know, these
4    are independent contractors.  They are free to go anytime
5    they want to.
6    Q.  They're salespeople?
7    A.  There were salespeople and technicians, you know,
8    service technicians.  I think we were reduced --  At one
9    point, I mean, the peak of our -- everything -- when
10   everything was going on we had 48 people in that little
11   office there.  And within eight months, I think we shrunk
12   down to seven over the end of 2018.  The majority of this
13   happened in 2019.  So --  And that's why I keep on
14   referring to when all this happened and when it all started
15   to fall apart a little bit.
16   Q.  Okay.  All right.  So as an independent
17   contractor with Solim, other than train sales reps, what
18   else did you do for the company?
19   A.  Customer service, technical support.  I am not
20   too tech savvy with computers, but over the years I was
21   able to learn how to service the customers.  You know, 100
22   percent of the time nowadays when I started, it was just a
23   credit card terminal.  And now there is integration with
24   DoorDash and Uber and software online ordering.  Again, I'm
25   not tech savvy, but there were a few people who spoke

22 (Pages 85 to 88)

Page 89

```
 1   English fluently.  So I did a lot of training with, like,
 2   DoorDash when it started coming around the corner.  Because
 3   we always had to re-invent new technologies to our clients.
 4   And I don't want to keep saying our community as if they
 5   have more needs, they don't, but they still do need someone
 6   who helped them understand in the language terms how to
 7   utilize the new technologies.  So to answer to your
 8   question, it was training inside and outside, the
 9   customers, too, our mutual clients with Priority.  Priority
10   just provided credit card services front and back end, I
11   understood that.  But you still have to manage equipment.
12   The better part of -- When I first started, it was just
13   all, you know, just old-fashioned terminals.  I think by
14   the end of 2019, half of our clients were on the computer
15   system.  So there was a lot of stuff that we had to learn,
16   a lot of stuff we had to learn first and be able translate
17   that be able to translate that into Korean in manuals.  I'm
18   not great at writing stuff, but I would still within Korean
19   manuals and stuff like that help them, gave them a quick
20   manual guide.  2018 and '19 was a pretty tough year because
21   when all of this technology stuff was coming out, and I
22   occupied a lot of time learning.  Because the core business
23   is, again, credit card.  But at the same time, if you lose
24   the POS side, it is easy to lose a customer because they
25   kind of go together.  So 2019, we started looking into
```

Page 90

```
 1   creating our own POS software at one point.  And that is
 2   where we invested a lot of people.  And that's why we grew
 3   so fast.  We contracted a lot of people that knew how to
 4   write codes and systems and so forth.  And you know, those
 5   are the people that didn't last long, but that took a lot
 6   of our expenses.  Not took, but that cost us a lot of
 7   expenses.  Because payroll alone had 50 or 30 or 40 people.
 8   It is not even close to equal to what we get or receive
 9   through a mutual relationship with Priority.  So we looked
10   at -- we looked at the money that needed to be there, and
11   we looked at how long, we looked at the value of the
12   portfolio that was there.  We discussed it with the
13   management team at Priority and, again, going back to the
14   same story.  So 2018/'19 is when we ventured out and
15   nothing worked out.  Really nothing worked out.  Nothing
16   was fruited, nothing was coming around the corner.  I think
17   not to blame, but I think that's probably one of the
18   reasons a lot of people left is because they just didn't
19   see a vision, a concrete agenda because we were trying to
20   do too much.
21       Q.  You talked about the sales reps.  What about the
22   residuals?  Do you know how much residuals you were being
23   paid by Priority in 2018 and 2019?
24       A.  Other than what KB tells me maybe towards the end
25   of the year, no.  Because again, if there was a huge
```

Page 91

```
 1   profit, then definitely I would look at it.  But we knew we
 2   were borrowing to survive, to maintain this, you know,
 3   workforce.  So I did not have a huge interest in how much
 4   was coming in.  I had a rough estimate, a rough idea.
 5       Q.  Like what was your rough idea of what was coming
 6   in?
 7       A.  Well, in the credit card industry you generally
 8   calculate about $70-$80 income per account.  And there is a
 9   schedule A.  And schedule A is a flash report of one's
10   transactions.
11
12       Q.  Right.
13       A.  So there are a lot of numbers involved, but on a
14   simple basis it's very simple.  You know, a certain
15   customer will produce this much volume.  And we generate
16   how much average income would be.  And then you constantly
17   negotiate that with Priority.  Because Priority is not my
18   employer.  They are just a -- you know, they're a partner.
19   They give me money to grow or, you know, which we mutually
20   agreed on.  So they fund us money to grow and, you know,
21   there's a portfolio.  It always goes to --  You know, Greg
22   I don't know if you know the credit card --  It always goes
23   to them first and then they calculate all the residuals.
24       Q.  Right.  So what was your ballpark of what the
25   residuals were?
```

Page 92

```
 1       A.  I want is a $75-$80,000.
 2       Q.  A month?
 3       A.  Yeah.  At the peak of our business, I think we
 4   had 850, somewhere around there.  But, you know, after the
 5   draw started, it was hard to calculate because, again,
 6   there was loans.
 7       Q.  The loans were being paid out of the residuals?
 8       A.  Yeah, the residuals.  So loans would -- the loans
 9   would be paid first and then the difference would come.  So
10   they would hold a pool of the money and I would know --  So
11   the residual that's deposited, unless you go into the
12   report on a daily -- on a monthly basis, it is very hard to
13   tell because you have a lump sum, but you, know, have a
14   loan that is being withdrawn every month.
15       Q.  Right?
16       A.  So the transaction was basically loan would be
17   drawn every month.  And then whatever is left over of the
18   residual, they would cushion it and say, hey, you know
19   what, you could borrow this much against whatever you have.
20   So it forces us to grow in order for us to be afloat, if
21   that explains anything.
22       Q.  Yes.  So 75 to 80,000 per month is what you think
23   the residuals were?
24       A.  Yes.
25       Q.  Okay.
```

Metro Atlanta Reporters, Inc.
770-985-2344

Page 93

```
 1        MR. MICHELL:  Let's mark that.  This is just the
 2    Petition.  Do you want a copy of it?
 3        MR. ROUNTREE:  Sure.
 4            (Whereupon, the court reporter
 5            marked Creditor's Exhibit
 6            No. 9 for identification.)
 7    BY MR. MICHELL:  (Resuming)
 8        Q.  Do you recognize this?  I guess there's really
 9    two documents.  There's a notice on the front and then
10    there's a Voluntary Petition.  They are clipped together
11    there so you can see them.
12        A.  Okay.
13        Q.  On the front it shows your address 6257 Clapham
14    Lane.  That is still where you live?
15        A.  Yes.
16        Q.  Okay.  I think you had said that.  Have you seen
17    this document before?  Did you review it; do you know?
18        A.  Well, I think this is a different format.
19        Q.  Okay.
20        A.  Just on a quick glimpse, I think these are the
21    questions when I petitioned for this.
22        Q.  For bankruptcy?
23        A.  Yeah.
24        Q.  Okay.  All right.  If you will turn to page 6.
25    On the bottom right-hand corner you can see the page
```

Page 94

```
 1    numbers?
 2        A.  (Witness complies with request of Counsel.)
 3    Okay, I'm there.
 4        Q.  You see down there for you, the first line down
 5    by the signature; "I've examined this Petition and I
 6    declare under penalty of perjury that the information
 7    provided is true and correct."  Do you see that?
 8        A.  Yes.
 9        Q.  If you go down to right above the signature, it
10    says, "I understand making a false statement, concealing
11    property, obtaining money or property by fraud in
12    connection with the bankruptcy case can result in fines of
13    up to 250,000 or imprisonment of up to 25 years or both;"
14    do you see that?
15        A.  Yes.
16        Q.  Okay.  Turn to page official form 107.  It is a
17    couple of pages later you will see it.  One, two.
18        A.  Page 8?
19        Q.  It says page 1 at the bottom, actually.
20        A.  Yeah, right here.
21        Q.  Do you see that?
22        A.  It says, "Statement of financial affairs for
23    individual filing for bankruptcy"?
24        Q.  Yes.
25        A.  Okay.
```

Page 95

```
 1        Q.  Down there it says from January 1 of the current
 2    year until the date you filed bankruptcy, which I guess was
 3    April 1st that your gross income was $10,000.  Do you see
 4    that?
 5        A.  Uh-huh (affirmative).
 6        Q.  Is that correct?
 7        A.  Yes.
 8        Q.  Where did that income come from?
 9        A.  Well, again, referral network, you know, 10 -- or
10    referral commission.
11        Q.  From who?
12        A.  From vendors such as BTJ Wings, A Town Wings.
13        Q.  They paid you a commission?
14        A.  Yeah, I did menu work for them.
15        Q.  Menu?
16        A.  It's a QSR.  It's a deli.  I would go in and help
17    them set up menus, like digital menus like what is behind
18    you, you know, and organize them.  So combo one, combo two,
19    combo three, combo four, and pricing.
20        Q.  Uh-huh (affirmative).
21        A.  And at times I would get $800 or $500.  And if I
22    find them an employee, right now these days it is hard to
23    find employees, and especially who speaks both languages,
24    I'll find them, they'll give me $800 here and there, $500
25    here or there.  I think I probably did at 10 or 12.
```

Page 96

```
 1        Q.  All for those two places?
 2        A.  There were a few more.  They were referrals.  And
 3    then I did IT work for their houses.
 4        Q.  The owners houses?
 5        A.  The owners houses, running wires when they buy a
 6    new house.
 7        Q.  Who are the owners of those two places?
 8        A.  His English name is Jake, one of the owners,
 9    Jake.
10        Q.  The owner of which one?
11        A.  A Town.
12        Q.  What is Jake's last name?
13        A.  I don't know.  And Mr. Moon is BTJ Wings.
14        Q.  And how did they pay you, by check?
15        A.  Cash.
16        Q.  Cash only?
17        A.  Yeah.
18        Q.  Okay.
19        A.  Since I don't have a bank account, it takes a
20    little -- it takes a percentile if I cash a check, so they
21    generally just pay me cash.
22        Q.  And you just keep the cash in your home?
23        A.  Well, you know, I spend it for -- Now that I --
24    The common expenses are covered, so gas, food.
25        Q.  Those are covered?
```

24  (Pages 93 to 96)

8/31/2021

Page 97

1      A.  That is what I would use the money on.
2      Q.  The $10,000 cash?
3      A.  Yeah.  It's not $10,000 exactly, I don't think,
4   but it would be very close to be about $10,000, so I would
5   use that for gas.
6          MR. ROUNTREE:  We always have to estimate on that
7      question there's not been a tax return filed.
8   BY THE WITNESS:  (Resuming)
9      A.  So prepaid phones, $50 here and there, and just
10  on daily expenses; gas, food, presents, so forth.
11     Q.  Do you still have a company car from Solim?
12     A.  No, I don't.
13     Q.  So how do you get around?
14     A.  I've been borrowing a friend's car for the past
15  six months.  The better -- better part of 2020, I didn't
16  really go out much until probably about May.  I had a lot
17  of friends who got Covid, so I had to quarantine and do a
18  whole bunch of stuff.  But for six months, I've been
19  borrowing a car from a friend.
20     Q.  What is the friend's name?
21     A.  Jin, Jin An.
22     Q.  A-h-n?
23     A.  A-n.
24     Q.  A-n?
25     A.  Yes.

Page 98

1      Q.  And what's the first name?
2      A.  Jin, J-i-n.
3      Q.  Jin An, all right.
4      A.  It was easy because it was -- you know, he had
5   the car paid for.
6      Q.  Would you flip over to the next page?
7      A.  (Witness complies with request of Counsel.)
8   Okay.
9      Q.  In 2020 you have $40,000 and in 2019 $40,000.
10     A.  Uh-huh (affirmative).
11     Q.  Where did that income come from?
12     A.  That would be Solim, and I would say PPS Business
13  Solution.
14     Q.  Okay.  That's the value of the bills they paid
15  for you?
16     A.  I would say so, because they would -- they would
17  have at least paid at least $3500 in utilities and the cars
18  and stuff like that that they were able to provide for me,
19  so I would consider that as an income.  Partial of that
20  came from Solim and after Solim was dissolved and KB left,
21  it came from PPS Business Solutions.
22     Q.  Right.  So that was all payment of your expenses
23  is your recollection?
24     A.  Yes, yes.
25     Q.  And that's your estimate of what those expenses

Page 99

1   were?
2      A.  Yes.
3      Q.  Okay.  Did you go through your bills to try and
4   confirm that, or are you just doing that off the top of
5   your head?
6      A.  Just as long as, you know, it was there that I
7   would understand it would be paid for.
8      Q.  And you think you received a 1099 from Solim or
9   PPS for --
10     A.  I want to say 2019 would be there, but 2020
11  wouldn't be.  PPS Business Solution, I don't know if they
12  filed 1099, I'd have to double check.  Or 2020 I would have
13  to double check.
14     Q.  But at this point you have filed your tax return
15  for the 2019 year, for the year of 2019; is that correct?
16     A.  I believe so.  But, you know, we did all the
17  bank finances, KB filed everything on my behalf.
18     Q.  Okay.
19     A.  So again, if you -- I'm pretty sure the
20  accountant at the time that he hired to use, they would
21  have all the information as well.
22         MR. MICHELL:  Will, you said you have some tax
23     returns?
24         MR. ROUNTREE:  I don't recall offhand what I have
25     or don't have, but I can certainly check right now.

Page 100

1          MR. MICHELL:  I thought you mentioned you had
2      some earlier, but I haven't seen any and you haven't
3      either, have you?  Okay.
4          MR. ROUNTREE:  I don't think I specifically said
5      that, you know, we do or we don't.  If I did, I didn't
6      mean, too.
7          MR. MICHELL:  I thought you said you produced
8      them to the Trustee?
9          MR. ROUNTREE:  Well, that's normally what we do
10     in the ordinary course.
11         MR. MICHELL:  Gotcha.
12         MR. ROUNTREE:  I don't specifically remember what
13     we would've produced.
14         MR. MICHELL:  Okay.
15         MR. ROUNTREE:  I'm almost positive we produced
16     some tax returns to the Trustee; I just don't know
17     what years they were for.
18         MR. MICHELL:  Maybe when we take a break --
19         MR. ROUNTREE:  That's literally a two-minute
20     question for my paralegal.
21         MR. MICHELL:  Okay.  Yeah, will you since we're
22     here, just check?
23         MR. ROUNTREE:  Yeah, sure.
24         MR. MICHELL:  Thanks.
25         (Whereupon, a recess was taken.)

25 (Pages 97 to 100)

8/31/2021

1     (Whereupon, the court reporter
2     marked Creditor's Exhibit
3     No. 10 for identification.)
4  BY MR. MICHELL: (Resuming)
5     Q.  Let me show you what has been marked as Exhibit
6  10.  Do you recognize that document?
7     A.  Yes.
8     Q.  What is it?
9     A.  It is a tax filing, I believe, 1040.
10    Q.  Is it your personal tax filing?
11    A.  Yes.
12    Q.  For the year 2020?
13    A.  Yes.
14    Q.  Did you prepare that yourself?
15    A.  Yes.
16    Q.  Is that the one you filed?
17    A.  Yes.
18    Q.  Do you know when you filed it?  I can't tell.
19    A.  I think it was June.
20    Q.  June of --
21    A.  This year.
22    Q.  This year?
23    A.  Yes.
24    Q.  Okay.
25    A.  I can get you an exact date if I need you.  I'm

1  not sure if it states an exact date.
2     Q.  Right.  And did you prepare your 2019 tax return
3  as well?
4     A.  No, I didn't.
5     Q.  Who prepared it?
6     A.  I believe 2019 was KB.
7     Q.  Okay.
8     A.  Yeah.
9     Q.  But 2020 was you.  I noticed on the first it
10 gives your home address as 2875 Berkeley Lake Road,
11 Northwest, Duluth Georgia; is that correct?
12    A.  No, it's not.
13    Q.  Okay.
14    A.  I think it might have been because it had prefix.
15    Q.  Is that your prior address?
16    A.  No, it's not.
17    Q.  Okay.
18    A.  What was the address again?  I think it was just
19 filled out incorrectly.
20    Q.  Do you recognize that address, 2875 Berkeley
21 Lake?
22    A.  I believe it is -- it's one of my old employee's
23 office addresses.  Sometimes when I didn't have the mails,
24 I had to -- When we closed the PPS Business Solution, I had
25 to forward all of our utility mail to an address, so I

1  think that is what the address is for.
2     Q.  You have to forward all of PPS Business
3  Solution's bills to an address?
4     A.  Yeah, because we had late utilities, like gas
5  bills and stuff like that.  And I didn't have a concrete
6  address then.  So I had it forwarded to a couple of
7  different addresses just to make sure that I get it and
8  that we were able to pay for it.
9     Q.  Were those bills in your name?
10    A.  I had a car insurance that -- that no one was
11 paying anymore after Solim.  I had car insurance and I
12 think I my son's Peach -- Peach Care forwarded to the old
13 address that I had to transfer to.  I think there was
14 another bill that I paid that we owed on.  It was a vendor
15 payment from a company called LTS.  We did some purchases
16 through them.
17    Q.  Solim did?
18    A.  Solim did, yes.  And we have to receive the last
19 bill after we left the previous address.
20    Q.  So you gave them this former employee's address?
21    A.  Yeah, because I just didn't have a concrete
22 mailing address.  I did not have a home then.  So that and
23 I had some stuff forwarded online, so instead of address.
24 So all of the mailing stuff I had to get it temporarily for
25 about three or four months.

1     Q.  All right.  What was the employee's name that
2  lived at 2875 North Berkeley Lake?
3     A.  Sam.  Or Jin, J-i-n.  Jin An.
4     Q.  Jin An lives there?
5     A.  Yes.
6     Q.  In looking at the Voluntary Petition right where
7  we were where it asked for the --
8     A.  What page?
9     Q.  The same one we left off on, page 2 at the bottom
10 is what it says, where it shows your gross income for the
11 year 2020.
12    A.  Okay.  This one?
13       MR. ROUNTREE:  He's talking about the statement
14 of financial affairs.  I assume he's going to be
15 asking you about question number 2.  You could just
16 look on mine.
17 BY MR. MICHELL: (Resuming)
18    Q.  It says $40,000 is the gross income that you had
19 for the year 2020, correct?
20    A.  Uh-huh (affirmative).
21       MR. ROUNTREE:  You are asking over here, 2020?
22       MR. MICHELL:  2020, yes.
23 BY MR. MICHELL: (Resuming)
24    Q.  2020, do you see that, $40,000?
25    A.  Yes.

26 (Pages 101 to 104)

Page 105

1    Q.  When I look at your tax return, which is Exhibit
2    10, it says income of twelve five; is that correct?
3    A.  Uh-huh (affirmative).
4        MR. ROUNTREE:  I think he just testified the tax
5    return was filed after we filed the schedules, so we
6    were estimating at the time.
7    BY MR. MICHELL:  (Resuming)
8    Q.  Gotcha.  So the 40,000 was incorrect is what
9    you're saying?
10   A.  Yeah.  Well, 40,000 is incorrect.
11   Q.  That was your estimate?
12   A.  Yeah.  Because I filed after we went over this.
13   Q.  Okay.  And where did you get that twelve five
14   figure from?
15   A.  Well, that was what -- Well, I paid in rent
16   because obviously I took in cash payments, so --
17   Q.  I'm sorry.  You took in cash payments for work
18   you did?  A.  Yeah.
19   Q.  Okay, go ahead.
20   A.  I wasn't sure because none of this is invoiced,
21   so they will pay me a lump sum of money.  So I wasn't able
22   to calculate.  But what I was able to calculate was the
23   months that I had to pay for partial of a rent.  And I
24   tried to retrack back to my expenses.  Because obviously
25   that's --

Page 106

1    Q.  That's how you figured out your income?
2    A.  That would equal to the income that I received
3    for that year.  So I looked at what I have paid for my
4    son's, you know, some of his school supplies and the rent
5    that I gave to -- partial rent I gave to a roommate or
6    friend, and then that's how I got the calculation to here.
7    When I -- My assumption is that when we calculated this,
8    when I used to work for Solim, the average expenses came
9    out to about 3,500, somewhere around there.
10   Q.  Your average expenses?
11   A.  For cars and gas and stuff like that.  So we just
12   multiplied it by 12 because that would be the expense.  And
13   that is what I would wrote here assuming that would
14   generally be my income.
15   Q.  Gotcha.
16   A.  Based on what I normally spent and what my
17   expenses were.
18   Q.  On the twelve five, there is no paper showing you
19   getting paid on this amount.  The twelve five shown on
20   Exhibit 10 is you retroactively looking back at your
21   expenses and trying to determine how much you paid in
22   expenses?
23   A.  Yes, yes.  Because that would be equal to the
24   income that I collected for that year.
25   Q.  Okay.  Let's go back to your Voluntary Petition.

Page 107

1    Turn to the next page.  Keep turning, turn one more.  Where
2    are we off?  Where it shows page 3 at the bottom.
3    A.  (Witness complies with request of Counsel.)
4    Q.  If you hand it to me, I can get to it and we can
5    stay on the same page together.  It shows -- Identifying
6    legal actions, it shows the Priority Payments lawsuit and
7    then it also shows the Park Village Shopping Center.  That
8    second lawsuit, was that a suit over the lease?
9    A.  Yeah.
10   Q.  They sued you over the lease, the landlord did?
11   A.  Yeah, 'cause we were back -- I think we were
12   back six, almost eight months.
13   Q.  In arrears on rent?
14   A.  Yes.
15   Q.  How was that resolved?
16   A.  They didn't have any choice.  You know, they're
17   down the street, so we walked over and said, hey, we are
18   not able to pay, we concluded the business.  And everybody
19   knew in our community that we were done.  So instead of
20   going to the County and going through all of that, I just
21   said, we are not able to pay and blissfully they were able
22   to, you know, just conclude it.
23   Q.  So the landlord dismissed this lawsuit?
24   A.  Yeah, they dismissed it, but I think initially
25   there were two or three months' deposit that we made

Page 108

1    according to the lease agreement.  Because you know how
2    sometimes you have to make a deposit to go in.
3    Q.  Yes.
4    A.  I think with that and just using that instead of
5    getting the money back, they used that towards the
6    settlement to the conclusion of the lease.  Thankfully, it
7    just somehow worked out.
8    Q.  You didn't have to pay any additional money?
9    A.  No, not to them.
10   Q.  And Solim didn't have pay any money to them?
11   A.  No, not to my knowledge.
12   Q.  Not that you are aware of?
13   A.  No.  This was one of the larger payments.  Our
14   rent was quite a bit, so it racked up because we weren't
15   able to pay for about seven months, six or seven months, I
16   believe.
17   Q.  It says Kim, et al.  Who all did they sue you
18   other than you; do you know?
19   A.  Well, KB was on the lease.  I mean, the lease --
20   the Park Village lease we saw earlier, I don't think that's
21   the original or the actual copy.  I think it may just be
22   just a draft and then we ended up revising it a little bit,
23   the cost on a monthly basis.  And then we added Kevin's
24   name to it.
25   Q.  So he was sued as well is what your recollection

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 109

1  is?
2      A. I don't think he's aware. Well, he wasn't -- I
3  don't know the term of sue. They sent -- They gave us a
4  letter saying that we are going to take you to court if you
5  don't pay.
6      Q. Okay.
7      A. So -- And you know, the office is a couple of
8  doors down where we used to be, their main office. So we
9  just walked over and we talked to them and let them know we
10 didn't have any money.
11     Q. Right. This question is asking you to identify
12 if you were a party in a lawsuit. And you have identified
13 a Park Village Shopping Center versus Kim in the Superior
14 Court of Gwinnett County. So that indicates to me that an
15 actual lawsuit was filed?
16     A. Okay.
17     Q. Do you not recall whether a lawsuit was filed?
18     A. You know, at the time I couldn't tell the
19 difference between just a notification letter versus if it
20 was filed. It might be easy for you guys, but it's hard
21 for us to tell. So I didn't realize it at the time if it
22 was a scare tactic, hey, we are going to go to the County.
23     Q. Okay.
24     A. When we were reviewing this and writing this, I
25 tried to think back to any legal document we ever received

Page 110

1  from any legal. And in my lifetime, it was, you know,
2  Priority Payment System and Park Village.
3      Q. Were you represented by an attorney in this
4  lawsuit?
5      A. No.
6      Q. Did you sign some sort of settlement agreement in
7  this lawsuit?
8      A. Yeah.
9      Q. Do you have a copy of that settlement agreement?
10     A. No, I don't. I think it was just what they call
11 some sort of resolution.
12     Q. Whatever the document is called, do you have a
13 copy of it?
14     A. I believe I could get it.
15     Q. Would you, please?
16     A. Yeah. And they are located at the same location.
17     Q. Flip to the next page, please, page 4. And it
18 says on part seven number 16 there, --
19     A. Okay.
20     Q. -- that you paid $4,662 to Rountree Leitman
21 Klein, I guess your attorney --
22     A. Uh-huh (affirmative).
23     Q. -- for this matter?
24     A. Uh-huh (affirmative).
25     Q. Was that in cash?

Page 111

1      A. Here, yes.
2      Q. Here?
3      A. Yes.
4      Q. Here?
5      A. Yes.
6      Q. So that is about half of all the money you made
7  for the first four months?
8      A. Yes.
9      Q. Keep flipping to page 6, please, or you can look
10 up top. Maybe it's easiest to look up there. Go to the
11 next page, page 13 of 48, let's do that. Maybe that will
12 keep us on track. Down at the bottom part 11 question 27
13 it's talking about Secom. And we talked a little bit about
14 this, but I wanted to make sure. Your recollection is that
15 you paid about $135,000, or that was the agreed upon price
16 for Secom, 135?
17     A. Yeah. But even -- Yeah, yeah.
18     Q. Although it was not entirely paid, correct?
19     A. Yeah, it was partially paid. You know, the
20 physical money. We didn't write them a check. They had a
21 lot of debt that they had. And the agreement was that we
22 cover his debt and pay for his debt so he could stay
23 afloat. Because we agreed if I didn't step in or if
24 anybody didn't step in and pay for his bills, that business
25 was going to flop. So we paid in return, we paid off his

Page 112

1  partial debt he had with vendors.
2      Q. We being Solim?
3      A. Solim, yeah.
4      Q. So that money came out of a Solim account?
5      A. Yeah. And every transaction would be in that
6  bank statement, anything paid out.
7      Q. All right. And I think you testified that there
8  were some documents documenting that transaction, or at
9  least one; is that right?
10     A. Yes, there would be.
11     Q. And agreement?
12     A. There's an agreement and there's every
13 transaction that has been paid to Secom, Inc.'s debt or
14 bill.
15     Q. Okay.
16     A. So there would be both.
17     Q. And down below here it says name of accountant or
18 bookkeeper Shun Kim.
19     A. Uh-huh (affirmative).
20     Q. Is that correct, Shun Kim?
21     A. You know, obviously, I didn't type this, but it
22 should be, you know, Chan Kim.
23     Q. That should be Chan Kim?
24     A. Yeah. A lot of times if someone is not familiar
25 with Korean or Asian names, they mishear or misspell.

28 (Pages 109 to 112)

Metro Atlanta Reporters, Inc.
770-985-2344

Page 113

1    Q.  And it's requesting, I think, the name of the
2  accountant or bookkeeper; is that right?
3    A.  Yeah.
4    Q.  So you were the accountant or bookkeeper for
5  Secom?
6    A.  Yes.
7    Q.  Okay.
8    A.  Because it was pretty straightforward.  It wasn't
9  producing money.  It was losing.  So Secom, Inc. was pretty
10  straightforward and easy.
11    Q.  I forget, I apologize.  Do you have financial
12  records for Secom like that, balance statements, tax
13  returns?
14    A.  Well, if you notice the date -- if you notice the
15  date, I think I may have 2019.  I think we were able to do
16  2019.  Because -- because the EIN -- the tax ID number
17  stayed the same.
18    Q.  After you purchased it?
19    A.  Yeah, after, you know, all the way from the get-
20  go.
21    Q.  Gotcha.
22    A.  So EIN was registered to Jae Hong Kim, which was
23  the original owners.  So from my recollection, we weren't
24  able to amend to do a filing, so -- but, you know, the old
25  owner stayed on for about a year.

Page 114

1    Q.  Is that Jae Hong Kim?
2    A.  Jae Hong Kim, yeah.  He stayed on for I'd say
3  about eight months, he stayed on.  So we agreed that we
4  would just keep -- we would do 2019 under his name and then
5  he files, since there was no income.  So he filed for 2019.
6    Q.  He filed a tax return?
7    A.  A tax return for 2019.
8    Q.  Okay.
9    A.  Because again, EIN stayed the same.  The only
10  thing that was changed was just an agreement letter saying
11  that I took over ownership and the bank account stayed the
12  same.  And then oddly enough, he did bookkeeping as well,
13  you know.  Because the bank account stayed the same all the
14  way to the end.
15    Q.  So it kept the same bank account?
16    A.  It kept the same the same bank account.  And at
17  one point, you know, we were going -- 'Cause it wasn't
18  producing profit.  It wasn't producing any income.  So we
19  just kept it the same.  And even though it says -- This is
20  probably when the corporation dissolved, but the company
21  itself stopped probably, you know, functioning or working
22  February, about a month before COVID.
23    Q.  Okay.
24    A.  From and to might -- from and to is basically
25  when I took over and then when the Corporation was

Page 115

1  dissolved.  But the operation itself actually stopped about
2  four months after, or four months before the dissolving
3  date.
4    Q.  Did it operate out of the same space as Solim?
5    A.  No.
6    Q.  It had a separate address?
7    A.  It had a separate address.
8    Q.  And the financial records for that company, do
9  you have then, Secom?
10    A.  I don't.  But if we needed it, we would be able
11  to get it.
12    Q.  How about bank statements for that company?
13    A.  I can't get a hold of the owner because he is in
14  Korea.
15    Q.  Jae Hong is?
16    A.  Yeah.  But if we were able to subpoena the
17  account, then yes.  We produced about four months of what I
18  had, four or five months.
19    MR. ROUNTREE:  I think we produced some of it.
20  BY THE WITNESS:  (Resuming)
21    A.  We produced six months of the statements that I
22  had.
23    Q.  Of payroll records?
24    A.  No, no; bank statements.
25    Q.  For?

Page 116

1    A.  Secom, Inc.
2    MR. MICHELL:  I haven't seen those.
3    MS. HONG:  I haven't either.
4  BY MR. MICHELL:  (Resuming)
5    Q.  The only bank statements I've received are from
6  Solim.
7    A.  I had four or five months and that was the most I
8  had, so I forwarded it.  But it might have been -- Since I
9  was very late in getting this paper out to you, I'm pretty
10  sure I could get it and give it to you guys.
11    Q.  Yes, please.  Whatever financial records or
12  statements you can get from Secom, I would like to see.
13    A.  Okay.  I will try to contact Jae Hong Kim to see
14  if he could get it.
15    Q.  But you believe he's in Korea?
16    A.  Well, we did not leave on the best of terms.
17    Q.  Okay.
18    A.  But I don't mind calling saying, hey, I need it.
19  And if he's got access to it, I don't see any reason why he
20  wouldn't.
21    Q.  How about KB; when he left Solim, did y'all leave
22  on good terms?
23    A.  Yeah, I mean, pretty decent because we worked
24  with each other for a little bit.  You know, he's a pretty
25  smart guy.

29 (Pages 113 to 116)

8/31/2021

Page 117

1    Q.  Okay.
2    A.  But we knew that our time was ending.  He had a
3  baby, and his wife became ill a little bit, so he wanted to
4  take some time off from whatever we were doing.
5    Q.  Y'all didn't split up because of some
6  disagreement or problem?
7    A.  No.  He didn't like me.  He didn't like the way
8  things were going.  He thought we were going too fast, so
9  there were a lot of business disagreements, obviously.  But
10  did we leave on terms where we are not able to communicate?
11  No.  I called him the other day to get -- I mean, he
12  provided the bank statements that he had.  I'm pretty sure
13  he is very willing because as far as accounting and
14  financial stuff goes, I should know in coincidence what was
15  going on, but he knows 95 percent of what was going on as
16  far as moneywise, accounting.
17    Q.  Did y'all use -- did Solim use a QuickBooks
18  accounting or something like that, do you know, some
19  accounting software?
20    A.  No, just Excel.
21    Q.  Spreadsheet?
22    A.  Yeah, or a spreadsheet.
23    Q.  Do you have any version of that spreadsheet?
24    A.  No, I don't.
25    Q.  But you know that one exists?

Page 118

1    A.  If he hasn't -- Well, it took him about three
2  weeks to retrieve this.
3    Q.  Meaning the bank account statements?
4    A.  Bank account statements, he had to go dig it up.
5  And it took him a little while.  And he's working full-
6  time.  I think he's running a restaurant.  So it took him a
7  little while to get these bank documents.  So if he's got
8  it, then I'm pretty sure he would be able to provide it.
9  If not, then I wouldn't have one.
10    Q.  Okay.  If you flip again I think looking up top
11  is the way for us to go.
12    A.  Yeah.
13    Q.  Go to 18 of 48.
14    A.  Okay.
15    Q.  Number 33 there asks if you have any claims
16  against third parties, whether or not you have filed a
17  lawsuit or made a demand, and it says, yes, you have claims
18  against Kwang Lim for business torts.  Is that KB?
19    A.  That's KB, yes.
20    Q.  What claims do you have against KB?
21    A.  Me against KB or KB against me?
22    Q.  This is asking you --
23    MR. ROUNTREE:  This is asking if you had claims,
24  potential claims against him.
25  BY THE WITNESS:  (Resuming)

Page 119

1    A.  Oh, he owed some money from before.  It was, I
2  think, some refund that we were supposed to get from our --
3  from a vendor.
4    Q.  Okay, let's break that down for me.  So KB owed
5  you money?
6    A.  No, he -- Well, since Solim was his bank account
7  or, you know, his account, we would purchase -- we would do
8  an order.  So let's say we order 100 of something and 10
9  becomes defective, we return it.  Since it was prepaid with
10  -- with the 10 being warped, sometimes we would send it out
11  and we would get money back after three or four months.
12    Q.  Back into the Solim account?
13    A.  Yeah.  But after Solim closed, there's no way for
14  anybody to do a refund.
15    Q.  Okay.
16    A.  So that's where we -- At one point we did a lot
17  of transaction with the vendors, you know, purchasing
18  security cameras and hard drives and computer parts.  And
19  then we would pack up -- we would pack up -- We would only
20  do a return, it's called an RMA, once a month.  So if any
21  defect of devices come together, then we would just ship it
22  out at once.  And then it takes about two or three months
23  for us to get the money back because of a defect, but even
24  though it's prepaid.  So if Solim's bank account is closed,
25  then there's no way for us to get the money back from him.

Page 120

1  So what we decided to do was is since they had to put the
2  money back into the original account, --
3    Q.  They?
4    A.  The vendor.
5    Q.  The vendor?
6    A.  Yeah, the vendor.
7    Q.  Okay.
8    A.  So let's say a computer broke it's a thousand
9  bucks, and then we send it out.  We are owed a thousand
10  bucks, but they could only put the money back into the same
11  account.
12    Q.  Okay.
13    A.  So what we decided to do since Solim closed, they
14  would send him out a check.  Then he would get it, and he
15  would hold onto it.  And that's the money -- Essentially
16  that is Solim's money, but he was a signer, an
17  accountholder, he would get it because he was the only
18  person who was able to draw money out or deposit.
19    Q.  Okay.
20    A.  And it racked up quite a bit because it racked up
21  close to about seven to $8,000 at one point.
22    Q.  Seventy thousand?
23    A.  Seven to 8,000.
24    Q.  Seven to 8,000?
25    A.  Yeah, seven to 8,000.

30 (Pages 117 to 120)

8/31/2021

Page 121

1    Q.  But why would you be owed it, because my
2  understanding from you before is you didn't get paid
3  anything by Solim?
4        A.  I didn't say owed to me, to Solim because it was
5  an operating expense.  Because we did operating together at
6  the time, so it's not his property for him to do because
7  he's never received that merchandise.  So at one point we
8  had a dispute, but we settled it.  Again, since Solim is
9  closed, you know, it's his money.  And I'm not able to cash
10  that check anyway, and he's not willing to cash the check.
11  So we settled it, hey, no big deal.  Just let's go ahead
12  and forget about it because it only came out to be about
13  seven to $8,000, because we assumed it was going to be a
14  very larger amount, the return rate.  But it ended up being
15  not as significant as we thought it was.  So both of us
16  gave us maybe three or four months to clear things out, any
17  returns or any money owed or any invoices that needed to be
18  paid.  We gave ourselves three months' leeway to meet and
19  communicate and see what's owed.  And in between -- in that
20  time, I think there was quite a bit of friction,
21  misunderstanding because I wanted him to stay on a little
22  longer to help to sort this out, whereas he just one day
23  closed the account.  And we weren't able to, you know, --
24  Now that Solim was closed, we weren't able to get the
25  vendor money back or any refunds.

Page 122

1        Q.  So do you believe now as we sit here that you
2  have a claim against KB?
3        A.  No, I don't.
4        Q.  Not for any business tort or otherwise?
5        A.  No, I don't.
6        Q.  Did any money change hands between you two over
7  this to resolve whatever your dispute was?
8        A.  No, we had dinner and just talked it out.  No
9  transaction was made.
10       MR. MICHELL:  Let's take a break.
11       (Whereupon, a recess was taken.)
12  BY MR. MICHELL:  (Resuming)
13       Q.  I wanted to follow up.  You said you did not have
14  a credit card, and I think you testified you were on the
15  road a lot.  How did you pay for things when you were on
16  the road?  Did you pay only cash?
17       A.  Most of the time.
18       Q.  For hotel rooms, food, anything like that you
19  just paid cash?
20       A.  It's rare that I stayed overnight.  When I do,
21  it's with a crew.  These are daily trips, leave in the
22  morning.  It's just not worthwhile to stay overnight
23  because it's just service work.
24       Q.  Gotcha, I see.  So you were just driving to a
25  location doing service work and then coming back?

Page 123

1        A.  Yeah, and we would attend shows, like beauty
2  supply shows and restaurant conventions, or POS shows,
3  technology shows.
4        Q.  These weren't all in Georgia, they were --
5        A.  95 percent of them are in Georgia.  Some were in
6  San Francisco, but that was once in eight years.
7        Q.  Okay.  And we had talked about KB; that I guess
8  you felt like he had owed you some money, but y'all had a
9  dinner and resolved that; is that correct?
10       A.  Yeah, we had a talk.  We had a talk.  Because
11  after eight years or almost seven years of working
12  together, there are some details that we needed to sort out
13  that we didn't think we had a chance to.
14       Q.  But you were able to get those resolved?
15       A.  With him, yes.
16       Q.  If you turn to page 25 of 48 looking up top
17  again?
18       A.  (Witness complies with request of Counsel.)
19       Q.  Well, I guess maybe where we ought to start is
20  turn back to 23.  This is creditors who have unsecured
21  claims.  And the first one listed there is Georgia
22  Department of Revenue, but the total claim is zero.  Do you
23  owe Georgia Department of Revenue any money?
24       A.  Well, I don't personally.
25       MR. ROUNTREE:  We always list them and the IRS as

Page 124

1  notice only in every case.
2        MR. MICHELL:  Gotcha.  That's why it's zero.
3  It's just so they can --
4        MR. ROUNTREE:  Right.
5        MR. MICHELL:  The same thing with IRS?
6        MR. ROUNTREE:  Just so in case they disagree they
7  can file a claim.
8        MR. MICHELL:  Gotcha.
9  BY MR. MICHELL:  (Resuming)
10       Q.  How about Jung Lee Yu?
11       A.  That's my ex-wife.  It's just actually
12  misspelled.  Jung Hee Yu.
13       Q.  H-e-e?
14       A.  Uh-huh (affirmative).
15       Q.  It lists zero also, but you listed her to notify
16  her that you were filing for bankruptcy?
17       A.  Yes.
18       MR. ROUNTREE:  Same thing with anyone to whom
19  domestic support obligations are owed.
20  BY MR. MICHELL:  (Resuming)
21       Q.  You have domestic support obligations through a
22  divorce decree?
23       A.  No.
24       Q.  Oh, just an agreement?
25       A.  It was just a mutual divorce.

31 (Pages 121 to 124)

Page 125

1    Q.  So you are not required to pay her any specific
2  money, but you do?
3    A.  Well, this year I paid her --
4    MR. ROUNTREE:  Let me object to the extent that
5  calls for legal conclusion.  I think he required, but
6  I'll let him answer.
7  BY THE WITNESS:  (Resuming)
8    A.  We separated on good terms.  Her parents are
9  financially well-off, so we are in agreement that she
10  raises, you know, my son.  So, you know, I help out just
11  for school supplies here and there, but other than that,
12  there's no --
13    Q.  There's no specific amount you pay each month?
14    A.  No, I don't.
15    Q.  The agreement you are talking about is just a
16  verbal agreement you have with her, and an understanding
17  that you would help out?
18    A.  Yeah, help out.  School supplies, you know, just
19  very minor, everyday stuff.
20    Q.  So as a creditor here, you list, I assume Kwang
21  Bin Lim, is that KB?
22    A.  Yes.
23    Q.  You list $150,000.  Do you owe him $150,000?
24    A.  At his departure, we agreed that there's got to
25  be some sort of worth for him to help build a company and

Page 126

1  service levels and stuff like that.  So we agreed that I
2  would pay roughly about five to -- depending on the month,
3  five to $7,000 for him to stay on.  But again, through the
4  talk, we were able to settle it and there's no financial
5  obligation to him anymore.
6    MR. ROUNTREE:  Did you finish responding?
7    THE WITNESS:  Yes.
8    MR. ROUNTREE:  To the extent it helps, let me
9  just say that a lot of these claims, including that
10  one, were scheduled as disputed.  I just didn't know
11  if you noticed that.
12    MR. MICHELL:  Gotcha.
13  BY THE WITNESS:  (Resuming)
14    A.  I did not want to not disclose any financial or
15  money obligations that --
16    Q.  I understand.
17    A.  -- will come up.
18    Q.  Thank you.  Gotcha.  I want to make sure I
19  understand your answer is that when he left, and he left
20  sometime in March of 2019?
21    A.  Somewhere around there, or a little earlier.
22    Q.  You and he agreed that you would pay him some
23  money?
24    A.  $150,000.
25    Q.  150?

Page 127

1    A.  Yeah, but it was not a lump sum.  It was over the
2  course of -- I think it was about 15 to 18 months.
3    Q.  And you did pay him some of that 150,000?
4    A.  Through -- Again, there was that refund that
5  went to him.
6    Q.  The refund, yes.
7    A.  That was partial of this.  And as business just
8  was not producing any money, and he had just started his
9  restaurant company, so he was pulling in, so we agreed
10  this is going to be gone.  I'm not in any position to pay
11  you financially, so we agreed that everything would be
12  settled.
13    Q.  Okay.  So that was also resolved at this same
14  dinner you had with him?
15    A.  Not a specific dinner.  But just as a metaphor,
16  we had a talk, and everything was settled.
17    Q.  I see, okay.
18    A.  So there's no financial obligation to him.
19    Q.  Okay, to that 150,000?
20    A.  Yes.
21    Q.  And when -- I mean, did you come to this
22  agreement with him; do you recall?
23    A.  He stayed on for about six months just to help
24  out.
25    Q.  In 2019?

Page 128

1    A.  Yeah.  He comes and goes, or if I have any
2  questions or any of the office.  So official is the date he
3  opened the restaurant.  So I would say mid or towards the
4  end of 2019.
5    Q.  Was when you and he had this talk and resolved
6  it?
7    A.  Yes, and he kind of helped out because he knew we
8  were going through some tough times.
9    Q.  Okay.
10    A.  So it's not like a departure per se where he just
11  picked up and left, he wanted to make sure that the Solim
12  account that he oversaw it.  Essentially, he didn't really
13  -- I didn't know anything about paying bills or stuff like,
14  so he had to train Jong Lee, PPS Business Solution of how
15  things work.  He stayed on a good part of, I'd say three or
16  four months.
17    Q.  I'm really focused more on when you two agreed
18  that you had resolved your disputes than when he left.
19  Thanks for that testimony, but I'm really asking more about
20  when you resolved it.
21    A.  I would say October or November.
22    Q.  Of 2019?
23    A.  2019, yes.
24    Q.  Okay.  And then the next three listed are
25  priority payment Systems, 482,116, 564,328 and then $1

8/31/2021

Page 129

```
1    million; do you see that?  And I see that they are listed
2    as disputed.  How did you arrive at the numbers that you
3    put in here?
4        A.  It was a number given to me by Priority.
5        Q.  You asked Priority for the amounts owed?
6        A.  No, no.  It was presented at the -- at the first,
7    I don't know what that document is called.
8        Q.  Okay.  When Priority sent you a demand letter or
9    something?
10       A.  Yeah, the big docket that they sent.
11       Q.  I see.  But you took those numbers from something
12   that Priority sent you, either a demand letter or a
13   complaint; is that what you're saying?
14       A.  Yeah, it was a pretty thick document.  It showed
15   -- it had the numbers there.  This is bankruptcy, but prior
16   to this, there was another --
17       Q.  Lawsuit?
18       A.  Yeah, another lawsuit.  So we took that same
19   number that was presented to me by Priority.
20       Q.  Okay.
21       A.  And that is the number that is here.
22       Q.  Well, all three of these?
23       A.  Yeah.
24       Q.  Okay, all right.  And you list them as disputed.
25   And what is your dispute with those?  Do you disagree with
```

Page 130

```
1    the number?
2        A.  Well, only partly because it's been almost a year
3    after I stopped working that it was presented to me.  And I
4    haven't received any promissory note or balance, like an
5    invoice to say this is your balance.  So not to dispute the
6    exact number.  You know, there's no doubt that there's debt
7    there.  But not to say dispute or dispute the amount
8    because I can't confirm these numbers throughout my
9    research because I have no access to the balances or what
10   they presume that I owe.
11       Q.  Gotcha.  I see.  You're not disputing that
12   there's a debt; what you're saying is you can't confirm
13   that these numbers are accurate or not?
14       A.  Yes, yes.
15       Q.  Okay.
16           MR. MICHELL:  Let's mark that.
17           (Whereupon, the court reporter
18           marked Creditor's Exhibit
19           No. 11 for identification.)
20   BY MR. MICHELL:  (Resuming)
21       Q.  I am going to show you what has been marked as
22   Exhibit 11.
23       A.  Okay.
24       Q.  I just want to walk through these.
25       A.  Okay.
```

Page 131

```
1        Q.  Okay.  So the first one on top there is company
2    business name PPS Biz Solutions, LLC; do you see that?
3        A.  Uh-huh (affirmative).
4        Q.  It lists you as the registered agent?
5        A.  Uh-huh (affirmative).
6        Q.  And it shows that 2550 Pleasant Hill, Suite 424
7    address?
8        A.  Uh-huh (affirmative).
9        Q.  That's where -- that's the address that Solim
10   operated out of?
11       A.  Yes.
12       Q.  And this is different than the checks I have seen
13   which say PPS Business Solutions, correct?
14       A.  Uh-huh (affirmative).
15       Q.  So what is this entity?  It says computer office
16   machine repair and maintenance.  Is that a different
17   business you are involved in?
18       A.  No, it's not.  I think this is one of our
19   employees or one of our 1099s or independent.
20       Q.  Independent contractor?
21       A.  Yeah, contractor.  And he needed help with
22   calculating expenses because I saw the name right here off
23   the bat, Han Kim.
24       Q.  Who is Han Kim?
25       A.  He used to work at Solim.
```

Page 132

```
1        Q.  Okay.
2        A.  And he needed to do a corporation.  And I think
3    that is where he listed me as a registered agent.
4        Q.  Did you help him form this corporation?
5        A.  I gave him what to do because, you know, his
6    English is not perfect.  So a corporation is generally done
7    online, and I was able to look in on how to file and how to
8    set him up.  And it was pretty straightforward because you
9    have to login and register it and I helped him do that.
10       Q.  Okay.
11       A.  So that's when I realized what the name was.  It
12   sounded familiar and then I looked at the name as Hon Kim.
13       Q.  So you have no ownership interest in this
14   company?
15       A.  No, I don't.
16       Q.  You have no involvement with this company?
17       A.  No involvement.
18       Q.  Why did you list yourself as the registered
19   agent?
20       A.  I didn't do it personally.  I have never
21   registered any corporation.  But again, he might have, when
22   it was forming and when he was doing it online might have
23   just thought he needed my help and just registered agent
24   seems to be more of a point of contact.
25       Q.  So you are saying he did that, not you?
```

33 (Pages 129 to 132)

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 133

```
 1      A.  He did himself, yeah.
 2      Q.  Let's go to the next one.  This is SecomUSA, LLC.
 3      A.  Okay.
 4      Q.  And that is the same address 2550 Pleasant Hill
 5  Road, Suite 424, correct?
 6      A.  Yes.  This is the same case.  Everybody was
 7  independent and I'm pretty sure it's probably within a
 8  similar date or so.  But every individual wants to do a tax
 9  write-off.  A sole proprietorship is just not beneficial
10  for them to do a tax write-off.  So we did 50, 60,000 miles
11  of driving and gas and they wanted to -- you know, we
12  helped each other out as far as filing to help so that why
13  they could maximize the tax benefits.
14      Q.  So this is Alex Yoo's company?
15      A.  Yes, it is.
16      Q.  And he worked at Solim as a sales rep?
17      A.  Yes.
18      Q.  Okay.  And he -- For tax purposes, you're saying
19  he wanted to form an LLC?
20      A.  That's what I would presume, but I can't speak
21  for him.
22      Q.  You didn't have anything to do with him --
23      A.  No.
24      Q.  -- with this?
25      A.  No.  But again, it goes back to like PPS Business
```

Page 134

```
 1  Solutions.  There are probably other ones that maybe I
 2  wasn't listed as an agent, but we helped out for existing
 3  1099 employees.
 4      Q.  And you just allowed them to use the same office
 5  address?
 6      A.  Yeah, they do.  Because, again, their gathering -
 7  - everybody's gathering spot is our office, and that's
 8  where they work independently out of.  And there could be
 9  numerous other corporations maybe that was filed at that
10  address because they wanted to make sure it gets filed.
11  And they used the office address to file multiple
12  corporations.
13      Q.  And do you think there was a tax advantage for
14  forming a corporation like that?
15          MR. ROUNTREE:  Object to form.
16  BY THE WITNESS:  (Resuming)
17      A.  It was up to them, you know, it was up to them.
18  Again, just to clarify, I provided the space.
19      Q.  Meaning the physical office space?
20      A.  Yeah.  Everybody came in and they got their
21  duties and they left.  So none of these corporations was
22  ever filed by myself.
23      Q.  Okay.
24      A.  Whether they used Chan Kim or Alex Kim or Susan
25  Park or Jaden Jong as a registered agent, we are not tax
```

Page 135

```
 1  experts, and they are not either.  A lot of times they
 2  would maybe think this is a physical address owner or lease
 3  or something like that to use me or whomever they choose to
 4  use.
 5      Q.  Okay.
 6      A.  So I can't answer for some of these names they
 7  have created for themselves.
 8      Q.  Okay.
 9      A.  And if you need --
10      Q.  So you might not even be aware of the fact that
11  it exists?
12      A.  No.
13      Q.  So when you look on SecomUSA's Facebook page,
14  which is in there attached, if you flip through there's
15  just pictures from their Facebook page posted by a person
16  named Sam An?
17      A.  Uh-huh (affirmative).
18      Q.  Do you know Sam An?
19      A.  Uh-huh (affirmative).
20      Q.  Who is that?
21      A.  Well, he used to be an employee of Solim.
22      Q.  Was he a sales rep also?
23      A.  He was more of a technical support.
24      Q.  Okay.
25      A.  Yeah.
```

Page 136

```
 1          MR. ROUNTREE:  I see a lot of blank pages.
 2          MR. MICHELL:  Keep going.  For some reason when
 3      it printed off, that's what it did.  When you finally
 4      get to pictures, there's a bunch of them.
 5  BY THE WITNESS:  (Resuming)
 6      A.  Do you want me to look at a specific page?
 7      Q.  No, no.  I just wanted you to identify him.  It
 8  says SecomUSA, I guess it was security guards and patrol
 9  services.  Do you know anything about --
10      A.  That is what Secom, Inc. was.
11      Q.  Same thing.
12      A.  Yeah, same thing.  And Secom in short is security
13  and communication in Korea.
14      Q.  Okay.
15      A.  In Korean, Secom basically means it's monitoring
16  in that word.  It's security and communications short --
17  was short for security and communications.  So a lot of
18  times they will use the same name, Secom, Security and
19  Communication Mississippi, Secom Atlanta.  Secom LTS, stuff
20  like that.
21      Q.  Gotcha.  And that's generally the business of
22  security guards and patrols, as opposed to credit card --
23      A.  Well, if you say ADP, we know ADP is --
24      Q.  Right.
25      A.  A lot of Korean communities, you know, we would
```

34 (Pages 133 to 136)

Page 137

1  use a familiar term to let them know that's what we do.
2  Because we have done a lot of low voltage work. I wanted
3  to transition away from credit card.
4      Q. Okay.
5      A. That's where we invested a lot of money. You
6  know, you can see from these pictures, this is expensive
7  setups and stuff like that. That is where all the, I'd say
8  the money went.
9      Q. Gotcha. I want to make sure. So you were -- had
10 made a decision to transition away from credit card
11 processing and move into this space, and that's when you
12 acquired Secom?
13     A. Yeah, 2019.
14     Q. 2019?
15     A. Secom, Inc.
16     Q. This was formed in late 2019, so that kind of
17 fits in with that timeline.
18     A. Yeah. And you know, we found a lot of similar
19 Facebook pages, which I'm not a tech savvy guy. Facebook -
20 - A corporation or a business cannot make a Facebook to
21 advertise, so it has to be an individual. So Sam Yu, I
22 know I'm throwing a whole bunch of random names out there,
23 but Sam Yu or Sae Hon Kim, they have Facebook pages that
24 have friends, so we would utilize that to get it out there.
25     Q. Gotcha.

Page 138

1      A. Someone who's got a lot of following just to get
2  the name out there.
3      Q. Gotcha. So SecomUSA was really just Alex Yoo who
4  was selling for Secom, Inc.; he formed a separate company,
5  correct?
6      A. Correct.
7      Q. Okay. So let's turn to the next thing, that is
8  Secom, Inc.
9      A. Just to clarify, there might be a lot more
10 corporations existing, independent salespersons.
11     Q. Subagents of yours formed?
12     A. Yeah, have set up.
13     Q. Okay.
14     A. That I may not have any knowledge of. And I know
15 at least the part that by setting -- the corporation
16 setting it up, all they do is take five minutes online.
17 They would use me, whomever, KB or John Lee as a registered
18 agent.
19     Q. Okay.
20     A. So just to clarify.
21     Q. Okay. And so Secom, Inc., again at that same
22 address, the 2550 Pleasant Hill Road Suite 424, this is the
23 company that you acquired?
24     A. Secom, yes.
25     Q. All right. And it lists Alex, you as the CFO and

Page 139

1  you as the CEO and secretary there; is that correct?
2      A. Correct, which this particular corporation was
3  owned. And I'm pretty sure there was probably more filing
4  to this.
5      Q. If you keep flipping through, you can see.
6      A. If you see on the last page?
7      Q. Yes.
8      A. Jae Hong Kim, and that's the same person?
9      Q. That's the man you purchased it from?
10     A. Yeah, the person.
11     Q. And he's the one who started the company?
12     A. Yeah, yeah, yeah. And all we did was I believe
13 just -- whomever did this filing just changed the names to
14 remove Jae Hong Kim, because you could do all this online
15 as well.
16     Q. So when you bought it, he was no longer the
17 officer, you were?
18     A. Correct.
19     Q. And so was Alex Yoo?
20     A. Correct.
21     Q. Okay.
22     A. Registered agent, I believe.
23     Q. Well, on the first page it says Alex Yoo was the
24 CFO.
25     A. Okay. And the original address is on the very

Page 140

1  back page of this business. Because even though this was
2  filed at 2550, it was actually -- they had their own office
3  at -- This is -- I think this was him home address. But
4  Secom had his own address. They had their office, they had
5  their own warehouse, they had equipment there. So 2550 was
6  Solim. 25 Pleasant Hill Road was where Solim and all the
7  guys reported there. When we took over Secom, Inc., they
8  had an office, existing office. So employees of theirs
9  worked out of there.
10     Q. Okay. And Secom is no more?
11     A. Secom is no more.
12     Q. The next one is PPS Business Solution, LLC.
13     A. Uh-huh (affirmative).
14     Q. This again, lists you as a registered agent?
15     A. And this was under Jong Lee.
16     Q. Jong Lee is another Solim employee?
17     A. Well, he is the owner of PPS Business Solution
18 after Solim, LLC.
19     Q. Gotcha. He took the place of KB?
20     A. KB, yes.
21     Q. Okay. And your connection to PPS Business
22 Solution was?
23     A. I was in the same position. I was the acting
24 manager, trainer, technical support.
25     Q. You did the same thing as you --

Metro Atlanta Reporters, Inc.
770-985-2344

Page 141

1    A.  Same thing.  The only reason we did this is
2  because KB has left.
3    Q.  Okay.
4    A.  And Jong Lee came in to take his place.
5    Q.  Okay.  All right.  If you flip through and
6  continue, there are Facebook pages, too.  And there are
7  pictures -- And this is on the PPS Business Solutions
8  Facebook page.  They're posted by Sam An also?
9    A.  What page do you want me to look at?
10    Q.  If you flip through towards, I don't know, I
11  guess the middle of it, it looks to me to be many of the
12  exact same pictures.
13    A.  Okay.
14    Q.  That was something he did for Secom, Inc.?
15    A.  Yes.
16    Q.  Okay.
17    A.  This is -- this is work that we did.  So
18  basically what I did was I go out, I sell low voltage, you
19  know, running network cables, projects, referral,
20  contacting contractors to see who could get work.  And
21  everybody was -- everybody got a cut.  It was basically all
22  commission.  So if I did it, I got a lump sum of the money.
23  And then each individual technician, and that's why they
24  are 1099 employees because they have the file for their own
25  expenses, and they have to pay for their own gas, and they

Page 142

1  had to pay for everything.  Then that's probably one of the
2  reasons they wanted to form a corporation so that way they
3  are able to get a better tax benefit.
4    Q.  Okay.  The last one we have is Y Production, LLC.
5  This is, again, Alex Yoo?
6    A.  Okay.
7    Q.  Do you know anything about Y Production, LLC?
8    A.  I have no knowledge of Y Production, LLC.
9    Q.  If you will put those together and keep them
10  together and put them in your stack, I would appreciate it.
11    A.  Right here?
12    Q.  Yeah, with the 11 on it on top rather than have
13  them all individual.  Here, hand that to me and I'll sort
14  it out.
15      (Whereupon, the court reporter
16      marked Creditor's Exhibit
17      No. 12 for identification.)
18  BY MR. MICHELL:  (Resuming)
19    Q.  Take a look at Number 12, Exhibit 12.  I believe
20  these are the agreements that you signed with Priority
21  Payment Systems. We're going to take a look at them.
22    A.  Okay.
23    Q.  The first one, do you recognize?  It says client
24  office application.
25    A.  Yes.

Page 143

1    Q.  Okay.  And that address that it lists there under
2  home address, that Ashford Dunwoody Road Atlanta, Georgia,
3  was that an office address or was that a home address?
4    A.  That was a home address in Dunwoody.
5    Q.  Did you own that home?
6    A.  It was an apartment, it was a rent.
7    Q.  When I flip over to the next page, the programmer
8  installer is listed as Chris Choi.
9    A.  Uh-huh (affirmative).
10    Q.  And then customer service manager KB Lim.  Is
11  that the KB we've been talking about?
12    A.  Yes.
13    Q.  And down below it is dated 6/2 of '14, I believe.
14  Is that your signature?
15    A.  Yes.
16    Q.  Okay.  Does that seem right to you when you
17  applied at Priority in June of 2014?
18    A.  Yeah, I think we -- It took us a long time at
19  the time with Duayne.
20    Q.  Duayne Haskett?
21    A.  Duayne Haskett going back and forth.  So it
22  started like towards the end of 2013.
23    Q.  Okay.
24    A.  And then we came to this I think maybe June here.
25  And programmer at the time I think this is when Chris Suh,

Page 144

1  the owner of Solim, his last name was Choi, that is
2  probably why I wrote Choi.  That is about the time I met
3  him with KB.
4    Q.  Okay, all right.
5    A.  Just the correction of the name because this
6  would be the same person.
7    Q.  Rather than --  What should it be?
8    A.  Chris Suh, S-u-h.  KB and Chris is the organizer
9  for Solim.
10    Q.  Chris H?
11    A.  S-u-h.
12    Q.  S-u-h?
13    A.  Yeah.
14    Q.  Why does it --  Do you think someone just wrote
15  the name down wrong?
16    A.  I didn't know him at the time.  I knew KB first.
17    Q.  Gotcha.  Okay.  So if you continue on, here is
18  the actual agreement for processing services.  You see it
19  is dated June 2nd of 2014.
20    A.  Yes, sir.
21    Q.  And it lists an address down there of 5725 Buford
22  Highway, Number 2211 Doraville; do you see that?
23    A.  Uh-huh (affirmative).
24    Q.  Was that office address or home?
25    A.  That was an office address.  It was our first

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 145

1  office.
2    Q.  Solim's first office?
3    A.  Yes.
4    Q.  Okay.  All right.  Let's flip through.  So if you
5  go to the second to last page there, this is the --  The
6  client is Chan -- Chan Kim.  Is that right?  Are you on the
7  right page?  Flip one page before.  I think you are looking
8  at --  The very last page is Priority Payment System's
9  signature, right?  Oh, you have them --
10    A.  I have it --
11    Q.  Yeah, sorry.
12      MR. ROUNTREE:  Ours is different, I think.
13  BY MR. MICHELL:  (Resuming)
14    Q.  Well, you just --  There you go.  We're dealing
15  with the second document.  You can separate them and look
16  at them.
17    A.  I got it, they are stapled.  Yeah, John?
18    Q.  Yeah.  And then the page before, that's you?
19    A.  Yes.  This one?
20    Q.  Yes.
21    A.  That's me.
22    Q.  This was your agreement or initial agreement with
23  Priority to process?
24    A.  Yes.
25    Q.  All right.  Let's go to the next document.  Is it

Page 146

1  an amendment?
2    A.  Uh-huh (affirmative).
3    Q.  This was November 1st of 2014, right?  And flip
4  to the last page.  Is that your signature?
5    A.  That's me.
6    Q.  Okay.  But that's your signature?
7    A.  Yes.
8    Q.  Okay, Chan S. Kim.  Do you remember why you
9  amended the agreement for processing services?
10    A.  I can't remember, but I'm pretty sure -- I think
11  this was because right of first refusal.
12    Q.  Right.
13    A.  I remember that.
14    Q.  Well, if you look at the second whereas clause,
15  so it says, "Whereas, in consideration for and in
16  connection with the loan between Priority and client, the
17  parties wish to have client commit to minimum number of
18  merchant approvals per year;" do you see that?
19    A.  Oh, okay, now I remember.  They paid a signing
20  bonus.
21    Q.  Do you remember how much it was?
22    A.  I think it was $200 per account.
23    Q.  Okay.
24    A.  Or somewhere -- 150.  It was something low,
25  something low.  This was when we were starting out.  We had

Page 147

1  nothing, you know, we had nothing.  I didn't have any
2  money.  So I knew that some companies offered a signing
3  bonus, right?  So I asked Duayne if that was available to
4  us, and he said it would be okay.  But I think that is why
5  he had to amend from here, if I remember correctly.  And
6  those accounts were obligated to not cancel because, you
7  know, because they had already paid me for signing bonuses.
8    Q.  Gotcha.
9    A.  Yeah.
10    Q.  And it says client, meaning you, right?  You are
11  defined as client up there, Chan Kim, you commit to a
12  minimum number of new merchant approvals per year; do you
13  see that?
14    A.  Yes.
15    Q.  So you are going to provide a minimum number of
16  merchants?
17    A.  Yes.
18    Q.  Okay.  And if you go down under right of first
19  refusal, it says client shall not market or sell merchant
20  services or on behalf of any other party other than
21  Priority?
22    A.  Uh-huh (affirmative).
23    Q.  So that's you will only board merchants with
24  Priority; is that correct?
25    A.  Yeah, but if you --

Page 148

1    Q.  Is that what that means?
2    A.  Yeah.  But if you look at right of first refusal,
3  basically to my knowledge is there is a lot of times where
4  Priority only -- their acquiring bank was Wells Fargo at
5  the time, and First Data at the time.  So we come across a
6  customer say who is using a software A, now software A is
7  not designed to work with Wells Fargo and First Data.  So
8  at the time, I think it was either -- this was before
9  Afshin, but Duayne and somebody else.  I said, what if we
10  come across anybody --  Okay, I understand that I'm
11  exclusive with you, that's fine.
12    Q.  You have to offer it to Priority --
13    A.  First.
14    Q.  -- first?
15    A.  They have to refuse it because they can't --
16    Q.  Gotcha, and then you could take it elsewhere?
17    A.  Yeah, yeah.
18    Q.  And there were certain merchants Priority
19  wouldn't board I'm sure?
20    A.  High risk merchants, online websites, Tae Kwon
21  Do, Karate.  Something that is in -- Priority was a pretty
22  strict company and they didn't want to board somebody who
23  prepaid.
24    Q.  Gotcha.  So you had to offer it to them and if
25  they turned it down, you could take it somewhere else?

37 (Pages 145 to 148)

8/31/2021

Page 149

1    A.  Yes.  Which was fine with me.  It was a longer
2   process, but it was fine with me.
3    Q.  Where would you take other merchants if they
4   didn't board at Priority?  Where did you board them?
5    A.  We never did.  It was just not worth the while.
6    Q.  Gotcha.  So if Priority didn't want them, you
7   just didn't board them?
8    A.  Yeah, but luckily Priority merged with Cynergy
9   after -- pretty fast, I mean, within six or seven months.
10  So what Cynergy brought was TYSIS and other platforms, and
11  a lot of other opportunities.
12   Q.  So you could board merchants with Cynergy?
13   A.  Yeah, so June they were only Priority, Priority.
14  But I think maybe July, it was just literally after a
15  couple of months and there was a lot of delay in doing this
16  because they were doing this merger thing.  Duayne was out
17  of the picture pretty fast and a whole bunch of people
18  came.  I never had to take it to anywhere.  It's a big
19  process to set anything up because you would have to go
20  through all this documentation just to become a sales
21  agent.
22   Q.  Right.
23   A.  And I had to learn everything again in Korean,
24  customer service, the numbers and programming.  And it's
25  not an easy fix.

Page 150

1    Q.  Gotcha.  Did you board any merchants with Cynergy
2   after Priority passed on them?
3    A.  I think we -- Yeah.  No.  At one point they
4   turned around and integrated the system pretty fast.
5    Q.  Okay.
6    A.  This was nine years ago.  This wasn't time when
7   you create an account online, so -- and it was all fax
8   documentation.
9    Q.  Okay.
10   A.  So the transition, the merge, the system merged
11  between First Data and TYSIS, which is Cynergy --
12   Q.  Yes.
13   A.  -- were pretty fast so there was no confusion as
14  to -- And they would let us know if, hey, we're going to
15  decline at First Data, do you want to get them under
16  Cynergy.  But even then, I think it was just a handful of
17  accounts, maybe two or three at the most.
18   Q.  Okay.
19   A.  Because Cynergy was just way too complicated, and
20  they did not have Korean support.  That didn't have 24-hour
21  support, so it was very difficult, so we just stopped doing
22  Cynergy or doing TYSIS overall.
23   Q.  Okay.  Next agreement is a security agreement.
24   A.  Yes.
25   Q.  Just flip them over one at a time.  It will be a

Page 151

1   separate document so it will be less confusing.  Look here,
2   security agreement.
3    A.  Okay.
4    Q.  Also dated November 21st of 2014.  If you flip to
5   the last page, is that your signature?
6    A.  Yes.
7    Q.  You signed this agreement?
8    A.  Uh-huh (affirmative).
9    Q.  Okay.  Do you recall what this was for?
10   A.  I think this is the initial request for multi-
11  draw.
12   Q.  Okay.
13   A.  This was what was required for me to sign to
14  start a multi-draw relationship.
15   Q.  Okay, let's go --
16   A.  And I noticed --
17   Q.  I'm sorry, I'm not trying to cut you off.  Go
18  ahead.
19   A.  I want to make sure I answer your question fully.
20  At the time between June and November, they would have
21  calculated what my worth was to do a multi-draw.  They
22  didn't give it to me because they liked me, but there were
23  minimum goals.  And they did notice that I did quite a few
24  accounts, so I made a request if that would be available so
25  that way I could go and hire more crew.  And at the time,

Page 152

1   Richard Harris was the guy, I remember him.  And when this
2   was drafted, and that's why there is a max of $20,000, I
3   think.
4    Q.  I think 200,000 is what I see.
5    A.  200,000 is cap, and then this was a multi-draw.
6    Q.  The max you could take was 20 at a time?
7    A.  Yes.  And every draw they would review it -- they
8   would review the balance sheet and the financials every
9   draw each month every time I requested it to evaluate if
10  the number is sufficient in order for them to okay the
11  approval.  So in other means is that I have to go through
12  the -- When Richard was there, that was the very first of
13  the promissory note relationship.  So it was a lot harder
14  because he wanted to review the balance sheet and the
15  health of our clients and what we did.  So there's more to
16  it than just this paper.  They wanted to make sure that
17  they -- we understood the technical support and then we
18  understood the other things.
19   Q.  Right.  If you look, this is a document known as
20  a security agreement, okay?  And I understand it was in
21  connection with the loan.  But really what it says down in
22  one is that it's security for repayment of indebtedness
23  evidenced by the note and the payment performance of other
24  obligations, right?
25   A.  Uh-huh (affirmative).

38  (Pages 149 to 152)

8/31/2021

Page 153

1    Q.  Debtor hereby grants and creates in favor of the
2  secured party a security interest in the following
3  properties, assets and rights of the debtor.  So you are
4  giving them a security interest in these assets of yours?
5    A.  Of course.
6    Q.  Okay.  Accounts, cash or cash equivalent,
7  residuals related to the merchants and any proceeds,
8  productions, substitution or replacements for any of the
9  foregoing.  Do you see that?
10   A.  Yes.
11   Q.  What accounts did you have to secure the money
12 you were borrowing from Priority?
13   A.  I would presume these are the merchants, referred
14 merchants.
15   Q.  Right.  But did you have referred merchants, you
16 Chan Kim?  Because that's who's signing this, Chan Kim.
17   A.  If you look at it, this is November 1st.
18   Q.  Right.
19   A.  So I've been -- I've been selling mutually with
20 Priority for six months.  So based on the referrals and the
21 merchants that were, per se, boarded, right, they were
22 processing, they would evaluate the worth of that because,
23 you know, I've been working for six months.
24   Q.  But were those your merchants or Solim's
25 merchants?

Page 154

1    A.  Solim's.
2    Q.  Okay.  Cash or cash equivalents.  Did you have
3  any cash or cash equivalent to secure this by?
4    A.  No.
5    Q.  Did you receive any residuals related to the
6  merchants?
7    A.  Yes.
8    Q.  You did?
9    A.  Solim.
10   Q.  Solim did, but this is not Solim.  This is Chan
11 Kim.  Chan Kim signed this.
12   A.  I understand, but every deposit was coming into
13 Solim.  So our business practice has never from the day
14 one.
15   Q.  So the cash that went to Solim was --
16   A.  This is just basically going back to the same
17 questions you asked earlier, sorry to raise my voice a
18 little bit.  But no money has came into my personal --
19 everything was wired ACH and all the money went into Solim,
20 LLC's bank account, which at the time was -- was operated
21 under KB.  So that habit has never changed from day one.
22 But I understand your question.  Did I have the cash or
23 cash equivalent?  No.
24   Q.  Did that cash, the Solim bank account, did that
25 secure this loan?

Page 155

1    A.  No, this was --
2        MR. ROUNTREE:  I object to the form.
3  BY THE WITNESS:  (Resuming)
4    A.  This was basically based on the residual that was
5  built over the course of six months.  So we worked hard, we
6  had enough accounts.  And we went back to them and said,
7  hey, you know what, is this equivalent, is this sufficient
8  enough to draw a loan.  And then the accounting would go
9  back, you know, hey, we need to review your accounts, we
10 need to review your accounts.  They have never asked do you
11 have cash, would that secure -- did that play a role for
12 them to say okay, they've never asked.  Again, this
13 relationship is based on residuals, which they get first
14 and then paid out to Solim, LLC afterwards.
15   Q.  So in your mind, the money that was borrowed by
16 you was secured by the residuals alone, that was it?
17   A.  Yeah, that's it.
18   Q.  Okay.
19   A.  Even at this time, residual was paid every month.
20 And, Greg, residuals doesn't build up that fast.  It takes
21 about three or four months after you board.  Because
22 everything is paid in the course of 30 days.
23   Q.  Uh-huh (affirmative).
24   A.  So let's say I board a merchant, day one.  It
25 takes about 2 to 3 weeks to get the program, you know, get

Page 156

1  the application in, downloaded the terminal.  And sometimes
2  there is a delay for us to install.
3    Q.  Uh-huh (affirmative).
4    A.  So and then they would have to process a full
5  month and then we would be paid a residual after the full
6  month.
7    Q.  Yeah.  I'm very familiar with the process.
8    A.  Priority gets it first and then they sent it to
9  us.  By even looking at this, I mean, I worked hard, but by
10 even looking at this for them to even secure or to say,
11 hey, you know what, you're good to go on this based on the
12 merchants you have given, this is strictly a merchant
13 based.  I'm pretty sure you know.  No one has evaluated my
14 cash value or how many cars that I had, equipment, so
15 forth.  So to answer to your question, this -- C, security
16 agreement is based on --
17   Q.  In your mind, yes.  I understand.  What it says
18 is what it says, but in your mind that's what it means.
19   A.  I just kind of misunderstood security agreement.
20 I thought this was more of a technical terminal issue.
21   Q.  Okay.
22   A.  Equipment was.
23   Q.  Okay.
24   A.  Then when you read that, I was like okay this
25 what that is.

39 (Pages 153 to 156)

Page 157

1    Q.  Go to the next one, the personal guaranty of Chan
2  Kim.
3    A.  Yes.
4    Q.  Do you see that if you flip to the last page?
5    A.  Yes.
6    Q.  Is that your signature, guarantor?
7    A.  Yes.
8    Q.  And the witness, do you recognize that signature?
9    A.  That's KB.
10    Q.  That's how he signs?
11    A.  Well, I don't know how he signs his signature.
12    Q.  That's what I'm asking.  Do you recognize that as
13  his signature?
14    A.  I don't recognize it, but I would presume it's
15  KB.  The answer to that would be I don't know.
16    Q.  Okay.  And you signed this about the same time,
17  November 1st of 2014?
18    A.  Yeah, yeah.
19    Q.  Let's go to the next agreement, which is the
20  residual purchase agreement from July 20th of 2018.  Do you
21  see that?
22    A.  Yes.
23    Q.  Let's turn to the signature page on the right-
24  hand column.  Is that your signature?
25    A.  Yes.

Page 158

1    Q.  You signed as Chan Kim d/b/a Priority Payments
2  Central South, the company, and Chan Kim as the owner,
3  correct?
4    A.  Uh-huh (affirmative).
5    Q.  That's your signature on both of those?
6    A.  That is.
7    Q.  Okay.
8    A.  There's only one, but that is my signature.
9    Q.  There's only one what?
10    A.  Signature.
11    Q.  I see two signatures.
12    A.  Are we on the same?  Residual purchase agreement.
13    Q.  Dated July 20, 2018.
14    A.  Maybe I'm missing a page.
15        MR. ROUNTREE:  I only see one signature.
16  BY MR. MICHELL:  (Resuming)
17    Q.  I think you went too far.  Because it's not
18  numbered, it's a little hard.
19    A.  I see it.
20    Q.  You see it now?
21    A.  Yes.
22    Q.  Is that your signature signing for Chan Kim d/b/a
23  Priority Payment Central South the company and Chan Kim the
24  owner?
25    A.  Yes.  But Priority Payment Central South is what

Page 159

1  they wanted to name us because this is when they were
2  creating regional offices.
3    Q.  Uh-huh (affirmative).
4    A.  So Priority Payment Central, there was already a
5  Priority Payment Central, central meaning Georgia, and they
6  had to come up with a name.
7    Q.  So you signed for both there?
8    A.  Yes.
9    Q.  And you mentioned earlier, there is a lot in this
10  agreement.  There is no sense going through it because it
11  says what it says.  But at 1.2 on the first page kind of
12  the middle of the first page, it says buyer, which is
13  Priority, shall pay the company, and the company is you?
14    A.  Yes.
15    Q.  $1,800,000 less 750,000 load prepayment pursuant
16  to the loan agreement.  Do you see that?
17    A.  Yes, sir.
18    Q.  So that's what you're talking about.  They were
19  paying you 1.8, but 750 of it was going to go to pay down
20  the debt from the multi-draw loan?
21    A.  Yeah.  And just to make a notation on this, and
22  I'm pretty sure it doesn't matter, this is when they were
23  going public, Priority Payment Systems, public IPO.  And
24  they pushed a lot of small offices to sell.  And not any
25  relevance to this -- So and this is where -- Well, you

Page 160

1  know what, I borrowed a lot by this time, and I wanted to
2  make sure they weren't worried about the health of our
3  business, and I didn't want to be on bad terms.  Here the
4  borrowed amount is already up at 750.  So they made an
5  offer, hey, you know what, we are about to go public.  We
6  want to make sure we hold these accounts in-house, not by
7  you guys, but we would pay a little better, but this might
8  give you an opportunity to pay down your loan.  So I think,
9  if I remember correctly, this is about 90 percent of the
10  loan that was at the time.  Because we were really focused
11  on getting the loan payment down, so we contributed close
12  to a little bit less than half of what we sold towards the
13  paydown of the loan.  And I think this was -- this really
14  did bring it down to zero balance and then Priority would
15  take ownership of the residuals.
16    Q.  So let's look at the last three pages.  I think
17  you start there earlier.  So go third from the end and then
18  we will just turn forward.  Third from the end.  There you
19  go.  This is the closing statement, and that shows what we
20  are talking about.  1.8 million.
21    A.  Yes.
22    Q.  750 is loan repayment.
23    A.  Uh-huh (affirmative).
24    Q.  1,000,050.  And that amount was paid to -- Well,
25  flip to the next page under the seller.  Is that your

Page 161

```
 1    signature?
 2        A.  That's my signature.
 3        Q.  And then you go to the next and Exhibit A is the
 4    instructions.  And this goes to this 6909 account.  That's
 5    the Solim account at Bank of America; is that correct?
 6        A.  Yep.
 7        Q.  Okay.
 8        A.  Which is the same account we used from day one.
 9        Q.  And it was paid into that, right?
10        A.  Yes.
11        Q.  These agreements that we've looked at, the
12    application, the security agreement, the personal guaranty,
13    the stock purchase agreement, did you negotiate these with
14    Priority?
15        A.  No.
16        Q.  Who did?
17        A.  It was prefixed.  I'm pretty sure you are
18    familiar with the industry.  The initial agreement that I
19    had, an attorney helped me out of California.
20        Q.  Okay.
21        A.  The very first one.
22        Q.  The application?
23        A.  Yeah, the very first application.
24        Q.  Okay.
25        A.  Other than that, you know, we trusted each other
```

Page 162

```
 1    or Priority.  And even then, I had a really good -- You
 2    know, I would walk in Alpharetta from time to time just to
 3    go over some stuff.
 4        Q.  So it was just you, in other words, talking with
 5    Priority about these agreements?
 6        A.  Yeah.  It was George Holmes was the point of
 7    contact, who is the relationship manager.  Before that, it
 8    was Linnell, she worked there.  She was more of a point of
 9    contact.
10        Q.  Okay.  And you mentioned Duayne Haskett; was he
11    involved in these?
12        A.  Duayne was just an introduction.  How I got to
13    Priority is just I walked in the front door, and I said
14    want to sell credit cards, at Duayne was the first one I
15    met.  George was -- But again, we had a pretty good
16    relationship because this was after maybe three or four
17    months.  They had a thing called Mexican retreat for top 50
18    or whatever.
19        Q.  President's Club?
20        A.  President's Club, and I never missed one.  I
21    couldn't go because some years I just couldn't go.  But on
22    the years I went, I got close with the customer service.
23        Q.  Okay.
24        A.  So point of contact here was George.
25        Q.  But it was you dealing with Priority on all of
```

Page 163

```
 1    these agreements?
 2        A.  Yes, yes, except for the first one.
 3        Q.  Except for the first one.  And I should've looked
 4    at this first.  This is a loan agreement.  This is from
 5    November 1st of 2014.  We got a little bit out of order with
 6    the residual purchase agreement, so I apologize.  So this
 7    was signed back in November 2014 with some of these others.
 8    Just so you know, what I've done is I put the loan
 9    agreement, the amendment to the loan agreement and then the
10    promissory notes on the various dates through here.  Okay?
11        A.  But they all come in at the same time.
12        Q.  Well, I'm not sure what you mean by that.  The
13    loan agreement itself was in November of 2014, then it
14    looks like y'all amended it in October of 2016?
15        A.  There would be an amendment to each draw.
16        Q.  That's what these -- each promissory note --
17        A.  Yeah, each draw.  So only one loan agreement
18    exists because of the principal and the interest and the
19    balance.  And then every time that I would request a draw,
20    they would send an amendment to this loan agreement.
21        Q.  Right.
22        A.  And along with that, they would attach financial
23    analysis to see if we were capped, and we were qualified to
24    get this money.  Does that make sense, Greg?
25        Q.  Yes.  And you could take a look at what you're
```

Page 164

```
 1    talking about in terms of the payoff.  Look at the last two
 2    there in the stack that I have.  July 3rd of 2018, it shows
 3    the balance being 1.137.  Do you see that?
 4        A.  The second one?
 5        Q.  Yeah.  July 3, 2018.  They may be out of order.  I
 6    don't know.
 7        A.  That's okay, yeah.  I see it.
 8        Q.  Do you see 1.137?
 9        A.  Yes.
10        Q.  This is the amount?
11        A.  Yes.
12        Q.  Then the very next one, July 31st of 2018 shows
13    it at 355,905, so that's after the 750 we just looked at
14    had been applied?
15        A.  Yes, yes.
16        Q.  Leaving that remaining balance?
17        A.  Yeah, and one of the reasons --
18        Q.  Oh, I'm sorry, there was some more going on in
19    2019, too.
20        A.  I want to note, not verbally, but as our balance
21    got higher, the talks of hey, you know you need to pay this
22    down, how are you going to do that type of conversation
23    came up.
24        Q.  Right, and that's part of it.  So on the loan
25    agreement, let's do what we did before.  Start back at the
```

41 (Pages 161 to 164)

8/31/2021

Page 165

1  loan agreement and go to the last page of the loan
2  agreement.
3      A. This one?
4      Q. Yeah. And tell me, is that your signature?
5      A. Yes.
6      Q. Then next the amendment to the loan agreement
7  should be next, the very next document.
8      A. Yes.
9      Q. Look on the very last page of that.
10     A. Is that July 3rd?
11     Q. It's October 21st of 2016.
12     A. Yes.
13     Q. The last page, is that your signature?
14     A. Yes.
15     Q. All right. Then we can go through the promissory
16 notes. I guess what I would do is just have you flip
17 through each one and confirm for me that that it's your
18 signature shown on the signature page for each one of them.
19     A. Okay.
20     Q. So the first one I show is December 5th.
21     A. 2014?
22     Q. Yes.
23     A. Okay, yes.
24     Q. All right.
25     A. Then there's a next page, yes.

Page 166

1      Q. Then I have one February 5th. It says 2014, but
2  I think that's actually 2015.
3      A. Yes. Signature?
4      Q. Yeah.
5      A. Yes.
6      Q. Yeah, 2/3/15. Then October 5th of 2015 is the
7  next one I have.
8      A. Yes.
9      Q. Your signature?
10     A. And yes.
11     Q. Okay. And you're looking both at the signature
12 on the end and you're looking at the schedule?
13     A. Yes, that's why I'm saying yes twice.
14     Q. November 5th, the same thing?
15     A. Yes and yes.
16     Q. Okay. February 8th, 2016? That's interesting.
17 It's like the loan agreement is stuck right in the middle
18 of it.
19     A. I see it, I see it.
20     Q. Okay.
21     A. Second amendment to the loan.
22     Q. I think this is wrong. It's got the first part
23 of your note, but then it's got -- Oh, so you'll have to
24 flip to the second to last page.
25     A. Yeah, I got it.

Page 167

1      Q. For some reason, there's stuff stuck in the
2  middle. That has to be a copying accident.
3      A. Well, no, that's true, but then there's a second
4  amendment to the loan part here, too. That's why I --
5      Q. Gotcha. So I just need to separate that out.
6  Let's check the signature there. Chan Kim, and then also
7  there is a schedule.
8      A. I don't think -- I think maybe if you look at
9  the signature it says payee. I don't know who that is.
10     Q. Let's fix this right here. The first two pages
11 are the amended promissory note. All right? And then
12 there's -- Let's do this. I think what happened is stuff
13 got stapled together incorrectly. Let's fix that.
14     THE WITNESS: I'm just going to step out for a
15 minute.
16     MR. MICHELL: Okay.
17     (Whereupon, a recess was taken.)
18 BY MR. MICHELL: (Resuming)
19     Q. So we're looking at the February 8, 2016. Is
20 that your signature
21     A. Yes and yes.
22     Q. Yes and yes. All right. March 4, 2016?
23     A. Yes, and the second page doesn't have a
24 signature.
25     Q. I see your signature is on the amended promissory

Page 168

1  note, but there is not a signature on the schedule. There
2  is; it's John Priore's, but it doesn't look like your
3  signature.
4      A. Yes, but these could be easily overlooked.
5      Q. Sure.
6      A. Because at this point, we had done this so many
7  times with Priority.
8      Q. April 5th, 2016, is that your signature?
9      A. Yeah. And there is no schedule.
10     Q. I don't see a schedule there either. July 6,
11 2016?
12     A. On the third page, yes. And on the fourth page,
13 yes. There are a couple pages here, I don't know.
14     Q. Is that part of the schedule or something else?
15     A. No. I remember one time, I don't know if this is
16 relevant to this date, they deposited the money into the
17 wrong account instead of Solim.
18     Q. I see. It looks like an internal document
19 showing ACH fee of $50 or whatever and then, I see, the
20 accountant --
21     A. We requested a draw for 50, but then take -- they
22 have a processing fee of $250 for each ACH processing fee.
23     Q. Gotcha.
24     A. That's why it comes out to 49 whatever.
25     Q. Same number every time?

42 (Pages 165 to 168)

8/31/2021

Page 169

1  A. Yes.
2  Q. Okay. The next is August 25, 2017.
3  A. Yes.
4  Q. The third page is the signature.
5  A. Yes and yes.
6  Q. All right. September 9, 2016?
7  A. Yes and yes.
8  Q. October 6, 2016?
9  A. Yes and yes.
10  Q. October 21, 2016?
11  A. Yes and yes.
12  Q. November 4, 2016?
13  A. Yes and yes.
14  Q. December 6, 2016?
15  A. Yes, yes and yes.
16  Q. February 9 of 2017?
17  A. Yes, yes.
18  Q. Why don't we just keep flipping and you tell me
19  if you come to one that is not your signature?
20  A. Yes and yes. Yes and yes. Yes and yes. Yes and
21  yes. This is May 4th.
22  Q. Correct. Next is June 5, 2018.
23  A. Yes and yes.
24  Q. July 3?
25  A. Yes and yes.

Page 170

1  Q. July 31 of 2018?
2  A. I'm sorry. Yes and yes. May 1st?
3  Q. Yes.
4  A. Yes, and that is the only copy.
5  Q. What's that?
6  A. There is not a schedule on it.
7  Q. There is not a schedule to it, I see that.
8  A. September 10th, 2019, signature but not John's.
9  Q. Right, just yours?
10  A. Uh-huh (affirmative).
11  Q. Okay. So I went through just trying to track.
12  Let me -- Let's see, what is the latest schedule that we
13  have?
14  MR. ROUNTREE: Let me tell my assistant something
15  while y'all are --
16  MR. MICHELL: Okay.
17  MR. ROUNTREE: I'll be right back.
18  BY THE WITNESS: (Resuming)
19  A. July 31st.
20  Q. Of 2018?
21  A. Yeah.
22  Q. I have some more recent than that, so I'm going
23  to mark it as well?
24  A. Do you want me to find it in this file, Greg?
25  Q. I didn't see it. I just looked myself. I've got

Page 171

1  it separate anyway, so I'll just show it to you.
2  A. Okay.
3  MR. MICHELL: Will you mark that, please? Hold
4  on one second, let me take a look at that.
5  (Whereupon, the court reporter
6  marked Creditor's Exhibit
7  No. 13 for identification.)
8  BY MR. MICHELL: (Resuming)
9  Q. Look at the residual agreement from May 1st of
10  2019.
11  MR. ROUNTREE: This one right here. This one is
12  the one you're looking at, right?
13  MR. MICHELL: Correct.
14  MR. ROUNTREE: What Exhibit number should I write
15  on here?
16  MR. MICHELL: It's part of -- It goes with 12.
17  All the ones we just looked at is 12. It goes on the
18  end right here.
19  MR. ROUNTREE: Okay.
20  BY MR. MICHELL: (Resuming)
21  Q. Do you recognize this?
22  A. Yes.
23  Q. So I don't know, six or eight pages from the end
24  page is the signature page; do you see it?
25  A. Uh-huh (affirmative).

Page 172

1  Q. Well, you're looking at -- Separate those out.
2  Those all go together. Let's look at just the residual
3  purchase agreement. Now, turn through until you get to the
4  signature page.
5  A. (Witness complies with request of counsel.)
6  Q. Is that your signature?
7  A. Yes, sir.
8  Q. Okay. And you recall this transaction?
9  A. Yes, sir.
10  Q. If you look, similar to the last one, if you look
11  at 1.2(a) there on the middle of the page, the amount of
12  this is $1,710,000.
13  A. Yes.
14  Q. Okay. And there was some amount taken out of it,
15  too, I believe. If you look, attached to it is a closing
16  statement.
17  A. Uh-huh (affirmative).
18  Q. It looks like $400,000 was taken out of this and
19  applied to the multi-draw loan balance also.
20  A. Yes.
21  Q. Do you recall that?
22  A. Yes.
23  Q. And the 1.31 was then deposited in it looks like
24  the PPS Business Solution account, 3577; is that correct?
25  A. Yes, that's correct.

43 (Pages 169 to 172)

Page 173

1    Q. So this was after you had requested Priority to
2 change the account it was depositing monies into?
3    A. Yes.
4    Q. So rather than Solim, it went into PPS Business
5 Solution?
6    A. Yes.
7    Q. And that money was received?
8    A. Yes.
9    Q. All right. And then we have another copy of just
10 what we looked at earlier?
11    A. Yes, I saw that.
12    Q. So that finishes up Exhibit -- Put that with
13 this. Here, put that with Exhibit 12. That is all the
14 Priority documents. Okay. Now we are looking at Exhibit
15 13.
16    A. Okay.
17    Q. Is that your signature on that?
18    A. Are we looking at the schedule?
19    Q. Yep.
20    A. Yes, that's my signature.
21    Q. And this is the latest one that I could find, but
22 I will tell you that there's --
23    MR. MICHELL: Let's mark that as 14.
24    (Whereupon, the court reporter
25    marked Creditor's Exhibit

Page 174

1    No. 14 for identification.)
2 BY MR. MICHELL: (Resuming)
3    Q. This one stops -- Exhibit 13, the last draw I
4 see to you is $100,000 in April of 2019.
5    A. Uh-huh (affirmative).
6    Q. Do you see that?
7    A. Yes.
8    Q. Let me show you Exhibit 14.
9    A. Okay.
10    A. So 13 and 14 are essentially the same thing?
11    Q. Yes, except 14 continues on --
12    A. Yeah, okay.
13    Q. -- past May.
14    A. I got it.
15    Q. It shows three additional draws: one on August
16 5th of 2019 for 50,000.
17    A. Uh-huh (affirmative).
18    Q. One on August 29th for 100,000.
19    A. Uh-huh (affirmative).
20    Q. And then one on September 10th of 2019 for
21 100,000?
22    A. Yes.
23    Q. Do you see that?
24    A. Uh-huh (affirmative).
25    Q. When I -- I tried to go back and look at kind of

Page 175

1 the numbers on this based on -- you can use 13 or 14. I
2 only include 14 because it has those additional draws,
3 right?
4    A. I gotcha. Greg, I gotcha. I see the dates.
5    Q. I mean by my math on the multi-draw account you
6 borrowed $510,000 in 2016?
7    A. Yes.
8    Q. 500,000 in 2017?
9    A. Uh-huh (affirmative).
10    Q. 450,000 in 2018?
11    A. Uh-huh (affirmative).
12    Q. And a million in 2019?
13    A. Uh-huh (affirmative).
14    Q. Does that sound correct to you?
15    A. That's the way -- Well, yeah, it sounds correct
16 because I signed every promissory note that I had
17 requested. It was made very clear through, you know,
18 through internal management to Priority at the time,
19 Priority has Priority Payment Central South, which was us,
20 Priority Payment Central South, which was us. And they
21 have a Priority Payment Central, which is another Korean
22 team.
23    Q. Okay.
24    A. And that's why we have to take the name Priority
25 Payment Central South --

Page 176

1    Q. Gotcha.
2    A. -- because there was a Priority Payment Central.
3 Priority Payment Central wanted to pull out, the owner of
4 Priority Payment Central didn't want to do business
5 anymore.
6    Q. Okay.
7    A. In conversation with Afshin, George and a couple
8 of other guys, it would be a good idea for us to take over
9 if we could buy his account, if we could purchase their
10 account.
11    Q. What was his name?
12    A. Paul Jon, J-o-n, but don't hold me to that. It
13 was Paul. It was Fat Paul, we called him Fat Paul.
14    Q. Okay.
15    A. So they were about the equivalent portfolio size
16 as us.
17    Q. All right.
18    A. And we met at the premier, or the once a year
19 thing.
20    Q. President's Club?
21    A. Yeah, President's Club. And I made a statement
22 that I wanted to see if we could buy out his portfolio.
23    Q. To Fat Paul?
24    A. From Fat Paul, his portfolio.
25    Q. Right. You made that statement to him?

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 177

1    A.  But I knew that he had existing -- I don't know
2  if every office has is it, but every office has some sort
3  of a draw relationship with Priority.
4    Q.  Okay.
5    A.  Similar as mine.  So we started investigating,
6  not investigating, but wanting to find out what --
7    Q.  How much money he owed to Priority?
8    A.  Yeah, and to see if it would work out.  Because
9  at the time we had a crew of 35 to 40, and he had a crew of
10  two or three.  His service level, he just wasn't into it.
11  His service level deteriorated.  Our account cancellation
12  ratio was very small because we were out there servicing
13  on-site and all that other stuff.  So communication line
14  was George Holmes made the idea, spoke with Afshin to see
15  if it was a good idea to do that.  And the initial proposal
16  was made.  And it took a while because there was a whole
17  bunch of stuff going on with Paul and Priority.  And George
18  would have been a mediator, communicating point.  And at
19  that time, if you notice the date on you say a million, the
20  next year, at that time, Secom, Inc. wasn't an immediate
21  decision.  It took us a year to take over to communicate
22  and see what kind of clients.  It just happened there was a
23  lot more going on than what we were promised for.  So 2019
24  was a year where we -- if you look at the draw, now I
25  remember a little bit, if you look at the draw, April '19

Page 178

1  where you had highlighted.
2    Q.  Yeah, just because that's where 13 stops.
3    A.  Yeah.  April 19, there was a draw of a hundred,
4  right?
5    Q.  Yes.
6    A.  Then if you look at August --
7    Q.  April 12th?
8    A.  I'm not mentioning the date, but April --
9    Q.  Gotcha, okay.  April of 2019?
10    A.  April 2019.
11    Q.  Uh-huh (affirmative).
12    A.  If you look at it, all of 2000 -- here's 500,000,
13  right, and this was preparing for purchase.
14    Q.  Right.  That is in January of 2019?
15    A.  Yes.  That's when everything was kind of kicking
16  in and we have enough people, we were going to do a whole
17  bunch superstar stuff.  And then if you look at April 12,
18  2019, there was a draw of 100,000.  This was us preparing
19  to purchase Secom, and that was kind of in the same
20  timeline.  Then that took about three months to go back and
21  forth.  Then August 20th, then August 29th there's a draw
22  of 100,000 and another 100,000, right?
23    Q.  Yes, I see that.  100,000, then 50, then 100,
24  then 100.
25    A.  Yeah.  So if you notice within the same month

Page 179

1  there was $250,000 drawn.
2    Q.  Just in --
3    A.  Just in three months.  And the reason for that is
4  we promised each other we would do a draw each month,
5  that's it.  I would have to request it and they would have
6  to approve it.  But back in July, I told George and I told
7  Afshin, and I think this was probably right after
8  President's Club in Nashville, I think it was somewhere in
9  there, that hey, you know what, I'm doing this, and I would
10  appreciate it if you could allow me flexibility for giving
11  me more money because I'm about to buy a security company.
12  I made it clear what was the money was being needed for,
13  made it very clear.  And at that time when we met, they
14  said okay.  I made the request, they reviewed it and they
15  released the money.  You know I can't force them to pay me.
16  They have to make a reasonable decision for them to pay me,
17  you know, pay the request that I've made.  This was right
18  around the time, August, when Secom, Inc. was going on.
19  And I needed the money to make the purchase and pay the
20  thousands and thousands of dollars he made to existing
21  employees and so forth.  So beyond, like you said, the
22  $150,000 or whatever the purchase price was between Secom
23  or the previous owner and myself, he had a lot of operating
24  debt.  His rent was due.  He hasn't paid his employee for
25  almost six months, or five of them.  We had to catch up to

Page 180

1  make sure they stayed on.  So our foot was in the door, and
2  we ended up getting of stings that we found out that he
3  managed to hide.
4    Q.  Right, right.
5    A.  So as soon as we got in in June, you know, Secom,
6  Inc. was -- Because it took about four months from April
7  to August, we were over our head.  But the initial payments
8  were made, we wanted to keep it going and that is when I
9  communicated with George in finance and Afshin that, hey,
10  you know what, I'm doing this.  I need more money, I've
11  already started this.  This was right around the time when
12  they visited the office.  Because when he comes down, he
13  comes down and he likes to talk in person because we are
14  only about 15 to 20 minutes down the road.  So I understand
15  where you're getting at, why all of a sudden in 2019 a
16  million because that jumps up from $500,000.
17    Q.  Yeah, but more -  I'm trying to be more precise
18  with my questions, although I appreciate the context.  On
19  the multi-draw loan, you borrowed a million.  And then on
20  the RPA in May of 2019, you received 1.3 million.
21    A.  Okay.
22    Q.  So in 2019 you received 2.3 from Priority just
23  through the RPA or through the multi-draw loan, correct?
24    A.  That's correct.
25    Q.  Okay.

45 (Pages 177 to 180)

Page 181

1    A.  Well, you know, our expenses, you know, the end
2  of 2018 and all of 2019, this is when the employees peaked.
3  You know, my max count was 48, and 48 coworkers.  Right?
4  So and I understand where you're coming from, where did all
5  this money go.  You know, you average payout of four to
6  $5,000 a month after -- and plus expenses, you have 50
7  people and taxes and purchases, that's $250,000 a month.
8  We went -- we absolutely went over our head, period.  You
9  know, if you review bank statements, no money was
10  transferred to my personal account and so forth.  Every
11  transaction from that Solim account all the way to PPS
12  Business Solution, every transaction was made out of that
13  account.  No transfer was made to a third party.
14    Q.  Let's take a look at it, that way you don't have
15  to go blindly.
16    A.  Yeah.  So just to clarify your question, you
17  know, you said does that make sense to you.  None of this
18  makes sense to me, Greg, but we were just over our head.
19  You know, why did you request -- why did you request so
20  much month after month after month, the answer to your
21  question is that we started all these talks that we wanted
22  to expand and then we started hiring these people based on
23  what we thought was going to work out.  And you know,
24  payroll was coming up 15th and 30th every month.  And you
25  know, KB and Susan and Jaden and everybody is telling me we

Page 182

1  are short on money.  And that's we -- I talked to the
2  person who is lending me money and they okayed it.  Is that
3  right?  I don't know.  But it was lent on the basis of
4  their approval.  And I'm kind of overstating because when
5  you say does this make sense to you, none of this makes
6  sense to me, Greg, now that I'm looking back.
7        (Whereupon, the court reporter
8        marked Creditor's Exhibit
9        No. 15 for identification.)
10  BY MR. MICHELL:  (Resuming)
11    Q.  Do you recognize this document?
12    A.  I can't say I do, but I'm assuming this is...
13    Q.  Let me ask you this.  On the first page, it's
14  dated August 1, 2020.  And those addresses up there, Chan
15  Kim, 6257 Clapham Lane.  Was that your address at the time,
16  home address?
17    A.  At the time, yes.
18    Q.  Take a look at it.  I need to know if you ever
19  remember seeing this or not.  I think you...
20    A.  To be honest with you, there was a pile of
21  paperwork that was sent to me.
22    Q.  So you may have seen it, you may not have?
23    A.  Yeah, I don't remember.
24    Q.  Okay.  So if you will flip back to the conclusion
25  part, I just want to ask you about - I don't know - between

Page 183

1  July 2019 and August of 2020, the number of merchants in
2  the portfolio dropped from 928 to 560.  Does that sound
3  correct to you?
4    A.  I don't keep track of the number of accounts.
5  Again, the residual was paid out, dispersed based on each
6  individual salesperson.
7    Q.  Meaning dispersed from the Solim bank account?
8    A.  Yeah.
9    Q.  Okay.
10    A.  Yeah.  Because he would calculate it and it takes
11  a little bit of a toll to calculate each individual sales
12  agent.  So when I was first in sales, you know, I keep
13  track of my number of accounts just to make sure my
14  residuals were correct.  But after some time, I just wasn't
15  in a position of that.
16    Q.  I think you testified earlier that y'all gone
17  from 48, 50 people down to about seven or eight?
18    A.  Yes.
19    Q.  Certainly the amount of residuals going out would
20  be less for those seven people than it would for when there
21  were 48, correct?
22    A.  Well, you have to remember, like I said, these
23  are salespeople that went out and they took their own
24  accounts, you know, their referred accounts.  So I don't --
25  Same -- the same way as Priority would feel that the

Page 184

1  salespeople, they feel entitled to their accounts.  They --
2  In all means from any perspective, that may be wrong, but I
3  don't have interaction with their customers or their
4  referred merchants.  So is it right for them to leave and
5  take all of their accounts?  You know I have a group of
6  salespeople that I overheard months later that they are
7  working together.  And then we are wondering why all of
8  these terminals are being returned because we provided all
9  the terminals.  Then one day I had four or five big UPS
10  boxes of just terminals are being returned.  And we are
11  obligated to cancel the account if they cancel.  Now, --
12    Q.  I want to make sure I'm understanding.  You're
13  saying when these sales reps left, they took merchants away
14  from Priority and took them somewhere?
15    A.  Correct, correct.
16    Q.  Did you do anything to try to get those merchants
17  back?
18    A.  At the beginning, we tried to call to find out.
19  But you know, it is very hard once they leave and they
20  transition and a new set of equipment is there, it's very
21  hard to get them back because they are already processing.
22  A lot of times they have intentionally returned the
23  terminals, say, three or four months later.  Because we are
24  not looking at these -- I am, for God's sake, not looking
25  at the volumes or, you know, money coming in because I

46 (Pages 181 to 184)

Page 185

1  won't see it. You know, all it does is just process if the
2  customers are, you know, so after, you know, they do a
3  conversion or they take the customers, they will collect
4  the devices because they have to put their own devices in
5  there. So back in say September 2019, I had four or five
6  boxes of UPS terminals and it was in the hundreds. That is
7  when I realized what was going on. I knew they were doing
8  that a little bit, but they were doing it in a significant
9  amount.
10     Q. But you could get on and see that your residual
11  was dropping, couldn't you?
12     A. I don't -- Look, I owe too much to look at the
13  residuals at that point to be honest with you. Because you
14  look at the numbers, what's the point of looking at the
15  residuals; they're going to draw, you know, Priority is
16  going to draw their cut --
17     Q. To pay back the loan?
18     A. Yeah, to pay back the loan. And some months it
19  was 700 -- George called me and said, hey, you know what,
20  your residuals are $761. At that point over the course of
21  seven or eight years, I've never looked at my finances.
22  I've never needed to look at it, or to look at was going
23  on. If the $50,000 draw was covering the payroll, we were
24  waiting for a big boost in income in 2020. Because I had
25  so many people we figured, hey, you know, we could get them

Page 186

1  to use credit cards and increase all this. So 2018 and
2  2019, I was busy borrowing money. I was busy communicating
3  with Afshin and George to buy Priority Payment System
4  Central. Because that person wanted out. That didn't
5  work. I was busy doing -- trying to buy this low voltage
6  security and communication company. I was out all the
7  time. I was out either negotiating trying to do this and
8  trying to do that. I should have taken a better look at
9  internal finances or all the stuff that was going on, but I
10  just never had to do it over the course of seven or eight
11  years. I've always had somebody who's done it. Now, you
12  know, whether they did a good job or not, it doesn't fall
13  on them now that I'm here in this office. I understand
14  your way of asking the questions, which I completely
15  understand, and I appreciate your comments, but at the same
16  time, how could I not know? We owe too much money for me
17  to -- It made me feel depressed looking at the residual
18  report.
19     Q. Gotcha. Because the amount to service the debt
20  at some point as your residuals were dropping, it overtook,
21  so you were --
22     A. Yeah, it overtook, and we were just borrowing to
23  pay things off. And in 2019 when all the stuff was going
24  on, the bigger borrowing, the payout, by that time, I just
25  had say too many people. And I just knew that Susan and

Page 187

1  all those guys were being bombarded and they were scared
2  crapless on the 15th and 30th when the payroll was due.
3  And all it really was I was busy borrowing money trying to
4  convince Priority to lend me more.
5     Q. Did you have noncompetes with any of these
6  subagents that left?
7     A. I thought I had a couple because, you know, I got
8  frustrated and I got very mad that I wanted to go after
9  some of these guys. But the answer to your question is no.
10  Because even if I did, it probably expired for our original
11  guys, our very long-term guys. I've never -- You know,
12  when they signed on seven or eight years ago, you know, we
13  did is schedule A or an ISO agreement like what myself and
14  Priority would do. But after, you know, two or three years
15  the relationship just takes over and we don't feel the need
16  to do it because we felt like we trust each other. That
17  was a bad move. And all of the new guys nowadays they
18  don't want to do a purchase agreement, they won't come on
19  board, so we just stopped doing it. So there's no agent
20  the contract.
21     Q. See you did not pursue any of these subagents for
22  taking merchants?
23     A. No. I mean, I almost wanted to get in a fight
24  with them when I saw them at a restaurant, but other than
25  that, no.

Page 188

1     Q. Let's take a look at the bank statements that you
2  gave me.
3     A. Okay.
4        MR. MICHELL: This is all just one.
5        (Whereupon, the court reporter
6        marked Creditor's Exhibit
7        No. 16 for identification.)
8        MR. MICHELL: Solim bank statements. Do you have
9  those?
10        MR. ROUNTREE: If you have an extra copy.
11        (Whereupon, a brief discussion ensued off the
12  record followed by a recess.)
13  BY MR. MICHELL: (Resuming)
14     Q. In front of you, this is Exhibit 16. And these
15  are all of the bank statements that we have received from
16  you.
17     A. Uh-huh (affirmative).
18     Q. They all appear to be for Solim, LLC,
19     A. Right.
20     Q. They start January 1st of 2016 and the last one
21  is March of 2019.
22     A. Okay.
23     Q. So let's take a look at the first one.
24     A. Just to clarify, I never looked at the bank
25  accounts. I did not have access, so some of the questions

8/31/2021

Page 189

1    that you may ask I will say I don't know because I wouldn't
2    know.
3        Q. Okay.
4        A. Some of the vendors that they paid out, I
5    wouldn't know which one. Sometimes they were worded
6    differently.
7        Q. So if you start with the first statement there,
8    let's just kind of try to go through in order. It shows
9    like most statements you see, go to the third page, it has
10    deposits in and then withdrawals.
11        A. Yes.
12        Q. The deposit it shows coming in there for
13    $49,076., that's from Priority; do you see that?
14        A. Yes.
15        Q. That's a residual payment, correct?
16        A. Yes.
17        Q. This is back in 2016?
18        A. Yeah, anything that says residu would be the
19    residual payment.
20        Q. When you go down below, you see these online
21    banking transfers to these checking accounts, checking
22    1972, 1998, 2012, 6679, 8744. Do you see those as I'm
23    reading down the list?
24        A. Correct.
25        Q. Do you know what those bank accounts are?

Page 190

1        A. I think it may be a sub bank account. This is
2    where KB may be transferred his portion of the residuals
3    into his bank account, my assumption. That would be my
4    assumption.
5        Q. But there are multiple bank accounts. Are all of
6    those KB's?
7        A. I don't know. I don't know.
8        Q. You don't know what any of those bank accounts
9    are?
10        A. No, I don't.
11        Q. Okay.
12        A. It could have been -- I don't know. These are
13    small portions of the money because it does not look
14    significant like on the third page. It may be like an
15    online payment transfer.
16        Q. Right.
17        A. Yeah.
18        Q. Okay. And flip to the back of that where it
19    shows pictures of the checks.
20        A. Yes.
21        Q. Who could sign checks on this account?
22        A. At the time it was Susan, Jaden, the managing
23    people.
24        Q. Right. Susan, Jaden?
25        A. Chris, KB, and anybody -- anybody who would be in

Page 191

1    the office that he would trust. Because we are not -- You
2    know, we are always on the road. And as long of these
3    people confirmed with KB, then it would be okay for them to
4    sign these checks.
5        Q. Okay. So that kind of management team that you
6    mentioned earlier, they could all sign checks, but you
7    couldn't?
8        A. They asked me to sign checks when I was there
9    just to get the pays out.
10        Q. So you did sign some checks?
11        A. Yes, yes.
12        Q. If you look through these checks, look at check
13    number 1454?
14        A. Okay.
15        Q. Is that your signature?
16        A. That's my signature.
17        Q. Okay. Then look down to 1461. Is that your
18    signature, check 1461?
19        A. Yes, it is.
20        Q. So you could sign checks as well?
21        A. Well, I would be allowed to just to get the
22    payments if he's not there.
23        Q. Okay.
24        A. Because, you know, we had -- KB you would go
25    overseas, you know, because his parents are overseas. My

Page 192

1    parents, my mom is overseas. Jaden would go get married or
2    family occasions. We would just circle through.
3        Q. So all the management folks that you listed,
4    those five or six people could all sign checks on this
5    account?
6        A. Yes, we just would trust each other just to make
7    sure. But KB would manage the account to make sure the
8    check recordings are complete.
9        Q. Let's go to the next month, which is February of
10    2016.
11        A. Okay.
12        Q. On the deposits and credits, there's three from
13    Priority. The first one is accounting for 49,750. That is
14    a $50,000 loan, correct?
15        A. Yes. Anything that's 49,750 would be a draw I
16    would assume.
17        Q. A draw on the multi-draw loan?
18        A. Correct.
19        Q. Then down below on 2/19 of 2016, it says
20    residual, so that's a residual?
21        A. My guess would be that would be the residual yes.
22        Q. And then you show monies going out down below to
23    those various accounts?
24        A. Uh-huh (affirmative).
25        Q. You don't know what -- you don't recognize 6679,

48 (Pages 189 to 192)

8/31/2021

---

Page 193

1 1980, any of those where this 2,000, 1500, 6,000 are going
2 out?
3     A.  I don't know any of the banking account because
4 again, I don't do any online transfers.  I never have to go
5 online and pay because this would all be under KB to
6 handle.
7     Q.  At the top of the next page, I can't tell where
8 you are exactly.  Withdrawals and debits, the second from
9 the top there on 216, this is 4500 it says to Kwang B. Lim.
10 That's KB, right?
11     A.  Yes.
12     Q.  What is that Chase Epay; do you know?
13     A.  KB had a Chase credit card that he used for
14 purchases.   Q.  Okay.
15     A.  So we could get rewards points, they offered it
16 pretty generously.  So my assumption would be, again, my
17 assumption would be if it just said Kwang B. Lim, I
18 wouldn't know what it is.  But since it says Chase, my
19 assumption would be it is a Chase business card that he had
20 with Solim, LLC that he paid payments on.
21     Q.  Down below on 2/29 there's another one for Kwang
22 B. Lim Chase Epay for $5,000?
23     A.  Yes.
24     Q.  Do you see that?
25     A.  Yes.  I would assume that's his Chase credit card

---

Page 194

1 payments.
2     Q.  Up in between there, checking account 8744, there
3 is a transfer of $13,492.  Do you know what that is?
4     A.  What that looks like is his residual payout.
5     Q.  KB's?
6     A.  KB's.  Just going from off of these numbers if
7 you make a payment to someone, it would even out to 8,000
8 or 7,000, or something like that.  But just by looking at
9 this, it would be some sort of residual calculation.
10     Q.  But you think a residual calculation he's done
11 and paid to himself?
12     A.  Paid to himself, yes.
13     Q.  Okay.
14     A.  The 6679 and these look like -- I don't know how
15 he did his calculation.  Remember, I had my expenses, so he
16 might've created accounts to separate what the expenses
17 were.  So just to clarify I have never had access to his
18 account.  I have never had to review expenses, but all the
19 answers I'm giving you is just my assumption because it
20 says Chase, or it says Kwang B. Lim.
21     Q.  Right, I understand that.
22     A.  Whereas, CC Insurance, Chang Kim, that would be
23 the insurance, car insurance payment or some sort.
24     Q.  Right, and these series of transfers to different
25 account numbers, you're saying you don't recognize any of

---

Page 195

1 those account numbers.  You think 8744 might be KB, but you
2 don't know?
3     A.  I don't know.
4     Q.  Okay.  If you go back to the checks, if you look
5 at 1471, is that your signature?
6     A.  Yes.
7     Q.  All right.  Let's go to the next.
8     A.  Okay.
9     Q.  Again, on deposits, we see a 48,000, residual
10 from Priority?
11     A.  Uh-huh (affirmative).  $39,700?
12     Q.  Oh, right above it?
13     A.  Yeah.
14     Q.  So that's --
15     A.  That would seem like a draw, a 40,000 draw.
16     Q.  Down below it is the residuals of 48?
17     A.  Yes.
18     Q.  Then there's one from Cynergy there.  What is
19 that?
20     A.  Cynergy is First Data's company.
21     Q.  Correct.
22     A.  It was probably residual off of one or two
23 accounts.
24     Q.  That were boarded with --
25     A.  Yes, and you're probably going to see that

---

Page 196

1 continuously throughout because that account didn't cancel.
2     Q.  When you come back down to seeing the money going
3 out, again, it's the same account.  6679, do you see that,
4 three different ones; 1,000, 8,000?
5     A.  Correct.
6     Q.  There's Chase pay to Kwang Lim of 6,000.  Go down
7 further, Chase pay to Kwang Lim of 3,000.  Go down a little
8 further, Chase pay to Kwang Lim of 2,600; do you see that?
9     A.  Yes.
10     Q.  Go on to the next page.  318, Chase pay to Kwang
11 Lim of 4,000?
12     A.  Correct.
13     Q.  Transfer to that 669 account, $19,000?
14     A.  Right.
15     Q.  Another 7500 to Kwang Lim right below that; do
16 you see that?
17     A.  Yes.
18     Q.  Come down a little further, 1300 to Kwang Lim.
19 Come down little further, 5,000 to Kwang Lim?
20     A.  Yes.
21     Q.  So a lot of this money was going out to KB,
22 right?
23     A.  Yeah.  And, you know, he's particular about
24 getting the most of his money I would say.  Because if he -
25 - Now I'm just glancing through.  There aren't a lot of

---

49 (Pages 193 to 196)

Page 197

```
 1   purchases, withdraw, you know what I mean, debits.
 2       Q.  Correct.
 3       A.  My assumption, because we purchased terminals,
 4   credit card terminals on a regular basis and POS equipment.
 5   And it says withdrawals and debits, but there's not a huge
 6   debit transactions like vendor purchases and stuff like
 7   that.  So he may have paid -- And he's a fair guy.  I
 8   never suspected him of doing anything wrong, but he may
 9   have used his account, say, Korean Airline mileage card,
10   Chase mileage card to make purchases and then basically
11   paid himself.  But Chase seems to be the obvious one that I
12   -- and I'm pretty sure that he's paid Chase credit card
13   with.  And the way he may have done was he may have created
14   different bank accounts.  Now, the only bank account I knew
15   was going out or deposited was this account.  But I think
16   that might be it.  Because if I look at the transfers of
17   this $100, right, there's no reason for him to do that
18   except if it was some sort of an auto pay that he's got it
19   set up.
20       Q.  So if you wanted to find out what these accounts
21   were, checking account 6679, checking account 1972, over on
22   the next page checking account 2012, checking account 8744
23   for $15,000, how would you find out what those accounts
24   were; would you ask KB?
25       A.  I would ask KB.
```

Page 198

```
 1       Q.  Do you know if he kept some list of what these
 2   accounts were?
 3       A.  I asked bank account -- or Bank of America over
 4   the phone to see if he could get it when I was there with
 5   him.  And it just takes them a little time, but they could
 6   access all the bank accounts that's affiliated with KB.
 7       Q.  Gotcha.
 8       A.  Or Solim, LLC.
 9       Q.  Gotcha.  So y'all have asked him to do that?
10       A.  Yeah, I don't see a problem.  You know, if he's
11   an account holder and he's able to provide me with this, it
12   just took him a little time to get these because it's so
13   large, he didn't realize what I needed.  But if it's under
14   his account and he needs to explain what these transfers
15   were, but I'm pretty sure we can access the bank account.
16       Q.  If you look back at the checks, if you look at
17   check 1500 and 1501.  That's your signature, isn't it?
18       A.  Correct.
19       Q.  1497 is your signature?
20       A.  Yes.
21       Q.  1495?
22       A.  Yes.  Some of them could be Jaden's.
23       Q.  Okay.  Let's go to the next.
24       A.  Whereas 1497 looks like Jaden's.
25       Q.  We're in April of 2016, the next.  We're going to
```

Page 199

```
 1   try to go through these.  So on April 5th, there's 49,750.
 2   Again, that's a draw from Priority, right?
 3       A.  Yeah.
 4       Q.  And then there's residual of 57.  Then we looked
 5   down to the money going out.  I see one, CMSL Sung Chan
 6   Han, 2215, what is that; do you know?
 7       A.  CMS?
 8       Q.  On April 4, 2016 down under withdrawals it's like
 9   the second one.
10       A.  I don't know.
11       Q.  Okay.
12       A.  I don't know if this is a wire.  It does not look
13   like a transfer because the other one says transfer.  It
14   could have been a payout for an employee.
15       Q.  You just don't know?
16       A.  No.
17       Q.  Then there's more with KB Chase on 4/6, 5,000, on
18   4/11, 5,000?
19       A.  Yeah.
20       Q.  Go over to the next page on 4/15, 5,300.  Then
21   you have this whole bank account transfers, including 1 to
22   6679 of $25,000.  Do you know what that is?
23       A.  No.
24       Q.  All right.
25       A.  But again, I think it might -- Again, looking at
```

Page 200

```
 1   6679 and all of those are repetitive from previous ones.
 2       Q.  Correct.
 3       A.  He might have paid a residual out to an agent
 4   because, again, I haven't gone through the checks, I don't
 5   know if he paid the sales crew in checks or transfer.  I'm
 6   pretty sure it's not cash.  So what I've noticed, at least
 7   in the four or five documentation that we have is that we
 8   have no debits except for, you know, checks written out.
 9   Some employees may require or may prefer ACH for their
10   payment, or some employee they have a bank account, he
11   could do a transfer.  I'm just giving you my assumption
12   because these four numbers of these bank accounts are
13   repetitive.  So look at 100, 100, 200 and 100, it could be
14   like a residual bonus or signing bonus like I had with
15   Duayne.
16       Q.  Right.
17       A.  So anybody who had a bank account or a Bank of
18   America, I think it might be that they signed on one
19   customer or two customers and he's transferring it to that.
20   It is my assumption just to give you maybe my thoughts on
21   maybe how these worked.
22       Q.  If you look at May 19th, checking 8744 and
23   checking -- No, sorry.  We're in May.
24       A.  Okay.
25       Q.  If you look on May 19, there's two large
```

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 201

1  transfers: one to 8744 and one to 6679.  Do you see that?
2  16,000 and 15,000.
3      A.  Give me one second.  I may be on the wrong page.
4      Q.  Are you on the May 1st, 2016 statement?
5      A.  May 1st through May 31st.
6      Q.  Okay.
7      A.  Second page?
8      Q.  Yes.
9      A.  I see it.
10     Q.  So there's a 16,000 to this 8744 and 15,00 to
11  6679.
12     A.  Uh-huh (affirmative).
13     Q.  Okay.
14     A.  I really think these are residuals that he paid
15  to an employee or to himself.
16     Q.  Who were the top residual or who were top
17  subagents that y'all had?
18     A.  Jaden Jong, well, you know, the original guys, or
19  the sign-on guys or the managing member guys.
20     Q.  Okay.  They were the --
21     A.  Yeah, because they brought on their own line of
22  clientele.
23     Q.  Okay.
24     A.  Jaden and Chris worked together.  They were more
25  of a team.

Page 202

1      Q.  Susan?
2      A.  Susan wasn't a salesperson, all.  Jaden and Chris
3  worked together so that might be a residual payment out to
4  them.  Now, it could be easily seen and then the 16,000,
5  say 97 and 93, my assumption would be that's KB.
6      Q.  That 8744?
7      A.  Yeah, because 8744 and 6679 is the main two that
8  comes up.  I mean, you see a lot of these transfers, but
9  they're not a large sum of money, you know, they're not in
10  thousands.  If you look here, here's a whole bunch of
11  transactions which is done the 19th and 20th, right?
12     Q.  That's right.
13     A.  The reason I say that is because residual gets
14  paid out sometime between the 19th 25th.  That's why you
15  see the deposits come in early and then the payments go
16  out.
17     Q.  Right.
18     A.  And then we promise our agents or anybody who
19  does any sign-on bonuses or any residual or anything like
20  that, we had agreed we pay out between the 20th and the
21  25th because sometimes it falls on a weekend.
22     Q.  Right.  But none of these accounts have anything
23  -- they aren't your accounts?
24     A.  No, no.
25     Q.  None of these transfers of money are going to

Page 203

1  you?
2      A.  No.  Well, I made it clear to you, I haven't
3  personally and commercially haven't had a bank account for
4  eight years.  So if we're going to ask that same question
5  going forward, I want to make it clear.  I personally
6  haven't had a bank account or credit card in eight years.
7  So none of this money would be transferred in any
8  affiliation to my name.
9      Q.  Okay.  But if not to your name, would they be
10  transferred to someone to hold for you?
11     A.  No, absolutely not.
12     Q.  You just went -- Although the folks you were
13  talking about, Jaden and Chris and KB, they were all
14  getting paid, you weren't getting paid anything?
15     A.  Yeah, because I was a lead.  That's why, all the
16  Priority Payment stuff, you know, these guys don't speak
17  much English.  I was a lead into creating this project.  My
18  payout was growing the business and taking -- just like
19  what Priority has done with me, taking a portion of them
20  and then, you know, we are just on a pathway to growth,
21  that's all I was focused on, building a crew and training
22  them.  But you can't do that without paying them correctly.
23  And KB is probably the largest payout because he was with
24  me from the get-go.  So that's why I see these numbers
25  increase, right, as time goes on.

Page 204

1      Q.  Right.
2      A.  Because 2016 wasn't a huge like, you know, Solim,
3  LLC shooting at the stars time period.  But KB brought on a
4  lot of customers based on his past work experience in the
5  beauty supply industry.
6      Q.  Let's look at -- Let's skip ahead.  Let's go to
7  July of 2016.
8      A.  Okay.
9      Q.  It looks like there is another loan on July 6 for
10  49,750?
11     A.  Correct.
12     Q.  Residuals are 45,000.
13     A.  Uh-huh (affirmative).
14     Q.  Come back through, it's transfers to the same
15  bank accounts.  13,000 Kwang Lim on his Chase Epay?
16     A.  Yeah.
17     Q.  Down below, another $5,000 to KB?
18     A.  Yeah.
19     Q.  All right.  Let's just keep an idea of kind of
20  the numbers.
21     A.  It looks a little more familiar now.  Again, I
22  don't see much debits besides -- for purchases because we
23  purchased directly through First Data.  TASQ is our main
24  vendor to purchase agreement?
25     Q.  Who?

51 (Pages 201 to 204)

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

Page 205

1    A.  TASQ, T-a-s-q.
2    Q.  Okay.
3    A.  TASQ would be one of our bigger vendors.  Because
4  as we grow, our expenses is going to grow, too, because
5  we're purchasing equipment.
6    Q.  So August of 2016, if we look there, it looks
7  like the residuals are nearly 70,000, along with another
8  loan of 40,000?
9    A.  Correct.
10    Q.  Then down below when I look at the money coming
11  out, KB has one for nearly $11,000.
12    A.  Yeah.
13    Q.  Next page, he has one for 8,000, one for 3,000,
14  one for 10,000, another for 10,000?
15    A.  I would almost bet -- I'm very -- At this
16  point, I'm very confident that these are Chase payment
17  cards that he used -- he probably used Chase to make
18  purchases and pay anything that we could pay with a credit
19  card.  Because I remember him mentioning that we had so
20  much rewards that we were -- we would be able to convert
21  that to cash value to make purchases.
22    Q.  Right.  So his Chase statements, I guess, would
23  be what we would need to look like to see what --
24    A.  Yeah.
25    Q.  -- that money was spent on?

Page 206

1    A.  Yeah.  Because Chase would be -- Because it
2  looks like as much as this was paid, Chase would be his go-
3  to -- was his go-to for vendor purchases.
4    Q.  Okay.  If you look at the next, September of
5  2016, look at check number 1682.
6    A.  Okay.
7    Q.  Is that your signature?
8    A.  Yeah, that looks like my signature.
9    Q.  For cash?
10    A.  Yeah.
11    Q.  Is that if you needed cash, you would write a
12  check for cash?
13    A.  I have never done it, but I think it might be
14  reimbursements for employees if they use gas.  I have some
15  -- You know, we've had some agents that didn't have bank
16  accounts, or they just needed cash really fast to get by,
17  or maybe signing bonuses.
18    Q.  Right.  That's what you think you were doing
19  there?
20    A.  I mean, I can't remember specifically September
21  22nd what that cash was for, but if you ask me if I cashed
22  it, that wouldn't be possible.  I have never cashed a check
23  under Solim, LLC.
24    Q.  Okay.  You would sign in when you were in the
25  office or something?

Page 207

1    A.  Yes.
2    Q.  If you go to --  Let's go to November of 2016,
3  let's skip ahead some.
4    A.  Okay.
5    Q.  So again, we start off deposits, there's a
6  49,750, so that's a $50,000 loan from Priority?
7    A.  Correct.
8    Q.  Residuals of 74,000?
9    A.  Correct.
10    Q.  Right?  The usual going it transfers out?
11    A.  Yes.
12    Q.  First of all, the address there, 2550 Pleasant
13  Hill Road, but it's Suite 106?
14    A.  Oh, we moved.
15    Q.  You moved within the same building?
16    A.  Yes, we grew from 106 to 424.
17    Q.  If you look ahead at January 2017, it looks like
18  you went to 422 as well?
19    A.  January?
20    Q.  January, keep going.  Here, we'll get to it, and
21  I'll show it to you again.
22    A.  The fact of the matter is I don't know what this
23  is, but we moved from the first floor to the second floor
24  within the same shopping complex.
25    Q.  Okay.

Page 208

1    A.  So if you notice the address change, that's the
2  reason for that.  We grew out of the 800 square-foot office
3  in the same complex to upstairs or the space that we moved
4  into was 3300 square feet.
5    Q.  Okay.  If you look back at the checks here --
6    A.  Are we looking at November?
7    Q.  I am, yes.  If you look at the checks, the checks
8  -- do you see the account they are drawn on?
9    A.  Okay.  What check number?
10    Q.  All of them.
11    A.  Okay.
12    Q.  Solim, LLC (PPS Card Service)?
13    A.  Okay.
14    Q.  So that was one and the same, Solim and PPS Card
15  Service?
16    A.  I'm not sure why I did it this way.  My
17  assumption would be -- I'm not sure why he changed to
18  Solim, LLC and then PPS Card Service.
19    Q.  Okay.
20    A.  I'm just really not sure.
21    Q.  Okay.
22    A.  But I think it might be because, it might be,
23  because at one point we had gotten to so much
24  reimbursements for charges because we paid for employees'
25  expenses, so I believe at one point KB gave everyone a

52 (Pages 205 to 208)

8/31/2021

Page 209

```
 1  check card.  Yeah.
 2       Q.  Everybody is who?
 3       A.  Everybody needs a reimbursement, so for gas, or
 4  for lunch.  We provided lunch for our crew.  So for lunch
 5  and gas.  Because he got tired of trying to calculate.  So
 6  at one point I remember -- We stopped after a certain
 7  time, but at one point he issued a check card to everybody.
 8       Q.  Did you have a check card?
 9       A.  No, I didn't.
10       Q.  Everybody except you?
11       A.  Yeah, because KB paid for everything, he didn't
12  have to keep track.  But what he really wanted to do was
13  keep track of employee spending.  So at one point he did
14  that and distributed it to each employee.  And I believe at
15  that time each card  had a max spending limit so he could
16  control.  And the reason I mention that is because it says
17  PPS Card Service and maybe that was around the same time he
18  did that.  He did that for the purpose of that.
19       Q.  Okay.  If you look at January 1st of 2017, the
20  Suite is now 422?
21       A.  Yes.
22       Q.  Y'all moved to 422 and then to 424?
23       A.  No.  It's always been 424.  Maybe this is a
24  misprint.
25       Q.  All right.  If you look at the deposits and
```

Page 210

```
 1  credits, there's another $50,000 loan from Priority.  And
 2  then on January 20th, there's residuals of 96,000.  Do you
 3  see that?
 4       A.  Yes.
 5       Q.  So it is going up?
 6       A.  Yes.  And again, just by looking at debits, I
 7  don't see a lot of debit card transactions, which kind of
 8  tells me that he has been using either Chase cards, right,
 9  because, you know, he had to have --
10       Q.  To pay for expenses, you mean other than all the
11  checks that are written?
12       A.  Yeah, other than checks written.  Because --
13       Q.  What were y'all's largest expenses?
14       A.  Well, payroll would be -- The larger ones would
15  be the shopping mall lease.
16       Q.  How did y'all pay for it; do you know?
17       A.  I don't know.  Maybe a check or a credit card.
18       Q.  You don't know?
19       A.  I don't know.  At the time it's -- It's always
20  going to be largest expenses are payroll, period.  Because
21  we are not in a selling business.  We are in a service
22  business.
23       Q.  What other expenses?  Rent, payroll.  What else?
24  Did y'all have insurance?
25       A.  Yes.  Worker's Compensation, basic insurance,
```

Page 211

```
 1  taxes quarterly, sales taxes, car maintenance.  I've
 2  noticed there is a whole bunch of a shop called 484, that
 3  is where we took our cars for repairs.  Because we are
 4  beating on these cars, gas, meals, their pay, just standard
 5  expenses.  But I presume the largest expenses is probably
 6  payroll, residual payouts.
 7       Q.  Other than the ones to KB on his Chase?
 8       A.  Yeah, and inside support.  Because at that time,
 9  if this was February 2017, we probably had at least 25, 30
10  people at least.  In general if you look at deposits,
11  $160,000, withdrawals and debits 84, checks are 61.  30 --
12  you know, 25 people multiplied by -- the lowest someone got
13  paid was $3500 max was 4,000.  If we calculate just in
14  payroll alone, that is $80-$90,000 with 25, 30 people in-
15  house.
16       Q.  Look at March of 2017, for example.
17       A.  Okay.
18       Q.  There is $186,000 in deposits, 128,000 out.
19       A.  Uh-huh (affirmative).
20       Q.  Right?
21       A.  100 --
22       Q.  Withdrawals and other debits --
23       A.  Yeah.
24       Q.  -- and checks.  So 200 out.
25       A.  Yeah.
```

Page 212

```
 1       Q.  So if you look at the ones to KB, there is a
 2  22,000, there's a 15,000, there's a 30,000, there's a
 3  5,000.
 4       A.  Where is there a 15,000?
 5       Q.  I'm just going down to withdrawals or other
 6  debits.  So that's 37.
 7       A.  Okay.
 8       Q.  67.  Almost $80,000 of the going out went to KB?
 9       A.  Again, the Chase credit card, you know.  These
10  are probably the purchases that he has made with his credit
11  card.
12       Q.  But that is not payroll, right?
13       A.  No, it's not.  The payroll would be maybe some of
14  the transfers, like online transfer to 6679 or maybe we
15  could identify it with the check.  I didn't go through this
16  personally, but I'm pretty sure when we go down the line,
17  I'm pretty sure like here looking at check number 1867,
18  Jung Hee Hwang, there's a check for 1077.07 and then
19  there's a check for Kyownghee Heu, check number 1813, you
20  know, 200.62.  And if you look at Eddy Kim right here,
21  check number 1854.
22       Q.  That's a check for 2,000.
23       A.  Yeah.  Then if you look at Hankook Business
24  Solutions, that's where we purchased the POS system
25  locally.  Then Tina Kim, she used to be a service
```

53 (Pages 209 to 212)

Metro Atlanta Reporters, Inc.
770-985-2344

8/31/2021

---

Page 213

1  representative. I am pretty sure we will go through this,
2  but when I look at this, here is $186,000 in deposits, and
3  then you have close to $200,000 in spending. If I retract
4  back to how many people were there, right, including KB and
5  sales agents, let's just say 20 people, I'm calculating
6  this in my head, this figure doesn't seem very off. And on
7  top of that, there aren't any debit transactions with a
8  debit card per se. So what my -- Because you are probably
9  going to see this Chase credit card payment with Kwang B.
10  Lim continuously. Here is a significant amount for $30,000
11  and he's paying it randomly. So he's probably making that
12  payment because he purchased equipment and other services,
13  anything that has to do -- anybody that will take a credit
14  card payment, I'm pretty sure he used Chase credit card to
15  build rewards and points.
16    **Q. But you're guessing; you don't know that?**
17    A. No, I'm guessing. I'm absolutely guessing. But
18  I know he was using a Chase credit card for purchases
19  because he told me he is using a Chase platinum card.
20    **Q. Okay. Well let's skip ahead because it is the
21  same story throughout; it just keeps increasing in numbers.
22  Now when we finally get up to August of 2017, that's when
23  it goes to Suit 424. But you don't think that was a move;
24  you think it was a --**
25    A. No, I know it's not a move, Greg, because I'm

---

Page 214

1  sure we moved one time from first level to second level.
2  I'm pretty sure maybe our mail started missing and then we
3  figured out 422 was the right suite number.
4    **Q. Okay.**
5    A. And I don't know if there is a suite number
6  called 422 there.
7    **Q. Okay. There's a -- On that August 2017, there's
8  a check number 2045 J. Buffalo in Athens.**
9    A. Okay.
10    **Q. For $26,000. Do you know what that is?**
11    MR. ROUNTREE: 4425 you said?
12    MR. MICHELL: 2045 is the check number.
13    MR. ROUNTREE: I'm sorry, 2045.
14    MR. MICHELL: 2045.
15  BY THE WITNESS: (Resuming)
16    A. J. Buffalo. Yes I do, actually. I read Korean,
17  I remember. There are about six J. Buffalo Wings in the
18  state of Georgia. I actually do remember those
19  specifically because Jaden screwed up. These are all owned
20  by Koreans. There are a couple of them in Athens. There
21  are a couple in the Roswell area. What time is it? Sorry,
22  Greg.
23    **Q. 4:30.**
24    A. So our data task involves doing a DDA change.
25    **Q. All right.**

---

Page 215

1    A. DDA change, customer request a DDA change. There
2  is a customer in Roswell that requested a DDA change. So
3  let me just clarify so that I don't get confused. So here
4  is J. Buffalo 1 and here is J. Buffalo 2 and then then
5  merchant has requested a bank account change for his
6  account. And our clerk located J. Buffalo, but instead of
7  doing a DDA change for J. Buffalo 1, she did a DDA change
8  for J. Buffalo 2. So all the money was going in --
9    **Q. To the wrong bank account?**
10    A. Yeah. So she calls us or whomever and says, hey,
11  I haven't gotten a deposit in about 15 or 20 days or so.
12    **Q. Right.**
13    A. So we had -- we had a huge dispute because J.
14  Buffalo 2 wanted to figure out, hey, am I going to pay tax
15  on this revenue, right, am I going to have to pay tax. And
16  this J. Buffalo 1 was going crazy because she wasn't
17  getting her money. So what we ended up doing we said,
18  let's settle with J. Buffalo 2 you later. And she was
19  short, and she was struggling, so get her the money so that
20  way we could compute this later and calculate this. And
21  that's exactly what that was for, now I remember. Because
22  this took forever for us to resolve.
23    **Q. So you were reimbursing money you had deposited
24  in the wrong account?**
25    A. In the wrong account. Which if it was maybe a

---

Page 216

1  smaller amount, we would rectify it, but it was such a
2  large amount, that's why I remember, yes.
3    MR. MICHELL: I'd like to go back for like
4  five minutes and see if there's anything particular
5  about these that I haven't already covered on the bank
6  statements and then maybe we can have a couple of
7  questions and shorten it up.
8    MR. ROUNTREE: Okay, good deal.
9    (Whereupon, a brief recess was taken.)
10  BY MR. MICHELL: (Resuming)
11    **Q. I want to go back just a little bit because I'm
12  not sure I am clear, or I know I am not clear on how back
13  when you were working for Solim how you paid for things.
14  Because you didn't get paid. You said that Solim paid some
15  bills for you, correct?**
16    A. Well, Solim -- And I am not a high maintenance
17  guy, so it's either rent or car payment.
18    **Q. But in terms of cash, you said that you paid for
19  some things with cash?**
20    A. Correct.
21    **Q. How did you get cash?**
22    A. Well, we did other selling, you know, credit card
23  sales. There are credit card terminal sales or equipment
24  sales. And a lot of our clients will pay us in cash.
25    **Q. So you would just keep that and use that as**

---

54 (Pages 213 to 216)

Metro Atlanta Reporters, Inc.
770-985-2344

Page 217

1  spending money?
2      A.  Yeah.  So if a customer buys a receipt printer,
3  we would go and install and we would say it's $264 and he
4  would give us cash.  And I would give it to KB and he has a
5  stack.  And I would say, hey, can I have $500, I'm running
6  low.  And honestly, sometimes I didn't ask, I would just
7  leave a note because he's an accounting person and needs to
8  keep track.  Believe it or not, we did come across quite a
9  bit of cash.  And by me not having a bank account, you
10  know, probably somebody can't imagine how could you not
11  have a bank account.  I work with a group of people as if
12  they were my family, so it would just never occur to me
13  that I had to.  One of the reasons it just made it a little
14  more convenient, I didn't have to deal with any of this,
15  you know, KB, I was pushing more work towards Susan and
16  everybody else.  And that's how I paid for my expenses.  I
17  think one of the expenses that probably changed was just
18  the insurance company was from, say, Geico to State Farm.
19  Other than that, everything -- all the expenses were paid
20  out of Solim's account.
21      Q.  Okay.  And any cash you needed for walking around
22  money you got from KB or you got from merchants who paid in
23  cash or you took it from --
24      A.  Essentially it's all from Solim because I
25  wouldn't go out and sell something and directly pocket it.

Page 218

1  I would give it with the invoice and the money, here is a
2  pile of $264 or 1,000 that I'm giving it to you because we
3  did this work and they paid that in cash.  So there's
4  always a folder, you know, he doesn't pay anybody else in
5  case.  So here's a folder that he would just click and
6  normally there's two or $3,000 in there and I'll just leave
7  a memo if I'm taking something, $500.  Or if I'm buying the
8  crew lunch, I'll just pull it out of there.
9      Q.  Right.  So when we look at things like you had
10  that one 1099 from Priority, I guess, for 400,000 something
11  dollars in 2015 that you produced, do you remember what I'm
12  talking about?
13      A.  The very first one that we saw?
14      Q.  Right.  How did you pay those taxes?
15      A.  What do you mean?
16      Q.  Well, you would be taxed on that income, correct?
17  When you paid your tax return, how would you pay your
18  taxes?
19      A.  Solim, KB from the get-go.
20      Q.  He paid those taxes for you?
21      A.  Or paid those taxes, but you know, at the very
22  beginning of 2014, 2015 we spent so much money in
23  equipment, nobody has made money.  Just because it says
24  $450,000 in the 1099 means that we didn't have expenses.
25  That was right around the time the EMV, the chip card has

Page 219

1  came around the corner.  And we dumped 500 or 600 credit
2  card terminals because it was no longer viable.  That's why
3  I said, and one of the reasons I don't see TASQ or POS
4  portal, those are our biggest vendors.  2015 and 2016 we
5  bought thousands and thousands of credit card terminals and
6  pin pads.  I haven't ran through this, but I haven't seen a
7  POS portal or TASQ.  2015, 2016, '17 was a huge expense
8  year for any credit card salesperson.
9      Q.  I think you said you are going to try to get your
10  tax returns from prior years?
11      A.  Yeah, I will.
12      Q.  You think those were filed and prepared by KB?
13      A.  I know at least the times I worked with KB, I
14  didn't have to do anything for taxes.
15      Q.  He took care of that?
16      A.  He took care of it.
17      Q.  And he paid it?
18      A.  To my knowledge, yes.
19      Q.  Okay.
20      A.  As to my knowledge, from 2014 to the beginning of
21  2019, that is about six or seven years or so.  I have never
22  had to deal with paying something out or filing something.
23      Q.  Did you ever get any refunds on your tax returns?
24      A.  You know, I was single most of the time up until
25  2017.

Page 220

1      Q.  What does that mean, yes or no?
2      A.  No, I have never received a refund.
3      Q.  Okay.
4      A.  Even if I did, I would not have a bank account to
5  deposit it.  But the expenses were there, and I never
6  received a check.
7      Q.  All right.  When you were working for Solim just
8  kind of during this time, 2014 to 2018, you talked you were
9  out on the road.  I mean, you were working a lot; is that
10  right?
11      A.  I was working a lot, yeah.
12      Q.  What does that mean, though?  Can you quantify
13  that?  Did you work 50 hours a week?
14      A.  Oh, yeah, a little more about.  We had internal
15  customer service, but that was only up until 6 o'clock when
16  people went home.  So we've got some customers that were
17  bars or karaoke bars that open until 2:00 or 4:00, so I
18  would take all those calls from 6:00 to say 2:00.  And I
19  did mention this to Priority.  None of our customer service
20  calls ever go to y'all because we take it all.
21      Q.  Gotcha.  But you think you were putting in 50 or
22  more hours a week during this time period when you were
23  working --
24      A.  Oh, yeah.
25      Q.  -- between sales training and being on the road

55 (Pages 217 to 220)

Page 221

1   and installations and customer service and all of that?
2      A.   Definitely, but I would take time off here and
3   there. So I would say about 45 to 50 would be adequate
4   hours.
5      Q.   About what you averaged during that time period?
6      A.   Yeah, probably because weekends are pretty
7   flexible.
8      Q.   If you look at the July 2018 statement, and I'm
9   looking at the deposits coming in. You see the amount
10  coming in there, deposits and other credits. I'll let you
11  catch up. Are you there?
12     A.   I'm there now.
13     Q.   1.2 million?
14     A.   Yes.
15     Q.   1,291,000?
16     A.   Yes.
17     Q.   On the 3rd there was a $50,000 loan from Priority
18  that came in, right?
19     A.   Yes.
20     Q.   On the 20th, there was $87,000 in residual from
21  Priority?
22     A.   Right.
23     Q.   And another 12,000. Did you open up a separate
24  book of Merchants with Priority; is that why there were two
25  separate residual payments?

Page 222

1      A.   No. I think at this point Cynergy is gone, they
2   consolidated.
3      Q.   Okay. That may have been the former Cynergy?
4      A.   My assumption, this is First Data and then this
5   is TYSIS.
6      Q.   First Data being the 87?
7      A.   Yeah, because our main terminal and platform and
8   software base is First Data and secondary POS base is
9   TYSIS. Priority was pushing a lot to get TYSIS boarded
10  more. So my assumption is why these were separated.
11     Q.   That on July 31st, 2018 there is 1,000,050.
12  That's the RPA?
13     A.   Correct.
14     Q.   The residual purchase agreement we talked about,
15  right?
16     A.   Correct.
17     Q.   When I look at the money going out, I see KB, he
18  took out, you know, big payments 20,000, 10,000, flip over
19  to the next page, 30,000. And then there are two transfers
20  on the 31st, one to that account 8744 and one to that
21  account 6679 of 225,000 and 100,000; do you see that?
22     A.   Correct.
23     Q.   And you still believe -- I know you don't know,
24  but you think 8744 was KB's account?
25     A.   I know for a fact that was KB's account.

Page 223

1      Q.   Okay.
2      A.   What he probably did here was my guess would be
3   number one, he paid himself back. Because at this time we
4   were delinquent in a few payments that he covered for a lot
5   of payments. And number two, maybe he paid himself on a
6   residual that was due to him that he was unable to pay
7   himself because when we were short.
8      Q.   Okay.
9      A.   Yeah. So when this money came, I know that a lot
10  of past due bills were paid, a lot of past due -- a lot of
11  past due payroll, we had a little bit of delay in payroll,
12  was paid as well.
13     Q.   But there was no catch-up paid to you?
14     A.   No, no catch-up paid to me.
15     Q.   Look at check number 2626. There is a payment of
16  4,223 to Park Village Shopping Center. That is the rent,
17  correct?
18     A.   What is the check number?
19     Q.   2626.
20     A.   Yes.
21     Q.   So it looks like it was paid by check?
22     A.   Yes.
23     Q.   Turn to check 2653, please.
24     A.   (Witness complies with request of Counsel.)
25     Q.   There is a $9,349 payment to, how do you say

Page 224

1   that, Yongjoo Jeong?
2      A.   Youngjoo Jeong.
3      Q.   Who is that?
4      A.   That's Jaden.
5      Q.   That is one of the kind of five managers?
6      A.   Yeah.
7      Q.   Okay.
8      A.   That's Jaden.
9      Q.   Okay. Go to January 1st of 2019, please.
10     A.   Okay.
11     Q.   On deposits there if you look down on January
12  29th of 2019, the very bottom of page 4, that's the
13  $500,000 loan payment from Priority; is that correct?
14     A.   Yes, sir.
15     Q.   And up above it, the two Priority payments you
16  see the 93,000 and the 16,000, that's residual?
17     A.   Yes.
18     Q.   Then you go up to page 3, there is a 49,750 from
19  Priority, so that is a $50,000; is that right? So in
20  January, there was a 50,000 loan from Priority and a
21  $500,000 loan from Priority?
22     A.   Yes.
23     Q.   Flip to page 10 of 14. On withdrawals and
24  debits, there's a $10,000 -- I'm sorry, $20,000 payment to
25  LTS Associate, Inc. Do you know what that is?

56 (Pages 221 to 224)

8/31/2021

Page 225

1    A.  That is our security and network wiring vendor.

2  They provide wires and equipment vendor.

3    **Q.  What about Cloud Nine, 13,000 below that?**

4    A.  What date?

5    **Q.  Right there, right below it.  January 30th, 2019,**

6  **the entry directly below it.**

7    A.  Cloud nine is -- I believe it's an equipment

8  company as well.  They do imports, overseas purchases,

9  overseas vendors, overseas camera systems and wires as well

10  as far as I know.

11    **Q.  Then come on down to January 31st, Blue Star**

12  **Hebron in Kentucky.  Do you know what that is?**

13    A.  I believe that it's a POS vendor, equipment

14  vendor.

15    MR. MICHELL:  I think that's all the questions I

16  have. Do you have anything, or did I forget to ask

17  anything?  Okay, that's it.

18    (Whereupon, the examination in the above-entitled

19  matter was concluded at 5:02 p.m.)

20         oOo

Page 227

1    E R R A T A  S H E E T
2  CHAN SUK KIM/9/15/21/TD
3    I have read the within and foregoing pages
   numbered 5 through 225 and no changes are required:
4    This, the day of , 2021.
5    _____
   CHAN SUK KIM
6
7  Sworn to and subscribed before me, this _____ day
   of _____, 2021.
8  _____
9  Notary Public
10       - - -
11    I have read the within and foregoing pages 5
   through 225 and the following changes are required as a
12  result of the transcription thereof:
   Page _____ Line _____:_____
13  Page _____ Line _____:_____
   Page _____ Line _____:_____
14  Page _____ Line _____:_____
   Page _____ Line _____:_____
15
16    _____
   CHAN SUK KIM
17
18  Sworn to and subscribed before me, this _____ day
   of _____, 2021.
19  _____
   Notary Public
20
21
22
23
24
25

Page 226

1    C E R T I F I C A T E
   STATE OF GEORGIA  )
2  COUNTY OF CHEROKEE  )
3
   I hereby certify that the foregoing examination
4  was taken down by me, as stated in the caption; and the
5  questions and answers were reduced to print by me; that the
6  foregoing pages 5 through 225 represent a true, correct,
7  and complete transcript of the evidence given on Tuesday,
8  August 31, 2021, by the witness, CHAN SUK KIM, who was
9  first duly sworn by me; that I am not a relative, employee,
10  attorney or counsel of any of the parties; am not a
11  relative or employee of attorney or counsel for any of said
12  parties; nor am I financially interested in the outcome of
13  the action.
14    This the 15th day of September, 2021.
15
16
17  _____
   Tanga Donnelly, CCR
18  Certified Court Reporter
   License No.  B-1868
19
20
21
22
23
24
25

57 (Pages 225 to 227)

# EXHIBIT C

Jun  03  2014  2:02PM  HP  Fax                                    page  4



*Next Generation Bank Card Solutions*




**PRIORITY**
PAYMENT SYSTEMS

## Table of Contents

Agreement for Processing Services ...........................................................................7
    1. ...............................................................................................................De
    finitions .....................................................................................................7
    2. ...............................................................................................................Da
    ta Management ........................................................................................9
    3. ...............................................................................................................Me
    rchants and Merchant Agreements..........................................................9
    4. ...............................................................................................................Co
    mpliance with Rules ...............................................................................11
    5. ...............................................................................................................Co
    mpensation to CLIENT............................................................................12
    6. ...............................................................................................................Du
    e Care and Liability ...............................................................................13
    7. ...............................................................................................................Ge
    neral ......................................................................................................13
    8. ...............................................................................................................Ter
    mination .................................................................................................15
    9. ...............................................................................................................Re
    sidual Valuation and Buy Out Option .....................................................16
    10. ..............................................................................................................As
    signment ................................................................................................16
    11. ..............................................................................................................Sal
    e of Merchant Services Business............................................................16
    12. ..............................................................................................................Co
    nfidentiality ............................................................................................16
Schedule A-1 .....................................................................................................17
Exhibit 1 .............................................................................................................18

Jun 03 2014 2:04PM HP Fax                                    page 6


**PRIORITY**
PAYMENT SYSTEMS

## Agreement for Processing Services

This Agreement for Processing Services ("Agreement") is made on 2ᴺᴰ day of June , 2014 ("Effective Date", by and between PRIORITY PAYMENT SYSTEMS LLC ("PRIORITY"), a Georgia Limited Liability Company with offices at 2001 Westside Parkway Suite 155, Alpharetta, GA 30004 and Chan S Kim ("CLIENT"), a (jurisdiction of organization) Sole proprietor (Corporation, partnership, sole proprietor, other) with principal offices at 5725 Buford Highway #211 Doraville GA 30340

PURPOSE OF AGREEMENT: The purpose of this agreement is to set forth the terms and conditions under which CLIENT shall refer to PRIORITY prospective merchants meeting the qualifications of PRIORITY, and for the purpose of providing to such referred merchants financial transaction processing services, and to set forth the compensation PRIORITY will pay to CLIENT for such referrals and other services described herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged and intending to be legally bound hereby, CLIENT and PRIORITY agree as follows:

1. **DEFINITIONS.** As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

   a. "Acceptable Merchant" shall mean a merchant who does not perform the services or sales described in Exhibit I, and who is acceptable to PRIORITY, as determined in its sole discretion and unfettered discretion.

   b. "American Express" or "AMEX" shall mean American Express Travel Related Services Company, Inc.

   c. "Assessment Fee" shall mean the fee that is collected from a Referred Merchant or CLIENT on behalf of the Card Associations for a Transaction.

   d. "Cardholder" shall mean (i) the person in whose name a Credit Card or Debit Card or other FTD has been issued, and shall also mean (ii) any person who possesses and uses a Credit Card or Debit Card or other FTD and who purports to be the person in whose name the Credit Card or Debit Card or other FTD was issued or whose signature appears on the Credit Card or Debit Card or other FTD as an authorized user.

   e. "Cause" shall mean the occurrence of any one or more of the following: (i) [reserved]; (ii) [reserved]; (iii) any failure by CLIENT to comply with the Rules and all applicable laws and regulatory requirements, whether Federal or state; (iv) any intentional misrepresentation by CLIENT or any employee, officer, agent or director of CLIENT in connection with the referral of a prospective Referred Merchant or an application by a prospective Referred Merchant for services hereunder; (v) [reserved]; (vi) the financial insolvency, bankruptcy or appointment of a receiver of CLIENT; (vii) [reserved]; and (viii) any failure by CLIENT to provide appropriate sales agent support (including without limitation merchant application review, site inspection, commission reporting and commission payment).

   f. "Chargeback" shall mean a Transaction charged back by a Cardholder pursuant to the Rules.

   g. "Credit Card" shall mean a (i) VISA card or other card bearing the symbol(s) of VISA U.S.A. Inc. or VISA International Inc. or (ii) a MasterCard card or other card bearing the symbol(s) of MasterCard International Incorporated or (iii) other card by a card issuer/licensor similar to MasterCard or Visa to be used as a FTD.

Client Initials CSK



**PRIORITY**
PAYMENT SYSTEMS

h. "Credit Card Associations" shall mean VISA U.S.A. Inc., VISA International Inc., MasterCard International Incorporated, American Express, Discover, et al and any successor organization or association.

i. "Debit Card" shall mean any card that enables the cardholder to pay for goods or services that primarily accesses a demand deposit account of the debit cardholder, bearing the symbols of a Debit Network.

j. "Debit Network" shall mean any Debit Card sponsoring organization or association that hereafter contracts with PRIORITY or Member to authorize and settle any transactions effected with their Debit Cards.

k. "Diners Club" shall mean Citicorp Diners Club, International, Ltd. A subsidiary of Discover Financial Services.

l. "Discover" shall mean DFS Services, LLC. A subsidiary of Discover Financial Services

m. "Financial Transaction Device" or "FTD" shall mean any credit, debit or other financial transaction device, including but not limited to a credit card, debit card, stored value card, smart card or other evolutionary device used for the purpose of effecting transactions through merchants in exchange for goods or services.

n. "Interchange Fee" shall mean the charge levied and collected in accordance with the Rules with respect to Credit Card transactions and, as such, may be amended from time to time according to the Credit Card Associations.

o. "JCB" shall mean Japanese Credit Bureau.

p. "MasterCard" shall mean MasterCard International, Incorporated (a Delaware corporation).

q. "Member" shall mean a financial institution, which is a principal member of VISA and MasterCard to whom the rights and obligations of Member hereunder may be assigned.

r. "Merchant Agreement" shall mean a contractual agreement (in a form approved by PRIORITY and Member and unaltered, prior to executing with Referred Merchant) executed among PRIORITY, Member and a Referred Merchant for services related to any FTD. The initial form of Merchant Agreement shall be provided by PRIORITY and Member, and the form of Merchant Agreement may be changed by either PRIORITY or Member, in its sole discretion.

s. "Merchant Loss" shall mean any loss incurred by PRIORITY for any reason attributable to a Referred Merchant, including but not limited to, losses due to uncollected fees, Chargebacks, and refunds to Cardholders.

t. "Merchant Services" shall mean the Credit card, Debit card or other FTD processing services offered or provided by PRIORITY and Member (or their designees) pursuant to Merchant Agreements.

u. "Merchant Operating Account" shall mean a deposit account maintained by a Referred Merchant at a FDIC-insured financial institution, which is acceptable to PRIORITY and Member and is a member of Automated Clearing House ("ACH").

v. "Pass Through" shall mean that PRIORITY may charge CLIENT for any fees, expenses, or penalties, whether or not specifically enumerated in Schedule A, incurred in connection with any fees, expenses, or penalties charged by Member, any Card Associations or other service providers.

w. "Referred Merchant" shall mean any seller of goods, services, or both, referred to PRIORITY and Member by CLIENT, and which is a party to a Merchant Agreement. During the term and subject to the provisions of this Agreement, CLIENT shall provide to all Referred Merchants the services described in Section 3. h below.

x. "Rules" shall mean applicable federal, state and local laws and regulations, the bylaws, rules, regulations and procedures issued by MasterCard, VISA, American Express, Discover, JCB, Diners, NACHA (National Automated Clearing House Association) and the bylaws, rules, regulations and procedures of a debit card network, as amended or supplemented from time to time.



**PRIORITY**
PAYMENT SYSTEMS

y.   "Sales Draft" shall mean a charge form or draft evidencing the purchase by a Cardholder of goods or services at a Referred Merchant location or otherwise contemplated by the applicable Merchant Agreement, by use of a FTD.

z.   "Transaction" shall mean the purchase or credit by a Cardholder of goods or services at a Referred Merchant's location, by use of a FTD.

aa.  "VISA" shall mean VISA U.S.A. Inc. (a Delaware corporation).

bb.  "Merchant Data" means any of the following information regarding a Merchant:  tax identification number, payment card account numbers, DUNS numbers, bank account/routing numbers or other such identifying numbers or any information that is reasonably considered confidential.  As used herein, Merchant Data shall also include any personal information of a Merchant's individual principals, owners, employees or agents, including, without limitation, such individual's last name in combination with any account numbers, card numbers, social security numbers, driver's license numbers or other information that, if compromised, would put the individual(s) at risk identity theft or other damages.



**PRIORITY**
PAYMENT SYSTEMS

2. **DATA MANAGEMENT.** CLIENT agrees not to file, house, store, or maintain any Merchant Data on its computer systems, networks, phones, tablets or otherwise. CLIENT further agrees not to access Merchant Data required for obtaining a credit bureau score or for accessing funds from the merchant's bank account(s). CLIENT grants PRIORITY audit rights to review and ensure practical security measures are in place to protect Merchant Data, transaction data, and proprietary access to PRIORITY's Systems.

3. **MERCHANTS AND MERCHANT AGREEMENTS.**

   a. Recruitment of Merchants. In accordance with the policies and procedures set forth in the Credit Underwriting Guidelines, established and amended from time to time by PRIORITY, CLIENT shall use its best efforts to locate, investigate and refer merchants CLIENT believes to be likely candidates for Credit Card processing relationships with PRIORITY and Member. Notwithstanding any other provisions in this Agreement, CLIENT shall have the right to submit merchant applications and merchants to PRIORITY on a non-exclusive basis. CLIENT will market the Merchant Services offered by PRIORITY and Member at CLIENT's own expense, in accordance with all Rules relating to third party service providers and in accordance with all policies and procedures of Member and PRIORITY (including without limitation the pricing terms for Referred Merchants) as such policies and procedures may be amended from time to time. Merchants referred to PRIORITY and Member by CLIENT that enter into a Merchant Agreement (i.e. Referred Merchants) will have a direct business relationship with PRIORITY and Member, and will be subject to the terms of the applicable Merchant Agreement entered into by and among PRIORITY, Member and the Referred Merchant. CLIENT shall not be a party to any Merchant Agreement and CLIENT shall have no additional rights granted to it or obligations imposed upon it by any Merchant Agreement.

   b. Grant of License to Distribute. PRIORITY hereby grants to CLIENT a non-exclusive license to sell Card Services in any geographical location in which PRIORITY is registered by the Associations of VISA and MasterCard. However, CLIENT agrees not to use any name, trademark, service marks or logos of PRIORITY without obtaining the express prior written consent of PRIORITY (which consent may be withheld for any or no reason). Additionally, CLIENT agrees that it will use PRIORITY'S trademarks and service marks only in accordance with the Rules and as approved by PRIORITY. CLIENT acknowledges and agrees that PRIORITY may at any time immediately and without advance notice prohibit CLIENT from using the name, trademarks, service marks or logos of PRIORITY for any or no reason. CLIENT shall have no authority to permit use of PRIORITY's marks by any third party without PRIORITY'S prior written consent.

   c. Trademarks and Logos. CLIENT will not use the name, trademarks, service marks or logos of Member without the express prior written consent of such party. CLIENT acknowledges and agrees that MasterCard and VISA are the sole and exclusive owners of these respective trademarks and service marks, and that CLIENT will not contest the ownership of such marks. Additionally, CLIENT will use the VISA and MasterCard trademarks and service marks only in accordance with the Rules and after prior written approval of PRIORITY and Member (and the Credit Card Associations, if required). CLIENT acknowledges and agrees that the Credit Card Associations may at any time immediately and without advance notice prohibit CLIENT from using the marks of the Credit Card Association for any or no reason. Member must be prominently identified by name, city, state, and phone number on any program materials describing the Merchant Services. CLIENT shall have no authority to permit use of the VISA or MasterCard program marks by any third party. Any solicitation material used by CLIENT must clearly disclose that the merchant agreement is by and among PRIORITY, Member and the individual merchant.

   d. Approval of Merchants. Member, or PRIORITY acting as its agent, shall review all applications submitted by prospective merchants referred by CLIENT. Member and


**PRIORITY**
PAYMENT SYSTEMS

PRIORITY each reserve the right in their sole discretion to refuse to sign a Merchant Agreement with any merchant referred by CLIENT.

e. **Merchant Agreements.** Merchant Agreements shall be on forms provided by PRIORITY and Member and shall define the terms upon which PRIORITY and Member will provide Merchant Services to Merchant.

f. **Merchant Reserves.** Upon the request of PRIORITY or Member, CLIENT will assist PRIORITY and Member in coordinating the implementation of such safeguards as PRIORITY or Member determine is prudent or necessary to create or require, with respect to any Referred Merchant, reserves, holdbacks, deposits or other safeguards against Merchant Losses. Without limitation as to additional or different safeguards, PRIORITY or Member may require a Referred Merchant to pay up to 100% of the funds deposited by a Referred Merchant for such amount of time as determined by PRIORITY and MEMBER, in their sole discretion.

g. **Services Provided by PRIORITY.**

   I. PRIORITY shall provide the following services on behalf of Member, to CLIENT and the Referred Merchants. Any fees for these services will be listed on a Schedule A:

   1. Merchant account implementation, including new merchant set-up and administration of credit policy. Implementation to include the creation of an authorization record and a settlement record with a PRIORITY approved vendor;
   2. Authorization access to Visa, MasterCard, AMEX, Discover, JCB, and any other serviceable FTD for any approved Referred Merchant;
   3. Settlement Services access to Visa, MasterCard, AMEX, Discover, JCB, and any other serviceable FTD for any approved Referred Merchant;
   4. Collections and Fraud Monitoring Service;
   5. First line customer service;
   6. Commissioning and reporting to CLIENT pursuant to this agreement; and
   7. Optional Training, including Sales Agent training, product and service(s) overviews and optional Collateral Marketing Materials, including merchant user guides, product brochures, and equipment templates.

   ii. PRIORITY makes no representations or warranties, expressed or implied, with respect to the continuity or provision of services under this Agreement. CLIENT acknowledges that the Services may be interrupted by labor disputes, acts of God or government, fires, power outages, telecommunication outages, computer malfunctions, civil disturbances or other causes or events not within the control of PRIORITY, and PRIORITY shall not be liable for any damages, or other delay due to any cause other than PRIORITY's gross negligence or willful misconduct.

h. **Services Provided by CLIENT.** In addition to the duties of CLIENT described elsewhere in this Agreement, CLIENT shall provide the following services on behalf of PRIORITY and Member to the Referred Merchants, in each case, at the CLIENT's sole expense:

   i. **Merchant Review and Recommendation by CLIENT.** If required by PRIORITY or the Rules, CLIENT and PRIORITY acknowledge and agree that CLIENT shall perform an on-site inspection of the primary location for every prospective Referred Merchant it proposes to solicit (and other locations as appropriate), and in accordance with the Rules, for the purpose of verifying the inventory, if applicable, reviewing the solicitation and sales materials, and verifying the information provided on the Referred Merchant's application. If appropriate, CLIENT will recommend the prospective Referred Merchant to PRIORITY. Once CLIENT recommends the prospective Referred Merchant to PRIORITY, CLIENT will submit a Merchant Agreement, executed by the prospective Referred Merchant, in a form acceptable to PRIORITY and Member. If PRIORITY or Member request additional due diligence materials and/or other information, CLIENT shall obtain such materials and/or information and submit them to



**PRIORITY**
**PAYMENT SYSTEMS**

PRIORITY. CLIENT and PRIORITY mutually acknowledge and agree that Member has the right to decline and/or terminate any Merchant accepted for processing by CLIENT or PRIORITY.

ii. Representation of Truth in Information. CLIENT shall provide PRIORITY and Member with information that CLIENT, to its best knowledge, represents as true and accurate. CLIENT will assume and will indemnify and hold harmless PRIORITY and Member for all direct and indirect liability and damages incurred by PRIORITY or Member in connection with or in any way relating to the applicable Referred Merchantarising out of or relating to: (a) Merchant Losses caused by CLIENT's breach of this Agreement, including losses due to uncollected chargebacks and fees and merchant fraud; and (b) Merchant Losses caused by any negligent or willful distribution of inaccurate or incomplete information to unduly benefit or enrich CLIENT, including losses due to uncollected chargebacks and fees and merchant fraud. Except for as set forth above, CLIENT shall bear no liability the value of any Merchant Losses.

iii. Training. CLIENT shall provide training to each Referred Merchant, if necessary, in the procedures and Rules applicable to the acceptance of Credit Cards, the operation of terminal equipment and the use of PRIORITY products and services. CLIENT shall also train new employees of the Referred Merchant.

iv. Merchant Support. CLIENT shall provide reasonable ongoing support to ensure Referred Merchants are continually apprised of their customer service requirements and to remedy any customer service problems encountered by such Referred Merchants. CLIENT shall supervise such personnel it may engage as employees or agents in activities hereunder. The responsibility for all such personnel shall be that of CLIENT only, including the responsibility of assuring full compliance by all such personnel with the Rules and the terms and provisions of this Agreement.

l. Other Obligations.

i. Excluded Types of Merchants. CLIENT agrees that it or its designee will not market the Merchant Services or any services substantially similar to the Merchant Services to any PRIORITY merchant, any merchant of a PRIORITY agent or any customer of PRIORITY (whether currently existing or hereafter acquired). CLIENT also agrees to follow the guidelines set forth on Credit Underwriting Guidelines established by PRIORITY and Member from time to time with respect to soliciting and referring merchants. If CLIENT has any uncertainty as to whether a particular merchant is covered by these restrictions or by Credit Underwriting Guidelines, CLIENT will discuss the matter in good faith with PRIORITY prior to proposing that such merchant enter into a Merchant Agreement with PRIORITY and Member.Notwithstanding any other provisions in this Agreement, if, without any action or conduct, direct or indirect, by CLIENT or any of its employees, agents, subsidiaries or principals, a merchant initiates a request to CLIENT to move its credit card processing services to another processor, then CLIENT must provide PRIORITY with written notice of any such written request and PRIORITY has the right to intervene to try and save the merchant for ten (10) days after the written notice from CLIENT to PRIORITY. CLIENT shall use its best efforts to maintain the merchant as a PRIORITY merchant. In the event that PRIORITY and CLIENT are unable to maintain the merchant as a PRIORITY merchant, then any such movement of the merchant by CLIENT away from PRIORITY shall be only for good cause (i.e. the merchant no longer wishes to process through PRIORITY) and is only for the occasional good faith movement of merchants and not to be used to move large numbers of Merchants. CLIENT may only move one merchant at a time and not more than three (3) per year in accordance with this Section. Notwithstanding any other provision in this Agreement, if PRIORITY fails to pay CLIENT any undisputed


**PRIORITY**
**PAYMENT SYSTEMS**

residuals as set forth in this Agreement after thirty (30) days written notice and a right to cure and such failure to pay residuals is not caused by an event allowing PRIORITY to terminate the residuals pursuant to the terms of this Agreement, then CLIENT may move the Referred Merchants to any processor that it chooses, in its sole discretion.

ii. Adverse Information. During the term of this Agreement, CLIENT agrees to notify PRIORITY and Member promptly in writing if CLIENT becomes aware of any information about the insolvency or bankruptcy (voluntary or involuntary) or change in ownership or business of any Referred Merchant, or if CLIENT becomes aware of any other significant adverse information about the financial condition of a Referred Merchant or about noncompliance with the Rules by a Referred Merchant, or any information indicating that any Referred Merchant's acceptance of Credit Cards is other than the bona fide sale of products or services indicated in the original Merchant Agreement signed by such Referred Merchant.

iii. Materials.

   1. All advertising and/or sales materials used by CLIENT shall be in compliance with the Rules.

   2. CLIENT shall not use, publish or distribute any materials that are not pre-approved in writing by PRIORITY when CLIENT is representing PRIORITY. Any marketing material which CLIENT desires to use, shall be forwarded to PRIORITY for approval, prior to publishing or distributing by CLIENT. PRIORITY agrees to review the marketing material within 10 business days of receipt. If PRIORITY does not respond within that time period, the marketing material submitted shall be deemed approved.

   3. While selling PRIORITY's product(s), CLIENT, when applicable, will provide a business card featuring PRIORITY's logo and Member Bank name, city and state. CLIENT must answer and respond to all telecommunications concerning services hereunder as PRIORITY, unless registered independently by VISA and MasterCard as an Independent Sales Organization and a Member Service Provider, respectively (as contemplated by the Rules).

   4. CLIENT agrees that upon receipt of any notice, from PRIORITY and or Member that CLIENT is utilizing non-compliant material, CLIENT will utilize its best efforts to recall the non-compliant material and cease its distribution.CLIENT will indemnify and hold harmless PRIORITY and Member from any loss, cost, claim, damage or expense (including reasonable attorney's fees and costs) incurred as a result of CLIENT using non-compliant material.

iv. Information. CLIENT shall distribute to its sales representatives, in a timely fashion, changes in operating mode and Rules received from PRIORITY or Member, that would affect the manner in which the Merchant Services are marketed by such representatives. CLIENT shall keep accurate records with respect to Referred Merchants' inquiries, orders, transactions and contacts which CLIENT makes pursuant to this Agreement. On behalf of PRIORITY and Member, CLIENT will request and use reasonable efforts to obtain and provide latest fiscal year business balance sheet and profit and loss statement on Referred Merchants and personal financial statements on principals, if requested by PRIORITY or Member.

4.  **COMPLIANCE WITH RULES.**

   a. Compliance with Rules. In accordance with the Rules regarding Member Service Providers, Independent Sales Organizations, Service Agents, and other similar


**PRIORITY**
**PAYMENT SYSTEMS**

designations by the Credit Card Associations, CLIENT acknowledges and agrees as follows:

  i. CLIENT understands and agrees to comply in all respects with the Rules (including without limitation the Rules regarding Member Service Providers);

  ii. CLIENT acknowledges and agrees that the Credit Card Associations have the right to enforce any provision of the Rules and to prohibit any conduct by CLIENT that creates a risk of injury to any one of the Credit Card Associations or that may adversely affect the integrity of their systems, information or both.  CLIENT agrees to refrain from taking any action that would have the effect of interfering with or preventing an exercise of such right by any one of the Credit Card Associations; and

  iii. in the event of any inconsistency between any provision of this Agreement and any of the Credit Card Association Rules, the Credit Card Association Rules will be afforded precedence and shall apply.

b. Registration (if applicable).  In connection with the services provided by CLIENT under this Agreement, CLIENT will register and will execute all applicable documents and agreements with VISA and MasterCard and will be in full compliance with the Rules. CLIENT further agrees to fully comply with the terms of any documents and agreements executed therewith.

## 5.  COMPENSATION TO CLIENT.

a. Processing Rates and Fees.  PRIORITY, acting on its own behalf and as Member's agent, shall pay to CLIENT as full consideration and compensation for the performance of all CLIENT's duties and obligations under this Agreement as set forth on Schedule A (referred to as CLIENT's residual stream or "Residuals").  PRIORITY shall use its reasonable efforts to make such payments within twenty (20) days following the end of each month. (For example, amounts payable to CLIENT for Referred Merchant revenues collected for March Transactions shall be paid to CLIENT by April 30, but PRIORITY will attempt to pay such revenues by April 20).

b. Pass-Through of Certain Fees.

  i. PRIORITY and Member reserve the right to pass through to CLIENT certain fees or penalties imposed by any Credit Card Association as a result of the activities, acts or omissions of CLIENT.    Additionally, CLIENT agrees to pay promptly any fees or penalties imposed by the Credit Card Associations with respect to CLIENT's registration as a service provider for Member.  All fees, expenses, or penalties charged to the CLIENT will be deducted from the CLIENT's residual stream and other amounts payable to CLIENT under this agreement.  CLIENT acknowledges that PRIORITY and Member, in their discretion and in accordance with the terms of the Merchant Agreements, may pass through to Referred Merchants any fees,  expenses, or penalties deemed necessary by PRIORITY, Member, the Credit Card Associations or other service providers.

  ii. PRIORITY may only amend Schedule A to reflect any additions, increases or decreases in the direct costs that it is charged by its vendors.  PRIORITY shall only be entitled to change the rates specified in the Schedule A by the same amount that its direct costs are changed by its vendors. During the term of the Agreement, CLIENT shall have to provide its consent before PRIORITY can add to Schedule A any additional products or services offered by PRIORITY. PRIORITY shall not charge CLIENT for any cost and fee increases that it does not implement to substantially all independent sales organizations and agents that are similarly situated to CLIENT (i.e. PRIORITY will not single out CLIENT for fees and cost increases).

c. Period of Compensation.  Payment of compensation to CLIENT hereunder with respect to a Referred Merchant shall terminate immediately upon termination of revenue to PRIORITY under the respective Merchant Agreement.  In the event that this Agreement

Client Initials ___


**PRIORITY**
PAYMENT SYSTEMS

is terminated prior to the termination of revenue to PRIORITY under any Merchant Agreement, PRIORITY shall continue to pay residual compensation to CLIENT with respect to any such Referred Merchant for so long as the respective Merchant Agreement continues in effect, except as otherwise set forth under this Agreement.CLIENT and PRIORITY agree that any errors or miscalculations in the residual compensation, as identified by either party, must be noticed to the other party to create a valid claim of amounts owed or payable.  Each party agrees that under no circumstance shall either party owe residual compensation overpayments or underpayments to the other party for any claim greater than one hundred eighty (180) days prior to the notice of dispute.

d.   Termination of Compensation.

(a) In the event (before or after any termination or expiration of this Agreement) of (x) the fraudulent conduct of CLIENT or any of its employees, agents or representatives (y) CLIENT commits a material breach (as defined below) of any of the card association rules or this Agreement, or (z) CLIENT or any of its employees, agents or representatives violates the provisions of section 3.1(i)(i), and CLIENT fails to remedy such conditions set forth in subsections (x-z) above within fifteen (15) days after receipt of written notice by PRIORITY, then PRIORITY shall be under no obligation to make further payments to CLIENT hereunder following the effective date of such termination subject to the procedure as set forth below.

(b) A material breach is defined as a breach of this Agreement which (a) involves a substantial failure to perform a term that is an essential element of this Agreement; or (b) the circumstances, including the language of this Agreement, the reasonable expectations of the parties, the standards and practices of the business, trade, or industry, and the character of the breach, indicate that: (A) the breach caused or is likely to cause substantial harm to the aggrieved party; or (B) the breach substantially deprived or is likely to substantially to deprive the aggrieved party of a significant benefit it reasonably expected under this Agreement.

(c) If CLIENT or its representatives engage in practices that involve elements of fraud, if the fraud or other conduct is determined to be the act of an individual who is not an owner, employee, agent or officer of CLIENT, or an individual acting in collusion with an owner, employee, agent or officer of CLIENT, in order to cure said breach CLIENT may cure the fraud during the time period of fifteen (15) days as follows. The fraud will be deemed cured if CLIENT terminates its relationship with the individual or individuals who have committed the fraud and compensates PRIORITY for the financial consequences of such fraud; provided, however, that if there are three (3) occurrences of such fraud within any consecutive twelve (12) month period, PRIORITY may cease payment of residuals immediately without the right of a cure period.

(d) In the event of a breach of breach of the non-solicitation provisions in section 3.1(i)(i), if the merchant in question has terminated its relationship with PRIORITY as a consequence of the solicitation, CLIENT may remedy the breach by (i) making the merchant move its processing back to PRIORITY within fifteen (15) days of written notice by PRIORITY to CLIENT and CLIENT must also pay PRIORITY any amounts it has collected in residuals for said merchant or (ii) paying PRIORITY forty (40) times the lost monthly residuals payable to PRIORITY. The remedy as set out in this paragraph is available for exercise a maximum of three (3) merchants per calendar year. CLIENT's right to receive compensation under this Agreement shall terminate in the event that PRIORITY or Member terminates this Agreement in accordance with Section 8, subject to CLIENT's notice of and right to cure any breaches or other grounds for termination as set forth in Section 8 or such other notice and cure provisions as set forth in this Agreement.  In addition, CLIENT's right to receive compensation under this Agreement shall terminate in the event that, during the term of this Agreement (including any extensions or renewals thereof), following the termination of this Agreement, or during the term of any Service Agreement (as defined herein) between PRIORITY and CLIENT

Client Initials CSK

Jun  03  2014  2:10PM  HP  Fax                                    page  15



**PRIORITY**
**PAYMENT SYSTEMS**

entered into pursuant to Section 8 of this Agreement, CLIENT or any of its subsidiaries, affiliates, or agents, directly or indirectly, solicits or contacts any Referred Merchant for the purpose of providing or receiving Merchant Services, or otherwise encourages a Referred Merchant to terminate a Merchant Agreement with PRIORITY and / or Member, subject to CLIENT's limited permitted exceptions to move Merchants as set forth in Section 3(i)(i) of this Agreement.

e.   **Amounts owed to PRIORITY.**  In the event, CLIENT's residual stream is insufficient to cover any fees, expenses, fines, penalties or any other cost due to PRIORITY from CLIENT, CLIENT will make such payment, of the full amount to PRIORITY within five (5) business days after notification from PRIORITY.

6.  **DUE CARE AND LIABILITY.** Except for the value of any merchant losses which will be governed pursuant to paragraph 3(h)(II),CLIENT hereby agrees to indemnify and hold harmless PRIORITY, Member, the Credit Card Associations, the Referred Merchants and the members of the Credit Card Associations from and against any claim, demand, loss, financial or otherwise, damage, liability or cost (including reasonable legal fees and expenses), caused by or in any way arising from: (i) any failure by CLIENT to fully comply with the Rules and all other rules, regulations, policies and procedures of PRIORITY, Member, any of the Credit Card Associations, or any other similar organization; (ii) any breach or default by CLIENT of this Agreement or any other agreement between CLIENT and (a) PRIORITY, (b) Member or (c) any Referred Merchant; (iii) any negligent or wrongful act or misrepresentation of information of or by CLIENT in performing or failing to perform its obligations hereunder; or (iv) any termination of this Agreement pursuant to Section 8 hereunder.  The obligations of CLIENT hereunder are not intended to cover typical credit losses (including chargebacks) incurred by PRIORITY or Member as a result of Referred Merchants' refusal or inability to pay, unless such credit losses are incurred by PRIORITY or Member as a result of any act or omission or misrepresentation of information of or by CLIENT as described in above.  In kind, PRIORITY hereby agrees to indemnify and hold harmless CLIENT from and against any claim, demand, loss, financial or otherwise, damage, liability or cost (including reasonable legal fees and expenses), caused by or in any way arising from: (i) any failure by PRIORITY to fully comply with the Rules and all other rules, regulations, policies and procedures of PRIORITY, Member, MasterCard, VISA and any other similar Credit Card licensor; (ii) any breach or default by PRIORITY of this Agreement or (ii) any gross negligence or wrongful act or misrepresentation of information of or by PRIORITY in performing or failing to perform its obligations hereunder.

7.  **GENERAL**

a.   **Governing Law.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

b.   **Entire Agreement.** All Schedules and Exhibits attached to this Agreement and the Rules are hereby incorporated into this Agreement by reference and made a part of this Agreement for all purposes.   This Agreement and those documents expressly incorporated herein represent the entire Agreement and understanding among PRIORITY, CLIENT and Member with respect to the matters contained herein and supersede and preempt any prior understandings, agreements, or representations by or between these parties, written or oral, which may have related to the subject matter hereof in any way.  Except as otherwise provided in this Agreement, it may be amended only by an instrument in writing signed by each of the parties hereto.

c.   **No Partnership or Agency.**  Nothing in this Agreement shall be deemed to constitute a partnership or joint venture between the parties hereto or be deemed to constitute CLIENT as an agent for PRIORITY or Member for any purpose whatsoever.  CLIENT is prohibited from acting as, or holding itself, himself, or herself out, as an agent of PRIORITY or Member.  PRIORITY, Member, and CLIENT acknowledge and agree that this Agreement does not constitute or appoint CLIENT as an agent of either PRIORITY or Member for any purpose whatsoever.  CLIENT is an independent contractor and not an


**PRIORITY**
PAYMENT SYSTEMS

employee of PRIORITY or Member. CLIENT expressly represents that it is an independent contractor under the laws of the United States and the common law and acknowledges that PRIORITY is relying upon this representation. It is understood that CLIENT maintains an independent business and, subject to the provisions of this Agreement, may work on other projects during or after the term of this Agreement. However, CLIENT will use its, his, or her best efforts to ensure the timely and proper completion of the services. It is mutually understood and agreed that CLIENT, while performing all services under this Agreement, shall operate at CLIENT's own expense, risk, discretion, and responsibility, except as the same may be limited by this Agreement. CLIENT acknowledges that it is CLIENT's sole responsibility to direct the time, manner, and method of accomplishing or performing the services contemplated by this Agreement and by the Rules. CLIENT may not incur any liability for, make promises or representations on behalf of, or otherwise act on behalf of PRIORITY. CLIENT is not eligible to participate in any benefits, plans, or programs sponsored or financed by PRIORITY, including without limitations, any insurance, paid leave, vacation, sick and holiday programs, plans or benefits as currently in effect or as modified or offered from time to time. CLIENT further understands and agrees that CLIENT is not covered under PRIORITY's or Member's workers' compensation insurance or state unemployment insurance coverages. CLIENT warrants that it has obtained all licenses, certificates, diplomas, and other professional designations, and satisfied all of the requirements imposed by law and by the Rules, which are necessary or appropriate prerequisites to CLIENT's rendition of services as an independent contractor under this Agreement. CLIENT acknowledges that CLIENT is fully responsible for CLIENT's own federal, state and local taxes.

d.  **CLIENT's Employees.** CLIENT acknowledges and agrees that during the term of this Agreement, all employees of CLIENT performing services for PRIORITY or Member, pursuant to this Agreement, whether or not such services are being performed on the property of PRIORITY or Member, and regardless of the nature of the task being performed are exclusively employed by CLIENT and not PRIORITY or Member. CLIENT acknowledges that it is CLIENT's sole responsibility to hire, train, supervise, discipline, and discharge its employees, and direct the time, manner and method of accomplishing or performing the services.   CLIENT acknowledges that it is solely CLIENT's responsibility to compensate its employees, provide CLIENT's employees with employee benefits, and to pay all applicable employment taxes with respect to CLIENT's employees. It is agreed that CLIENT's employees are exclusively employed by CLIENT and not jointly with PRIORITY or Member.

e.  **Third Party Rights.** This Agreement is solely for the benefit of the parties hereto and nothing herein, express or implied, shall be deemed to be for the benefit of any third party or create any third party rights or standing to sue.

f.  **Notices.** Any notice required or permitted under this Agreement shall be in writing and may be delivered by personal service or by U.S. certified mail, return receipt requested and postage prepaid, to the addresses of the parties set forth below, or such other addresses as may be provided by written notice to the other parties in accordance with the terms of this notice provisions. Any such notice shall be effective upon the earlier of (i) five days after deposit in the mail properly addressed and postage prepaid, or (ii) actual receipt.

i. If to PRIORITY:          PRIORITY PAYMENT SYSTEMS LLC
                            2001 Westside Parkway Suite 155
                            Alpharetta Georgia 30004
                            Attn: Corporate Counsel
                            With a copy to: CEO & COO

Jun 03 2014 2:12PM HP Fax                                    page 17


**PRIORITY**
PAYMENT SYSTEMS

ii. If to CLIENT:          CLIENT:        chan   s   Kim

                          Street Address:  5725  Buford Highway #211

                          City, St, ZIP:   Doraville  GA  30340

                          Attn:            chan  s  Kim.

g. **Dispute Resolution.** The parties agree: (1) that this Agreement, and any claims, demands, disputes and controversies between or among the parties or any persons bound hereby arising out of or relating to this Agreement, the documents executed in connection herewith, or the transactions contemplated hereby or thereby (individually and collectively, a "Dispute"), shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to conflict of law principles; (2) to submit themselves and any such Dispute to the exclusive jurisdiction of the state and federal courts located in Fulton County, Georgia; and (3) that they will not commence any action arising out of or related to this Agreement in any other court, venue or jurisdiction.Each party agrees to submit to the personal jurisdiction of the state and federal courts in Fulton County, Georgia and will not object to any action brought therein on the grounds of lack of jurisdiction, venue, or forum non conveniens.

h. **Force Majeure.** Neither party shall be liable to the other for any failure or delay in its performance of this Agreement in accordance with its terms if such failure or delay arises out of causes beyond the control and without the fault or negligence of such party.

i. **Waiver.** Any waiver or delay by any party hereto in asserting or exercising any right shall not constitute a waiver of any further or other rights of said party. If any part of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby.

j. **Attorney's Fees.** In the event any party hereto is determined, in connection with a final and binding arbitration pursuant to Section 7.g above, to have breached this Agreement, then the non-defaulting party shall be entitled to recover expenses incurred in enforcing the provisions of this Agreement, including reasonable attorneys' fees and costs.

k. **Severability.** If any provision of this Agreement is found illegal, invalid or unenforceable, such finding will not affect any other provision hereunder. This Agreement shall be deemed modified to the extent necessary to render enforceable the provisions hereunder, and to comply with the Rules.

l. **TERM OF AGREEMENT.** The term of this Agreement shall be for a period of two (2) years commencing from the date of this Agreement. Thereafter, this Agreement shall renew automatically for additional successive one-year terms, unless any party hereto provides the other parties written notice of intent not to renew this Agreement at least ninety (90) days prior to the expiration of the then current term. The terms of this Agreement shall remain in force with respect to all Transactions processed hereunder and all Chargebacks, fees and liabilities relative thereto.

m. **LIMITATION OF LIABILITY. EXCEPT FOR THE CONFIDENTIALITY OBLIGATIONS AND INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT,IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTYFOR EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION LOSS OF PROFIT, SAVINGS OR REVENUE, OR THE CLAIMS OF THIRD PARTIES INCLUDING END USERS, WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP OF PRIORITY AND CLIENT.**



**PRIORITY**
PAYMENT SYSTEMS

**8.  TERMINATION.**

a.  **Termination for Cause.**  Any party hereto may terminate this Agreement upon a default hereunder by another party if such default is not cured within (30) days of receipt of written notice thereof from the non-breaching party.  PRIORITY or Member may also terminate this Agreement for Cause, if such reason for the "for Cause" termination is not cured within thirty (30) days of receipt of written notice thereof.  This Agreement shall terminate upon commercially reasonable notice upon the occurrence of any one of the following:

    i. the termination of Member's MasterCard and VISA licenses and membership;

    ii. the termination of the PRIORITY/Member Agreement (provided, PRIORITY will attempt to give CLIENT at least sixty (60) days notice prior to termination); or

    iii. the termination by MasterCard or VISA of CLIENT's registration as a third party service provider for Member, if applicable.

Before terminating pursuant to sections 8(a)(i) – (iii) above, PRIORITY will use commercially reasonable and good faith efforts to retain a new sponsor bank or otherwise cure the reason allowing for termination. CLIENT acknowledges and agrees that the sponsoring bank and PRIORITY may terminate their relationship or sponsoring bank may terminate its sponsorship of CLIENT. If this occurs, or sponsoring bank ceases to be a member bank of Visa or MasterCard, PRIORITY will use commercially reasonable and good faith efforts to timely secure a replacement member bank to sponsor the CLIENT and the Program and assist with the transfer of Bank's rights and obligations under this Agreement and the Merchant Agreements to the replacement member bank.

b.  **Other Termination.**  PRIORITY or Member may, at its option, terminate this Agreement immediately without notice to CLIENT in the event of any one of the following events:

    i. the filing of a bankruptcy petition, insolvency, inability to meet its debts (in the ordinary course of business) or dissolution of CLIENT;

    ii. CLIENT making an assignment by CLIENT for the benefit of its creditors or an offer of settlement or extension to its creditors generally;

    iii. the appointment of a trustee, conservator, receiver or similar fiduciary for CLIENT or for substantially all of CLIENT's assets;

c.  **Certain Post-Termination Rights.**

    i. In the event of termination of this Agreement, PRIORITY and Member shall have the right, in addition to the other rights and remedies under this Agreement and at law and in equity, to exercise a right of set-off against such funds and payments otherwise due to CLIENT pursuant to this Agreement., for any amounts due to PRIORITY or Member hereunder pursuant to this Agreement, and, in the event of termination of this Agreement for cause, any damages suffered by PRIORITY or Member hereunder and at law, then owing or which may thereafter become owing.  No termination of this Agreement shall affect any Merchant Agreement that is in effect as of the time of termination.

    ii. After termination of this Agreement, CLIENT agrees to cooperate in all reasonable respects with PRIORITY and Member throughout the remaining term (including the initial term, any renewal term, or potential renewal term) of each Referred Merchant's Merchant Agreement.  CLIENT agrees not to solicit or encourage any Referred Merchant to terminate a Merchant Agreement in force with PRIORITY or Member for any reason during the initial term of that Merchant Agreement or any renewal term or potential renewal term thereof.Sections 5, 6, 8.c, 9, 10, and 11 shall survive termination of this Agreement.

**9.  ASSIGNMENT.**  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.  Notwithstanding the foregoing sentence, however, this Agreement may not be assigned by CLIENT without the prior written consent of PRIORITY, such consent not to be unreasonably withheld. Notwithstanding any other provision in this Agreement,

Jun 03 2014 2:13PM HP Fax                               page 19



**PRIORITY**
PAYMENT SYSTEMS

if PRIORITY sells it portfolio of merchants or its right to compensation for the Referred Merchants submitted by CLIENT to PRIORITY, PRIORITY or the purchaser must continue to fulfill PRIORITY's obligations under this Agreement, including, but not limited to, PRIORITY's obligation to pay compensation and residuals to CLIENT.

10. **SALE OF MERCHANT SERVICES BUSINESS.** Should CLIENT ever seek to sell its portfolio of Merchant Services business or more than 50% of CLIENT's business derived from its efforts hereunder, or receive an offer to purchase same that it chooses to accept, CLIENT will notify PRIORITY in writing of the offer and material attributes and PRIORITY will then have thirty (30) days from the receipt of such written notice to extend an offer to CLIENT on substantially identical terms. If PRIORITY makes such an offer within the permissible time period, CLIENTshall consummate the sale with PRIORITY. If PRIORITY fails or refuses to exercise its right of first refusal, CLIENT shall be free to sell its portfolio of Merchant Services business to the other purchaser on the terms set forth in the notice to PRIORITY. If CLIENT fails to sell its Merchant Services business to PRIORITY within 60 days of PRIORITY's offer, CLIENT agrees to reimburse PRIORITY for its time, travel expense, materials, and legal fees and any other relative expense to the process as stated in this section.

11. **CONFIDENTIALITY.** During the term of this Agreement (including any extensions or renewals thereof), and for so long as the information, data, or material remains confidential, CLIENT, PRIORITY and Member each agree that it will not disclose and will retain in strictest confidence all information,data, and material belonging to or relating to the business of the other parties to this Agreement, which is designated, verbally or in writing, as "confidential" by the party to which such information or data belongs or relates (including without limitation the terms of this Agreement and information related to ReferredMerchants), and that each party will safeguard such information and data by using the same degree of care and discretion that it uses with its own data that such party regards as confidential. In the event that the CLIENT or PRIORITY becomes legally required or compelled to disclose any confidential information, data, or material of the other party, then the party that becomes so legally required or compelled shall provide the other party with prompt prior written notice of such legal requirement so that the other party may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement. In the event that such protective order or other remedy is not obtained, and/or regardless of whether or not the other party waives compliance with the terms of this Agreement, the party that becomes so legally required or compelled agrees to disclose only that portion of the confidential information, data, or material of the other party which the party who is subject to such legal requirement is advised by written opinion of counsel is legally required to be disclosed and to exercise best efforts to obtain assurances that confidential treatment will be accorded such information, data, and material.

Accepted this 2ᴺᴰ day of June , 2014        CLIENT:  Chan  S Kim .

                                            By:     Chan  S Kim

                                            Title:   owner

                                            Date:   6/2/14

Client Initials CSK

Jun  03  2014  2:14PM  HP  Fax                                            page  20


**PRIORITY**
PAYMENT SYSTEMS

Accepted this ___4___ day of ___June___, 20_1_4      PRIORITY PAYMENT SYSTEMS, LLC

                                                    By: _____

                                                    Title: ___President . CEO___

                                                    Date: ___6-4-14___

Jun 03 2014 2:02PM HP Fax                                    page 2


**PRIORITY**
PAYMENT SYSTEMS

# CLIENTOffice Application

| Application for: | ISO/MSP | Agent Office | (circle one) |
|---|---|---|---|
| Legal Name: | Chan S Kim | | |
| DBA Name: | Chan S Kim | | |
| Other DBA Name: | Chan S Kim | | |
| Business Address | 5725 Buford Highway Doraville GA 30340 #211 | | |
| Business City, ST, Zip | | | |
| Business Phone: | 770-451-4044 Fax 678-348-7295 | | |
| Business E-Mail: | Happy honda 1001 @ gmail.com | | |
| Business Web Site: | | | |
| Date Business Established or Incorporated: | | State of Filing: | |
| Type of Business: | Corporation    Partnership    Sole Proprietor    LLC | | (circle one) |
| Federal Tax ID #: | | Dunn & Bradstreet # | |
| Square Footage of Office: | 1000 Sq | Time at this Office: 3 yrs | |
| Type of Space: | Office Bldg    Home    Other    (circle one) | | |
| Number of W-2 Employees: | | Number of 1099 Employees: 3 | |
| List all Banks/Processors you are registered with as an ISO/MSP or Agent: | | | |

## Personal Data of Owner(s) or Officers

| Name 1: | Chan S Kim | | Title: Owner | |
|---|---|---|---|---|
| Social Security Number: | 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 | % Ownership: 100 | DOB: 12/09/79 | |
| Home Address: | 5834 R Ashford Dunwoody Rd | | | |
| Home City, ST, Zip | Atlanta GA 30319 | | | |
| Home Phone: | | Cell Phone: 770-310-4798 | | |
| Name 2: | | | Title: | |
| Social Security Number: | | % Ownership: | DOB: | |
| Home Address: | | | | |
| Home City, ST, Zip | | | | |
| Home Phone: | | Cell Phone: | | |
| Name 3: | | | Title: | |
| Social Security Number: | | % Ownership: | DOB: | |
| Home Address: | | | | |
| Home City, ST, Zip | | | | |
| Home Phone: | | Cell Phone: | | |
| Have any of the principals ever been convicted of a felony? | Yes    No | (If yes, attach details) | | |
| Have any of the principals ever filed for bankruptcy? | Yes    No | (If yes, attach details) | | |
| Have any of the principals ever bee terminated by VISA, MasterCard, Bank or Processor or assessed fines or penalties? | Yes    No | (If yes, attach detail) | | |

Jun 03 2014 2:02PM HP Fax                                      page 3


**PRIORITY**
PAYMENT SYSTEMS

### Additional Office Contacts

| | | |
|---|---|---|
| Office Manager: Chan S Kim, | | Ext: |
| Application Processor: | | Ext: |
| Programmer/Installer: chris choi | | Ext: |
| Customer Service Manager: KB Lim. | | Ext: |
| Additional Customer Service Number | | |
| Sales Manager: Chan Kim. | | Ext: |
| Office Hours: 9 - 6 p m. | | |
| Additional Information: | | |

To induce PRIORITY Payment Systems, reliance thereon, the undersigned certify the accuracy of all foregoing information and authorize PRIORITY Payment Systems, its designated member of Visa/MasterCard, or other agents employed by PRIORITY Payment Systems, to investigate the references, statements, or information given to obtain credit, criminal, or other financial information on the business and owners/officers listed above. I/we further agree to notify PRIORITY Payments Systems promptly of any and all changes which may occur from time to time in the information and statements contained herein. The undersigned further acknowledge and agree that all information marked "confidential" provided by PRIORITY Payment Systems, including but not limited to pricing information and credit policy, will be kept in strict confidence and not disclosed to any third party without the prior written consent of PRIORITY Payment Systems.

Owner/Officer Signature _____ Date 6/3/14

Owner/Officer Signature _____ Date_____

## AMENDMENT TO THE AGREEMENT
## FOR PROCESSING SERVICES

THIS AMENDMENT (the "Amendment") to the Agreement for Processing Services between Chan Kim ("Client") and Priority Payment Systems, LLC ("Priority"), is entered into and effective as of November 1, 2014 ("Effective Date").

WHEREAS, Priority and Client are party to an Agreement for Processing Services dated as June 2nd, 2014 (the "Agreement"); and

WHEREAS, in consideration for and in connection with a loan between Priority and Client, the parties wish to have Client commit to a minimum number of new merchant approvals per year.

NOW, THEREFORE, in consideration of the premises recited herein and for other good and valuable consideration, the receipt and the adequacy of which are hereby acknowledged, the Agreement is amended as follows:

1.      The Agreement is amended by inserting a new Section 7(n) as follows:

Right of First Refusal. For the period beginning November 1, 2014 and ending on the date all debts owed to Priority by Client (including without limitation, amounts owed pursuant to the Loan Agreement between Priority and Client dated as of November 1, 2014 (the "Loan Agreement")) are repaid, Client shall not market or sell Merchant Services of, or on behalf of, any party other than Priority. Client acknowledges and agrees that Priority has the sole authority, in its discretion, to accept or reject any prospective merchant, but the Client is obligated to present all applications from parties seeking Merchant Services to Priority. Only under the circumstance that an application has been submitted, and declined by Priority (and such decline is documented), Client may submit such application to a third party processor. Client acknowledges and agrees that Priority shall have the right to audit the books and records of Client to ensure compliance with the restrictions of this Section 7(n). The provisions of this section 7(n) shall be binding on Client, its affiliates, successors and assigns. Failure to comply with the provisions of this Section 7(n) shall be a material breach of this Agreement, and Priority shall be entitled to terminate the Agreement for cause, including termination of compensation pursuant to Section 5(d)

2.      The Agreement is amended by inserting a new Section 7(o) as follows:

Other Agreements. The breach of any agreement between Priority and Client (including without limitation, the Loan Agreement), shall be a material breach of this Agreement and Priority shall be entitled to terminate the Agreement for cause, including termination of compensation pursuant to Section 5(d). Notwithstanding anything to the contrary contained within the Agreement, Priority shall have the right to take, when due, any loan payments owed by Client to Priority, from any available residuals accruing under the Processing Agreement, and if such residuals fully pay all such due payments, then there shall be no material breach of the Agreement. The breach of this Agreement shall also

2884859 1

constitute an "Event of Default" under any other agreement between Priority and Client, including, without limitation, the Loan Agreement.

3.    Client and Priority acknowledge and agree that this Amendment has been made in accordance with Section 7(b) of the Agreement and constitutes an effective and binding amendment to the Agreement.  This Amendment is limited to the amendments set forth herein and shall not constitute an amendment, modification, acceptance or waiver of any other provision of the Agreement.  Except as expressly amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions thereof.

4.    Capitalized terms used in this Amendment shall have the same meanings as in the Agreement unless otherwise defined herein.

5.    This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

**[Signature Page Follows]**

2

IN WITNESS WHEREOF, the undersigned have executed this instrument on behalf of Client and Priority on the date first set forth above.

**CLIENT:**

**CHAN S. KIM**

By: _____

Name: _____Chan Kim_____

Title: _____owner_____

**PRIORITY:**

**Priority Payment Systems LLC**

By: _____

Name: _____Richard Harris_____

Title: _____COO_____

2884859.1

# EXHIBIT D

## LOAN AGREEMENT

THIS LOAN AGREEMENT, made as of the 1st day of November, 2014 (the "Effective Date"), is by and between Priority Payment Systems LLC, a Georgia limited liability company ("Lender"), and Chan S. Kim (the "Borrower"), an individual resident of the state of Georgia.

## RECITALS

WHEREAS, the Borrower is party to that certain Agreement for Processing Services, as amended ("Processing Agreement"), with the Lender dated June 2nd, 2014, as amended from time to time, pursuant to which the Borrower acts as an agent of Lender and is entitled to receive certain residual payments from Lender in respect of merchants that are referred to Lender by the Borrower (the "Residuals"); and

Borrower has requested that Lender make a multi-draw loan in the amount of $200,000.00 to Borrower. Lender is willing to make such loan to Borrower on the terms and conditions set forth in this Agreement.

## SECTION 1.  DEFINITIONS

As used herein:

**"Activation Bonus Exposure"** means the amount Lender pays to Borrower as a bonus incentive that is liable to being recovered as detailed in the bonus incentive letter dated May 29, 2014 between Borrower and Lender, as amended from time to time (the "Activation Letter"). Lender has the right to recover a bonus incentive within one year of the merchant approval, such that the Activation Bonus Exposure to Lender is calculated as the total bonus incentive paid within a one-year rolling period minus any Clawback Amount recovered in a one-year rolling period.

**"Activation Leverage Ratio"** means the sum of (a) the outstanding Loan balance and (b) and the Activation Bonus Exposure, divided by (c) the Residual Net Value. For example, if the outstanding Loan balance is $80,000.00, the Activation Bonus Exposure is $20,000.00, and the Residual Net Value is 15,500.00 then the Activation Leverage Ratio would equal six and one half (6.5) [($80,000.00+$20,000.00)/$15,500.00) = 6.5].

**"Agreement"** means this Loan Agreement, as it may be amended, restated, modified, renewed or extended from time to time.

**"Borrower"** has the meaning set forth in the Recitals.

**"Borrowing Limit"** shall mean an amount equal to the product of (a) the Residual Net Value of the Borrower's monthly residuals generated under Processing Agreement and (b) a multiplier of five (5).

CSK

"**Business Day**" means any day on which the state banks and national banking associations in the State of Georgia are open for the conduct of ordinary business.

"**Card Association Rules**" means those rules, regulations, bulletins and other guidance issue by or on behalf of the card associations (VISA USA, Mastercard International, Discover, American Express Travel Related Services, and any similar card association) and the PCI Security Standards Council, including without limitation PCI-DSS.

"**Chargeback**" shall mean a charge on a credit card or debit card that is returned or unpaid by the financial or other institution that issued such card and a charge as otherwise defined in the Card Association Rules. For purposes of this definition, chargeback shall also include those card association fines, penalties, fees and losses related to or arising from Merchant transactions.

"**Clawback Amount**" means the amount Lender reserves the right to recover from Borrower for the bonus incentives as described in the Activation Letter.

"**Closing**" means the valid execution and delivery of the Note, this Agreement, and Collateral Documents to Lender.

"**Collateral**" means any property securing the Obligations from time to time.

"**Collateral Documents**" means the documents governing the Lender's interest in the Collateral, including without limitation the documents specified in Paragraphs 3.1(b) and (c), and including the Processing Agreement.

"**Effective Date**" has the meaning set forth in the Recitals.

"**Event of Default**" has the meaning set forth in Paragraph 8.1.

"**Financial Statements**" means the financial statements filed in connection with the Loan.

"**Financing Statements**" means any one or more filings made pursuant to the UCC to perfect the security interests in the Collateral granted to Lender pursuant to the Collateral Documents.

"**Indebtedness**" means, as to any Person, all items of indebtedness whether matured or unmatured, liquidated or unliquidated, direct or contingent, joint or several, including without limitation:

(a) All indebtedness guaranteed, directly or indirectly, in any manner, or endorsed (other than for collection or deposit in the ordinary course of business) or discounted with recourse;

(b)      All indebtedness in effect guaranteed, directly or indirectly, through agreements, contingent or otherwise: (i) to purchase such indebtedness: or (ii) to purchase, sell or lease (as lessee or lessor) property, products, materials or supplies or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such indebtedness or to assure the owner of the indebtedness against loss: or (iii) to supply funds to or in any other manner invest in the debtor;

(c)      All indebtedness secured by (or for which the holder of such indebtedness has a right, contingent or otherwise, to be secured by) any mortgage, deed of trust, collateral assignment of lease, pledge, lien, security interest or other charge or encumbrance upon property owned or acquired subject thereto, whether or not the liabilities secured thereby have been assumed; and

(d)      All indebtedness incurred as the lessee of facilities, goods or services under leases that, in accordance with generally accepted accounting principles consistently applied, should be reflected on such Person's balance sheet.

"**Interest Period**" means, initially, the period commencing on the date hereof and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) of the next calendar month, and thereafter shall mean the period commencing on the date immediately following the last day of the preceding Interest Period and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) of the next calendar month; provided, however, that (x) if any Interest Period would end on a day that shall not be a Business Day, such Interest Period shall be extended to the next Business Day and (y) no Interest Period with respect to any Loan shall end later than the Loan Termination Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"**Laws**" means all ordinances, statutes, rules, regulations, order, injunctions, writs or decrees of any government or political subdivision or agency thereof, or any court of similar entity established by any thereof.

"**Loan**" means the term loan in the amount enumerated in Paragraph 2.1 made to Borrower by Lender hereunder.

"**Loan Documents**" means this Agreement, the Note, the Collateral Documents, or any other document executed or delivered by or on behalf of Borrower evidencing or securing the Obligations.

"**Loan Termination Date**" means the earlier of a) the date upon which all debts owed to Lender by Borrower (including without limitation, amounts owed pursuant to this Loan Agreement) are repaid in full or, b) October 20, 2017.

"**Material Adverse Change**" means a material adverse change in the business, conditions or prospects (financial or otherwise) or in the results of Borrower's business or in the value of the Collateral.

CSK

"**Material Adverse Effect**" means, when referring to the taking of an action or the omission to take an action, that such action, if taken, or omission, would have a material adverse effect on the business, condition or prospects (financial or otherwise) or results of operations of such Person, or might materially impair the value of the Collateral.

"**Merchants**" means those certain merchants set forth on <u>Schedule 9.14</u>, and any and all merchants originated by Borrower and processed by Lender now or in the future.

"**Note**" means a promissory note duly executed and delivered to Lender by Borrower, as it may be renewed, extended or modified from time to time.

"**Obligations**" means all of the obligations of Borrower:

(a) To pay the principal of and interest on the Note in accordance with the terms thereof and to satisfy all of Borrower's other liabilities to Lender hereunder, whether now existing or hereafter incurred, matured or unmatured, direct or contingent, joint or several, including any extensions, modifications, and renewals thereof and substitutions therefor;

(b) To repay Lender all amounts advanced by Lender hereunder on behalf of Borrower, including, but without limitation, advances for overdrafts, principal or interest payments to prior secured parties, mortgagees, or lienors, or for taxes, levies, insurance, rent, repairs to or maintenance or storage of any of the Collateral; and

(c) To reimburse Lender, on demand, for all of Lender's reasonable out-of-pocket expenses and costs, including the fees and expenses of its counsel, in connection with the enforcement of this Agreement and the documents required hereunder, including, without limitation, any proceeding brought or threatened to enforce payment of any of the obligations referred to in the foregoing paragraphs (a) and (b), or any suits or claims against Lender whatsoever as a result of Lender's execution of this Agreement and making of its Loan, all as more specifically set forth in Paragraphs 9.4 and 9.7 hereof; and in addition, to reimburse Lender for its reasonable attorneys' fees and expenses in connection with the preparation, administration, amendment, modification or waiver of this Agreement and the other Loan Documents.

"**Permitted Liens**" means:

(a) Liens in favor of Lender, its sponsoring bank and any card associations;

(b) Liens arising from judgments and attachments in connection with court proceedings provided that the attachment or enforcement of such liens would not result in an Event of Default hereunder and such liens are being contested in good faith by appropriate proceedings, adequate reserves have been set aside and no material Collateral is subject to a material risk of loss or forfeiture and a stay of execution pending appeal or proceeding for review is in effect; and

(c)      Liens in existence on the date hereof listed on Schedule 1 hereto.

**"Person"** means any individual, corporation, partnership, association, joint-stock company, estate, trust, unincorporated organization, limited liability company, joint venture, court or government or political subdivision or agency thereof.

**"Processing Agreement"** means the Processing Agreement duly executed by the Borrower and Lender, as may be amended, supplemented or replaced from time to time.

**"Principal"** is the amount borrowed, or the part of the amount borrowed, which is issued and remains unpaid (excluding interest).

**"Principal Advance"** is the amount borrowed, or the part of the amount borrowed, (excluding interest) which is issued to Borrower from time to time pursuant to this multi-draw loan.

**"Records"** means correspondence, memoranda, tapes, books, discs, paper, magnetic storage and other documents and information of any type, whether expressed in ordinary or machine language.

**"Residual Net Value"** is the value of Residuals adjusted for chargeback and other risks, set-off of fees, expenses, activation bonuses, any other obligations under the Processing Agreement, and any other adjustments, as determined by Lender.

**"Security Agreement"** means the Security Agreement duly executed by the Borrower and Lender as a secured party.

**"UCC"** means the Uniform Commercial Code as in effect on the date hereof in the State of Georgia, as it may be amended from time to time; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of a security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Georgia. **"UCC"** means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

**"Unmatured Default"** means an event which but for the lapse of time or the giving of notice, or both, would constitute an Event of Default.

## SECTION 2. THE LOAN.

2.1     The Loan.     Subject to the terms and conditions of and relying on the representations, warranties and covenants contained in this Agreement, Lender agrees to loan to Borrower an amount of up to two hundred thousand dollars ($200,000.000) (the "Multi-Draw Loan"), the proceeds of which Borrower will use for the exclusive purpose of growing the business for Lender.  Subject to the terms and conditions of this Agreement, Lender will fund twenty thousand dollars ($20,000) of the Multi-Draw Loan on the Effective Date. Subject to the

terms and conditions of this Agreement, Lender can fund subsequent draws upon written request from Borrower, to be funded on the twentieth day of the month following such request, in monthly increments not to exceed $20,000.00, net of the reasonable fees and expenses of Lender, including, without limitation, the reasonable fees of counsel to Lender; provided, however, that if the date of the twentieth day of the month is not a Business Day, then any funding hereunder shall be due on the immediately previous Business Day. Principal Advances on the Multi-Draw Loan shall be funded only during the first 12 months from the Effective Date. In no event shall the Obligations exceed $200,000.00 at any time.

(a)     It is the intention of the Lender to fund each Principal Advance to the Borrower upon request from the Borrower; however, the funding of each Principal Advance occurs at the sole and unfettered discretion of Lender and Lender shall bear no obligatory responsibility henceforth to process the Principal Advance(s).

2.2     Payments.   The Loan shall be repaid pursuant to the terms of the Note. Notwithstanding anything to the contrary contained within the Agreement, Lender shall have the right to take any payments due under the Agreement from Borrower's accrued residuals under the Processing Agreement and if such accrued residuals are sufficient to pay any and all loan payments, when due, then no material breach of the Loan Agreement will result.

2.3     Optional Prepayment - Premiums in Certain Events.  Borrower may, upon two (2) Business Days' prior written notice to Lender, prepay the Loan in whole or in part. In the event that Borrower prepays any portion of the principal of the Loan in excess of the amortization of principal set forth on Schedule I of the Note, the Borrower shall pay a prepayment fee in an amount equal to the present value of Borrower's remaining loan payments using an annualized discount rate of 7.00% to which sum is then added to any other of Borrower's Obligations owed to Lender. Any prepayment shall be applied to first to fees and expenses, second to interest then due and payable, third, to principal under the Loan.

## SECTION 3.  CONDITIONS PRECEDENT

The obligation of Lender to fund the Loan is subject to the following conditions precedent:

3.1     Documents Required for the Closing.  Borrower shall have delivered to Lender prior to the initial disbursement of the Loan the following, duly executed by Borrower, as applicable:

(a)     The Note; and

(b)     The Security Agreement and any related Financing Statements to be filed in connection therewith.

(c)     Personal Guaranty

(d)     Amendment to the Agreement for Processing Services

3.2    Legal Matters.   At the time of the Closing and thereafter, all legal matters incidental to the Loan shall be satisfactory to Lender and its counsel in their sole discretion.

## SECTION 4.  COLLATERAL SECURITY

The Loan shall be secured by the Collateral, pursuant to the terms of the Security Agreement.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement, Borrower represents and warrants to Lender as follows:

5.1    Due Organization and Qualification.   Borrowers are residents of the State of Georgia; Borrower has the lawful power to own its respective properties and to engage in the business it conducts, and the addresses of all places of business of Borrower as of the Closing are as set forth in Schedule 5.1.

5.2    No Conflicting Agreement.   Borrower is not in default with respect to any existing Indebtedness, and the making and performance of this Agreement, the Note and the Collateral Documents will not (immediately, or with the passage of time or the giving of notice, or both):

(a)    Violate any Laws, or result in a default under any material contract, agreement, or instrument to which Borrower is a party or by which Borrower or any of its property is bound; or

(b)    Result in the creation or imposition of any security interest in, or lien or encumbrance upon, any of the Collateral except in favor of Lender.

5.3    Capacity.   Borrower has the power and authority to enter into and perform this Agreement, the Note and the Collateral Documents, and to incur the Obligations herein and therein provided for, and has taken all action necessary to authorize the execution, delivery, and performance of this Agreement, the Note and the Collateral Documents.

5.4    Binding Obligations.   This Agreement and the Collateral Documents are, and the Note when delivered will be, valid, binding, and enforceable in accordance with their respective terms subject to the general principles of equity (regardless of whether such question is considered in a proceeding in equity or at law) and to applicable bankruptcy, insolvency, moratorium, fraudulent or preferential conveyance and other similar laws affecting generally the enforcement of creditors' rights.

5.5    Litigation.   There is no material pending or threatened order, notice, claim, litigation, proceeding or investigation against or affecting Borrower.

5.6     Title.  Borrower has good and marketable title to all of the Collateral, subject to no security interest, encumbrance or lien, or the claims of any other Person except for Permitted Liens.

5.7     Financial Statements.  The Financial Statements, including any schedules and notes pertaining thereto, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and fairly present the financial condition of Borrower upon the dates thereof.

5.8     Taxes.  Borrower has filed all federal, state and local tax returns and other reports it is required by Law to file prior to the date hereof, has paid or caused to be paid all taxes, assessments and other governmental charges that are due and payable prior to the delinquency thereof, and has made adequate provision for the payment of such taxes, assessments or other charges accruing but not yet payable and has no knowledge of any deficiency or additional assessment in connection with any taxes, assessments or charges not provided for on its books.

5.9     Compliance with Laws and Card Association Rules.  Borrower has complied with all applicable Laws and Card Association Rules in the operation of its business and with respect to the Collateral.

5.10    Consents: Governmental Approvals.  Each consent, approval or authorization of, or filing, registration or qualification with, any Person required to be obtained or effected by Borrower, in connection with the execution and delivery of the Loan Documents or the undertaking or performance of any obligation thereunder has been duly obtained or effected; further, no authorization, consent, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by Borrower of any Loan Documents to which it is or will be a party, except for approvals which have been obtained and are in full force and effect.

5.11    Full Disclosure.  No representation or warranty by Borrower contained herein or in any certificate or other document furnished in connection with the Loan, in light of the circumstances in which they were made, by Borrower pursuant to this Agreement contains any untrue statement of material fact.

5.12    Material Contracts.  All parties to all material contracts and other commitments to which Borrower is a party have complied with the provisions of such material contracts and other commitments; no party is in default under any provision thereof; and no event has occurred which, but for the giving of notice or the passage of time, or both, would constitute a default thereunder.

5.13    No Commissions.  Other than with respect to the fees payable to Lender hereunder, Borrower has not made any agreement or taken any action which may cause anyone to become entitled to a commission or finder's fee as a result of the making of the Loan.

5.14    Survival.  All of the representations and warranties set forth in Section 5 shall be true and correct when made and shall survive until all Obligations are satisfied in full.

## SECTION 6.  AFFIRMATIVE COVENANTS

Borrower covenants as follows:

6.1     Use of Proceeds.  Borrower will use the proceeds of the Loan only for the purposes detailed in Section 2.1, and will, at Lender's reasonable request, furnish Lender such evidence as it may reasonably require with respect to such use.

6.2     Financial Statements and Reports.  Borrower will furnish to Lender within seven (7) Business Days of Lender's request true and complete copies of the unaudited balance sheet and the related unaudited statement of income of Borrower for each calendar quarter then ended, together with a year-to-date compilation and the notes, if any, related thereto.

6.3     Taxes; Copies of Returns.  Borrower will file all tax returns and appropriate schedules attached thereto that are required to be filed under applicable law prior to the date of delinquency.  Borrower will pay, prior to delinquency, all taxes, assessments and charges or levies imposed upon them or on any of their property or which any of them is required to withhold or pay over, except where contested in good faith by appropriate proceedings with adequate security therefor having been set aside in a manner satisfactory to Lender.  Borrower will pay or cause to be paid, all such taxes, assessments, charges or levies forthwith whenever foreclosure on any lien that attaches (or security therefor) appears imminent.  Within seven (7) Business Days of Lender's request therefor, Borrower will furnish Lender with copies of federal and state income tax returns filed.

6.4     Records and Inspection.  Borrower shall maintain its financial books, accounts and Records substantially in accordance with generally accepted accounting principles consistently applied, and Borrower will, when requested so to do, make available during regular business hours any of its financial Records for inspection by duly authorized representatives of Lender, and will furnish Lender any information regarding their financial condition within a reasonable time after written request therefor.

6.5     Maintenance of Existence; Compliance with Laws.  Borrower will take all necessary steps to renew, keep in full force and effect, and preserve its corporate existence, good standing, and franchises in each jurisdiction wherein the nature of the business transacted by it or property owned by it is both material and makes such actions necessary, and will comply in all respects with all present and future Laws and Card Association Rules applicable to Borrower.

6.6     Payment of Indebtedness.  Borrower will pay when due from such Person (or within applicable grace periods) all Indebtedness for borrowed money (whether direct or indirect) due any Person, except when the amount thereof is being contested in good faith by appropriate proceedings and with adequate security therefor being set aside in a manner satisfactory to Lender.  If default is made by Borrower in the payment of any principal (or installment thereof) of, or interest on, any such Indebtedness, Lender shall have the right, in its discretion, to pay such interest or principal for the account of Borrower and be reimbursed by Borrower therefor.

6.7    Notice of Litigation.  Borrower will give immediate notice to Lender and provide copies to Lender of the institution of any litigation, suit or proceeding involving Borrower, or the overt threat thereof.

6.8    Notice of Default.  Borrower will notify Lender immediately if it becomes aware of the occurrence of any Event of Default or of any fact, condition or event that only with the giving of notice or passage of time or both, could become an Event of Default, or of the failure of Borrower to observe any of its undertakings hereunder.

6.9    Notice of Name Change or Location.  Borrower will notify Lender thirty (30) days in advance of any change in the location of the state of primary residence of Borrower.

6.10    Compliance with Processing Agreement; Exclusivity or Services.  Borrower shall enter into an exclusive Processing Agreement with Lender on terms acceptable to Lender, and Borrower shall comply with all obligations under the Processing Agreement.  Borrower shall ensure that the Processing Agreement remains in full force and effect from the Effective Date until all Obligations hereunder are paid in full.  Borrower shall ensure that the Processing Agreement remains in full force and effect from the Effective Date until all Obligations hereunder are paid in full.

6.11    Right of First Refusal.  In the event that Borrower shall receive an offer (whether oral or written) with respect to the purchase of any material portion of Borrower's assets, any of the Merchants, or a business combination with any Person, either directly or indirectly ("Proposed Transaction"), then Borrower shall inform Lender of such offer and the proposed terms thereof.  Thirty days prior to Borrower's acceptance of any offer related to a Proposed Transaction, Borrower must permit Lender to enter into the Proposed Transaction on substantially the same terms as the prior offer.

6.12    Operation of Business.  Borrower shall not enter into any agreement with any Person other than Lender to provide or market electronic payment processing services or any services related thereto, including but not limited to the services provided by Lender, to any merchants originated by Borrower.  Borrower shall not deliver any new merchant applications to any Person other than Lender during the term of the Loan made pursuant to this Loan Agreement.

## SECTION 7.  NEGATIVE COVENANTS

Borrower hereby covenants and agrees as follows:

7.1    Sale of Collateral.  Except in the ordinary course of business, Borrower shall not sell, transfer, lease or otherwise dispose of all or any part of the Collateral.

7.2    Encumbrances.  Borrower will not: (a) mortgage, pledge, grant or permit to exist a security interest in or lien upon any of the Collateral, now owned or hereafter acquired, except

for Permitted Liens, or (b) covenant or agree with any Person other than Lender to pledge or grant a security interest in or a lien upon any of the Collateral.

7.3     Untrue Certificate.    Borrower will not furnish Lender any certificate or other document delivered pursuant to this Agreement or the other Loan Documents that will contain any untrue statement of material fact or that will omit to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

7.4     Margin Stock.    Borrower will not directly or indirectly apply any part of the proceeds of the Loan to the purchasing or carrying of any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or any regulations, interpretations or rulings thereunder.

7.5     Loans and Advances.    Borrower will not make any loan or advance to any other Person.

7.6     Chargebacks.    Borrower shall not permit a level of Chargebacks with respect to the Merchants to exceed 1% of average monthly volume.

7.7     Residuals.    Borrower shall not earn less than $7,500.00 in Residuals from Lender in any month until all Obligations are paid in full and the loan documents are terminated.

## SECTION 8. DEFAULT

8.1     Events of Default.    The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)     Borrower shall fail to pay in full within three (3) Business Days of the date when due any installment of principal or interest payable hereunder.

(b)     Borrower shall fail to observe or perform any obligation or covenant to be observed or performed by any of them, jointly or severally, under any of the Loan Documents; provided, however, if such failure is not related to the payment of money, Borrower shall have five (5) Business Days after the occurrence of such breach to cured such failure.

(c)     A breach of or event of default shall occur under any material agreement binding Borrower.

(d)     Any financial statement, representation, warranty or certificate made or furnished by Borrower in connection with this Agreement or the Loan, or as inducement to Lender to enter into this Agreement, or in any separate statement or document to be delivered hereunder to Lender, shall be false, incorrect, or incomplete when made, in light of the circumstances under which it was made.

(e)     Borrower shall admit its inability to pay debts as they mature, or shall make an assignment for the benefit of its or any of its creditors.

(f)     Proceedings in bankruptcy of Borrower, or for the readjustment of any of Borrower's debts, under the United States Bankruptcy Code, as amended, or any part thereof, or under any other Laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced by Borrower, or shall be commenced against Borrower, and not dismissed within sixty (60) days of such an involuntary filing.

(g)     A receiver or trustee shall be appointed for any substantial part of Borrower's assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of Borrower, or Borrower shall discontinue business or materially change the nature of any of its business.

(h)     A judgment creditor of Borrower shall obtain possession of any Collateral or other assets by any means, including, but without limitation, levy, distraint, replevin or self-help.

(i)     Any proceeding shall be instituted against Borrower.

(j)     Lender at any time feels insecure with respect to the Collateral, the business of the Borrower or the prospects of the Obligations being paid in full.

(k)     A breach, default or event of default shall occur under the Processing Agreement or any agreements between Lender and Borrower.

(l)     Obligations at any time exceed the Borrowing Limit.

(m)     The ratio of the (a) Residual Net Value, divided by (b) the monthly installment of principal and interest payable hereunder is less than one and a half (1.5x).

8.2     Acceleration.  Upon the occurrence of any Event of Default, Lender may, at its option, declare the principal and interest accrued on the Note and all other Obligations to be immediately due and payable, whereupon the same shall become forthwith due and payable, without presentment, demand, protest, or any notice of any kind except as set forth above; provided, that in the case of the Events of Default specified in clause (f), (g) or (h) above with respect to Borrower, without any notice to Borrower or any act by Lender, the Note and all other Obligations shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are waived by Borrower.

If as of any payment date the Activation Leverage Ratio exceeds eight (6.5), Borrower must immediately pay down the then outstanding Loan balance in immediately available funds such that the Activation Leverage Ratio does not exceed eight (6.5) ("Cure Amount").  If the Cure Amount is unpaid by Borrower, Lender will have the right to setoff the Cure Amount against any amounts due to Borrower by Lender.

8.3     Remedies.  After any acceleration, as provided for in Paragraph 8.2, Lender shall have, in addition to the rights and remedies given it by the Loan Documents, all those allowed by all applicable Laws, including, but without limitation, the UCC as enacted in any applicable jurisdiction.  Without limiting the generality of the foregoing, Lender may immediately, without demand of performance and without other notice (except as specifically required by the Loan Documents) or demand whatsoever to Borrower, all of which are hereby expressly waived, and without advertisement, sell at public or private sale, in any manner and at any location authorized by Laws, or otherwise realize upon, the whole, or, from time to time, any part of the Collateral, or any interest which Borrower may have therein.  After deducting from the proceeds of sale or other disposition of the Collateral all expenses (including all reasonable expenses for legal services), Lender shall apply such proceeds toward the satisfaction of the Obligations.  Any remainder of the proceeds after satisfaction in full of the Obligations shall be distributed as required by applicable Laws.  Notice of any sale or other disposition shall be given to Borrower at least ten (10) days before the time of any intended public sale or of the time after which any intended private sale or other disposition of the Collateral is to be made, which Borrower hereby agrees shall be reasonable notice of such sale or other disposition.  Borrower agrees to assemble, or to cause to be assembled, at its own expense, the Collateral at such place or places as Lender shall designate.  At any such sale or other disposition, Lender may, to the extent permissible under applicable Laws, purchase the whole or any part of the Collateral, free from any right of redemption on the part of Borrower, which right is hereby expressly waived and released.

Without limiting the generality of any of the rights and remedies conferred upon Lender under this Paragraph 8.3, Lender may, to the full extent permitted by applicable Laws:

(a)     Enter upon the premises of Borrower, exclude therefrom Borrower or any officer or employee thereof, and take immediate possession of the Collateral, either personally or by means of a receiver appointed by a court of competent jurisdiction, using all necessary and lawful self-help to do so;

(b)     At Lender's option, use, operate, manage and control the Collateral in any lawful manner;

(c)     Upon the occurrence of an Event of Default, Lender may, without notice to or consent of Borrower, purchase for itself or sell to a third party on its own behalf all rights of Borrower related to the Merchants, including, without limitation, the right to receive residuals under the merchant agreements, the Processing Agreement and any similar or related agreement, for an amount equal to the product of (i) the average monthly residual payment received by Borrower with respect to the Merchants for the trailing twelve month period and (ii) a multiplier of six (6).  Borrower shall fully cooperate with Lender to effectuate the purchase and/or sale of its rights related to the Merchants and shall refrain from contesting such sale in any regard.  In the event that the purchase price exceeds the Obligations, Lender shall remit the balance to Borrower after set-off with respect to all Obligations.  In the event that the purchase price is less than the Obligations hereunder, Borrowers shall remain liable for the balance of the Obligations;

(d)     Collect and receive all receivables, rents, income, revenue, earnings, issues and profits therefrom; and

(e)     Maintain, repair, renovate, alter or remove the Collateral as Lender may determine in its discretion.

### SECTION 9. MISCELLANEOUS

9.1     Construction.  The provisions of this Agreement shall be in addition to those of any security agreement, note or other evidence of liability held by Lender, all of which shall be construed as complementary to each other; provided, in the event of any inconsistency, the provisions of this Agreement shall control.  Nothing herein contained shall prevent Lender from enforcing any or all other security agreements in accordance with their respective terms.

9.2     Further Assurance.  From time to time, Borrower will execute and deliver to Lender such additional documents and will provide such additional information as Lender may reasonably require to carry out the terms of this Agreement.

9.3     Enforcement and Waiver by Lender.  Lender shall have the right at all times to enforce the provisions of the Loan Documents in strict accordance with the terms thereof, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times.  The failure of Lender at any time or times to enforce its rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom in any way or manner contrary to specific provisions of the Loan Documents or as having in any way or manner modified or waived the same.  All rights and remedies of Lender are cumulative and concurrent and the exercise of one right or remedy shall not be deemed a waiver or release of any other right or remedy.

9.4     Expenses of Lender.  Borrower will, on demand, reimburse Lender for all reasonable out-of-pocket fees and expenses, including without limitation the fees and expenses of legal counsel for Lender, incurred by Lender in connection with the preparation, administration, amendment, restatement, modification, or enforcement of the Loan Documents and the collection or attempted collection of the Note.

9.5     Notices.  Any and all notices or other communications permitted or required to be made under this Agreement shall be in writing and shall be delivered personally or sent by facsimile transmission, mail or nationally recognized courier service (such as Federal Express) using the intended recipient's address set forth below, or such other address as may have been supplied in writing by the intended recipient and of which receipt has been acknowledged in writing.  Unless otherwise expressly provided herein, notices or other communications shall be deemed to have been duly given or made (a) upon personal delivery, (b) when sent by facsimile (confirmation of receipt received), (c) on the third (3rd) day after the date of mailing, or (d) on the day after the date of delivery to such courier service, as the case may be.  Rejection, refusal to accept or inability to deliver because of a changed address of which no notice was given shall not affect the validity of any notice or other communication given in accordance with the provisions of this Agreement.

(a)     If to Borrower:              5725 Buford Highway, #211
                                      Doraville, GA 30340

Fax No.: 678-348-7245

(b) If to Lender:   Priority Payment Systems LLC
2001 Westside Parkway Suite 155
Alpharetta, Georgia 30004
Attention: Richard Harris
Fax No.: 866-804-3457

9.6 Waiver and Release.  To the maximum extent permitted by applicable Laws, Borrower:

(a) Waives notice and opportunity to be heard, after acceleration in the manner provided in Paragraph 8.2, before exercise by Lender of the remedies of self-help, set-off, or of other summary procedures permitted by any applicable Laws or by any agreement with Borrower, and, except where required hereby or by any applicable Laws, notice of any other action taken by Lender; and

(b) Releases Lender, and its officers, directors, attorneys, employees, and agents from all claims for loss or damage caused by any act or omission on the part of any of them except for gross negligence, recklessness or willful misconduct.

9.7 Indemnification.  Borrower hereby indemnifies and holds Lender, and its officers, directors, employees and agents free and harmless from and against any and all actions, causes of action, suits, losses, liabilities and damages, and expenses in connection therewith, including, without limitation, reasonable counsel fees and disbursements, incurred by Lender as a result of, or arising out of, or relating to the execution, delivery, performance or enforcement of the Loan Documents or any instrument contemplated therein, except for Lender's gross negligence or willful misconduct.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of such liabilities and costs permitted under applicable Laws.

9.8 Applicable Laws.  The Laws of the State of Georgia, other than its conflicts of laws rules, shall govern the construction and interpretation of this Agreement and the validity and enforceability of this Agreement, and of its provisions and the transactions pursuant to this Agreement, except for those transactions for which the parties have chosen other laws to govern or for which other mandatory choice of law rules apply.

9.9 Binding Effect, Assignment and Entire Agreement.  This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and permitted assigns of the parties hereto.  Lender may endorse, assign and/or transfer any of the Loan Documents to which it is a party.  Borrower has no right to assign any of its rights or obligations hereunder without the prior written consent of Lender.  This Agreement and the documents executed and delivered pursuant hereto constitute the entire agreement between the parties, and supersede all

prior agreements and understandings among the parties hereto. This Agreement may be amended only by a writing signed on behalf of each party.

9.10   Severability.  If any provision of this Agreement shall be held invalid under any applicable Laws, such invalidity shall not affect any other provision of this Agreement that can be given effect without the invalid provision, and, to this end, the provisions hereof are severable.

9.11   Counterparts.  This Agreement may be executed by the parties independently in any number of counterparts, all of which together shall constitute but one and the same instrument which is valid and effective as if all parties had executed the same counterpart.

9.12   Venue.  It is agreed that venue for any action arising in connection with this Agreement or the Obligations secured hereby shall lie exclusively with courts sitting in the State of Georgia, unless Lender otherwise agrees in writing.

9.13   Waiver of Trial by Jury.  LENDER AND BORROWER HEREBY WAIVE TRIAL BY JURY IN ANY ACTIONS, PROCEEDINGS, CLAIMS OR COUNTER-CLAIMS, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT OR THE LOAN DOCUMENTS.

9.14   Right of Setoff.  Lender and Borrower acknowledge that Lender shall retain its common law right of setoff (including, without limitation, with respect to residuals related to the Merchants) with respect to any of the Obligations.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**BORROWER:**                                **CHAN S. KIM**

By: _____

Name: _____

Title: _____

**LENDER:**                                  **PRIORITY PAYMENT SYSTEMS LLC**

By: _____

Name: _____

Title: _____

# EXHIBIT E



# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement"), dated November 1, 2014, is made and entered into on the terms and conditions hereinafter set forth, by and between Chan S. Kim, a Georgia individual (the "Debtor"), and Priority Payment Systems LLC, a Georgia limited liability company (the "Secured Party").

## WITNESSETH:

WHEREAS, pursuant to the terms of that certain Loan Agreement of even date herewith by and between the Debtor and the Secured Party (the "Loan Agreement"), the Secured Party has agreed to make a multi-draw loan to the Debtor in the amount of $200,000.00 (the "Loan");

WHEREAS, the first draw on said Loan is evidenced by a certain Promissory Note of even date herewith, executed by the Debtor and payable to the order of the Secured Party, in the original principal amount of $20,000.00 (as the same may be renewed, extended, modified, amended, supplemented or replaced from time to time, the "Note"); and

WHEREAS, it is a condition of the Secured Party's agreement to extend credit to the Debtor that the Debtor execute and deliver this Agreement;

## AGREEMENTS:

NOW THEREFORE, as an inducement to cause Secured Party to extend credit to the Debtor, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, it is agreed as follows:

1.    Creation of Security Interest. As security for the repayment of the indebtedness evidenced by the Note and the payment and performance of any and all other obligations of Debtor to Secured Party (collectively, the "Obligations"), the Debtor hereby grants to and creates in favor of the Secured Party a security interest in the following properties, assets and rights of the Debtor, whether now owned or hereafter acquired or arising, and wherever located (the "Collateral"):

       (a)    Accounts,

       (b)    cash or cash equivalents,

       (c)    residuals related to the Merchants, and

       (d)    any Proceeds, products, substitutions or replacements for any of the foregoing.

All capitalized terms in this Section 1, which are not otherwise defined in the Loan Agreement, shall have the meanings set forth in the Uniform Commercial Code (the "UCC") of the applicable jurisdiction.

2.    <u>Authorization to File Financing Statements</u>.  The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file, in any jurisdiction, financing statements (including any amendments thereto) that cover the Collateral contain any other information required by the UCC, in any relevant jurisdiction, for the sufficiency or filing office acceptance of any initial financing statement or amendment.

3.    <u>Other Actions Regarding Attachment. Perfection and Priority</u>.

(a)    <u>Collateral in the Possession of a Third Party</u>.  If any goods constituting Collateral at any time are in the possession of a third party, the Debtor shall promptly notify the Secured Party thereof and, if requested by the Secured Party, shall promptly obtain an acknowledgement from such person, in form and substance satisfactory to the Secured Party, that such person holds such Collateral for the benefit of the Secured Party and shall act upon the instructions of the Secured Party, without the further consent of the Debtor.

(b)    <u>Other Actions as to Any and All Collateral</u>.  The Debtor further agrees to take any other action reasonably requested by the Secured Party to insure the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral, including (i) authorizing, executing (to the extent that the Debtor's signature is required), delivering and filing financing statements and amendments relating thereto under the UCC, (ii) complying with any provision of any statute, rule, regulation or treaty of any jurisdiction as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (iii) obtaining governmental and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other person obligated on Collateral, and (iv) taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction.

4.    <u>Representations and Warranties</u>.  The Debtor hereby represents and warrants to the Secured Party as follows:

(a)    That the Debtor is a corporation operating in the state of New York

(b)    The execution and delivery of this Agreement and the performance and observance of the obligations of the Debtor hereunder are within the power of the Debtor and have been duly authorized by all necessary action on the part of the Debtor properly taken.

(c)    This Agreement is a legal, valid and binding obligation of the Debtor and is enforceable against the Debtor in accordance with its terms.



2

(d)     The Debtor is the owner of the Collateral, free from any adverse lien, security interest or other encumbrance except for the security interest created by this Agreement and the Permitted Liens.

5.     Covenants and Agreements.  The Debtor hereby covenants and agrees with the Secured Party as follows:

(a)     The Debtor will pay, or cause to be paid, to the Secured Party (taking into account any applicable grace periods) the Obligations as and when the same shall be due and payable, whether at maturity, by acceleration or otherwise, and will promptly perform all of the Debtor's obligations under this Agreement, the Note and the other Loan Documents.

(b)     Without providing at least thirty (30) days' prior written notice to the Secured Party, the Debtor will not change the state of his principal residence.

(c)     Except for the security interest herein granted and any Permitted Liens, the Debtor shall be the owner of the Collateral free from any lien, security interest or other encumbrance, and the Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Secured Party, except holders of any Permitted Liens.

(d)     The Debtor shall not (i) create, grant or suffer to exist any lien or other encumbrance on or security interest in the Collateral in favor of any person other than the Secured Party and any holders of Permitted Liens, (ii) permit any of the Collateral to be levied upon under any legal process, except to the extent such event could not reasonably be expected to have a Material Adverse Effect, (iii) permit anything to be done that may impair the security intended to be afforded by this Agreement, nor (iv) permit any tangible Collateral to become attached to or commingled with other goods without the prior written consent of the Secured Party.

(e)     The Debtor will keep the Collateral in good order and repair, will not permit anything to be done that may materially impair the value of the Collateral and will not use the same in violation of law or any policy of insurance thereon.

(f)     Except in the ordinary course of business, Borrower shall not sell, transfer, lease or otherwise dispose of all or any material part of the Collateral.

6.     Notification to Account Debtors and Other Persons Obligated on Collateral.  Debtor, at the request of the Secured Party, shall notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party and that payments in respect thereof are to be made directly to the Secured Party or to any financial institution designated by the Secured Party as the Secured Party's agent therefor, and the Secured Party may itself, if an Event of Default has occurred and is continuing, without notice to or demand upon the Debtor, so notify account debtors and other persons obligated on Collateral.  After the making of such a request or the giving of any such notification, the Debtor shall hold any

proceeds of collection of the Collateral and other Collateral received by the Debtor as trustee for the Secured Party without commingling the same with other funds of the Debtor and shall turn the same over to the Secured Party in the identical form received, together with any necessary endorsements or assignments, for deposit in a special bank account maintained by the Secured Party over which the Secured Party alone has power of withdrawal. In addition, if requested by the Secured Party, the Debtor will immediately notify all account debtors and other persons obligated in respect of Collateral to direct payments to the Secured Party. The Secured Party shall apply the proceeds of collection of the Collateral and other Collateral received by the Secured Party to the Obligations, such proceeds to be applied promptly after final payment in cash or other immediately available funds of the items giving rise to them.

7.   Default and Remedies.

(a)   The occurrence of a default or an event of default under the Loan Agreement shall constitute an Event of Default under this Agreement (each an "Event of Default").

(b)   Upon the occurrence and during the continuance of an Event of Default, the Secured Party may proceed to:

(1)   take possession of the Collateral, and for that purpose the Secured Party may, so far as the Debtor can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom,

(2)   collect and receive any and all amounts payable or distributable in respect of the Collateral and hold the same as additional Collateral or apply the same to the Obligations,

(3)   dispose of all or any part of the Collateral by public or private sale, in such manner and order as the Secured Party shall determine, subject to and in accordance with applicable requirements of the UCC or other applicable law, and

(4)   exercise any and all other rights, powers, privileges, options and remedies provided by the UCC or other applicable law, as well as all other rights and remedies possessed by the Secured Party pursuant to the Loan Documents.

(c)   Upon the occurrence and during the continuance of an Event of Default and upon demand by the Secured Party, the Debtor shall assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party that is reasonably convenient to the Secured Party and the Debtor.

(d)   Any notice of sale, lease or other intended disposition of the Collateral by the Secured Party sent to the Debtor at least ten (10) days prior to such action, shall constitute reasonable notice to the Debtor.



(e)     Subject to any applicable provisions of the UCC, the proceeds of the exercise of the Secured Party's remedies hereunder shall be applied to the Obligations in such order of priority as the Secured Party shall determine.

(f)     The Secured Party may waive any default or Event of Default before or after the same has been declared without impairing its right to declare a subsequent default or Event of Default hereunder, this right being a continuing one.  The Secured Party shall not be deemed to have waived any of its rights upon or under any of the Obligations or Collateral unless such waiver shall be in a record authenticated by a duly authorized representative of the Secured Party.

8.     Notices.  Any and all notices or other communications permitted or required to be made under this Agreement shall be in writing and shall be delivered personally or sent by facsimile transmission, mail or nationally recognized courier service (such as Federal Express) using the intended recipient's address set forth below, or such other address as may have been supplied in writing by the intended recipient and of which receipt has been acknowledged in writing.  Unless otherwise expressly provided herein, notices or other communications shall be deemed to have been duly given or made (a) upon personal delivery, (b) when sent by facsimile (confirmation of receipt received), (c) on the third (3rd) day after the date of mailing, or (d) on the day after the date of delivery to such courier service, as the case may be.  Rejection, refusal to accept or inability to deliver because of a changed address of which no notice was given shall not affect the validity of any notice or other communication given in accordance with the provisions of this Agreement.  For purposes of this Agreement:

The address of the Debtor is:

Chan Kim
5725 Buford Highway, #211
Doraville, GA 30340
Fax No.: 678-348-7245

The address of the Secured Party is:

Priority Payment Systems LLC
2001 Westside Parkway Suite 155
Alpharetta, Georgia 30004
Attention: Richard Harris
Fax No.: 855-270-0111



9.    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed by and construed according to the laws of the State of Georgia.  The Debtor agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State of Georgia or any federal court sitting therein, and consents to the non-exclusive jurisdiction of each such court and to service of process in any such suit being made upon the Debtor by mail at the address specified herein.  The Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

10.    <u>Successors & Assigns</u>.  This Agreement binds and inures to the benefit of the parties and their respective successors, successors-in-title and assigns, as applicable.

12.    <u>Definitions</u>.  All capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed thereto in the Loan Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Debtor and the Secured Party have caused this Agreement to be executed by their respective duly authorized officers or other duly authorized representatives as of the day and year first above written.

DEBTOR:

CHAN S. KIM

By: _____

Name: ____chan Kim_____

Title: ____owner_____

SECURED PARTY:

PRIORITY PAYMENT SYSTEMS LLC

By: _____

Name: ____Richard Harris_____

Title: ____COO_____

# EXHIBIT F

# PERSONAL GUARANTY OF CHAN KIM

This Personal Guaranty (the "Guaranty") is made this 1st day of November, 2014, by the undersigned, Chan S. Kim (the "Guarantor"), in favor of **Priority Payment Systems, LLC (the "Lender")**, and relates to the payment obligations of Cornerstone Association Merchant Services, Inc. (the "Borrower") to Lender, as set forth in the Loan Agreement between Lender and Borrower dated November 1, 2014 (the "Agreement").

Guarantor hereby acknowledges, agrees, and promises to perform as follows:

1. **Purpose and Consideration:** Guarantor acknowledges that the execution and delivery of this Guaranty by Guarantor is a condition to Lender's entering into the Agreement with Borrower, and is made to induce Lender to enter into the Agreement. Guarantor is a stockholder, partner, member, manager, officer or director of Borrower.

2. **Guaranty:** Guarantor hereby absolutely, unconditionally and irrevocably, guarantees the full and prompt payment by Borrower of each and every present and future liability, debt and obligation (the "Guaranteed Obligations") of the Borrower under the Agreement.

Further, if Borrower should fail to pay any of the Guaranteed Obligations on the due date thereof (whether due on demand, at stated maturity, upon acceleration or otherwise) or any other Event of Default (as such term is defined in the Agreement) shall occur or exist, or if Borrower should dissolve or become insolvent, or if Borrower should die, or if a petition for an order for relief with respect to Borrower should be filed by or against Borrower under any chapter of the Bankruptcy Code (as such term is defined in the Agreement), or if a receiver, trustee or conservator should be appointed for Borrower or Guarantor or any of Borrower's or Guarantor's property, or if Borrower should default in the observance or performance of any covenant or agreement with the Lender and such default shall not be cured within any cure period mutually agreed upon in writing by Borrower and the Lender, then, in any such event and whether or not any of the Guaranteed Obligations is then due and payable or the maturity thereof has been accelerated or demand for payment from or performance by Borrower has been made, the Lender may without notice to Guarantor make any or all of the Guaranteed Obligations immediately due and payable hereunder as to Guarantor and the Lender shall be entitled to enforce the Guaranteed Obligations of Guarantor hereunder. **Guarantor expressly acknowledges and agrees that in order to satisfy the Guaranteed Obligations hereunder, Lender may attach, lien, levy upon or otherwise liquidate any or all of Guarantor's personal assets, including but not limited to Guarantor's interest in the dwelling owned by Guarantor located at 3734B Ashford Dunwoody Road, Atlanta, GA 30319.** Nothing herein shall be construed to authorize the Lender to charge or to collect from Guarantor interest that has not yet accrued, is unearned or subject to rebate or is otherwise not entitled to be collected by the Lender under applicable law.

3. **Guaranty as Independent:** The obligations of Guarantor hereunder are independent of the obligations of Borrower, and Guarantor expressly agrees that a separate action or action may be brought and prosecuted against Guarantor whether or not any action is brought against Borrower and whether or not Borrower is joined in any action against Guarantor and that Lender may

1

pursue any rights or remedies it has under the Agreement and under this Guaranty in any order or simultaneously or in any other manner.

**4. Waiver by Guarantor:**  Guarantor hereby waives:

  i)  any right to required Lender to proceed against, give notice to or make demand upon Borrower;

  ii)  any right to require Lender to pursue any remedy of Lender;

  iii)  any right to participate in or to direct the application of any security held by Lender;

  iv)  any defense arising out of any disability or other defense of Borrower, including cessation, impairment, modification, or limitation, from any cause, of liability of Borrower or of any remedy for the enforcement of such liability; and

  v)  any and all rights under OCGA § 10-7-24, *et seq.*

**5. Subordination by Guarantor:**  Guarantor hereby agrees that any indebtedness of Borrower to Guarantor, whether now existing or hereafter created, shall be subordinated to any indebtedness of Borrower to Lender.

**6. Authorizations to Lender:**  Guarantor authorizes Lender, without notice or demand and without affecting Guarantor's liability hereunder, from time to time to

  i)  change, amend, modify or alter any of the terms, covenants, agreements, or conditions contained in the Agreement;

  ii)  extend or renew the Agreement;

  iii)  change, renew, compromise, extend, accelerate or otherwise change the time for payment of any amounts under the Agreement;

  iv)  waive or fail to take action with respect to any default by Borrower under the Agreement; and

  v)  waive or fail to take action with respect to any remedy under the Agreement.

**7. Application of Payments Received by Lender:**  Any sums of money that Lender receives from or on behalf of Borrower may be applied by Lender to reduce any indebtedness of Borrower to Lender as Lender, in his sole discretion, deems appropriate.

**8. Termination of Guaranty:**  This Guaranty may not be terminated by Guarantor and shall terminate upon the full payment and satisfaction of all of the Guaranteed Obligations.

**9. Notices and Demands.**  All notices and demands under this Guaranty shall be in writing and shall be deemed properly given if: (i) sent by registered or certified United States mail, postage prepaid, return receipt requested, addressed to the party to receive the notice or demand at the address set forth for such party below, three (3) business days after postmark or (ii) delivered to a nationally recognized overnight courier service for next business day delivery, to its addressee at such party's address as noted below, on the next business day after such delivery. The parties' addresses for such Notices and Demands are:

Guarantor:                Chan S. Kim
                          5725 Buford Highway #211
                          Doraville, GA 30340
                          Fax No.: 678-348-7245

2

Lender:                     Priority Payment Systems, LLC
                            2001 Westside Parkway Suite 155
                            Alpharetta, Georgia 30004
                            Attention: Richard Harris
                            Fax No.: 855-270-0111

Either party may change such addresses from time to time by providing notice as set forth above.

**10. Entire Agreement:** This Guaranty constitutes the entire agreement between the parties hereto with respect to the matters specifically addressed herein and supersedes any prior guaranty between the parties regarding such matters. This Guaranty shall not be modified or altered except by a written instrument executed by Guarantor and the Lender.

**11. Binding Effect:** This Guaranty shall be binding upon the Guarantor and its successors and assigns and inure to the benefit of the Lender and its successors and assigns.

**12. Governing Law:** This Guaranty shall be governed by the laws of the state of Georgia (exclusive of the choice of law rules thereof). Guarantor hereby consents to the jurisdiction of the state and federal courts in the state of Georgia in any dispute arising from or in connection with this Guaranty. Guarantor further agrees that service of process may be made, in addition to any other method permitted by law, by certified mail, return receipt requested.

**13. Severability:** If any provision of this Guaranty shall be held to be invalid or unenforceable in whole or in part, then the invalidity or unenforceability of such provision shall not by held to invalidate any other provision contained herein and all such other provisions shall remain in full force and effect.

**14. Attorneys' Fees:** Guarantor agrees to pay all expenses incurred by the Lender in connection with enforcement of the Lender's rights under this Guaranty, including, but not limited to, court costs, collection charges and reasonable attorneys' fees and disbursements.

**15. Captions for Convenience:** The headings and captions hereof are for convenience only and shall not be considered in interpreting the provisions hereof.

**16. Capitalized terms:** Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed under seal on the day and year noted below.

Date: _____10/31/14_____

**Witness:**                                          **Guarantor:**

_____                    _____

Print Name: Kwang Bin Lim

Address: 304 Knelston Oak Drive Suwanee GA 30024

# EXHIBIT G

# AMENDED PROMISSORY NOTE

## (Multi-Draw Note)

$714,637.20                                                              September 10, 2019

**FOR VALUE RECEIVED,** the undersigned, Chan S. Kim (the "Maker"), promises to pay to the order of PRIORITY PAYMENT SYSTEMS LLC, a Georgia limited liability company ("Payee"; Payee and any subsequent holder(s) hereof are sometimes herein referred to individually and collectively as "Holder"), the principal sum of   SEVEN HUNDRED FOURTEEN THOUSAND, SIX HUNDRED THIRTY SEVEN AND 20/100 DOLLARS ($714,637.20), together with interest and loan charges on the aggregate unpaid principal balance of the loan evidenced hereby at the rate(s) specified below; provided that in no event shall the interest and loan charges payable in respect of the indebtedness evidenced hereby exceed the maximum amounts from time to time allowed to be collected under applicable law. Capitalized terms used herein without definition shall have the meanings set forth in the Loan Agreement dated as of November 1, 2014, by and among Maker, as Borrower, and Payee, as Lender.

Commencing on the twentieth day of the month immediately following the Effective Date, this Note shall be paid in monthly installments, which shall be due and payable on the twentieth day of each month through the Loan Termination Date; provided, however, that if the date of any payment due and payable (including, the Loan Termination Date) is not a Business Day, then any payments hereunder shall be due on the immediately previous Business Day. The principal amount due hereunder, together with interest, loan charges and any other Obligation accruing hereunder, shall bear interest at the applicable interest rate set forth in Table 1 below (the "Interest Rate"). From the Effective Date through the Loan Termination Date, the Note shall be paid in equal monthly installments consisting of principal plus interest at the Interest Rate. On the Loan Termination Date, all outstanding principal, interest accrued but unpaid and any other amounts accrued and unpaid shall be immediately due in full. On or before the Effective Date, Payee shall provide to Maker a Schedule I, which shall indicate the full amount of Principal and all accrued interest due to date, and shall set forth the monthly installment payment schedule for the Note through the Loan Termination Date. Schedule I may be amended from time to time to reflect any additional Principal Advances made by Payee to Maker under the Loan Agreement. In the event of a conflict between the terms of this Note and Schedule I, then Schedule I shall control.

Table 1. Interest Rate

| Minimum Leverage Ratio | Maximum Leverage Ratio | Interest Rate |
| --- | --- | --- |
| 10.01x | 12x | 17.50% |
| 8.01x | 10x | 15.00% |
| 0x | 8x | 12.50% |

Maker shall have the right to prepay the Loan pursuant to the terms of the Loan Agreement. All amounts received for payment of this Note shall be first applied to any expenses due Holder under this Note, the Loan Agreement or the Security Agreement, then to accrued and unpaid interest, and finally to the reduction of the outstanding principal amount.

Upon the occurrence of an Event of Default, the entire outstanding principal balance of the indebtedness evidenced hereby, together with all accrued and unpaid interest thereon any other amounts accrued and unpaid, may be declared, and immediately shall become, due and payable in full.

2875014.3

*CSK*

Presentment for payment, demand, protest and notice of demand, protest and nonpayment are hereby waived by Maker and all other parties hereto. Notwithstanding anything to the contrary contained within the Agreement, Holder shall have the right to take any payments due under this note and the Loan Agreement from Maker's accrued residuals under the Processing Agreement and if such residuals are sufficient to pay any and all loan payments, when due, then no material breach of the Loan Agreement will result.

It is the intention of Maker and Holder to conform strictly to all laws applicable to Holder that govern or limit the interest and loan charges that may be charged in respect of the indebtedness evidenced hereby. Anything in this Note or any of the other Loan Documents to the contrary notwithstanding, in no event whatsoever, whether by reason of advancement of proceeds of the loans, acceleration of the maturity of the unpaid balance of any of the Obligations (as defined in the Loan Agreement) or otherwise, shall the interest and loan charges agreed to be paid to any Holder for the use of the money advanced or to be advanced under this Note exceed the maximum amounts collectible pursuant to applicable law. Maker and the Payee have agreed that:

(a)     if for any reason whatsoever the interest or loan charges paid or contracted to be paid by Maker to the Holder in respect of the Obligations shall exceed the maximum amount collectible under the law applicable to the Holder, then, in that event, and notwithstanding anything to the contrary in this Note or any other Loan Document (i) the aggregate of all consideration that constitutes interest or loan charges under the law applicable to such Holder that is contracted for, taken, reserved, charged or received under this Note or any other Loan Document or otherwise in connection with the Obligations under no circumstances shall exceed the maximum amounts allowed by such applicable law, and any excess paid to any Holder shall be credited by such Holder on the principal amount of the Obligations (or, to the extent the principal amount outstanding under this Note and the other Loan Documents has been or thereby would be paid in full, refunded to Maker), and (ii) in the event that the maturity of any or all of the Obligations is accelerated by reason of an election of the Holders resulting from any Event of Default, or in the event of any required or permitted prepayment, then such consideration that constitutes interest or loan charges under the law applicable to any Holder may never include more than the maximum amounts allowed by the law applicable to such Holder, and any excess interest or loan charges provided for in the Loan Documents or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Holder on the principal amount of the Obligations (or, to the extent the principal amount of the Obligations has been or thereby would be paid in full, refunded by such Holder to Maker);

(b)     all sums paid or agreed to be paid to the Holder for the use, forbearance or detention of sums due under the Loan Documents shall, to the extent permitted by applicable law, be prorated, allocated and spread throughout the full term of the Obligations until payment in full so that the rate or amount of interest and loan charges on account of the Obligations will not exceed any applicable legal limitation; and

(c)     the right to accelerate the maturity of the Obligations does not include the right to accelerate the maturity of any interest or loan charges not otherwise accrued on the date of such acceleration, and the Holder do not intend to charge or collect any unearned interest or loan charges in the event of any such acceleration.

This Note has been negotiated, executed and delivered in the State of Georgia, and is intended as a contract under and shall be construed and enforceable in accordance with the laws of said state, without reference to the conflicts or choice of law principles thereof, except to the extent that Federal law may be



applicable to determining the maximum amount of interest that may be charged by Holder in respect of the indebtedness evidenced hereby.

      This Note amends and restates, and is issued in substitution for and replacement of, any earlier dated promissory note between Maker and Payee (the "Existing Notes"), which Existing Notes shall be terminated.

<strong>(Signature Page Follows)</strong>



**IN WITNESS WHEREOF,** the undersigned Maker has caused this Note to be executed by its duly authorized officer as of the date first above written.

                              **PAYEE:**

                              _____

                              Priority Payment Systems LLC

                              **MAKER:**

                              _____

                              Chan S. Kim



# EXHIBIT H



STANLEY
ESREY &
BUCKLEY

Greg Michell                                                    (404) 835-6221 (fax)
(404) 835-6208 (phone)                                         gmichell@seblaw.com

August 1, 2020

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Chan S. Kim                              Chan S. Kim
5725 Buford Hwy., #211                   2550 Pleasant Hill Road, #424
Doraville, GA 30340                      Duluth, GA 30096

Chan S. Kim                              Chan S. Kim
3734 B Ashford Dunwoody Road             6257 Clapham Lane
Dunwoody, GA 30319                       Johns Creek, GA 30097

Chan S. Kim
2875 North Berkeley Lake Rd, #2
Duluth, GA 30096

Re:     **Notification of Breach and Demand for Remedy**
        Agreement for Processing Services - June 2, 2014
        Amendment to Agreement for Processing Services – November 1, 2014
        Loan Agreement - November 1, 2014
        Personal Guaranty – November 1, 2014
        Residual Purchase Agreements - July 20, 2018 and May 1, 2019
        Amended Promissory Note - September 10, 2019

Mr. Kim:

    This firm represents Priority Payment Systems LLC in connection with your numerous breaches of the above-referenced Agreements.  Unless otherwise defined herein, capitalized terms in this letter have such meaning as defined in those Agreements.   From this point forward, please direct all communication regarding this matter to me.

**Breach of the Agreement for Processing Services ("Processing Agreement")**

    Priority has learned that you have solicited merchants away from Priority (some without their knowledge) and diverted those merchants to another processor, in violation the Processing Agreement, including, but not limited to

Chan S. Kim
August 1, 2020
Page 2

_____

the following:

- Section 3(l)(i), which prohibits you from marketing the Merchant Services or any services substantially similar to the Merchant Service to any Priority merchant;
- Section 5(d), which prohibits you directly or indirectly from soliciting or contacting any Referred Merchant for the purpose of providing or receiving Merchant Services, or otherwise encouraging a Referred Merchant to terminate a Merchant Agreement with Priority; and
- Section 7(n), as amended, which prohibits you from marketing or selling the Merchant Services of, or on behalf of, any party other than Priority.

Your violations of Sections 3, 5, and 7 constitute material breaches of the Processing Agreement, and entitle Priority to terminate the Processing Agreement for cause and/or terminate your compensation pursuant to Section 5(d) of the Processing Agreement. See Section 7(o), as amended. Accordingly, you have fifteen (15) days from receipt of this letter to cure the above breaches by either: (i) moving the merchants back to Priority or (ii) paying Priority 40 times the lost monthly residual payable to Priority. Failing such cure, *Priority hereby terminates your compensation under the Processing Agreement effective fifteen (15) days from receipt of this letter.*

In addition, Priority invokes its rights under Section 7(n) to audit your books and records. Please provide me with one or more dates in the next fifteen (15) days on which I may come to your office to inspect these records.

## **Breach of the Residual Purchase Agreements ("Purchase Agreements")**

By soliciting merchants away from Priority and diverting them to another processor, you have also violated the Residual Purchase Agreements with Priority including, but not limited to the following:

- Section 4.4, which prohibits you from doing anything to impair the continued payment of the Residuals to Priority or engaging in activities that violate the Purchase Agreements or the Processing Agreement.
- Section 6.10, which prohibits you from, directly or indirectly, soliciting, diverting, taking away, or attempting to solicit, divert or take away, any of the merchants which are or were a party to any of the merchant agreements related to the Portfolio or Sub-Portfolio, or their respective affiliates.

As set forth in Section 6.10, these violations constitute material breaches of the

Chan S. Kim
August 1, 2020
Page 3

———————————————

Purchase Agreements, and entitle Priority to injunctive relief enjoining such breaches and any threatened breach as well as any remedy available at law as well as or in lieu of equitable relief. Moreover, pursuant to Section 5.1, you are required to indemnify Priority from any and all losses, including reasonable attorneys' fees, suffered by Priority as a result of your breach of the Purchase Agreements, the Processing Agreement, or the other agreements and documents to be executed and delivered by you pursuant to the Purchase Agreements or Processing Agreement.

As you know, you have also materially breached the Residual Purchase Agreements by, among other things, failing to: (i) pay the Buyer's Ownership Amount ($45,000) each month; (ii) achieve the specified Residual Thresholds; and (iii) maintain the minimum Net Residuals set forth in Section 2.8(c). Pursuant to Section 1.3, therefore, you are obligated to pay Priority the shortfall amount. Pursuant to that Section, Priority has the option, in its sole discretion, to either demand that you pay the shortfall amount in immediately available funds or deduct and withhold the shortfall amount from the amounts that would otherwise be payable to you pursuant to the Processing Agreement. Accordingly, *Priority hereby demands that you pay the shortfall amount in immediately available funds.*

## <u>Breach of the Loan Agreement and</u><br><u>Amended Promissory Notes ("Promissory Notes")</u>

As you also know, you have materially breached the Loan Agreement and Promissory Notes by, among other things, failing to make the agreed upon monthly installment payments.[1] Pursuant to the terms of the Promissory Notes, upon the occurrence of such an Event of Default, the entire outstanding principal balance of the indebtedness evidenced thereby, together with all accrued and unpaid interest thereon any other amounts accrued and unpaid, may be declared, and immediately shall become, due and payable in full. Accordingly, *Priority hereby declares the entire outstanding principal balance of the indebtedness evidenced by the Promissory Notes, together with all accrued and unpaid interest thereon any other amounts accrued and unpaid, immediately due and payable in full.*

In addition, Section 7(o) of the Processing Agreement, as amended, provides that Priority shall have the right to take, when due, any loan payments owed by you to Priority, from any available residuals accruing under the Processing Agreement. *Accordingly, notice is hereby given that, to the extent it is*

———————————————

[1] Section 7(o) of the Processing Agreement, as amended, provides that the breach of the Processing Agreement shall also constitute an "Event of Default" under any other agreement between Priority and you, including, without limitation, the Loan Agreement.

Chan S. Kim
August 1, 2020
Page 4

_____

*not doing so already, Priority will exercise its lawful right of setoff by taking all available residuals accruing under the Processing Agreement to offset the amounts owed by you under the Loan Agreement and Promissory Notes.*

## Conclusion

As a result of your willful conduct and breaches, Priority has been severely damaged. As of July 20, 2020, the outstanding balance of your loan is $482,116.97, with interest accruing on that amount at 12½% per annum. In addition, due to your solicitation of Priority merchants, since July 2019, the total number of merchants in the portfolio has dropped from 928 to 560, and the residual stream has dropped from approximately $180,000 per month to approximately $57,000 per month, which is insufficient to cover the amounts you owe Priority. As a result, the current shortfall amount owed under the Purchase Agreements for May, June, and July residuals is $84,211.27. Pursuant to Section 5(d) of the Processing Agreement, therefore, **Priority demands that you remit the full amount currently owed to Priority - $564,328.24 – in certified funds within five (5) business days of receipt of this letter** at the following address:

> Priority Payment Systems, LLC
> 2001 Westside Parkway, Suite 155
> Alpharetta, GA 30004
> Attn: Bradley J. Miller, General Counsel

Failing that, Priority will pursue all remedies available to it in law or equity for the collection of this amount and all other damages it incurs, including filing a civil complaint against you in the appropriate venue for, among other things, injunctive relief and breach of contract. It is evident that you will not be able to pay the Buyer's Ownership Amount ($45,000) each month for the remaining term of the Purchase Agreements or to transfer the Sub-Portfolio as required in Section 1.2(b) of those agreements at the 32 and 39 month anniversaries of the BOA Effective Dates for the Purchase Agreements. As a result, Priority will seek not less than $1,974,000 in damages, plus the expected value of the Sub-Portfolio residuals at historic performance levels, plus attorneys' fees and costs.

Under no circumstances should you interpret anything in this letter as a waiver of any claim or defense or as an election of remedies. Priority reserves all rights afforded it and all remedies available to it under the referenced Agreements and Georgia law. Furthermore, any delay or postponement of any action by Priority shall not constitute a waiver.

This matter demands your immediate attention. You will not receive any

Chan S. Kim
August 1, 2020
Page 5

further notice from Priority regarding this demand, and your failure to respond will be deemed an admission of your liability for the amount demanded.  Govern yourself accordingly.

Sincerely,

Greg Michell

DGM/nj

cc:   Thomas C. Priore
      Bradley J. Miller, Esq.

      (via email)

# EXHIBIT I

# RESIDUAL PURCHASE AGREEMENT

## CHAN S. KIM (d/b/a Priority Payments Central South)

THIS RESIDUAL PURCHASE AGREEMENT (this "Agreement") is entered into as of July 20, 2018 ("Agreement Effective Date"), by and among Priority Payment Systems LLC, a Georgia limited liability company ("Buyer"), on the one hand, and Chan S. Kim (d/b/a Priority Payments Central South), a sole proprietorship and individual resident of the state of Georgia (the "Company"), (Chan S. Kim is the owner/member/shareholder of the Company and is collectively referred to herein as the "Owner") (with the Company and the Owner collectively referred to herein as the "Sellers"), on the other hand. Buyer, the Company, and the Owners may each be individually referred to herein as a "Party" and collectively referred to herein as the "Parties". This Agreement hereby supersedes and replaces that certain Residual Purchase Agreement dated May 21, 2018 ("Prior Agreement"), by and among Priority Payment Systems LLC and Chan S. Kim (d/b/a Priority Payments Central South). For clarity, as of the Agreement Effective Date, the Prior Agreement shall be of no further force and effect.

WHEREAS, the Company is party to that certain Agreement for Processing Services, as amended ("Processing Agreement"), with Priority Payment Systems LLC (the "Processor") dated June 2, 2014, as amended from time to time, pursuant to which the Company acts as an agent of Processor and is entitled to receive certain residual payments from Processor in respect of merchants that are referred to Processor by the Company; and

WHEREAS, the Company is party to that certain Loan Agreement, as amended ("Loan Agreement"), with Priority Payment Systems LLC, dated November 1, 2014; and

WHEREAS, the Company further wishes to sell and Buyer wishes to purchase the right to receive certain of the Company's residuals applicable to Merchants in the Portfolio (hereinafter "Residuals") all as more particularly described in Section I of this Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## I. TERMS OF PURCHASE, SALE AND ASSIGNMENT; NEW PROCESSING AGREEMENT.

### 1.1 Purchase of Residuals.

(a)    Pursuant to the Processing Agreement, Seller acts as an agent of Buyer and is entitled to receive certain residual payments from Buyer in respect of merchants that are referred to Buyer by the Seller (hereinafter, "Residuals"). For purposes of this Agreement, the "Closing Date" shall be the date determined by Buyer that is not later than 30 days after the date upon which Buyer's parent company shall be listed on a publicly-traded stock exchange. In the event that Buyer's parent company is not listed on a publicly-traded stock exchange by November 1, 2018, this Agreement will terminate in which case, none of the parties to this Agreement shall have any further obligation or liability to any other party to this Agreement.

(b)    Each month, for a thirty two (32) month period beginning with the second Residual payment due to Company following the Closing Date, regardless of the date when such Residual was earned (hereinafter, the "BOA Effective Date"), the Company hereby sells, assigns, conveys, transfers and delivers to Buyer, and Buyer hereby purchases and accepts from the Company, Residuals in the amount of $45,000.00 (the "Buyer's Ownership Amount"), relating to all merchants that exist under the Processing Agreement, whether now existing or hereafter arising, including but not limited to the merchants listed on Exhibit 1.1 (the "Portfolio") and, to the extent necessary to enforce its right to such Residuals, all instruments and documents relating to such Residuals and the rights related thereto, free and clear of all liens, mortgages, charges, encumbrances, security interests, equities, claims and impediments. The term "Residuals" as used in this Agreement means any and all residual payments, residual payment rights, direct revenues, instruments and documents related to or arising from the Portfolio. For the avoidance of doubt, Company shall not be eligible to receive or have any right, title or interest in the Buyer's Ownership Amount. Notwithstanding the provisions above, the assignment of the Portfolio and Residuals shall not include the Company's rights, claims or causes of action, if any, against third parties relating to the Portfolio at or prior to the Closing Date.

### 1.2 Initial Purchase Price.

(a)    Subject to the terms and conditions hereof and in reliance upon the representations, warranties and covenants of the Sellers set forth herein and as consideration for the sale and purchase of the Residuals and the covenants of the Sellers set forth herein, Buyer shall, on the Closing Date, pay the Company the amount of One Million Eight Hundred Thousand and 00/100 dollars ($1,800,000.00) (the "Initial Purchase Price"), less $750,000.00 loan prepayment pursuant to the Loan Agreement, which will equal a payment to the Seller in the amount of $1,050,000.00 ("Payment to Seller"), in cash or otherwise immediately available funds. For clarity, the Buyer's Ownership Amount applicable to the Residuals for Sellers' processing activity during the month preceding the BOA Effective Date (which Residuals are paid on or about the 20ᵗʰ of the month) will belong to Buyer. The Initial Purchase Price is based on the $45,000.00 monthly Buyer's Ownership Amount which, for purposes of this Agreement, may also be regarded as the "Reference Residual". The Initial Purchase Price was calculated based on a multiple of forty times (40x) the Reference Residual. Sellers agree that Buyer will receive no less than the Buyer's Ownership Amount during each of the first thirty two (32) months beginning with the BOA Effective Date of the Agreement to be deducted from the monthly Residual under the Processing Agreement. For purposes of this Agreement, "Net Residual" shall mean recurring Residuals related to the Portfolio, net of all fees and expenses, including interchange, assessments, Processing Expenses and sales commissions and net of Buyer's Ownership Amount purchased from Sellers by Buyer pursuant to this Agreement. "Processing Expenses" include, but are not limited to, authorization, settlement, clearing, terminal support, merchant billing / statementing, chargebacks, retrievals, underwriting, fraud monitoring, ACH processing, and similar costs and expenses. The Initial Purchase Price and/or the Reference Residual may be subject to adjustment and clawback, as applicable, as more particularly set forth in Section 1.3 of this Agreement. Notwithstanding any provisions in this Agreement to the contrary, in the event that Buyer does not pay the Initial Purchase Price within thirty (30) days of the Closing Date, then all obligations of the Parties shall cease and this Agreement shall be void without recourse to the Parties and Buyer shall not be entitled to the Residuals (as defined in the Processing Agreement) associated with the Portfolio which Residuals shall revert back to Company.

(b)    On, or about, the 32 month anniversary of the BOA Effective Date, Buyer will identify and select merchants from the Portfolio, with respect to which merchants the Residuals of such merchants will be approximately equivalent to, but no less than equal to the Buyer's Ownership Amount (the "Sub-Portfolio"), and provide written notice to Company (the "Notice") of the merchants selected for inclusion in the Sub-Portfolio. Such Sub-Portfolio Notice shall fix the composition of the Sub-Portfolio and be binding on the Company and Buyer thereafter. Such Sub-Portfolio will be attached hereto as Exhibit 1.1(b) to this Agreement. As of the date of the Sub-Portfolio Notice, Buyer will have the right to retain 100% of the Residuals associated with the merchants

in the Sub-Portfolio, while Company retains 100% of any Residuals relating to the remaining Portfolio merchants not included in the Sub-Portfolio.

1.3 Residual Threshold.

(a)  In the event that the Buyer has not received Residuals in the amount of Five Hundred Forty Thousand and 00/100 dollars ($540,000.00) that were deducted from Residuals that were due to be paid to Seller between the twelve-month period following the BOA Effective Date, then the Parties agree that Company shall be obligated to pay to Buyer the applicable shortfall amount. Buyer shall have the option, in its sole discretion, to either: (i) demand that Company pay the shortfall amount in immediately available funds, or (ii) deduct and withhold the shortfall amount from the amounts that would otherwise be due and payable from Buyer to Company pursuant to the Agreement for Processing Services.

(b)  In the event that the Buyer has not received Residuals in the amount of Nine Hundred Thousand and 00/100 dollars ($900,000.00) applicable to the Residuals paid from the 13th month to the 32nd month following the BOA Effective Date, then the Parties agree that Company shall be obligated to pay to Buyer the applicable shortfall amount (with credit given for any shortfall amount previously paid by Company to Buyer).  Buyer shall have the option, in its sole discretion, to either: (i) demand that Company pay the shortfall amount in immediately available funds, or (ii) deduct and withhold the shortfall amount from the amounts that would otherwise be due and payable from Buyer to Company pursuant to the Agreement for Processing Services.

1.4 Excluded Assets and Liabilities. Except for the Buyer's Ownership Amount, Buyer is not purchasing any other assets of the Company. Buyer is expressly not agreeing, and under no circumstances shall Buyer be obligated, to pay, discharge or assume any liability of the Company or the Owners, and none of the Residuals shall be, or shall become, subject to any liability of the Company or the Owners, whether fixed or contingent, recorded or unrecorded, known or unknown, including without limitation, any residual or other payment due to agents or subagents, if any, with respect to the Residuals (the "Agent Liabilities"). The Company and the Owners shall retain all debts, liabilities, obligations, contracts, loans, commitments, or undertakings (collectively, "Liabilities") arising on or after the Agreement Effective Date under or relating to the Residuals, the Processing Agreement or any other Liabilities arising at any time relating to the Company and/or the Owners, including without limitation, any Agent Liabilities.

1.5 Deliveries of the Parties. Concurrently with the execution of this Agreement:

(a) Sellers shall deliver to Buyer the following:

(i) a closing statement and agreement (the "Closing Statement") duly executed by each of Sellers that is in form and substance reasonably satisfactory to Buyer.

(b) Buyer shall deliver to the Company the following:

(i) the Initial Purchase Price;

(ii) a certificate of incumbency in the form attached hereto as Exhibit 1.5(b)(iii) for officers of Buyer executing this Agreement or any of the other agreements contemplated herein;

(iii) the Closing Statement duly executed by Buyer.

(c) "Closing" shall be deemed to have occurred when the Sellers' have performed all of their obligations with respect to the Sellers' deliveries and Buyer has performed all of its obligations with respect to Buyer's deliveries as set forth in this Section 1.5.

II. REPRESENTATIONS AND WARRANTIES OF SELLERS. The Sellers, jointly and severally, represent and warrant as of the date hereof, as follows:

2.1 Organization; Good Standing.

(a) The Company is duly organized, validly existing and in good standing under the laws of its state of organization and has the power to own its properties and assets and carry on its operation of its business as it is presently being conducted. The Company is qualified to do business and is in good standing in those states where the business of the Company requires qualification. Each Owner has all requisite authority and capacity necessary to enter into this Agreement and to execute, deliver and perform all of his/her/its obligations under all agreements, instruments and documents to be executed and delivered by him/her/it in connection with the transactions contemplated by this Agreement. The execution, delivery and performance of this Agreement by each Owner does not and will not breach any statute or regulation of any applicable governmental authority. The execution, delivery and performance of this Agreement by each Owner does not, and each Owner's consummation of the transactions contemplated by this Agreement will not, violate any provision of or result in the acceleration of any obligation under, any mortgage, lease, agreement, instrument, order, license, arbitration award, judgment or decree to which any Owner is a party or by which any Owner or the Residuals are bound. This Agreement constitutes, and upon their execution and delivery, the other agreements to be executed and delivered by each Owner will constitute, the valid and binding obligations of each Owner, enforceable against such Owner in accordance with its or their terms. The Company will continue to comply with and honor all Company obligations including, but not limited to, the Processing Agreement and Company's operating agreement.

2.2 Authority; No Conflict; Enforceability. Sellers have the power and authority to enter into and to perform all of their obligations under this Agreement, to sell the Residuals and to execute, deliver and perform each and all of their obligations under all of the agreements to be executed and delivered by them in connection with the transactions contemplated by this Agreement. The execution, delivery and performance of this Agreement by the Sellers do not conflict with or result in a breach or default under any of the terms, conditions, or provisions of the Company's governing documents. The execution, delivery and performance of this Agreement by the Sellers does not, and the consummation of the transactions contemplated by this Agreement will not, violate any provision of, or result in the acceleration of any obligation under, any mortgage, lease, agreement, instrument, order, license, arbitration award, judgment or decree to which the Sellers are a party or which concerns the Residuals. This Agreement constitutes, and upon their execution and delivery, the other agreements to be executed and delivered by the Sellers will constitute, the valid and binding obligations of the Sellers, enforceable against the Sellers in accordance with its or their terms.

2.3 Compliance with Law and Card Association Rules.

CSK

(a) The Sellers have complied with and are in compliance with all laws applicable to the Company's business. The Sellers have all material consents, permits, franchises, licenses, concessions, authorities, (including without limitation all easements, rights of way, and similar authorities), authorizations and approvals of governmental authorities and other persons or entities required in connection with the operation of its business as now being conducted; and to the Knowledge (as defined below) of the Sellers there is no event or circumstance that has occurred that would cause any of these to be cancelled or suspended. The transaction contemplated by this Agreement does not require compliance with any bulk sales act or similar law.

(b) To the extent required by the Rules (as defined below), the Company is registered by a member of and in good standing with the Card Associations (as defined below), or does business by or through or in the name of an entity so registered. All approvals, permits and licenses of Card Associations required to conduct the business of the Company are in full force and effect and are being materially complied with. To the Knowledge of the Sellers, there is no investigation, proceeding or disciplinary action (including fines) pending, taken, or threatened against the Company by a Card Association or its applicable agent, whether relating to an alleged violation of the Rules or otherwise. The Company does not store, process or handle cardholder data or information. As used herein: "Card Associations" means MasterCard International, Inc., VISA International, Inc., VISA USA, Inc. and any other card association, debit card network or similar entity with whom Processor or the Company has or should have a direct or indirect sponsorship agreement; and "Rules" means the bylaws, regulations and/or requirements that are promulgated by the Card Associations.

2.4 Title to Assets. The Company has good and marketable title to the Residuals, free and clear of any restriction on transfer or rights of any third party. To the Sellers' Knowledge, there are no facts or conditions affecting the Residuals that could, individually or in the aggregate, interfere in any respect with the receipt thereof by Buyer. The Residuals have not been pledged as collateral, and are not subject to any lien, for any debt, liability or other obligation of any nature, including taxes. Following the consummation of the transactions contemplated herein, no Seller will retain any interest, nor shall any third party have any interest in, the Reference Residuals.

2.5 Litigation. There are no actions, suits or proceedings at law or in equity or before any government agency or other instrumentality of any kind whatsoever pending, or to the Knowledge of the Sellers, threatened against any Sellers or the Company which would affect the Residuals. Neither the Company nor any Seller is not subject to any judgment, order, writ or injunction of any court or governmental agency.

2.6 No Consent. Neither the execution, delivery or performance of this Agreement by the Sellers will (i) conflict with or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both would constitute a default) under, or result in the termination or in a right of termination or cancellation of, or accelerate the performance required by, or result in the creation of any lien upon any of the Residuals or result in being declared void, without further binding effect, or subject to amendment or modification, any of the terms, conditions or provisions of, any material contract, license, franchise, permit, or other material instrument or commitment or obligation to which any Seller is bound or which affects the Residuals, (ii) violate any law, regulation or rule applicable to any Seller or the Residuals, or (iii) require any consent, approval or authorization of, or notice to, or declaration, filing or registration with, any governmental authority. No Seller is subject to any noncompetition or exclusivity agreements, understandings or arrangements which restrict or will restrict their ability to service the merchants in the Portfolio.

2.7 Absence of Changes. Since April 1, 2018 (the "Reference Date"), the Sellers represent that they have conducted business only in the ordinary course of business, consistent with past practice and warrant that that they will continue to do so until the Closing Date. The Sellers further warrant that the Company has not experienced any Material Adverse Change (as defined below) and no fact or condition exists or is reasonably contemplated or threatened which would have or which reasonably could be expected to have a Material Adverse Effect. The Sellers further represent that they will notify Buyer of any Material Adverse Effect that occurs between the Agreement Effective Date and the Closing Date. Without limiting the generality of the foregoing, prior to the Closing Date, the Sellers represent that they will not:

(a) make any material change in the Company or its operations or in the manner of conducting its business;

(b) subject the Residuals to any Liens (as defined below);

(c) terminate any agreement with Processor or any merchant which is responsible for residual revenue in excess of 5% of the Reference Residual (a "Material Merchant");

(d) experience any material change in its relations with Processor or any Material Merchant without notifying Buyer; or

(e) agree, whether in writing or otherwise, to take any action or omit to take any action which would result in a Material Adverse Change or any of the foregoing matters.

The term "Liens" means any lien, mortgage, pledge, assignment, security interest, right of set-off, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any capital lease in the nature thereof) and any option, trust, purchase option, call, or similar right of a third party, or any other preferential arrangement having the practical effect of any of the foregoing.

The term "Material Adverse Effect" means (a) any state of facts, change, event, effect or occurrence (when taken together with all other states of fact, changes, events, effects or occurrences) that results in, or is reasonably likely to, result in an adverse impact equal to or greater than 5% to the financial condition, results of operations, prospects, properties, assets or liabilities (including contingent liabilities) of the Company taken as a whole; and (b) any state of facts, change, event, effect or occurrence that shall have occurred or been threatened that (when taken together with all other states of facts, changes, events, effects or occurrences that have occurred or been threatened) is reasonably likely to prevent, delay, or materially affect the performance by Sellers of any of its obligations under this Agreement or the consummation of the transactions contemplated hereby; provided, however, that none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: any adverse change, event, development, or effect (whether short-term or long-term) arising from or relating to (i) general business or economic conditions, including such conditions related to the business of a Party, other than such conditions which disproportionately impact Sellers as compared to other companies operating within the same industry, (ii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) general changes in the financial, banking, or securities markets, other than such changes which disproportionately impact Sellers as compared to other companies operating within the same industry, or (iv) changes in laws, rules, regulations, orders, or

CSK

other binding directives issued by any governmental entity; other than such changes which disproportionately impact Sellers as compared to other companies operating within the same industry.

2.8 Contracts.

(a) Attached hereto as Exhibit 2.8(a) are copies of the forms of merchant agreements upon which the Portfolio is based. No merchant agreement included in the Portfolio includes any material deviations from such forms. No agreement which affects the Sellers or the Residuals obligates or will obligate the Sellers (by the terms of any of such contracts, or at the option of the other party to such contracts) to (i) make a lump sum payment in lieu of any future stream of revenue or otherwise, (ii) acquire or assume any asset or liability, (iii) offer a right of first refusal or similar preferential right (except to Processor) or (iv) pay ongoing residuals to any third party (other than Buyer).

(b) To the Knowledge of the Sellers, there is no existing dispute by or among any of the Company, Processor and a Material Merchant and no Material Merchant intends to terminate or materially reduce its annual credit/debit card volume, whether as a result of this Agreement or otherwise. There are no Material Merchants that receive services from the Company, or for whom the Company receives Residuals, that are not a party to a merchant agreement.

(c) The thirteen (13) most recent residual reports issued by Processor in respect of the Portfolio are attached hereto as Exhibit 2.8(c) (each a "Residual Report"). Since the date of the most recent Residual Report, there has not been any material adverse change (i.e., a change of more than 5% in the value of the Residuals taken as a whole. Each Residual Report is representative of a month during which business was conducted in the ordinary course, and does not contain any overpayment or other errors, to the Knowledge of the Sellers. For thirty two months after the Closing Date, Company agrees to maintain the amount of residuals payable under the Processing Agreement including the $45,000.00 monthly Buyer's Ownership Amount in an amount equal to at least $65,000.00 per processing month.

(d) To the Knowledge of the Sellers, there are no facts or circumstances existing or reasonably anticipated to occur in the future that would cause the merchant attrition rate for periods following the Closing to exceed historical merchant attrition rates.

(e) With respect to all agreements with Processor, including the Processing Agreement, the Company is, and to the Knowledge of the Sellers, all other parties thereto are, in compliance with all material applicable terms and requirements thereof, and have been in compliance at all times since the Reference Date.

2.9 Solvency. No Seller will be rendered insolvent (either by an inability to pay their debts as they mature or by the fact that the sum of their aggregate debts are greater than a fair valuation of all of their aggregate property) by the consummation of the transactions contemplated by this Agreement. The Sellers will receive fair consideration, fair equivalent value and reasonable value in exchange for the Residuals. No Seller is presently engaged in and are not contemplating engaging in a business or transaction for which the property remaining with it would constitute unreasonably small capital.

2.10 Taxes. The Company has filed all tax returns and paid all taxes, including without limitation any federal, state, local, or foreign income, sales or franchise tax or other taxes measured by income or profits and all employment taxes, sales, use or stamp taxes, due as of Closing and will continue to file returns and pay taxes due after Closing as required by taxing authorities.

2.11 Brokers or Finders. The Sellers have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other like payment in connection with this Agreement.

2.12 Disclosure. This Agreement does not contain any untrue statement of a material fact nor does it omit to state a material fact required to be stated in order to make such statement or this Agreement not misleading. No other documents or instruments heretofore or hereafter furnished by the Sellers to Buyer in connection with this Agreement contains or will contain any such untrue statement or omission of a material fact. The Sellers do not have Knowledge of any fact that has specific application to its business (other than general economic or industry conditions) and that may materially adversely affect the Residuals or the prospects, financial condition or results of operations of the Company's business that has not been set forth in this Agreement.

III. REPRESENTATIONS AND WARRANTIES OF BUYER. Buyer represents and warrants, as of the date hereof, as follows:

3.1 Organization; Good Standing. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Georgia and has the power to own its properties and assets and carry on its business as it is presently being conducted.

3.2 Authority; Conflict; Enforceability. Buyer has the power and authority to enter into and to perform all of its obligations in connection with the transactions contemplated by this Agreement. The execution, delivery and performance of this Agreement by Buyer does not conflict with or result in a breach or default under any of the terms, conditions, or provisions of Buyer's Certificate of Formation or Operating Agreement, as amended and restated, or other governing documents. This Agreement constitutes, and upon their execution and delivery, the other agreements to be executed and delivered by Buyer will constitute, the valid and binding obligations of Buyer.

IV. COVENANTS AND AGREEMENTS OF THE PARTIES.

4.1 Cooperation. Buyer and Sellers shall cooperate to comply with all applicable laws and regulations. Buyer and Sellers shall cooperate in securing all consents, approvals, waivers, or permits required from each person or governmental authority whose consent, approval, waiver or permit with respect to the sales and transfers contemplated hereby are necessary for Buyer to receive the Residuals after the date hereof.

4.2 Affirmative Covenants of the Sellers. The Sellers hereby covenant and agree that, so long as either the Company or Buyer is entitled to receive any Residuals relating to the Portfolio, the Sellers shall:

(a) defend the right, title and interest of Buyer in, to and under the Residuals against all claims which are adverse to Buyer;

CSK

(b) from time to time during regular business hours following reasonable notice by Buyer, permit Buyer, its agents or representatives to visit the offices and properties of the Company for the purpose of reviewing the information of the Company with respect to the Residuals and the Company's performance hereunder;

(c) maintain accessible all records reasonably necessary or advisable for the collection of all amounts in respect of the Residuals, detailed monthly reports from Processor or other reports pertaining to the Residuals;

(d) fully perform in a timely manner and comply with all material terms, covenants and other provisions required to be performed and observed by it in connection with the Processing Agreement;

(e) notify Buyer promptly after becoming aware of the threat of termination or termination of either of the Processing Agreement;

(f) preserve and maintain its corporate existence, rights, and privileges; and,

(g) use all commercially reasonable efforts to maintain good relations with merchants.

4.4 Negative Covenants of Sellers. Sellers covenant and agree that, so long as either the Company or Buyer is entitled to receive any Residuals relating to the Portfolio:

(a) no Sellers will sell, pledge, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any adverse claims upon or with respect to the Residuals;

(b) no Seller shall do anything to impair the continued payment of the Residuals and shall not extend, amend, modify, substitute or waive the terms of the Processing Agreement without the consent of Buyer; and

(c) no Seller will (i) knowingly engage in activities which violate this Agreement or the Processing Agreement; (ii) operate its business in an unsound or unsafe manner; or (iii) engage in activities which may impose financial risk to Buyer. To the extent that any Seller violates any of the negative covenants set forth in Section 4.4 (a) or (b), the actions taken by the Sellers with respect to such violation(s) shall be null and void and without effect.

4.5 Further Action. Buyer and Sellers shall, at any time after the date of this Agreement at the request of another Party and without further consideration, execute and deliver such further instruments of assignment, transfer or assumption and take such further action as the other may reasonably request in order to more effectively transfer, reduce to possession or record title to the Residuals.

Sellers hereby constitute and appoint Buyer their true and lawful attorney, with full power of substitution, in the name of the Company or otherwise, and on behalf and for the benefit of Buyer, to demand and receive from time to time any and all of the Residuals; to give receipts and releases for or in respect of the same or any part thereof; to collect for its account all receivables and other items transferred hereunder; to endorse checks and other instruments; to institute and prosecute, from time to time, in the name of the Company or otherwise, any and all actions, suits and proceedings which Buyer deems proper to collect, assert or enforce any claim, title, right, debt, note or actions, suits or proceedings in respect to the Residuals; and to execute such other documents and take such other action as may be necessary from time to time to carry out this Agreement and the conveyance of the Residuals. Sellers hereby declare that the foregoing powers are coupled with an interest and shall be irrevocable.

V. INDEMNITIES

5.1 Indemnity by Sellers. Sellers, jointly and severally, shall indemnify and hold harmless Buyer and its members, shareholders, directors, officers, employees and affiliates (collectively, "Buyer Indemnified Parties"), from and against any and all liabilities, losses, damages, demands, claims, suits, costs and expenses, including without limitation reasonable attorneys' fees, and any and all amounts paid in settlement of any claim or litigation (collectively, "Damages"), asserted against, resulting to, imposed upon, or incurred or suffered by any of them, directly or indirectly, as a result of or arising out of the following: (i) any inaccuracy in or breach or nonfulfillment of any of the representations, warranties, covenants or agreements made by the Sellers in this Agreement, the Processing Agreement, or the other agreements and documents to be executed and delivered by the Sellers pursuant to this Agreement or the Processing Agreement; (ii) any liability imposed on or incurred by any Buyer Indemnified Party arising from or in connection with the operation of the Company; and
(iii) any claims relating to or arising from subagents or independent contractors of Sellers, including, without limitation, claims relating to or arising from Sellers failure to pay all or part of the amounts owed to the counterparties pursuant to subagent or independent contractor agreements.

5.2 Indemnity by Buyer. Buyer shall indemnify and hold harmless Sellers and their members, shareholders, directors, officers, employees and affiliates from and against all Damages asserted against, resulting to, imposed upon, or incurred or suffered by any of them, directly or indirectly, as a result or arising out of any inaccuracy in or breach or nonfulfillment of any of the representations, warranties, covenants or agreements made by Buyer in this Agreement or the other agreements and documents to be executed and delivered by Buyer pursuant to this Agreement.

5.3 Survival. All of the warranties and representations made by the Parties in this Agreement shall survive the execution of this Agreement and remain operative and in full force and effect and may be relied upon regardless of any other information, or any investigation or inquiry, by or on behalf of the party to whom the warranty or representation is given and shall not be deemed merged into any instrument or document delivered at Closing.

VI. MISCELLANEOUS

6.1 Notices. Notices under this Agreement shall be given in writing and delivered by hand, or overnight delivery service (by a nationally recognized carrier) or sent by certified mail/return receipt requested, postage prepaid, to the addresses set forth on the signature page hereto. Notices shall become effective upon receipt

CSK

6.2 Assignment. This Agreement may not be assigned by any Party hereto without the consent of the other Parties, provided however that Buyer may assign this Agreement or the Residuals without the consent of Sellers to: (i) any of its affiliates; (ii) to any entity purchasing all or substantially all of the assets of Buyer; or (iii) to any entity that gains control of Buyer by way of merger, acquisition or otherwise.

6.3 Amendment. This Agreement may be amended only by a writing signed by all of the Parties hereto.

6.4 Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party. The exchange of copies of this Agreement and of its signature pages by facsimile transmission or in pdf format shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile or in pdf format shall be deemed to be their original signatures for all purposes.

6.5 Governing Law. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of Georgia, without regard to its conflict of law principles. Each party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Georgia and of the United States of America located in Fulton County, the State of Georgia (the "Courts") for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts), waives any objection to the laying of venue of any such litigation in such courts and agrees not to plead or claim in any Georgia court that such litigation brought therein has been brought in an inconvenient forum.

6.6 Knowledge. "Knowledge" shall have the meaning set forth below:

    (a) An individual will be deemed to have Knowledge of a particular fact or other matter if (i) that individual is actually aware of the fact or matter or (ii) a prudent individual could be expected to discover or otherwise become aware of the fact or matter in the course of conducting a reasonable investigation regarding the accuracy of the statement, a representation or warranty made with respect thereto.

    (b) A Party, other than an individual, will be deemed to have Knowledge of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, employee, agent, executor or trustee of that Party (or in any similar capacity) has, or at any time had, Knowledge of that fact or other matter (as set forth in (a) above), and any such individual will be deemed to have conducted a reasonable investigation regarding the accuracy of the statements, representations and warranties made herein by that Party.

If any Seller has Knowledge of any particular fact or other matter, such fact or other matter shall be deemed to be "to the Knowledge of Sellers" or "to Sellers' Knowledge" as used herein.

6.7 Expenses. Whether or not the transactions contemplated hereby shall be consummated, the Parties agree as follows: (i) Sellers will pay the fees, expenses, and disbursements of Sellers and their respective agents, advisers, attorneys and accountants incurred in connection with the subject matter hereof and any amendments hereto; and (ii) Buyer shall pay the fees, expenses and disbursements of Buyer and its agents, advisers, attorneys and accountants incurred in connection with the subject matter hereof and any amendments hereto.

6.8 True Sale. It is the express intent of the Parties that the conveyance of the Residuals to Buyer as provided in this Agreement be, and be construed as, a true sale of the Residuals to Buyer. It is expressly the intention of the Parties that such conveyance shall not be deemed to be a pledge of the Residuals by the Company to Buyer to secure a debt or other obligation of the Sellers or any other person, and shall not be deemed to be a merchant finance or cash advance lending product or service which is offered in reliance on a merchant's credit and charge card receivables.

6.9 Construction. Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular and references to the singular include the plural, (ii) references to any gender include the other gender, (iii) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (iv) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (v) the terms "day" and "days" mean and refer to calendar day(s), (vi) the terms "month" and "months" mean and refer to calendar month(s), and (vii) the terms "year" and "years" mean and refer to calendar year(s).

6.10 Non-Solicitation. All of the terms, conditions, covenants, and provisions of this Section 6.10 are collectively referred to as the "Non-Solicitation Arrangements".

(a) Each Seller hereby agrees that during the Nonsolicitation Period (as hereinafter defined), such Seller will not, without the express written consent of Buyer, directly or indirectly solicit, divert, take away, or attempt to solicit, divert or take away, any of the merchants which are or were a party to any of the merchant agreements related to the Portfolio or the Sub-Portfolio, or their respective affiliates.

(b) For purposes of this Agreement, the "Nonsolicitation Period" shall mean the period commencing on the Closing Date and terminating forty eight (48) months thereafter, or the non-solicitation period provided in the Processing Agreement, whichever is longer. If, in any judicial proceeding, a court refuses to enforce any of the covenants (or any part thereof) set forth in this Section 6.10, then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced.

(c) Each Seller acknowledges and agrees that, in the event of a breach or threatened breach of any of the covenants and promises contained in this Section 6.10, Buyer shall suffer irreparable injury for which there is no adequate remedy at law, and Buyer shall therefore be entitled to temporary, preliminary, and permanent injunctive relief enjoining said breach or threatened breach without having to post a bond or other security. Each Seller further acknowledges and agrees that Buyer shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of such breach. Sellers acknowledge and agree that the Non-Solicitation Arrangements are reasonable in scope, content and duration, are not overly broad or unduly burdensome, and are reasonably intended to protect the legitimate business interests of Buyer. Buyer represents, and Sellers further acknowledge and agree, that the Non-Solicitation Arrangements are a material inducement for Buyer to enter into this Agreement and that Buyer would not enter into the transactions contemplated by this Agreement in the absence of such Non-Solicitation Arrangements.

CSK

(d) Notwithstanding any other provision in this Agreement to the contrary, Section 6.10(a) shall be of no force or effect in the event Buyer fails to make payment pursuant to the terms of this Agreement of the Initial Purchase Price and which is not subject to a good faith dispute between Buyer and a Seller, and Buyer fails to cure such non-payment within fifteen (15) days of written notice from such Seller about such non-payment.

**[remainder of page intentionally blank]**
**[signature page follows]**

CSK

IN WITNESS WHEREOF, the duly authorized representatives of the Parties have executed this Residual Purchase Agreement as of the Agreement Effective Date.

PRIORITY PAYMENT SYSTEMS LLC
("Buyer")

By: _____
Name: John V. Priore
Title: CEO
Address: 2001 Westside Pkwy., Suite 155
            Alpharetta, Georgia 30004

Chan S. Kim (d/b/a Priority Payments Central South)
("Company")

By: _____
Name: Chan K.m
Title: Owner
Address: 2550 pleasant hill Rd #424
            Duluth GA 30096

Chan S. Kim
("Owner")
By: _____
Address: 2550 pleasant hill Rd #424
            Duluth GA 30096

EXHIBIT 1.1

MERCHANT PORTFOLIO

| Merchant ID | Merchant Name | Merchant ID | Merchant Name |
|---|---|---|---|
| 554402000390161 | LAKE CITY INT'L FARMERS MARKET | 554402000347583 | SUPER ATL WINGS |
| 8739295900300040 | RED OAK PACKAGE STORE TSYS | 554402000366849 | ANGIE'S BEAUTY ATLANTA |
| 554402000166215 | EGGSLUT LOS ANGELES | 554402000119834 | JC HAIR LAND |
| 8739295900300013 | SAMURAI BLUE TSYS | 554402000347229 | AMERICAN WINGS & DELI WARNER ROBINS |
| 554402000428581 | EGGSLUT BEVERLY CENTER | 554402000367540 | WOORI DUMPLING HOUSE |
| 554402000149328 | Rising Roll Gourmet midtown | 554402000363028 | J DENTAL CARE P. C. |
| 554402000384131 | EGGSLUT GLENDALE | 8739295900300035 | BEAUTY EXPO TSYS |
| 554402000432252 | DOLLAR PLUS & BEAUTY | 554402000420190 | DEPOT PACKAGE STORE |
| 554402000360461 | EGGSLUT VENICE | 554402000171181 | PROFESSIONAL CLEANERS |
| 554402000356584 | ORIENTAL MART | 554402000124941 | GOOD FEELINGS ATLANTA |
| 518089240787507 | KALI FOOTWARE | 554402000438200 | DISCOUNT MEAT WORLD |
| 554402000140891 | Rising Roll at Atlantic Station | 554402000411900 | U BEAUTY FITZGERALD |
| 8739295900300028 | TSUNAMI OF HARBISON TSYS | 554402000130096 | STAR BEAUTY SUPPLY ATLANTA |
| 554402000357319 | KIMCHI MART PEMBROKE PINES | 554402000184440 | GEM CLEANERS 3330 |
| 554402000399790 | SHIRTS & PANTS FLUSHING | 554402000440610 | SOY BEAUTY SUPPLY |
| 554402000415901 | BRANDED BARREL | 554402000308007 | Q KARAOKE AND BILLIARDS |
| 554402000399873 | US BEAUTY MART MARIETTA | 554402000353706 | YOUNGS DRY CLEANER MA |
| 554402000381962 | CREST LIQUORS | 554402000154286 | HAIR SOUTH |
| 554402000438721 | TSUNAMI | 554402000392340 | CAFE DULUTH |
| 554402000156745 | CHINA GARDEN RESTAURANT | 554402000317750 | KING BEAUTY SUPPLY |
| 554402000386839 | SORA BEAUTY SHOP | 554402000442830 | LANETT BEAUTY SUPPLY |
| 554402000327413 | LEE TIRE COMPANY | 554402000356980 | OCEAN BEAUTY SUPPLY |
| 554402000326801 | Wings 101 | 554402000338582 | POP CULT ( FLORIDA MALL) |
| 554402000399881 | US BEAUTY MART ALBANY | 554402000165530 | JOINUS CLEANERS DRUID |
| 554402000387522 | LOVEJOY PACKAGE STORE | 554402000319772 | CARIS BEAUTY SUPPLY |
| 554402000356634 | KIMCHI MART | 554402000132449 | JK BEAUTY SUPPLY TAMPA |
| 554402000178848 | OSAKA SUSHI & THAI | 518089240787838 | COLUMBIA BEAUTY SUPPLY |
| 554402000103465 | J BUFFALO HOUSE | 554402000391060 | HAMADA JAPANESE GRILL & SUSHI |
| 554402000332924 | SUSHI SPOT | 554402000442202 | BEAUTY PLAZA DISCOUNT |
| 554402000130252 | WEI'S HIBACHI BUFFET | 554402000317685 | NEW STAR BEAUTY SUPPLY |
| 554402000102657 | PIONEER APPAREL | 554402000151712 | LELAND BEAUTY |
| 554402000375188 | PY BEAUTY MAX OCALA | 554402000352039 | CORNER CLEANERS |
| 554402000189621 | SARIONE RESTAURANT | 554402000430686 | YAMI JAPANESE SUSHI & STEAK |
| 554402000353722 | FRIED TOMATO BUFFET NEWNAN | 554402000353474 | Q BEAUTY SUPPLY |
| 554402000399717 | US BEAUTY MART JONESBORO | 554402000414110 | ARIRANG COLUMBIA |
| 554402000390674 | ROYAL BEAUTY SUPPLY ORLANDO | 554402000435313 | GRAND WORLD MART |
| 554402000354514 | AMERICAN DELI EAST POINT | 554402000152629 | LIZ TAILOR |
| 554402000307975 | HW BEAUTY SUPPLY #1 | 554402000327163 | ANGIES BEAUTY PLUS |
| 554402000313932 | ORIGAMI SUSHI | 554402000194555 | NAIL TIME |
| 554402000389288 | US BEAUTY MART DOUGLASVILLE | 554402000434720 | COLE'S CLEANERS |
| 8739295900300025 | KIKU JAPANESE STEAK & SUSHI TSYS | 554402000190256 | JANG WON JUNG |
| 8739295900300019 | C & C WING N GRILL CONYERS | 554402000135392 | NEW KOA ORIENTAL GROCERY AND GIFT |
| 554402000439950 | DIXIE PACKAGE | 554402000197483 | YES HAIR & BEAUTY SUPPLY |
| 554402000341107 | Eve's II Beauty Supply | 554402000391243 | SNOW CLEANERS |
| 554402000109199 | MARU SUSHI | 518089240784884 | Beauty Magic |
| 554402000414946 | HAIR PLUS BEAUTY SUPPLY | 554402000445080 | WING & FISH MARIETTA |
| 554402000423392 | CAJUN SEAFOOD MARKET | 554402000179549 | US BEST TAEKWONDO CENTER |
| 554402000341826 | KISSME BEAUTY SUPPLY | 554402000112250 | HAIR JOY |
| 554402000381632 | FRIED TOMATO BUFFET KENNESAW | 554402000190413 | LITTLE TOKYO |
| 8739295900300018 | SATO JAPANESE RESTAURANT | 8739295900300031 | YOSHI SUSHI TSYS |
| 554402000445197 | J BUFFALO WING BUFORD | 554402000140962 | THOMAS BEAUTY SUPPLY |
| 8739295900300014 | SARIONE GRILL TSYS | 8739295900300008 | LUXURY NAIL & SPA TSYS |
| 554402000429415 | NASHVILLE CLEANERS | 554402000357947 | BROOKWOOD CLEANERS |
| 8739295900300033 | TIFFANY'S HOMETOWN BUFFET | 554402000340679 | FASHIONVIEW BEAUTY SUPPLY |
| 8739295900300038 | STAR FISH TSYS | 554402000343087 | BEAUTY LINE CHARLESTON |

cgK

| | | | |
|---|---|---|---|
| 554402000399675 | US BEAUTY MART COLLEGE PARK | 554402000386151 | LEE BEAUTY SUPPLY |
| 518089240783514 | WINDSOR PACKAGE STORE | 554402000300756 | PRONTO CLEANERS |
| 8739295900300012 | 9292 KOREAN BBQ | 554402000176495 | DIXIE WINGS |
| 554402000310763 | A&K BEAUTY SUPPLY | 554402000329722 | FASHION CLEANERS SUWANEE |
| 554402000426502 | INOKO EXPRESS | 554402000322040 | BEAUTY DEPOT 4001 |
| 554402000368654 | NONA SUSHI | 554402000372649 | ROY'S HAIR & ACCESSORIES |
| 554402000442608 | KILROY'S PACKAGE STORE | 554402000307587 | WORLD WINGS |
| 8739295900300020 | KOREAN HOUSE ASHEVILLE | 554402000417956 | K BEAUTY WAYCROSS |
| 554402000157081 | THAI HOUSE | 554402000301457 | UNGA HAIR SALON |
| 554402000415604 | BUFFALO HOUSE CAFE | 554402000332734 | 285 SKY JEWELRY |
| 554402000300020 | LADY & KIDS | 554402000156919 | ABC BEAUTY SUPPLY |
| 554402000305961 | BEAUTY TOWN PENSACOLA | 518089240777284 | PLAZA CLEANERS CONYERS |
| 554402000343111 | NEW ORLEANS SEAFOOD | 554402000307017 | CORNER WINGS CAFE |
| 554402000340240 | ALBANY BEAUTY | 554402000177071 | Star Karaoke |
| 518089240784405 | european dry cleaner | 554402000163881 | BEAUTY TOUCH |
| 554402000341792 | KOREANA RESTAURANT COLUMBUS | 554402000375451 | VALERO FOOD MART |
| 554402000387159 | KOOKOO'S FISH MARKET & DELI | 554402000198820 | SOS BEAUTY SUPPLY |
| 554402000370205 | windsor cleaner | 554402000140277 | CARRIAGE CLEANERS-CHESHIRE BRIDGE |
| 554402000374579 | GARLIC N GINGER | 554402000112318 | Yoon's Beauty Supply |
| 554402000043066 | SUSHI SUMO ALPHARETTA | 554402000346544 | LEE'S AUTO CENTER |
| 554402000142927 | MATOI SUSHI | 554402000162925 | JIN'S CLEANERS |
| 554402000144634 | BEAUTY ONE | 554402000176651 | CLEAN N CARE #1 |
| 8739295900300030 | E. M. BOP TSYS | 554402000434175 | BEAUTY WORLD ATMORE |
| 518089240787127 | VICTORY BEAUTY SUPPLY | 554402000366641 | OAKHURST CLEANERS |
| 554402000389007 | NATURAL MARKET LAND O LAKES | 554402000445783 | I CRAB NEW ORLEANS SEAFOOD |
| 554402000359083 | HONG KONG STAR CHINESE CUISINE | 554402000412445 | SUSHI CIRCLE |
| 554402000329243 | EAST ORLANDO BEAUTY SUPPLY | 554402000144014 | Super Wings & Philly |
| 8739295900300036 | HAPPY HOUSE KOREAN RESTAURANT TSYS | 554402000178301 | World Dry Cleaner |
| 554402000347591 | WILLEO CLEANER | 554402000141184 | GOLDEN BEAUTY SUPPLY |
| 554402000411348 | NDM FARMERS MARKET WHOLE SALE | 554402000436121 | SISTER'S BEAUTY SUPPLY #2 |
| 554402000424226 | CONCORD LIQUOR | 554402000430363 | OK ALTERATION & SHOE REPAIR |
| 8739295900300010 | MARU SUSHI & GRILL TSYS | 554402000334201 | DJ BEAUTY SUPPLY |
| 8739295900300027 | KIM'S BAR B Q | 554402000400333 | WINGS & PHILLY DECATUR |
| 554402000439240 | SHASA BEAUTY GARNERS FERRY | 554402000162107 | ALPHA CLEANERS |
| 554402000351379 | MAJESTIC NAILS & SPA | 554402000393587 | HAPPY NEIGHBORHOOD |
| 554402000198689 | OS HAIR | 554402000190231 | BEAUTY ZONE |
| 554402000340661 | JOY BEAUTY MOBILE | 554402000142216 | MEGA BEAUTY SUPPLY |
| 554402000107128 | PARTY TIME PACKAGE | 554402000116764 | ECO SMART CLEANERS |
| 554402000414938 | INSTYLE WIG & BEAUTY | 554402000363440 | KNC WIRELESS |
| 8739295900300037 | GINZA SUSHI & KOREAN BBQ TSYS | 554402000185462 | ESTHER'S BEAUTY SUPPLY |
| 554402000340299 | EMPIRE PACKAGE | 554402000336842 | DUKE & DUCHESS OF WINDSOR |
| 554402001246 | K1 BEAUTY | 554402000304097 | COCO 4 BEAUTY SUPPLY |
| 554402000362426 | NATURAL MARKET TAMPA | 554402000381814 | ANGIE'S BEAUTY SUPPLY STOCKBRIDGE |
| 554402000418129 | VENUS BEAUTY SUPPLY GREENVILLE | 554402000432294 | J BUFFALO WINGS |
| 554402000111542 | VENUS BEAUTY PLAZA NORTH METRO | 554402000181529 | CHIC PORT CHARLOTTE |
| 554402000371781 | AMERICAN DELI CASCADE | 554402000417071 | SALINNA NAILS & SPA |
| 554402000427591 | LINDA'S FASHION & BEAUTY | 554402000444257 | CLOUD9 DULUTH |
| 554402000110122 | BEAUTY DEPOT 10369 | 554402000431734 | WOW POKE N JUICE |
| 554402000144089 | FASHION U.S.A MEMPHIS | 554402000365635 | SO GOOD CHICKEN & WINGS |
| 554402000167296 | BEST BEAUTY SUPPLY | 554402000178863 | Arirang Korean Food Duluth |
| 554402000366492 | SOLID GOLD BEAUTY SUPPLY #1 | 554402000406926 | BT 2 BEAUTY SUPPLY |
| 554402000434738 | IMPERIAL HAIR & BEAUTY SUPPLY #1 | 554402000305557 | SHILLA KOREAN RESTAURANT |
| 554402000376541 | TOKYO SUSHI | 554402000107110 | D ALTERATION |
| 554402000365270 | SANDY'S BEAUTY SUPPLIES INC. | 554402000173906 | PEOPLE'S BEAUTY SUPPLY |
| 554402000186571 | SUNWESTERN SUITES | 554402000360404 | SOOJI NAIL & DAY SPA |
| 554402000183673 | ROCK HILL MART | 554402000304196 | SJ BEAUTY & SALON |
| 554402000118166 | CONNIE'S BEAUTY SUPPLY | 554402000397588 | MIMI BEAUTY SUPPLY SUMTER |
| 554402000333765 | SJ HAIR BEAUTY SUPPLY | 554402000414375 | BEAUTY & FASHION |
| 554402000167122 | BELLAGIO NAIL BAR | 554402000390138 | SHELL GAS STATION FAIRBURN |
| 554402000170340 | SAKURA JAPANESE STEAK HOUSE | 554402000384289 | KIM'S PLUS BEAUTY PALATKA |
| 554402000165100 | SUMO SUSHI | 554402000177279 | DINO'S QUALITY CLEANERS |

CSK

| | | | |
|---|---|---|---|
| 554402000193383 | BIEN ASSORTI NAIL SALON | 554402000342048 | AUBURN CLEANERS |
| 554402000439232 | SHASA BEAUTY BROAD | 554402000194423 | Power Cleaners |
| 554402000150649 | HI BEAUTY SUPPLY | 554402000335968 | WING MASTER MCDONOUGH |
| 554402000434803 | IMPERIAL HAIR & BEAUTY SUPPLY #5 | 554402000378653 | ORIENTAL FOOD & GIFT |
| 518059670004803 | AMERICAN DELI ( DOUGLASVILLE ) | 554402000392076 | BEAUTY WORLD EAST POINT |
| 554402000360958 | FIN FUSION SUSHI | 554402000348284 | BELMONT CLEANERS |
| 554402000144170 | BUFFALO STREET | 554402000353961 | LAVISTA NAILS |
| 518089240786863 | queens beauty supply | 554402000183830 | CHIC CORAL SPRING |
| 554402000199125 | YES BEAUTY SUPPLY | 554402000112904 | SUN CLEANER |
| 518089240786905 | ENSLEY SEAFOOD EXPRESS #3 | 554402000127977 | MK TRADING |
| 554402000183731 | I BEAUTY 210 | 554402000357616 | BUDDY CLEANERS |
| 554402000434811 | IMPERIAL HAIR & BEAUTY SUPPLY #6 | 554402000156182 | IP ALTERATION |
| 554402000311811 | HI TECH CLEANERS ROSWELL | 554402000304071 | ROXY BEAUTY SUPPLY |
| 554402000300152 | KOREAN SPOON | 554402000109454 | GOM PRINTING & SIGNS |
| 8739295900300017 | HANSHIN POCHA TSYS | 554402000183681 | CHARLOTTE BEAUTY SUPPLY #1 |
| 554402000302604 | I LOVE WINGS LAWRENCEVILLE | 554402000185579 | KC BEAUTY SUPPLY |
| 8739295900300029 | SPORTSTIME BAR N GRILLE TSYS | 554402000446138 | EYE BELIEVE EYE CARE |
| 8739295900300016 | MANGOS RESTAURANT GRILL&BAR TSYS | 554402000126946 | CLOTHING CARE |
| 554402000344457 | NEW HOPE BEAUTY | 554402000132415 | SIGNATURE TAILOR OF TAMPA |
| 554402000134494 | BEAUTY EMPIRE | 554402000176677 | CLEAN N CARE #2 |
| 554402000318592 | UNI BEAUTY OUTLET OCALA | 554402000424812 | FLOWER CLEANERS |
| 554402000104299 | UNLIMITED PCS 1308 | 554402000351429 | RIVER NAILS |
| 554402000188516 | TAMPA JEWELRY OUTLET | 554402000449454 | PIONEER APPAREL COM |
| 554402000166298 | WINTER PARK CLEANER | 554402000183400 | SUE'S ART AND FRAMING |
| 554402000371799 | AMERICAN DELI GRESHAM | 554402000163618 | Georgetown Cleaners |
| 554402000135780 | MR BILLS PACKAGE STORE | 554402000188169 | ART CLEANER ALPHARETTA |
| 554402000435685 | HOUSE OF CHAN | 554402000196030 | LEE S SHOE REPAIR |
| 554402000343806 | METRO BEAUTY PASCAGOULA | 554402000108688 | dry cleaning service |
| 554402000420240 | STAR BEAUTY SUPPLY N CHARLESTON | 554402000405605 | YOUNG'S FASHION B/S MERIDIAN |
| 554402000383091 | GOOD OL COUNTRY BUFFET | 554402000372474 | TONY MOLY COSMETIC |
| 554402000366286 | MIKATA JAPANESE STEAK HOUSE COLUMBUS | 554402000381475 | PROFESSIONAL GLASS TINTING |
| 554402000370452 | MAPO KOREAN BBQ | 554402000308643 | MAMA S CHEESE STEAK |
| 554402000156141 | YOUNG HAIR & BEAUTY LAKELAND | 554402000109553 | JOYLAND MURFREESBORO |
| 554402000194175 | Young's Cleaners | 554402000391193 | JCN INTERNATIONAL INC |
| 554402000194457 | K BEAUTY LAWRENCEVILLE | 554402000301432 | MADISON ADULT MEDICINE |
| 554402000317693 | LEGEND CAFE | 554402000373571 | S&K GROCERY & TOBACCO |
| 554402000110858 | A-1 TRADING | 554402000445874 | AMERICAN DELI CAMPBELLTON |
| 554402000408096 | SUNNY BEAUTY SUPPLY LADSON | 554402000185926 | TOP BEAUTY & CELLULAR |
| 554402000134932 | UPTOWN INN & SUITES | 554402000428003 | HOT 1 BEAUTY |
| 554402000165712 | SUSHI AVENUE | 554402000183871 | Dunwoody Cleaners |
| 554402000367250 | SUSHI HEEYA | 554402000314914 | CHUNG'S SALES CORP |
| 554402000187260 | YOUNG'S FASHIONS NILES | 554402000387183 | LIZ'S BEAUTY SUPPLY |
| 554402000104281 | EVANS PACKAGE | 554402000368613 | HAIR GALLERY |
| 554402000401810 | GOLDEN MART #1 BEAUTY 5300 | 554402000403782 | CAIDEN BEAUTY SUPPLY |
| 554402000300731 | K DISCOUNT BEAUTY | 554402000167254 | QUALITY CLEANERS AND ALTERATION OF RINGGOLD |
| 554402000358200 | QUEEN'S BEAUTY SUPPLY 2115 | 554402000363341 | WONS TAEKWONDO EDUCATION |
| 554402000156109 | ACCESS APPAREL | 554402000347377 | AMERICAN DELI LITHONIA |
| 554402000332387 | URBAN BEAUTY | 554402000174151 | JOINUS CLEANERS CHESHIRE |
| 554402000123539 | Wing & Fish GA | 554402000408211 | BETHEL PRINTING |
| 554402000415810 | PORT ROYAL DRY CLEANERS | 554402000184424 | GEM CLEANERS 5451 |
| 554402000366831 | ANGIE'S BEAUTY STONE MOUNTAIN | 554402000394510 | BEAUTY WORLD BREWTON |
| 554402000174672 | KIMS BEAUTY SUPPLY CAIRO | 554402000186098 | PRIME COMMUNICATION |
| 554402000118216 | FANTASTIC BEAUTY SUPPLY 2 | 554402000430918 | SHARON'S FASHION & STYLE |
| 554402000442384 | BTJ WINGS | 554402000190140 | ACE FASHION 1 |
| 554402000321786 | A & D BUFFALO'S COLUMBUS | 554402000195255 | S & M BEAUTY SUPPLY |
| 554402000425264 | HELLO CHICKEN | 554402000328807 | CITY PACKAGE |
| 554402000139295 | TOP CLEANER AUGUSTA | 554402000411512 | PASTA AND WINGS |
| 554402000109686 | BEAUTY OUTLET JACKSONVILLE | 554402000184994 | VERY BEST CLEANERS |
| 554402000109603 | METRO PCS VILLA RICA | 554402000414722 | BLUE PC |
| 554402000383471 | TREE STORY BAKERY & CAFE #2 | 554402000131912 | BOOST MOBILE MACON |

CSK

| | | | |
|---|---|---|---|
| 554402000314906 | YAMA | 554402000434431 | MAKE MORE BEAUTIFUL |
| 554402000340752 | K BEAUTY SUPPLY GRIFFIN | 554402000378539 | GOM PRINTING & SIGN DULUTH |
| 554402000304089 | COCO 3 BEAUTY SUPPLY | 554402000151209 | AQUA SKIN & BODY |
| 554402000368977 | GANG NAM STYLE KARAOKE | 554402000320440 | HAN'S TOOL |
| 554402000325712 | UTOP FASHION & BEAUTY INC | 554402000168781 | JP CLEANERS |
| 554402000334219 | WINGS & PHILLY GAINESVILLE | 8739295900300007 | FOR U BEAUTY HARTSVILLE TSYS |
| 554402000376970 | FAIRWAY ONE STOP #2 | 554402000178210 | ROYAL CLEANERS ALGONQUIN |
| 554402000430512 | C J BEAUTY SUPPLY | 518089240785964 | modern care cleaner |
| 554402000134486 | BJ COUNTRY BUFFET | 554402000395723 | CLOVER CLEANERS DULUTH |
| 554402000442186 | KIMS BEAUTY SUPPLY LUGOFF | 554402000312157 | A-1 BEAUTY SUPPLY |
| 554402000383992 | J BUFFALOS ATHENS | 554402000402750 | Super Carniceria Jalisco #1 |
| 554402000177295 | BEST QUALITY CLEANERS #2 | 554402000305979 | KIKYE WIGS & MORE |
| 554402000197392 | GOP CHANG ON FIRE | 554402000176685 | CLEAN N CARE #3 |
| 554402000389064 | POKE CITY | 554402000343129 | I NAILS SALON & SPA ATLANTA |
| 554402000187534 | JENNY'S WIGS & BEAUTY | 554402000365866 | DYNASTY CLEANERS |
| 554402000427112 | K BEAUTY SUPPLY MILLEDGEVILLE | 554402000372094 | HOT WINGS EXPRESS |
| 554402000304105 | COCO 5 BEAUTY SUPPLY | 554402000343376 | STYLE HQ |
| 554402000112482 | Pride Cleaners | 554402000415448 | K BEAUTY SUPPLY LILLINGTON |
| 554402000125146 | FANCY BEAUTY SUPPLY MURFREESBORO | 554402000441188 | DIANA W BEAUTY SUPPLY |
| 8739295900300001 | HAIR MAX BEAUTY SUPPLY | 554402000397877 | ITAEWON KOREAN RESTAURANT |
| 554402000178038 | K-TOWN | 554402000443762 | PARIS NAILS |
| 554402000304337 | ARETE | 554402000145193 | GLAM2 |
| 554402000379073 | U BEAUTY #2 | 554402000318402 | JD'S FASHION - A |
| 554402000409706 | Plaza Liquors | 554402000356352 | GREENS BEAUTY SUPPLY |
| 554402000391417 | DREAM HAIR BEAUTY SUPPLY | 554402000120741 | PRO CLEANERS SUGARLOAF |
| 554402000191403 | BEAUTY EMPORIUM | 554402000420281 | JM COMMUNICATION |
| 518089240775114 | Beauty World FAYETTEVILLE | 554402000424184 | WING MASTER LAWRENCEVILLE |
| 554402000383844 | C & C HOT WINGS MORELAND | 554402000343046 | Peter's Food Mart |
| 554402000319319 | J-LO BEAUTY SUPPLY E ADAMO | 554402000401794 | GOLDEN MART #1 BEAUTY 4772 |
| 518089240781823 | BUDDY BEAUTY MART | 554402000412585 | CHICNCOOL.COM-SEVEN TREES |
| 554402000378497 | ONESTOP FOOD MART | 554402000128215 | J QUALITY CLEANERS |
| 554402000367821 | 5 STAR BEAUTY | 554402000352765 | SPA BRILLANTE |
| 554402000321802 | PLAZA CLEANERS CANTON | 554402000174862 | CHUNG'S TAE KWON DO |
| 554402000174490 | NEWBERRY BEAUTY SUPPLY | 554402000191056 | STAR DELI |
| 554402000181818 | DIAMOND BEAUTY SUPPLY | 554402000181834 | OAKMAN BEAUTY SUPPLY |
| 554402000127050 | CHINA BUFFET OF CHEN'S BROTHER | 554402000404459 | ACOUSTIC WAVE THERAPY LLC |
| 554402000357236 | ACE BEAUTY SUPPLY HOOVER | 554402000300749 | 909 CLEANERS |
| 554402000120790 | TERIYAKI HOUSE | 554402000148775 | K-WIG BEAUTY SUPPLY |
| 554402000365817 | I NAILS SALON AND SPA ALPHARETTA | 554402000445049 | DAILY FASHION |
| 554402000360743 | MY BEAUTY SUPPLY | 554402000450056 | PRESSTINE CLEANERS |
| 554402000104232 | UNLIMITED PCS 1162 | 554402000411918 | BEAUTY LAND |
| 554402000173328 | RAMSEY BEAUTY | 554402000443721 | BEAUTY LINE COLUMBIA 2 |
| 554402000182485 | SUNNY BEAUTY SUPPLY & FASHIONS | 554402000306936 | WOW HIBACHI |
| 554402000301366 | ATL MASSAGE | 554402000182154 | CHU'S CARIS BEAUTY SUPPLY |
| 554402000442947 | JIN KOREAN RESTAURANT | 554402000428045 | SHABUYA |
| 554402000183699 | CHARLOTTE BEAUTY SUPPLY #2 | 554402000182683 | S&J ALTERATIONS |
| 554402000366476 | 120 CLEANERS | 554402000386417 | MAFOOSKY'S DELI |
| 554402000339648 | STAR BEAUTY SUPPLY CHARLESTON | 554402000178137 | MKC WIRELESS |
| 554402000370775 | MIKATA JAPANESE STEAK HOUSE DOTHAN | 554402000342386 | GRACE BEAUTY SUPPLY VICKSBURG |
| 554402000109512 | JOYLAND DICKERSON | 554402000347393 | SASSY BEAUTY |
| 554402000307223 | MAMAS WINGS | 554402000342378 | GRACE BEAUTY SUPPLY MERIDIAN |
| 554402000114355 | NATURAL ICE CREAM | 554402000441170 | LOCA BEAUTY |
| 554402000154302 | BESCO BEAUTY | 554402000412502 | WILD GINGER THAI CUISINE (ONLINE) |
| 554402000307389 | BEAUTY DEPOT AUGUSTA | 554402000171199 | CLASSIC CARE CLEANERS |
| 554402000324269 | CHINA WING | 554402000172874 | SJ HAIR STUDIO |
| 554402000357228 | ALABASTER BEAUTY SUPPLY | 554402000352245 | LUCKY ORIENTAL MARKET |
| 518089670004811 | AMERICAN DELI ( CENTERVILLE ) | 554402000332478 | NEW BEAUTY SUPPLY |
| 554402000381012 | YOUNGS BEAUTY SUPPLY SUMMERVILLE | 554402000361907 | SKY CLEANERS |
| 554402000182527 | TYPHOON OF TOKYO | 554402000128843 | SIGNATURE ACE CLEANERS |
| 554402000142422 | OLD FASHION CLEANERS | 554402000167999 | J BEAUTY |
| 554402000174680 | T&T MART, INC | 554402000173831 | FAMILY WINGS & PHILLY |

CSK

| | | | |
|---|---|---|---|
| 554402000349779 | BEAUTY WAY | 554402000190330 | SILVER STAR DELI |
| 554402000410654 | VENUS BEAUTY SUPPLY STONE MOUNTAIN | 554402000326140 | BEAUTY HAIR LAND |
| 554402000410860 | TOFU VILLAGE & BBQ | 554402000192393 | KIMS WIGS AND BEAUTY SUPPLY WAYCROSS |
| 554402000331017 | HYUNDAI ORIENTAL GROCERY & GIFT | 554402000135996 | I COMMUNICATION |
| 554402000176511 | MIMI BEAUTY SUPPLY COLUMBUS | 554402000127613 | YORKTOWN CLEANERS |
| 554402000362467 | OXFORD CLEANERS STONE MOUNTAIN | 554402000173062 | BEAUTY WORLD AUSTELL |
| 554402000178541 | Town & Country Cleaners | 554402000167858 | A PLUS BEAUTY SUPPLY |
| 554402000442798 | BEAUTY LINE COLUMBIA | 554402000185496 | NEW RAINBOW CLEANER MAIN ST |
| 554402000107151 | SHREE CLEANER | 554402000185520 | PURE ELEGANCE CLEANER |
| 554402000249258 | KIRIN HOUSE | 554402000381723 | METRO BEAUTY MARIETTA |
| 554402000307876 | HW BEAUTY SUPPLY NASHVILLE | 554402000166314 | HUNT CLUB CLEANERS, INC. |
| 554402000437384 | METRO BEAUTY BILOXI | 554402000448597 | TROY SUPERMARKET |
| 554402000304618 | BEAUTY MART | 554402000431387 | LIMA AFRICAN HAIR BRAIDING |
| 518089240784892 | First Beauty Town | 554402000372680 | RUBY BEAUTY SUPPLY |
| 554402000386144 | YOUNG'S FASHION & BEAUTY GREENVILLE | 554402000447516 | PARIS NAILS |
| 554402000395608 | SONAMOO AUTO CARE | 554402000149286 | NORTH BEAUTY SUPPLY |
| 554402000304063 | COCO BEAUTY SUPPLY | 554402000163493 | BEAUTY QUEEN |
| 554402000382911 | BUFFALO STREET #2 | 554402000168435 | APPLE CLEANERS |
| 554402000302695 | J-LO BEAUTY SUPPLY E BEARSS | 554402000182998 | MAS AUTO SERVICE |
| 554402000182600 | BEAUTY DEPOT 1007 | 554402000149294 | BEST FOR LESS |
| 873929590030003 | JD'S FASHION #19 TSYS | 554402000141846 | CLOVER CLEANER MARIETTA |
| 873929590030032 | THE DEPOT SPORTS BAR & GRILL TSYS | 554402000374058 | HADOM |
| 554402000340877 | YOUNG'S ORIENTAL FOOD & GIFT | 518089240784348 | SUE ANN CLEANERS |
| 554402000109587 | METRO PCS DALLAS | 554402000142018 | CHOICE CLEANERS ATLANTA |
| 554402000164905 | FABRIC CARE CLEANERS NORCROSS | 554402000375477 | MYUNG DONG HAIR SALON |
| 554402000420091 | GLAM BEAUTY SUPPLY | 554402000436758 | SOPHIA WHOLESALE |
| 554402000340232 | OK BEAUTY & FASHION | 554402000139345 | love beauty supply |
| 554402000383463 | VINCENT BAKERY | 554402000354084 | JD HART BEAUTY SUPPLY |
| 554402000193466 | Save Dollar Beauty Supply | 554402000148072 | PEACH CLEANERS |
| 554402000107102 | PAUL'S IGA | 554402000306878 | CRUSH |
| 554402000317776 | US IMPORT | 554402000180950 | KIMBERLYS ALTERATION |
| 518089240783506 | BO'S PACKAGE STORE | 554402000332841 | HEBBARD PACKAGE STORE |
| 554402000197004 | SONG ESTRELLA HAIR AND WIGS | 554402000379081 | J & J TRADING |
| 554402000121756 | HAPPY SUMO | 554402000430207 | K & S WORLD MARKET |
| 554402000108035 | YZ USA | 554402000360305 | A PLUS CLEANERS |
| 554402000174243 | EMANI BEAUTY SUPPLY | 554402000433474 | FANCY BEAUTY SUPPLY CLARKSVILLE |
| 554402000401869 | FAST TIMES | 554402000409904 | PURE DRY CLEANERS |
| 554402000109611 | K-2 ORIENTAL FOOD & GIFTS | 554402000366047 | THAT CLEANING PLACE |
| 554402000121863 | SUMO RESTAURANT | 554402000383638 | BOOST MOBILE 1945 |
| 554402000165357 | NCF FLORIDA | 518089240776997 | Hills Cleaner |
| 554402000436063 | WASABI JAPANESE RESTAURANT | 554402000348227 | ROYAL WIG & BEAUTY |
| 554402000327247 | TISUN BEAUTY SUPPLY | 554402000172452 | STUDIO LEE |
| 554402000111260 | PARKS CLEANER | 554402000404806 | La Escondida |
| 554402000376533 | OISHI SUSHI DOTHAN | 554402000437483 | MYUNG DONG HAIR SALON #2 |
| 554402000363309 | SOUTH EAST MEAT | 554402000428847 | SMILE 1 DENTAL GROUP |
| 554402000171884 | SISTER'S BEAUTY SUPPLY | 554402000325027 | Beauty 8 Mart |
| 554402000307884 | HW BEAUTY SUPPLY #2 | 554402000134551 | HIP BEAUTY SUPPLY |
| 554402000335000 | JK BEAUTY SUPPLY JACKSON | 554402000417592 | CAFE 7080 LOUNGE |
| 554402000347773 | KIMS ENTERPRISES | 554402000127902 | WANG BEAUTY SUPPLY |
| 554402000344481 | ANGIE'S BEAUTY DEPOT | 554402000303008 | MIN BEAUTY SUPPLY |
| 554402000144642 | BEAUTY ONE ROOSEVELT | 554402000387894 | HARBOR INN SEAFOOD |
| 554402000321778 | A & D BUFFALO'S FLORENCE | 554402000149518 | J. PARK TAEKWONDO AND HAPKIDO |
| 554402000443176 | SUN BEAUTY SUPPLY | 554402000367748 | VENUS WIG SHOP TAMPA |
| 554402000335604 | Conyers Car Wash | 554402000447078 | CJ BUFFALO WINGS |
| 554402000407650 | LANNA THAI CUISINE | 554402000376780 | BEAUTY AND BEYOND |
| 554402000312843 | Premier Nails & Spa | 554402000332965 | JOINUS CLEANERS NORTHSIDE |
| 554402000182980 | VENUS BEAUTY SUPPLY #3 DORAVILLE | 554402000416800 | PRO CARE CLEANERS |
| 554402000339671 | Presto Cleaners | 554402000388363 | BEAUTY DEPOT |
| 554402000324251 | Oxford Cleaners Atlanta | 554402000312744 | JONGS JEWELRY |
| 554402000175158 | BABY JANE'S HOME COOKING | 554402000330696 | A.C.SALVAGE |
| 554402000355644 | STAR BEAUTY SUPPLY GOOSE CREEK | 554402000135756 | C&N DRYCLEANERS |

CSK

| | | | |
|---|---|---|---|
| 554402000132159 | NEW KOREA GARDEN RESTAURANT | 554402000188961 | SWAN CLEANER |
| 8739295900300006 | FOR U BEAUTY DARLINGTON TSYS | 554402000180919 | Gold Medal Tailors |
| 554402000338178 | BEAUTY WORLD KINSTON | 554402000390666 | VIVIR BEAUTY SUPPLY |
| 554402000385328 | WHAT THE HAIR BEAUTY SUPPLY | 554402000175331 | NICE CLEANERS |
| 554402000180901 | HELEN'S ALTERATION | 554402000148106 | JP BEAUTY |
| 554402000132134 | MOMOYA JAPANESE RESTAURANT | 554402000192104 | MO BEAUTY |
| 554402000135764 | EBONY BEAUTY SUPPLY 2 | 554402000373274 | WHERE YOU CAN SHINE |
| 518089240787176 | CHINA WOK PENSACOLA | 554402000149146 | YOUNG HAIR & BEAUTY TAMPA |
| 554402000128140 | MOON'S JEWELRY | 554402000442814 | HIKARI SUSHI |
| 554402000143065 | CHUNG GE MARKET | 554402000139923 | GLAM |
| 554402000366823 | ANGIE'S BEAUTY SANDY SPRINGS | 518089240779231 | A 1 Alteration Embroidery Cleaners |
| 554402000350017 | BEAUTY STOP 2 | 554402000403816 | ALPHA AUTO SERVICE |
| 554402000106823 | K BEAUTY SUPPLY AUGUSTA | 554402000163162 | COCO RESTAURANT |
| 554402000309567 | YOUNGS FASHION & BEAUTY MARION | 554402000332825 | YOUNGS BEAUTY SUPPLY NORTH CHARLESTON |
| 554402000368225 | DJ'S BEAUTY OUTLET | 554402000304709 | J-LO BEAUTY OUTLET |
| 554402000147868 | KH FOOD STORE | 554402000306399 | TEXTILE CLEANING SERVICES |
| 554402000410571 | BEAUTY TOWN DUNN | 554402000370833 | ANGIE'S BEAUTY SUPPLY MORROW |
| 554402000366880 | ANGIE'S BEAUTY MCDONOUGH | 554402000129296 | HIGH TECH AUTO REPAIR |
| 554402000114821 | SOUTHERN KITCHEN | 554402000315218 | ANGELA'S BEAUTY SUPPLY |
| 554402000195628 | DESHON CLEANERS | 554402000413724 | NYC7 |
| 554402000335802 | ACE K CLEANERS | 554402000152587 | BLOOMINGDALE CLEANERS |
| 554402000355651 | SUNNYS BEAUTY SUPPLY II | 554402000130609 | SHELL FOOD MART |
| 554402000345835 | KIMS BEAUTY SUPPLY WEST COLUMBIA | 554402000436238 | PIZZA K |
| 554402000367516 | HOT BEAUTY | 554402000128777 | BAGS DIRECT |
| 554402000191957 | FASHION CLEANERS MARIETTA | 554402000449736 | BEAUTY & BEYOND 1615 |
| 554402000132878 | VIP CLEANER | 554402000449819 | 600 DEGREES PIZZA |
| 518089240785238 | Doremi Restaurant & Bar | 554402000403204 | FASHION USA ELBERTON |
| 554402000187237 | Oxford Cleaners Snellville | 554402000330084 | KORNER MARKET |
| 554402000409532 | WING SPOT | 554402000441626 | TROY SUPERMARKET |
| 554402000379446 | BEAUTY MARK | 554402000356303 | SEOUL RESTAURANT |
| 554402000312025 | JOLIE CLEANERS & LAUNDRY | 554402000306977 | CRUSH TOO |
| 554402000182592 | BEAUTY DEPOT 3000 | 554402000420836 | BEAUTY 4 U |
| 554402000366815 | ANGIE'S BEAUTY AUSTELL | 554402000345801 | PHOENIX COLLISION & REPAIRS INC |
| 554402000111294 | GRACE DENTAL CARE PC | 554402000187245 | Suwanee Point Cleaners |
| 554402000338129 | POP CULT (CITRUS) | 554402000143305 | APPLE TREE CLEANERS |
| 554402000434837 | IMPERIAL HAIR & BEAUTY SUPPLY #2 | 554402000413369 | BY NATURES |
| 554402000339630 | BEAUTY & WIG | 554402000197251 | QUEEN'S FASHIONS |
| 554402000445346 | MIKATA JAPANESE STEAK HOUSE ENTERPRISE | 554402000358184 | QUEEN'S BEAUTY SUPPLY 3309 |
| 554402000109538 | JOYLAND CLIFTON | 554402000361659 | QUALITY MEAT MARKET |
| 554402000416123 | J BEAUTY SUPPLY | 554402000367334 | WOORI BARBER SHOP |
| 554402000174763 | Grace Beauty Supply | 554402000128868 | ENGLEWOOD BEAUTY SUPPLY |
| 554402000178020 | CS CLEANERS | 554402000431890 | LEE BEAUTY SUPPLY MONTGOMERY |
| 554402000331462 | Esquire Dry Cleaners (Bethelview) | 554402000315382 | 31 TOUCH CLEANERS |
| 554402000375006 | EVER FASHION | 554402000402388 | SAM'S MART |
| 554402000173708 | WING NUTS | 554402000444240 | CLOUD 9 DORAVILLE |
| 554402000363077 | TUFF LUCK AUGUSTA | 554402000131797 | NATIONAL CLEANERS & LAUNDRY |
| 554402000391557 | HIGHLAND BEAUTY SUPPLY | 554402000435644 | SIDES OF SEOUL |
| 554402000139428 | MOSHI MOSHI JAPANESE RESTAURANT | 554402000184416 | GEM CLEANERS 2338 |
| 554402000174128 | IN MODE 21 BEAUTY SUPPLY | 554402000435941 | JC TRAVEL |
| 554402000311761 | DESIGNER CLEANERS | 554402000147686 | EDWARD'S CLEANERS |
| 554402000393793 | TREE STORY BAKERY & CAFE ZION | 554402000394239 | 501 HAIR LLC |
| 8739295900300004 | FOR U BEAUTY 1785 TSYS | 554402000391565 | AUSTELL INT'L FARMERS MARKET |
| 554402000336412 | LIVE OAK BEAUTY SUPPLY | 554402000315226 | LEE'S BEAUTY SUPPLY SUMTER |
| 554402000143107 | SK BEAUTY SUPPLY | 518089240784488 | KORUSA(WWW.PESTRONG.COM) |
| 554402000410290 | K'S BEAUTY SUPPLY HUNTSVILLE | 554402000385831 | THE TOP TAEKWONDO |
| 554402000310714 | CHOIS INTERNATIONAL | 554402000177261 | MODERNWAY DRY CLEANERS |
| 554402000305987 | H K BEAUTY | 554402000352716 | NOLUWA |
| 554402000338137 | POP CULT (BRANDON) | 554402000370544 | BOOST MOBILE 141 |
| 554402000174193 | PRO CLEANERS SMYRNA | 554402000301358 | 2ND TO NONE |
| 554402000413849 | S BEAUTY AUGUSTA | 554402000410498 | JENNY'S DOLLAR PLUS |

CSK

| | | | |
|---|---|---|---|
| 554402000112664 | SUNNY'S HOMECOOKING | 554402000432534 | HWY 31 SHIPPING & PACKAGING |
| 554402000301705 | KIMSWIG&BEAUTYSUPPLYBRUNSWICK | 554402000178566 | Joy Cleaners |
| 554402000170159 | FASHION WORLD TALLAHASSEE | 554402000338103 | EDGE TOTAL HAIR |
| 554402000361923 | NUTRITION POWER | 554402000352054 | SUPER MEAT MARKET |
| 554402000307165 | GOOD FEELINGS | 554402000434217 | CIRCLE BROTHERS |
| 554402000416636 | I LOVE WINGS LILBURN | 554402000182923 | DAILY CLEANERS |
| 554402000181891 | KIM'S ORIENTAL MARKET | 554402000437152 | EKOREATIMES SE |
| 554402000309849 | S BEAUTY HEPHZIBAH | 8739295900300042 | SARIONE BISTRO TSYS |
| 554402000196998 | GATES CLEANERS | 554402000331553 | C & D HAIR CARE |
| 554402000423525 | HAIR CITY | 554402000428367 | COCO COLLECTION |
| 554402000168559 | MAXI CLEANERS OF ORLAND PARK | 554402000450882 | TRANS DESIGN |
| 554402000183889 | The Perfect Cleaners | 554402000125328 | WHITE EAGLE CLEANERS |
| 554402000359448 | BIG BROTHER MINI SUPERMARKET | 554402000371849 | SUNNY BEAUTY SUPPLY TROY |
| 554402000386235 | JMC BEAUTY SUPPLY | 554402000315317 | GOBEAUTYGIRLS |
| 554402000352849 | CAFE 211 | 554402000349860 | FLOWERS BY LUCAS |
| 554402000426171 | FEET PRESS SPA | 554402000449686 | MIK CLEANER |
| 554402000190165 | FRANKLIN MARKET | 554402000174177 | JOINUS CLEANERS ATLANTA |
| 554402000429217 | HERITAGE CLEANERS 3001 | 554402000157446 | LAKEVIEW CLEANERS |
| 554402000342130 | TEXACO GAS STATION & FOOD MART | 554402000185512 | NEW RAINBOW CLEANER MADISON |
| 554402000342022 | NO. 1 CHINESE RESTAURANT | 554402000353383 | USA NAILS |
| 554402000379453 | KIMCHI MART | 554402000315374 | APEX TOUCH CLEANERS |
| 554402000381715 | METRO BEAUTY KENNESAW | 554402000173567 | WIRELESS EXPRESS AUSTELL |
| 8739295900300005 | FOR U BEAUTY 3551 TSYS | 554402000445114 | KOMAN'S |
| 554402000413831 | POP CULT (PREMIUM OUTLET) | 554402000442004 | YUSABU TAEKWONDO SCHOOL |
| 554402000345850 | O BOK KOREAN RESTAURANT | 554402000339028 | MOON'S BEAUTY SUPPLY |
| 554402000404699 | CHRISTIE'S CLEANERS | 554402000440156 | VENUS WIG SHOP #2 |
| 554402000194522 | I BEAUTY 210 #2 | 554402000196162 | CT LAWRENCEVILLE |
| 554402000322768 | I LOVE WINGS NORCROSS | 554402000115394 | SHALOM ACUPUNCTURE & HERBS CLINIC |
| 554402000382754 | CINGIE BEAUTY SUPPLY | 554402000167049 | WIRELESS EXPRESS RIVERDALE |
| 554402000417253 | SOOKY'S BEAUTY & WIGS | 554402000229969 | MARTIAL ARTS SCHOOL |
| 518089240778563 | GODDESS BEAUTY | 554402000131748 | CT WIRELESS |
| 554402000380915 | CLEAR H2O CLEANERS | 554402000144584 | CAREONE DENTAL ASSOCIATES |
| 554402000363762 | PHAT PHISH CAFE | 554402000124339 | J & J ANGEL |
| 554402000367565 | BEAUTY OUTLET BIRMINGHAM | 554402000128835 | BONNE COLLECTION |
| 554402000429407 | HERITAGE CLEANERS 5504 | 554402000182865 | YES PHARMACY |
| 554402000447318 | JC TRAVEL | 554402000328088 | PISCES SUSHI AND GLOBAL BISTRO |
| 554402000162404 | KOKO'S SUSHI | 554402000352203 | BOOST MOBILE 2324 |
| 554402000385666 | BOOSTMOBILE 186 | 554402000448878 | FAMILY NAILS SALON |
| 554402000387241 | MIMI BEAUTY SUPPLY SARASOTA | 554402000338269 | K BEAUTY SUPPLY WARNER ROBINS |
| 554402000315242 | FANCY BEAUTY SUPPLY LA VERGNE | 554402000170332 | WILD GINGER THAI CUISINE |
| 554402000411561 | DOREMI KARAOKE | 554402000139683 | SWEET RENT |
| 554402000441949 | EYE JOA | 554402000167031 | WIRELESS EXPRESS OPELIKA |
| 554402000328781 | KNC SHORT STOP | 554402000176461 | PRIME DENTAL STUDIO |
| 554402000441543 | HAIR PLUS AND YOUNG FASHION | 554402000387829 | AUBURN GUESTHOUSE |
| 554402000369439 | KYUNG HEE TAE KWON DO | 554402000145839 | YONG IN TIGER MARTIAL ART INC |
| 554402000372466 | TONY MOLY | 554402000126888 | NWA BODY |
| 554402000417899 | SEOUL MART | 554402000118240 | AMY'S BEAUTY SUPPLY |
| 554402000364406 | AMERICAN WINGS & DELI EAST POINT | 554402000389510 | PLAZA CLEANERS MARIETTA |
| 554402000311472 | TOWN TAILOR | 554402000188144 | JENNIES BEAUTY SUPPLY |
| 554402000317230 | LAKE CITY BEAUTY SUPPLY | 554402000197475 | CHONG RO RICE CAKE INC |
| 554402000111344 | K&J BEAUTY SUPPLY | 554402000384180 | TREE STORY BAKERY & CAFE #1 |
| 554402000112433 | KC BEAUTY DEPOT | 554402000450189 | UH WOO DON |
| 554402000187443 | PRO CLEANERS DOUGLASVILLE | 554402000434555 | BEAUTYVILLE |
| 554402000424556 | MATANE JAPANESE DINING | 554402000407668 | VOV SUNGLASSES |
| 554402000374009 | NEIGHBORHOOD STORE | 554402000137927 | ASIAN STAR |
| 554402000340638 | AMERICAN DELI DULUTH | 554402000322529 | CK'S CLEANERS |
| 554402000417808 | ASIA MARKET | 554402000174722 | BEST QUALITY CLEANERS |
| 554402000381210 | EMPIRE LIQUOR | 554402000302703 | JOON TRADING |
| 554402000112656 | SUNNY'S HOMECOOKING FAIRFAX | 554402000322578 | ALL BRIGHT CLEANERS |
| 554402000447052 | CHIC N COOL | 554402000450320 | J & J BEAUTY SUPPLY |
| 554402000130187 | IS NEW STAND | 554402000109439 | ADVANCED INTEGRATED SYSTEMS |

CSC

| | |
|---|---|
| 554402000343079 | J & J Dry Cleaners |
| 554402000440503 | RAKU |
| 554402000109751 | UNI BEAUTY SUPPLY PENSACOLA |
| 554402000199356 | ACE BEAUTY MART |
| 554402000343434 | SUSHI OSAKA |
| 554402000148585 | BEAUTY DEPOT 239 |
| 554402000161893 | POP CULT BIRMINGHAM |
| 554402000331181 | SMYRNA NAILS |
| 554402000368399 | FASHION WORLD DOTHAN |
| 554402000309203 | AMERI BISTRO |
| 554402000178087 | Y & Y BEAUTY SUPPLY |
| 554402000434159 | QUEEN'S BEAUTY SUPPLY 633 |
| 554402000149302 | SOOKY'S WIG |
| 554402000353482 | Y'S BEAUTY SUPPLY |
| 554402000190132 | CHIC BRANDON |
| 554402000128850 | KOKO FASHION INC. |
| 554402000438598 | CORNER STORE |
| 554402000322032 | C & S BEAUTY DEPOT |
| 554402000401745 | QUEEN'S BEAUTY 1300 |
| 554402000175612 | JK HOUSE |
| 554402000173914 | PEOPLE'S BEAUTY SUPPLY 2 |
| 554402000197616 | SIGNATURE CLEANER |
| 554402000397802 | EAST POINT FISH & WING |
| 554402000374454 | CHAMPION BILLIARD |
| 554402000396861 | SUE BEAUTY SUPPLY 301 |
| 554402000396853 | SUE BEAUTY 6539 |
| 554402000123018 | CHINA WOK DOUGLASVILLE |
| 554402000335943 | NEW YORK BUFFALO WINGS |
| 554402000437939 | BJ BUFFET |
| 554402000353466 | TOFU VILLAGE |
| 554402000424333 | ANGIE'S BEAUTY SUPPLY NORCROSS |
| 554402000370783 | MIKATA JAPANESE STEAK HOUSE TROY |
| 554402000128991 | BOOST MOBILE COLUMBUS |
| 554402000423731 | DISCOVERY WING |
| 554402000177121 | GOOD FEELINGS |
| 554402000108381 | AURA ENTERPRISES |
| 554402000426221 | JEWELRY OUTLET |
| 554402000124784 | CORNER PHARMACY |
| 554402000427229 | US BEAUTY OUTLET |
| 554402000402099 | FINESSE CLEANERS |
| 554402000377705 | CJ'S KOREAN TAKEOUT |
| 554402000411579 | K'S BEAUTY SUPPLY MADISON |
| 554402000131474 | FAME BEAUTY SUPPLY |
| 554402000350249 | LAWRENCEVILLE BEAUTY MART |
| 8739295900300041 | FUKU ASIAN BISTRO TSYS |
| 554402000336248 | PARK AVENUE HAIR SALON |
| 554402000370874 | COCO 7 BEAUTY SUPPLY |

| | |
|---|---|
| 554402000412429 | EAST SIDE CLEANER |
| 554402000317727 | ATLANTA COMICS & GAMES |
| 554402000432286 | KMC MED LLC |
| 554402000133306 | SUSHI N NOODLE INC |
| 554402000425223 | MOCHA DELITES |
| 554402000127621 | CHOICE CLEANERS WOODRIDGE |
| 554402000343038 | I CRAB NEW ORLEANS SEAFOOD |
| 554402000448027 | MYCOCOBEAUTY.COM |
| 554402000414888 | APEX NAIL & SPA |
| 554402000196097 | E ZONE (ANY BIZ SOLUTION) |
| 554402000358226 | SHELL GAS STATION COLLEGE PARK |
| 554402000415877 | YAMATO JAPANESE RESTAURANT WESLEY CHAPEL |
| 554402000370809 | MIKATA JAPANESE STEAK HOUSE ENTERPRISE |
| 554402000450734 | BALLY BUDAEJJIGAE |
| 554402000450627 | GRAND WINGS |
| 554402000450619 | JOY PIZZA N JOY CHICKEN |
| 554402000227161 | NATURAL GIFT |
| 554402000450787 | KOKAI THAI BISTRO |
| 554402000149856 | BEAUTY MAX |
| 554402000415802 | PPS BUSINESS SOLUTION |
| 554402000388736 | JIN KOREAN RESTAURANT |
| 554402000141515 | NARUTO CAFE |
| 554402000306902 | BJ BUFFET |
| 554402000141192 | OGA'S HOME COOKING |
| 554402000427872 | BEAUTY OUTLET AUGUSTA |
| 554402000388827 | GOLMOK DAE JANG |
| 554402000445924 | FUKU ASIAN BISTRO |
| 554402000424853 | BTJ WINGS |
| 554402000438523 | PPS BUSINESS SOLUTION |
| 8739295900300039 | PPS BUSINESS SOLUTION TSYS |
| 554402000450460 | EBONY BEAUTY SUPPLY BATESVILLE |
| 554402000448753 | MOVIE MAKER MENTORS |
| 554402000411322 | NDM FARMERS MARKET NORCROSS |
| 554402000411330 | NDM FARMERS MARKET DULUTH |
| 554402000411306 | NDM FARMERS MARKET LAWRENCEVILLE |
| 554402000411298 | NDM FARMERS MARKET MORROW |
| 554402000425181 | NDM FARMERS MARKET COBB |
| 554402000308809 | J BUFFALO WING BUFORD |
| 554402000451906 | LATTOO (Emily J Aveda Salon) |
| 554402000451690 | BEST WINGS & DELI |
| 554402000411314 | NDM FARMERS MARKET SMYRNA |
| 554402000436485 | THE KOREAN ASSOCIATION OF THE GREATER ATLANTA AREA |
| 554402000434787 | NDM FARMERS MARKET STONE MOUNTAIN |
| 554402000446203 | BEAUTY & MORE |
| 554402000360693 | LIMA HAIR BRAIDING |
| 554402000446195 | BEAUTY CITY |



**Exhibit 1.1(b)**

**Sub-Portfolio**

**EXHIBIT 1.5(b)(iii)**

**OFFICER'S CERTIFICATE OF BUYER**

The persons set forth below are duly elected, qualified and acting officers of Priority Payment Systems LLC ("Buyer") as of the date hereof, holding the indicated offices, and the signatures set forth opposite their names are the genuine signatures of each such person.

| Name | Title | Signature |
|------|-------|-----------|
| John V. Priore | Chief Executive Officer, President and Manager | |
| Bruce E. Mattox | Chief Financial Officer | |
| | | |
| | | |
| | | |

IN WITNESS WHEREOF, I have set my hand to this Certificate solely in my capacity as an officer of Buyer as of the [_____] day of [_____], [____].

PRIORITY PAYMENT SYSTEMS LLC

By: _____

Name: John V. Priore

Title: CEO

The undersigned, as General Counsel of Buyer, certifies that John V. Priore was at all times relevant to the subject matter hereof, to the date hereof, the duly elected and qualified CEO of Buyer, and that his signature is set forth after his name above.

By: _____

Name: Christopher Price

Title: General Counsel

**EXHIBIT 2.8(a)**

FORMS OF MERCHANT AGREEMENTS COMPRISING THE PORTFOLIO

Attached.

CSIC

EXHIBIT 2.8(c)

RESIDUAL REPORTS

Attached.

### EXHIBIT 2.8(e)

**PROCESSING AGREEMENT**

Attached.

CSC

**EXHIBIT 2.8(g)**

PURCHASE PROGRAM AGREEMENT

Attached.

**CLOSING STATEMENT AND AGREEMENT**
of
**Priority Payment Systems LLC, on the one hand**
**and**
**Chan S. Kim d/b/a Priority Payments Central South, on the other hand**

**July 20, 2018**

This Closing Statement and Agreement (this "<u>Closing Statement</u>") lists the disbursements to be made at or in connection with the Closing of the purchase of the Residuals pursuant to that certain Residual Purchase Agreement dated of even date herewith (the "<u>Purchase Agreement</u>") by and between Priority Payment Systems LLC ("<u>Buyer</u>"), on the one hand, and Chan S. Kim d/b/a Priority Payments Central South ("<u>Seller</u>"), on the other hand. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement. Payment instructions are attached hereto as <u>Exhibit A</u>.

**Parties:**

| Buyer | Priority Payment Systems LLC |
|---|---|
| Seller | Chan S. Kim d/b/a Priority Payments Central South |

**I. Sources of Funds**

Buyer's bank account                                $1,800,000.00

**II. Use/Disbursement of Funds by Buyer**

Loan Repayment to Buyer                          $750,000.00

Payment to Sellers (Exhibit "A")               $1,050,000.00[1]

***TOTAL USES/DISBURSEMENTS:***                **$1,800,000.00**

This Closing Statement may be executed in counterparts, each of which shall be deemed an original, but all of which shall be deemed one and the same document. Images of facsimile signatures shall have the effect of original signatures and be binding on the parties.

IN WITNESS WHEREOF, the parties hereto have executed this Closing Statement and Agreement as of the day and year first above written.

---

[1] This payment represents the Initial Purchase Price (i.e., $1,800,000.00) due to Sellers pursuant to § 1.2 of the Residual Purchase Agreement, less: (a) a $750,000.00 loan prepayment with respect to that certain Loan Agreement and related loan documentation between Chan S. Kim d/b/a Priority Payments Central South and Priority Payment Systems LLC, dated November 1, 2014. The disbursements of funds as detailed in this Closing Statement shall take place on the Closing Date of the Purchase Agreement.



**BUYER:**

**Priority Payment Systems LLC**

By: _____

Name: John V. Priore

Its: Chief Executive Officer & President

**SELLER:**

**Chan S. Kim d/b/a Priority Payments Central South**

By: _____

Name: Chan S. Kim

**Exhibit A**

**ACH Instructions**

**Payment Instruction:**

Amount:          $1,050,000.00

Beneficiary:     Solim LLC.

Account Name:    Solim LLC

Account #:       33 404 3996909.

Bank Name:       Bank of America

Bank Address:    2608 Pleasant hill Rd Duluth GA 30096

ABA #:           061000052

CSK

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 7 |
| Chan Suk Kim, | ) | |
| | ) | CASE NO. 21-52662-LRC |
| Debtor. | ) | |
| ------------------------------------------------------ | ) | |
| | ) | |
| Priority Payment Systems, LLC, | ) | |
| | ) | ADVERSARY PROCEEDING |
| Plaintiff, | ) | CASE NO. 21-05112-LRC |
| | ) | |
| v. | ) | |
| | ) | |
| Chan Suk Kim, | ) | |
| | ) | |
| Defendant. | ) | |

### CERTIFICATE OF SERVICE

This is to certify that on this day, I served the following parties with a copy of the Amended Adversary Complaint by placing true and correct copies of the same in the U.S. Mail with adequate postage affixed to insure delivery, and/or otherwise indicated, addressed to:

Chan Suk Kim
6257 Clapham Lane
Johns Creek, Georgia 30097

William A. Rountree (via electronic service and email)
Rountree Leitman & Klein, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329

This the 31st day of January, 2022.

__/s/_____
Soo J. Hong
GA Bar No. 129608
Attorney for Plaintiff

Blevins & Hong, P.C.
191 Roswell Street
Marietta, GA 30060
678-354-2290
shong@cobbcountylaw.com